# Exhibit A

Civil Actions

## Case Summary

### Case No. 2024-CAB-004575

| | | | |
|---|---|---|---|
| **American Federation of Teachers v. The Higher Education Loan Authority of the State of Missouri** | § § § | Location: | **Civil Actions** |
| | | Judicial Officer: | **Ross, Maurice** |
| | | Filed on: | **07/22/2024** |

---

## Case Information

| | |
|---|---|
| Case Type: | Statutory Claim |
| Subtype: | Consumer Protection Act |
| Case Status: | **07/22/2024  Open** |

---

## Assignment Information

**Current Case Assignment**

| | |
|---|---|
| Case Number | 2024-CAB-004575 |
| Court | Civil Actions |
| Date Assigned | 07/22/2024 |
| Judicial Officer | Ross, Maurice |

---

## Party Information

| | | | |
|---|---|---|---|
| | | | *Lead Attorneys* |
| **Plaintiff** | **American Federation of Teachers** | | **Gould, Adam Michael** |
| | 555 New Jersey Avenue NW | | *Retained* |
| | Washington, DC 20001 | | 212-390-9058(W) |
| | | | Selendy Gay |
| | | | 1290 6th Avenue |
| | | | New York, NY 10104 |
| | | | agould@selendygay.com |
| | | | |
| **Defendant** | **The Higher Education Loan Authority of the State of Missouri** | | **Feith, Daniel J.** |
| | 633 Spirit DR | | *Retained* |
| | Chesterfield, MO 63005 | | 202-736-8711(F) |
| | | | 202-736-8417(W) |
| | | | DFeith@Sidley.com |

---

## Events and Orders of the Court

| | |
|---|---|
| 07/22/2024 | Complaint Filed |
| |     Docketed on:  07/23/2024 |
| |     Filed by:  Plaintiff American Federation of Teachers |
| 07/23/2024 | Initial Order [Remote]    (Judicial Officer: Ross, Maurice) |
| 07/23/2024 | Notice |
| 07/26/2024 | Motion for Leave of Court Filed |
| |     *Opposed Motion for Certification and Assignment to Civil I Calendar* |
| |     Docketed on:  07/29/2024 |
| |     Filed by:  Plaintiff American Federation of Teachers |
| 07/29/2024 | Affidavit/Declaration of Service of Summons and Complaint |

**Civil Actions**

## Case Summary

### Case No. 2024-CAB-004575

Docketed On:   07/30/2024
Filed By:   Plaintiff American Federation of Teachers
Served On:   Defendant The Higher Education Loan Authority of the State of Missouri

08/15/2024

Motion to Extend Filed     (Judicial Officer: Ross, Maurice)
*Consent Motion To Extend Time For Filing Responsive Pleading*
Docketed on:   08/16/2024
Filed by:   Defendant The Higher Education Loan Authority of the State of Missouri

08/19/2024

Order Granting Motion     (Judicial Officer: Ross, Maurice)
*Order Granting Consent Motion to Extend Time for Filing Responsive Pleading; efiled and eserved on parties from Chambers (kr)*
Signed on:   08/19/2024

08/19/2024   Notice

10/25/2024   **Remote Initial Scheduling Conference**   (9:30 AM)   (Judicial Officer: Ross, Maurice)

---

## Financial Information

**Defendant**     The Higher Education Loan Authority of the State of Missouri
Total Financial Assessment                                                          20.00
Total Payments and Credits                                                          20.00
**Balance Due as of 08/26/2024**                                                    **0.00**

**Plaintiff**     American Federation of Teachers
Total Financial Assessment                                                         140.00
Total Payments and Credits                                                         140.00
**Balance Due as of 08/26/2024**                                                    **0.00**

eFiled
7/22/2024 9:36:07 AM
Superior Court
of the District of Columbia

**IN THE SUPERIOR COURT**
**OF THE DISTRICT OF COLUMBIA**

**AMERICAN FEDERATION OF**
**TEACHERS**

**555 New Jersey Avenue N.W.**
**Washington, D.C. 20001**

      **Plaintiff,**

**v.**

**THE HIGHER EDUCATION LOAN**      Civil Action No. _2024-CAB-004575_
**AUTHORITY OF THE STATE OF**      **JURY TRIAL DEMANDED**
**MISSOURI**

**633 Spirit Drive**
**Chesterfield, MO 63005-1243**

      **Defendant.**

## COMPLAINT

Plaintiff American Federation of Teachers ("AFT"), on behalf of itself, its members, and the general public, by and through its counsel, brings this action against the Higher Education Loan Authority of the State of Missouri ("MOHELA" or "Defendant") and alleges the following based upon information, belief, and the investigation of its counsel:

## INTRODUCTION

1.    Since 2011, the U.S. Department of Education ("ED") has paid MOHELA over $1.1 billion dollars to do one job: help borrowers navigate their student loan options. MOHELA has consistently failed at this job to borrowers' detriment. Americans—including American educators, front-line health care workers, and other public service workers—are drowning in student loan debt. But at a time of high costs and waning pandemic support—when borrowers need help the most—instead of providing cash-strapped borrowers making payments on their student loans for the first time in three-and-a-half years with the assistance they need, MOHELA

traps eight million borrowers in a system of its own design, rife with errors, misinformation, and broken promises.  In doing so, MOHELA violates the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq*.

2.      The student debt crisis touches forty-five million Americans who owe more than $1.7 trillion in student loans.  But for borrowers whose loans are serviced by MOHELA, the crisis is especially acute.

3.      By cutting corners, prioritizing its bottom line, and deliberately ignoring its responsibilities to borrowers, MOHELA, in a few short years, has grown from a small loan servicer to a leviathan in the industry, tripling its servicing portfolio during the COVID-19 pandemic to more than eight million student loan borrowers.  That includes borrowers seeking Public Service Loan Forgiveness ("PSLF"), a program created by Congress in 2007 to provide a path to loan forgiveness for teachers, first responders, and other public servants as well as those working at non-profit organizations.  MOHELA's shocking series of abuses, described below, particularly impacts teachers and other public service workers, preventing them from accessing the loan forgiveness Congress promised them almost two decades ago.

4.      The sheer scale of MOHELA's wrongdoing is staggering and reaches across the country.  ED announced in October 2023 that "MOHELA failed to meet its basic obligation by failing to send billing statements on time to 2.5 million borrowers."  That same month, MOHELA used the wrong federal guidelines to calculate payments, causing 280,000 borrowers to make excessive payments.  But these well-publicized blunders are merely the tip of the iceberg.

5.      MOHELA misleads and misinforms borrowers, fails to process applications for PSLF and income-driven repayment ("IDR") plans in a timely manner or entirely, fails to provide refunds, miscalculates balances, over-charges borrowers, fails to respond to borrower inquiries,

and denies borrowers information to which they are entitled.  Borrowers whose loans are serviced by MOHELA cannot get the savings or forgiveness to which they are entitled, cannot trust the accuracy of MOHELA's statements of how much they have to pay, and cannot get money back from MOHELA that is rightfully theirs.  Each of these wrongs impacts thousands or more individuals, their families, and communities—people who are working hard and playing by the rules, but whose financial futures are imperiled by MOHELA's actions.

6.     MOHELA's misconduct is not just a question of incompetence.  MOHELA knew exactly the responsibilities it took on as a servicer and willfully disregarded those responsibilities, instead gobbling up more and more of the market even as its incapacity and unwillingness to serve existing borrowers was increasingly apparent.  MOHELA's servicing failures are exacerbated by a scheme it designed to inhibit borrowers' ability to access live customer service representatives and instead divert borrowers to inadequate "self-service" phone and website platforms.  This scheme results in long call wait times and poor service, leaving borrowers unable to get basic information about their accounts or correct the problems MOHELA causes.  Borrowers who connect with a live customer service representative encounter people whom MOHELA has failed to train or supervise, resulting in the dissemination of inaccurate, unhelpful, and often damaging information.

7.     Individually, any one of MOHELA's failings would be sufficient to cause financial, mental, and emotional distress.  Collectively, they result in a Kafkaesque experience and make it practically impossible for borrowers to correct account errors, make important decisions to protect their economic well-being, or even confirm basic information about their student loans.

8.     MOHELA's systemic failures have been ongoing for years, fueled by corporate indifference and prioritizing exponential growth and its own bottom line at the expense of

borrowers on whom America relies to educate our children and keep us well. MOHELA's abuses must end.

9.     AFT, which represents 1.8 million public school teachers, health care workers, and other public service workers across the country, has expended significant resources to alleviate the harm MOHELA causes.  Under the leadership of AFT President Randi Weingarten, AFT has spent, and continues to spend, tens of thousands of dollars on debt clinics to educate members to better navigate the mess created by MOHELA, and it has diverted more than two thousand hours of valuable staff time that would otherwise have been spent focused on issues like collective bargaining; retirement security; healthcare; student learning conditions; and educators', public employees' and health care workers' working conditions.  It has also been forced to contract with an outside vendor to aid members with student debt.  AFT is required by its mission to provide its members with accurate information precisely to address MOHELA's failure to do its job.   In addition, AFT has expended significant resources to investigate MOHELA's egregious behavior so that it can better assist its members, as detailed below.

10.     Even when armed with accurate information, however, AFT's ability to help individual borrowers is often limited to explaining their options.  Action on this advice generally requires borrowers to work through their designated student loan servicer, which for AFT members is often MOHELA.  Due to MOHELA's dysfunction, however, it remains practically impossible for borrowers to fully understand their rights relating to their federal student loans, or to properly manage those loans.

11.     Now, left with no choice, AFT comes to this Court seeking relief from MOHELA's pattern of abuse on behalf of itself, its members, and the general public affected by MOHELA's misconduct.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.* ("DCCPPA"), which provides that "[a] nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District." *Id.* § 28-3905(k)(1)(C).

13.     This Court has personal jurisdiction over the parties in this case.   AFT is headquartered in the District of Columbia and, by filing this complaint, consents to this Court having personal jurisdiction over it.

14.     This Court has personal jurisdiction over MOHELA pursuant to D.C. Code § 13-423 because MOHELA has transacted business in the District of Columbia by servicing student borrower accounts nationally, including accounts of student loan borrowers residing or attending educational institutions in the District of Columbia, in its role as a servicer of federally owned loans originated under the Direct Loan program for ED.   Through those acts, MOHELA purposefully directs its conduct to the District of Columbia and avails itself of the benefits and protections of District of Columbia law.   AFT's claims for relief on behalf of itself, its members, and the general public arise from those acts. MOHELA also maintains a corporate office in the District of Columbia.

15.     Venue is proper in this Court because "[a]ny claim under [the DCCPPA] shall be brought in the Superior Court of the District of Columbia." *Id.* § 28-3905(k)(2).

## PARTIES

### A.     Plaintiff

16.     AFT is a membership organization representing 1.8 million pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel;

higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals.

17.     AFT's headquarters is in Washington, D.C., and it has 1.8 million members across all fifty U.S. states, with more than five thousand members in the District of Columbia.

18.     AFT is a nonprofit organization within the meaning of the DCCPPA because it is an organization that is "neither organized nor operating, in whole or in significant part, for profit." D.C. Code § 28-3901(a)(14)(B).

19.     AFT's purpose is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and communities.  AFT does so by ensuring its members receive fair pay and benefits for their critical work, and by fighting for safe working conditions that also benefit students, patients and all those who use public services.  Helping children and students is at the core of AFT's mission.  So too is the economic security and dignity of AFT's members and their families.

20.     As part of this work, AFT takes a leading role in fighting for the financial stability of public service, education, and health care workers, particularly when it comes to the increasingly crippling cost of education.

21.     AFT, its mission, and its members are harmed by MOHELA's unlawful actions.

22.     AFT's resources have been and continue to be diverted to address MOHELA's misconduct in the form of debt clinics, member education, member assistance, investigations and research.  For example, since January 2022, at least thirty-five AFT employees have dedicated more than 2,500 hours—or approximately $150,000 in staff time—to addressing student loan issues, including MOHELA's unlawful conduct.

23.     This work includes, as of the date of filing, holding more than 119 AFT National Student Debt Clinics since 2022 alone, reaching more than 5,000 people—part of the more than 25,000 AFT has reached since launching the clinics.  The fifteen clinics held so far in 2024 have cost AFT more than $37,500.  The debt clinics, which are led by AFT staff and are held in-person and virtually, are designed to educate members about IDR and PSLF programs, address member questions, and educate members about its partnership with Summer, described below, to assist members with their loans.  These clinics are necessary because AFT members do not receive the support and information they need to make informed decisions about their federal student loans from their assigned loan servicers, including MOHELA, and because even when members do know what steps they would like to take, their efforts are often thwarted by the servicers.  AFT also expends resources to train volunteers to assist members of their local unions in navigating MOHELA's morass.

24.     AFT has had to contract with Summer, a Certified B Corporation that partners with employers and labor unions to organize and simplify borrowers' student loans.  AFT planned to end its contract with Summer at the end of 2024, but expects to be required to continue the contract because of the challenges to members created primarily by MOHELA's abuses.  The Summer contract costs AFT $675,000 per year (a total of $1,350,000 for the years 2023 and 2024).  But for MOHELA's misconduct that affects AFT's members, AFT would likely no longer need to contract with Summer.

25.     AFT has spent thousands more researching and publicizing MOHELA's misdeeds and collecting data from members to understand the depth of harm that MOHELA has wrought.

26.     AFT has held numerous events and produced videos, articles, and reports shining a light on MOHELA's abusive conduct.  AFT has also conducted advocacy campaigns to push for

better policies and oversight of MOHELA; engaged in awareness campaigns to inform members of their rights and understand their challenges with MOHELA; and provided support and services to members harmed by MOHELA.

27.     In February 2024, in conjunction with the Student Borrower Protection Center, AFT published a comprehensive report called "The MOHELA Papers" documenting MOHELA's long line of abuses.

28.     In April 2024, AFT spent more than $4,000 to facilitate the congressional testimony of a member about her experiences with MOHELA, including flights, lodging and additional expenses.

29.     AFT's President, Randi Weingarten, has also devoted her time and attention to advocating for borrowers and directing AFT's work to counteract MOHELA's grievous wrongs. And AFT's mission requires AFT to take these steps on behalf of its members.  But the resources AFT has expended to combat MOHELA's unlawful behaviors would have been spent advancing its mission to secure economic security and dignity for its members, were it not for MOHELA's widespread malfeasance.

30.     AFT is unable to assure the economic stability and dignity of its members because of MOHELA's misconduct, which, as detailed herein, includes failing to respond to borrowers' most basic student loan needs and committing grave servicing errors, costing borrowers staggering sums and jeopardizing their financial wellbeing.  AFT is doing all it can to address these needless harms but can only do so much—the ultimate solution must come from changes to MOHELA itself.

31.     Because approximately seventy-five percent of AFT's 1.8 million members work in roles eligible for the PSLF program, AFT has a front-row seat to MOHELA's unlawful conduct, particularly as it affects public service workers.

**B.     Defendant**

32.     Defendant MOHELA is one of the largest student loan servicers in the United States.  MOHELA is headquartered in Missouri, maintains an office in the District of Columbia, and currently employs hundreds of individuals across the country who work remotely in other states including Pennsylvania, Texas, Florida, Nebraska, and Utah.  MOHELA's current staff consists of 1,277 employees and 2,010 subcontractors, who perform customary loan servicing, administrative, and advisory functions.

33.     MOHELA was established in 1981 pursuant to the Missouri Higher Education Loan Authority Act, Title XI, Chapter 173, Section 173.350 to 173.445 of the Missouri Revised Statutes, inclusive, as amended (the "Authorizing Act"), as "a public instrumentality and body corporate" and its exercise of the authority granted it was "deemed to be the performance of an essential public function."  Mo. Ann. Stat. § 173.360.

34.     MOHELA's initial purposes was "to assure that all eligible postsecondary education students have access to student loans that are guaranteed or insured, or both, and in order to support the efforts of public colleges and universities to create and fund capital projects, and in order to support the Missouri technology corporation's ability to work with colleges and universities in identifying opportunities for commercializing technologies, transferring technologies, and to develop, recruit, and retain entities engaged in innovative technologies."  *Id.*

35.     Under its Authorizing Act, MOHELA can sue and be sued in its own name.  *Id.* § 173.385.1(3).

36.     MOHELA's assets are not part of the state of Missouri's revenue and cannot be used for the payment of Missouri's debts.  *Id.* §§ 173.386, 173.425.  Missouri, in turn, cannot be liable for MOHELA's debts.  *Id.* § 173.410.  The vast majority of MOHELA's funds are segregated from state funds and controlled exclusively by MOHELA as a self-sustaining and financially independent entity.

37.     Decades after it was established, MOHELA altered its business model and launched a national student loan service company to service federally owned loans originated under the Direct Loan program for ED.  Its primary mission is to service student borrower accounts nationally.  In addition to servicing Direct Loans and ED-held Federal Family Education Loan Program ("FFELP") loans for ED, MOHELA also services commercial FFELP loans and private student loans.

38.     Pursuant to its contract with ED, as of March 31, 2024, MOHELA services approximately $380.6 billion in Direct Loans and ED-owned FFELP loans representing more than eight million accounts for borrowers across the country.  Since 2011, ED has paid MOHELA over $1.1 billion for the servicing of Department-held loans.

39.     On July 1, 2022, MOHELA became the interim PSLF program federal servicer on behalf of ED.

40.     In April 2023, ED awarded MOHELA a ten-year Unified Servicing and Data Solutions contract.

41.     In January 2024, MOHELA entered into a Binding Letter of Intent to service the Navient-owned and -serviced portfolios.  Navient, a massive loan servicing company that at one time serviced more than six million accounts with loans totaling more than $200 billion, exited its

relationship with ED in October 2021 after repeated scandals.  MOHELA agreed to service its remaining FFELP loan and private student loan portfolios.

42.     Although as of July 1, 2024, ED transitioned the administration of the PSLF program from MOHELA to the federal government, the majority of borrowers pursuing PSLF are still serviced by MOHELA and subjected to its ongoing misconduct.  In addition, MOHELA is one of the companies hired by ED for the administration of PSLF.

43.     MOHELA's total operating revenues increased $243.9 million in just one year— from $114.7 million in fiscal year 2022 to $358.6 million in fiscal year 2023.  The primary reason for the increase was an uptick in net servicing fee revenue of $171.7 million due to MOHELA's growth in the number of borrowers serviced, including $68.7 million through PSLF.

44.     In 2023, $295 million of MOHELA's $358.6 million in revenue was "derived from servicing fees for federal loans nationwide."

45.     With this major addition to MOHELA's commercial services, MOHELA's current out-of-state loan servicing business, which obligates it to manage loan accounts for millions of student borrowers across the country, now dwarfs its statutorily mandated work for Missouri residents.

## FACTUAL ALLEGATIONS

### A.     Background on Federal Student Loans

#### 1.     The Rise of Federal Student Loans

46.     In 1965, Congress enacted the Higher Education Act of 1965 ("HEA") to increase access to postsecondary educational opportunities by providing assistance in the form of grants and loans to students to attend colleges and universities.

47.     Over time, the HEA has authorized several different types of federal student loans, including loans issued by private lenders and guaranteed by the federal government.

48.     Since 2010, the federal government's primary student loan program has been the William D. Ford Direct Student Loan Program ("Direct Loan Program").  Through the Direct Loan Program, ED lends directly to borrowers and is the holder of the loans.

49.      Today, forty-five million Americans owe more than $1.7 trillion in student loan debt.  This crisis is years in the making, as the cost of higher education has nearly tripled, even accounting for inflation, since 1980.  Today, the typical undergraduate student with loans graduates with nearly $30,000 in debt.

50.     All of this unfolds at a time when higher education is more critical than ever.  The unemployment rate for college graduates is about half of what it is for those with only a high school diploma.  And those with college degrees earn almost twice as much per year—in fact, the wage gap between college and high-school graduates has never been wider.

51.     Americans find themselves trapped: seeking higher education and expanded economic opportunity often entails taking on crushing debt; forgoing higher education leaves narrowed opportunity and diminished earnings.

52.     For too many borrowers, the burden of their student debt is unaffordable.  Prior to the COVID-19 pandemic, nearly one in four borrowers was behind on their federal student loan payment, and one in five borrowers was in default on their loan.  One million borrowers defaulted on their loans a year.

53.     The student loan crisis is particularly acute for communities of color.  Students of color are more likely than their white peers to require debt, and in a higher amount, in order to afford a higher education.  Borrowers of color have greater challenges when in repayment. Black borrowers default at twice the rate of their white peers.  And after twenty years of repayment, the

typical Black borrower owes ninety-five percent of their original balance whereas the typical white borrower has paid off ninety-four percent of their original balance.

> **2.** **Income-Driven Repayment Plans and Public Service Loan Forgiveness**

54. Federal student loans are generally considered one of the more affordable ways to finance higher education because they offer more flexible repayment terms than private loans.

55. One subset of repayment plans is known as the Income-Driven Repayment ("IDR") plans.

56. As the name suggests, IDR plans set borrowers' monthly payments based on their annual income, rather than their loan balance.

57. The four active IDR plans are (i) Saving on a Valuable Education ("SAVE") (formerly Revised Pay As You Earn ("REPAYE")); (ii) Pay As You Earn ("PAYE"); (iii) Income-Based Repayment ("IBR"); and (iv) Income-Contingent Repayment Plan ("ICR"). Although each has different requirements, they all follow the same general parameters.

58. IDR plans all establish a borrower's monthly payment by, first, determining a borrower's "discretionary income" as income that exceeds a certain percentage of the federal poverty line and, second, setting monthly payments as a percentage of that discretionary income, divided by twelve. For SAVE, discretionary income is the difference between the borrower's income and 225% of the poverty guideline accounting for the borrower's family size and state of residence.

59. Another key feature of IDR plans is that they provide for the discharge of any remaining loan balance after twenty or twenty-five years of payment, with the timeframe for discharge depending on the plan and on whether the loans were taken out for undergraduate or graduate education.

60.     For many borrowers, IDR plans result in monthly payments that do not cover all of the interest that accrues on their loan each month.  This results in negative amortization, where account balances increase over time due to unpaid interest, even though borrowers are in good standing on their loans and making regular payments.  That means that, after timely paying every month for years, a borrower could still owe more than they borrowed.

61.     The IDR plans' debt cancellation feature serves as a release valve by allowing for cancellation of all outstanding debt at the end of a certain term, regardless of outstanding principal or interest.  This debt cancellation feature is critical to ensuring that borrowers, especially low- and middle-income borrowers, are not stuck in a government-sponsored debt trap for their entire lives.

62.     All IDR plans require borrowers to annually recertify their income and family size, among other things, so that their income-based payments can be adjusted each year.  Failure to recertify in a timely manner can result in borrowers being dropped from their IDR plan and their payments increasing.

63.     Borrowers need not wait for their annual deadline to recertify their incomes; if their income changes—for example, decreases due to job loss or a switch to part-time employment—they can recertify at that time.  However, they are not *required* to recertify until the annual deadline, and a borrower whose income changes soon after they have recertified can keep their payment based on their old income and is not required to recertify again until the next deadline. The purpose of this is to avoid payment shock for borrowers, and to ensure they have consistency and predictability in their monthly payment obligations; borrowers who receive a mid-year pay bump will not immediately see the increased wage siphoned off to loan payments.

64.     The IDR plans are critical to many borrowers, not just because they offer lower payments and debt cancellation after twenty or twenty-five years, but also because they are qualifying repayment plans for borrowers seeking debt cancellation through PSLF.  Under the PSLF program, borrowers who work in qualifying public service jobs who make payments through certain repayment plans are entitled to have the remainder of their federal student loan debt canceled after 120 such monthly payments.  Payments made by public service workers on the IDR plans count toward PSLF.

65.     Qualifying employers include U.S.-based government organizations at any level (federal, state, local, and tribal), meaning that public school teachers, first responders, public health workers and members of the U.S. military all qualify for PSLF.  501(c)(3) non-profit organizations are also qualifying employers.

### 3.     ED Hires Student Loan Servicers to Handle Day-to-Day Operations

66.     The federal government does not administer the student loan system's day-to-day activities itself.

67.     Student loan servicers perform a wide array of tasks, such as sending monthly bills, receiving and processing monthly payments, and providing customer service.  They also receive and process applications for repayment plans and loan discharge programs, such as IDR and PSLF. In the case of IDR, student loan servicers apply program parameters and payment formulas set by Congress and by ED in order to determine borrowers' eligibility for an IDR plan and to calculate the monthly payment based on income and family size.

68.     Student loan servicers are borrowers' primary, and often only, official points of contact regarding their federal student loans.

### 4.   MOHELA's Responsibilities

69.   As a student loan servicer, MOHELA has had and continues to have several essential responsibilities.  These include:

a.   Being an accessible point of contact, by telephone, email, and through its web portal for borrowers seeking answers and information about their accounts, including how to apply for programs that they are eligible for; how to make payments; the amount of their payments; and other central information to ensure that they remain current and in good standing on their accounts.

b.   Providing accurate and meaningful information to borrowers about available programs and their implications, through access to knowledgeable customer service representatives and information available in mailings and on its website.

c.   Sending timely billing statements.

d.   Correctly calculating payment amounts.

e.   Maintaining the correct repayment and forbearance status for borrowers.

f.   Automatically transferring borrowers in the REPAYE program to the SAVE plan and properly calculating their payments.

g.   Accurately tracking payments toward PSLF forgiveness.

h.   Accurately advising borrowers of IDR recertification dates.

i.   Timely and accurately processing applications and requests for new and existing programs, including SAVE and the refund program available during the COVID-19 Payment Pause, during which federal student loan payments and collections were paused and interest rates were reduced to zero percent ("Payment Pause").

70.   Borrower experiences in recent years during the Payment Pause, and particularly since it ended on September 1, 2023, have made clear that MOHELA is unable to fulfill its responsibilities as a student loan servicer.  Its behavior is egregious even in an industry known for poor servicing at borrowers' expense.

71.   Even during the Payment Pause, when there were relatively fewer accounts that required proactive monthly servicing, MOHELA struggled to meet borrowers' needs.  Its failures

ran the gamut from being inaccessible, to providing inaccurate information, to making significant errors affecting borrowers' lives in the District of Columbia and across the country.

72.     Tragically for the millions of borrowers whose loans MOHELA services, its systemic failure to live up to its responsibilities and the resulting harm to borrowers continues today.  Countless borrowers still cannot access their accounts, get ahold of MOHELA customer service representatives, receive the benefits of loan forgiveness, or recoup excessive payments they were forced to make, all because of MOHELA's mismanagement.

### 5.     MOHELA's Student Loan Servicing Portfolio Explodes

73.     In 2020 and 2021, several student loan servicers chose not to renew their contracts with ED to service the federally held student loan portfolio.

74.     In total, approximately 16 million borrower accounts, representing about one-third of the borrower population, had to be transferred from one of the departing servicers to some other company or entity.

75.     ED faced a particularly critical void because one of these departing servicers, the Pennsylvania Higher Education Assistance Agency ("PHEAA"), had been the exclusive student loan servicer for borrowers seeking PSLF.

76.     PSLF-eligible borrowers saw regulatory improvements and a special one-time waiver of certain eligibility requirements for PSLF beginning in 2021 ("Limited PSLF Waiver"), shortly before PHEAA's departure.  As a result, hundreds of thousands of public service workers who previously were deemed ineligible for PSLF finally reaped the benefit of Congress's promise of debt forgiveness.

77.     The regulatory improvements to PSLF, which removed barriers that had previously prevented qualified applicants from seeking PSLF, resulted in an enormous influx in PSLF applications.  Those applications triggered the transfer of the applicants' accounts to PHEAA for

servicing.  As the PSLF portfolio ballooned, millions of borrowers' accounts needed a new servicer upon PHEAA's exit.

78.     In 2022, MOHELA successfully sought to become the new exclusive PSLF servicer and took over both the related loan servicing and program administration responsibilities.  That was in addition to MOHELA's existing responsibilities as a federal student loan servicer.

79.     As a result of these loan transfers, MOHELA's portfolio more than tripled in less than three years, growing from 2.5 million borrowers in February 2020 to 8.4 million by the fall of 2023.

80.     Given its long involvement in the student loan system, MOHELA knew or should have known the enormity of the task that it was taking on.  As detailed below, however, it quickly became apparent that MOHELA was not up to the task.

81.     Upon information and belief, MOHELA conducted its own analysis, in dialogue with ED, about the costs it would incur to comply with its obligations and negotiated a compensation package to cover the investments required to meet its new responsibilities.

82.     Upon information and belief, the compensation package covered $159.7 million, or a 134% increase, in total general and administrative expenses, due in significant part to the company's tremendous growth in its student loan portfolio.

83.     Upon information and belief, ED did not guarantee MOHELA a profit.  However, even with the funds it received to service its expanded portfolio, the company was unable or unwilling to invest in ensuring adequate customer service for borrowers.

### 6.     COVID-19: Student Loan Payment Pause, Limited PSLF Waiver, IDR Account Adjustment & Waiver of IDR Recertification

84.     MOHELA's responsibilities expanded from servicing only a relatively small portion of the federal student loan portfolio to playing a central role in the student loan system at

the same time that the student loan system experienced an unprecedented pause.  This allowed MOHELA initially to shield from public view its incapacity and unwillingness to adequately do the job.

85.     In March 2020, the world was thrust into a total shutdown due to the COVID-19 pandemic.  Millions were left without jobs and unable to pay for basic necessities, let alone student loan bills.

86.     In response, Congress passed and President Trump signed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in March 2020, which, among other things, paused federal student loan payments and collections and reduced interest rates to zero percent, resulting in the Payment Pause.  So as to not deprive borrowers of credit toward loan cancellation through either IDR or PSLF, each paused month counted as a qualifying payment toward these programs.

87.     The Payment Pause was intended to afford borrowers some relief during the economic uncertainty caused by the pandemic and was extended several times by both the Trump administration and, after January 2021, the Biden administration.

88.     The Payment Pause only applied to federal student loans, and only to those federal student loans that were held by ED.

89.     During this period, borrowers could choose to make payments, but were not required to do so.

90.     Any borrowers who did make voluntary payments were eligible for refunds of those payments as long as the refund request was made before the Payment Pause ended.  ED instructed borrowers to contact their student loan servicer to request a refund.

91.     During the Payment Pause, although the vast majority of federal student loan borrowers' accounts required minimal servicing, MOHELA and the other servicers were still required to manage these accounts and to field questions from borrowers.

92.     Even without monthly bills, borrowers needed assistance with their student loans, and reasonably turned to their servicers, like MOHELA, for help.  In MOHELA, they found virtually none.

93.     In addition to seeking general clarification about their accounts, many borrowers sought assistance to take advantage of two specific opportunities that arose during the Payment Pause.

94.     First, in October 2021, ED announced the Limited PSLF Waiver, referenced above.

95.     Second, in April 2022, ED announced the IDR Account Adjustment.  Similar to the Limited PSLF Waiver, this opportunity gave student loan borrowers credit toward cancellation under IDR for certain periods of previously ineligible time, such as time spent on another repayment plan or in long periods of forbearance.  The Account Adjustment, like the Limited PSLF Waiver, would result in some borrowers' loans being cancelled and other borrowers moving closer to cancellation.   For borrowers working in public service, credit under the IDR Account Adjustment would count toward PSLF.

96.     Both these opportunities required borrowers with federal student loans outside the Direct Loan Program to convert those loans into Direct Loan Program loans through a process called consolidation.  Even for borrowers within the Direct Loan Program (who were already eligible for both opportunities), consolidation could maximize the benefits they could receive.  Both opportunities, however, had deadlines by which borrowers had to consolidate in order to benefit.

97.     Although the process of consolidating is simple, understanding these two opportunities and determining whether consolidation was necessary or advantageous is not. Borrowers therefore reasonably sought assistance from their loan servicers, including MOHELA, to take advantage of the Limited PSLF Waiver and IDR Account Adjustment.

98.     Despite the relatively low demands on servicers during the Payment Pause, borrowers seeking assistance from MOHELA experienced excessive call wait times and an inability to reach customer service representatives.

99.     In May 2023, it was announced that the Payment Pause would officially end on September 1, 2023, at which point interest would begin to accrue again, with payments becoming due the following month.

100.    For many borrowers, especially those who graduated during the Payment Pause, this transition ("Return to Repayment") marked the first time they had to make a payment on their student loans.

101.    The federal government informed borrowers that, unless they proactively changed their repayment plan at some point, borrowers would be returned to the same plan and monthly payment amount that were in place when the Payment Pause began in March 2020.

102.    During the Payment Pause, borrowers who were enrolled in IDR, which generally requires annual recertification, were not required to recertify their income and family size.  As Return to Repayment approached, ED clarified that no borrower would have to recertify for IDR until March 2024.  In effect, this meant that IDR borrowers could maintain payments based on their 2019 or 2020 incomes until March 2024.  Borrowers' 2019 or 2020 incomes are generally likely to be lower than those in 2024, given post-pandemic inflation and a stronger job market.

103.    In March 2024, ED extended the IDR recertification date to September 2024 and announced that any borrower who had recertified in anticipation of the March deadline would have their payment reverted to his or her prior IDR amount.

104.    Upon information and belief, ED communicated these deadlines to its student loan servicers, both so that the servicers could abide by the correct deadlines and so that the servicers could advise inquiring borrowers about their loans.

### 7.    The SAVE Plan

105.    At the same time borrowers were preparing to resume payments, a new repayment plan became available, known as the "SAVE" plan.

106.    Under the SAVE plan, a qualifying borrower's discretionary income is any income above 225% of the federal poverty line, up from 150% under REPAYE, and monthly payments are set to ten percent of discretionary income, divided by twelve.  For borrowers with only undergraduate debt, payments are calculated as five percent of discretionary income. For borrowers with a mix of undergraduate and graduate debt, the percentage of discretionary income is a weighted average between five and ten percent, proportional to the borrower's undergraduate versus graduate debt.

107.    Under the new SAVE plan, any interest that is not covered by the calculated monthly payment will be waived by the government.  That provision is meant to end the negative amortization described above.  This benefit only applies to monthly interest that accrues while enrolled in SAVE and is not retroactive.

108.    Any Direct Loan, including a Direct Consolidation Loan, is eligible for SAVE, except for Parent PLUS Loans, a type of Direct Loan taken out to finance a dependent child's education.  Direct Consolidation Loans used to consolidate a Parent PLUS Loan are also ineligible for SAVE.

109.    For most borrowers, the SAVE plan is the most affordable payment plan available. As such, enrolling in this plan could be life-changing.

110.    The SAVE plan was slated to take effect on July 1, 2024.  However, certain aspects of it were implemented early, in time for the resumption of payments.  The aspects of the SAVE plan that were implemented early include the increase in the federal poverty level used to calculate payments and the waiver of unpaid monthly interest.

111.    ED urged eligible student loan borrowers to take advantage of the SAVE plan.

112.    Borrowers already enrolled in REPAYE were automatically transferred to the SAVE plan, whereas borrowers enrolled in other repayment plans had to affirmatively apply to SAVE.

113.    Because only borrowers enrolled in SAVE receive its interest waiver benefits, a borrower with eligible loans who has applied to SAVE would continue to accrue interest on those loans until the application was processed and the borrower was approved for the plan.

114.    For a borrower whose monthly payment on SAVE does not cover their monthly interest accrual, any delay in processing and enrollment therefore results in interest accruing that otherwise would have been waived were it not for the delay.

115.    Borrowers' loans may be put into an administrative forbearance while their SAVE application is being processed, during which time payments are not due.  However, interest continues to accrue during the forbearance period, prior to approval for SAVE.

**B.      MOHELA Grossly Mishandles Its Loan Servicing Responsibilities**

**1.      MOHELA Fails to Bill Some Borrowers and Inaccurately Bills Others**

116.    MOHELA's servicing failures extend to even the most basic servicing functions. With payments due starting October 1, 2023, following the end of Payment Pause, borrowers should have received bills at least twenty-one days in advance of their payment due date. However,

millions of borrowers never received a timely bill, resulting in missed payments and unintentional delinquency, while others received inaccurate bills, resulting in improper payments.

117.    On October 30, 2023, just thirty days after the first borrower payments were due, ED announced that MOHELA had "failed to meet its basic obligation by failing to send billing statements on time to 2.5 million borrowers" and that, as a result, over 800,000 borrowers were delinquent on their loans.

118.    ED explained that MOHELA had also billed some borrowers for an incorrect amount and put other borrowers back into repayment who should have been in forbearance while debt relief applications were pending.

119.    ED withheld $7.2 million in payments to MOHELA as a result of the company's servicing errors.

120.    This penalty did not help the millions of borrowers whose loans MOHELA improperly serviced.

121.    Instead, affected borrowers' accounts were placed into administrative forbearance while MOHELA took corrective action.  This came as a surprise to many borrowers, and occurred without any meaningful explanation from MOHELA as to why borrowers were no longer being billed.

122.    Other borrowers remained in repayment but believed that their bills contained errors and struggled to reach knowledgeable MOHELA representatives who could resolve their concerns.

123.    This resulted in a frustrating scenario in which some borrowers who wished to make payments on their loans were stuck in forbearance, while others who wished to stop payments while their accounts were reviewed could not get the help they so badly needed.

124.    Of those who were billed, some borrowers' payments were made automatically via debit from their bank accounts.  When borrowers receive incorrect bills, this results in incorrect amounts being withdrawn from their bank accounts.

125.    For some borrowers, these automatic payments were unexpected, as they had never authorized MOHELA to debit their bank account.  In the lead-up to payments resuming, ED had instructed that for borrowers to utilize auto-pay, they would have to opt in and reauthorize the government and its servicers to debit their bank accounts, even if they had been enrolled in auto-pay before the Payment Pause.  Despite this instruction, some borrowers who had not opted back into auto-pay had their bank accounts debited by MOHELA to pay their student loans.

### 2.    MOHELA Fails to Accurately and Timely Process Important Borrower IDR, PSLF, and Refund Applications

126.    In addition to mishandling Return to Repayment, MOHELA mishandled—and continues to mishandle—the rollout of the new SAVE plan.

127.    With the SAVE plan launching at approximately the same time as payments resumed, many borrowers sought to understand whether they qualified for this new repayment plan, how the plan would benefit them, and how to enroll.

128.    Any delay in applying for SAVE has a real cost for borrowers, given that interest began to accrue on September 1, 2024, and SAVE's unpaid interest waiver feature only applies to borrowers once they are enrolled in the plan.

129.    Per ED's instructions, borrowers already enrolled in REPAYE should have been transitioned to the SAVE plan without the borrowers having to take any action, and their payments should have been calculated using their most recent IDR records.

130. However, rather than automatically transitioning borrowers from REPAYE to the SAVE plan, MOHELA instructed some already-enrolled borrowers to apply for the SAVE plan in order to access the plan's benefits.

131. When borrowers followed MOHELA's incorrect instruction, their new IDR was based on their then-current income and family size, rather than their 2019 or 2020 income and family size, which should have been used. For many borrowers, these updated numbers resulted in a higher monthly payment.

132. For eligible borrowers who applied to the SAVE plan directly—either because MOHELA incorrectly advised them to do so or because they were required to do so under the appropriate rules—MOHELA failed to review and approve their applications in a timely manner. Some borrowers continued to make payments on their existing payment plan while their application was under review, in which case the delay prolonged higher monthly payments. Other borrowers opted for administrative forbearance while their application was under review, during which time they were not required to make payments but interest continued to accrue on their account. Had MOHELA promptly enrolled those borrowers in SAVE, that interest would have been waived for borrowers with low or $0 monthly payments. In either event, delays in processing SAVE applications cost borrowers money.

133. MOHELA's failures extended to the most basic tasks. For example, it used the 2022 federal poverty guidelines instead of the 2023 guidelines to calculate payments, resulting in higher payments for approximately 280,000 borrowers.

134. Borrowers bore and continue to bear the cost of MOHELA's errors in implementing SAVE through higher payments and accrued interest.

135.    Many borrowers seeking clarity or assistance also found themselves thrown back into MOHELA's frustrating call center wait times or were referred to inadequate online resources. When borrowers did speak with a representative, they were unable to get answers to basic questions.  These issues persist.

136.    At the same time, many borrowers who requested refunds of voluntary payments made during the Payment Pause are still waiting for these refunds to be processed months later.

137.    In some instances, MOHELA even increased borrower account balances as if the payments were refunded, even when the borrower had not received any refund check.

138.    Since contacting MOHELA representatives is practically impossible and, for those who do make contact, is often useless, these borrowers with increased balances but no refunds are left with no options to remedy this situation.

139.    For example, Chelsey G., a single mother of two, is an AFT member whose federal student loans are serviced by MOHELA.  In the fall of 2023, when Chelsey was entitled to a $0 monthly payment because MOHELA failed to timely provide her billing statement, MOHELA continued to collect payments via auto-debit in October, November, and December to the tune of $1,200. MOHELA promised a refund.  Chelsey has yet to receive a cent.  Instead, as of the summer of 2024, MOHELA continues to bill Chelsey the inaccurate amount, attempting to charge her more than ten times her correct payment amount.

140.    Likewise, Samuel L. is a D.C. borrower who made a payment under PAYE during the Payment Pause that amounted to over $900.  Although MOHELA acknowledged that Samuel was entitled to a refund, Samuel has yet to receive anything.

141.    MOHELA's record on PSLF is just as egregious.

142.     Borrowers who achieve debt cancellation due to PSLF or IDR are also eligible for refunds in some instances, where their debt relief was delayed and as a result they made unnecessary payments.  Here, too, many borrowers await the refunds they are owed.

143.     Moreover, MOHELA receives payment from the federal government for each processed PSLF application—including when MOHELA must reprocess applications after a wrongful denial.

144.     MOHELA currently has over 1 million outstanding PSLF applications, a 1000 percent increase compared to before MOHELA took over the portfolio.  Borrowers are being forced to continue making payments while they wait for relief.

### 3.     MOHELA Actively Misleads Borrowers and Withholds Information from Borrowers

145.     In addition to inaccurately billing borrowers as described above, MOHELA has routinely provided, and continues to provide, inaccurate information about a variety of issues to borrowers.

146.     MOHELA knew or should have known what programs and policies were in effect. However, it failed to train its employees, provide them with accurate call scripts, or even simply to respond to inquiries in a manner that could meet borrowers' needs.

147.     Even once borrowers were enrolled in SAVE, MOHELA improperly instructed borrowers to recertify their income and family size well in advance of the deadline to do so.

148.     Under clear ED guidelines, no borrower should have had to recertify for an IDR plan prior to March 2024, and federal regulations prohibit servicers from sending recertification notices more than ninety days before the recertification deadline.

149.     However, as early as July 2023 and into December 2023, MOHELA instructed borrowers enrolled in an IDR plan to recertify their income and family size—often resulting in

higher payments for borrowers.  MOHELA did this both by sending borrowers written notices instructing them to recertify and by orally advising borrowers who called for assistance to do so.

150.    As a result of MOHELA's improper instruction, borrowers recertified earlier than required.  Many borrowers' payments increased well before they should have, and MOHELA then collected these amounts during months when payments should have been lower.

151.    MOHELA's misinformation does not stop there.

152.    For example, on or around August 2, 2023, one borrower asked MOHELA whether consolidating her Direct Loans would result in losing her existing PSLF credit.  In a written message, a customer service representative responded that, "if you consolidate [your loans] you will lose all PSLF qualifying payments that you currently have."  Due to the IDR Account Adjustment, this was inaccurate.



153.    Inaccuracies such as these—misinforming borrowers that consolidating would result in them losing all of their PSLF qualifying payments—have the foreseeable result of dissuading borrowers from taking advantage of loan relief opportunities.  During the IDR Account Adjustment, for example, a borrower with existing PSLF credit who consolidated would not lose that credit, and through the Adjustment could potentially gain additional credit, thereby reaching loan forgiveness on a faster timeline.  If a borrower abided by MOHELA's inaccurate information, they would have missed this opportunity and would remain indebted for longer than was necessary.

154.    In addition to failing to appropriately respond to borrower inquiries, MOHELA also jeopardized government efforts to help borrowers qualify for debt relief, including by failing to

cooperate with the State of California's efforts to identify borrowers for outreach to maximize participation in the IDR Account Adjustment.

155.    The Consumer Financial Protection Bureau ("CFPB") complaint database currently has close to 5,000 borrower complaints relating to MOHELA's servicing failures.

> ### 4.    MOHELA Systematically and Knowingly Subjects Borrowers to Dropped Calls, Hours-Long Holds, Uninformed Representatives, and Inaccurate Online Content

156.    Borrowers' desire to speak with customer service representatives to clarify their individual circumstances became more acute as the Payment Pause concluded.  For some borrowers, this would mark their first experience with loan repayment.  For others, they hoped pending debt cancellation applications would be approved quickly and that they would not have to resume payments at all.

157.    Despite this great and foreseeable need for customer assistance, in the months leading up to Return to Payment, borrowers reported hours-long wait times to speak with MOHELA customer service representatives.

158.    Borrowers' virtual inability to reach customer service representatives or to otherwise obtain assistance is a feature, not a bug, of MOHELA's business model. This phenomenon is the result of business decisions the company made to engage in "call deflection" rather than the required customer service.

159.    "Call deflection" is the practice of diverting callers to MOHELA's website, ED's website, or other self-service features, rather than connecting callers with a live customer service representative, thereby allowing the company to maintain lower staffing levels than would otherwise be necessary to meet borrowers' needs.  This strategy is laid out in MOHELA's internal Return to Repayment "Playbook."

160.    Although online and self-service options may be appropriate for some borrowers or actions, they cannot meet all borrowers' needs.

161.    Further, many of the resources to which MOHELA deflects callers are incomplete or inoperable.  For example, between November 15, 2023, and December 12, 2023, the company's website warned borrowers that "you may be experiencing issues while logging in."



162.    MOHELA knew that not all of its online features were up-to-date or available.

163.    Furthermore, MOHELA makes it practically impossible for borrowers to get help with their loans. Instead of adequately staffing and appropriately training customer service representatives, MOHELA affirmatively took steps to make it harder for borrowers to receive help.

164.    This is especially frustrating for borrowers because in its written notices, MOHELA represents that borrowers can contact it for assistance. For example, in one of its recent notices to a borrower that her account was placed into administrative forbearance, MOHELA advertised its services by stating: "Difficulty Making Payments?  We can help.  Student loan counselors are available to discuss your repayment options including: Income-driven repayment plans, other repayment plans and schedules, [and] availability of consolidation, deferment, or forbearance."

Borrowers' experiences, however, make clear that MOHELA's loan counselors are not, in fact, available to help.

165.    During the period when borrowers sought to take advantage of the Limited PSLF Waiver and IDR Account Adjustment, borrowers were practically unable to contact MOHELA customer service representatives due to unreasonable call wait times and dropped calls.

166.    These unreasonably long wait times have been well publicized by news media and by individual borrowers sharing their stories online.  One borrower shared his experience of calling MOHELA three times and experiencing call wait times of 144 minutes, 149 minutes, and fifty minutes, respectively.

167.    Although student loan servicers, including MOHELA, also offer electronic messaging platforms, borrowers fared no better there.  On X, formerly known as Twitter, one borrower shared that after sending a written message, MOHELA replied that it would respond within three days, but that he was still waiting for a reply three *weeks* later.

168.    Similarly, from November 2022 to March 2023, AFT member and retired community college professor Kathleen White called and emailed MOHELA thirty times without receiving any information and, as a result, made unnecessary payments that later had to be refunded.

169.    Borrowers who did reach a customer service representative reported that these MOHELA employees lacked knowledge of the Waiver and/or Adjustment opportunities, seemed unfamiliar with the student loan system, and generally could not answer borrowers' questions.

170.    Once Return to Repayment began, MOHELA's servicing errors and the resulting consumer harms became even more stark.

171. The simple task of confirming what a borrower's monthly payment amount would be once payments resumed turned into an hours-long ordeal.  For those borrowers who could not afford to spend hours on hold, they were left without accurate information, leading to unnecessary payments and inability to access programs that would have reduced the accrual of interest.

172. As outlined above, MOHELA's willful and continuing failure to allow borrowers access to properly trained customer service representatives has real-world consequences for borrowers.

**5.     MOHELA Blocks Borrowers' Access to Account Information**

173. In 2024, MOHELA further inhibited borrowers' ability to get help or even to self-service their accounts by discontinuing its mobile app, which many borrowers use to make payments and manage their accounts.  By removing this resource, MOHELA has required more borrowers to call for assistance, diverting them into its call deflection pipeline.

174. Shortly thereafter, MOHELA announced that it was internally transitioning its borrower accounts from one servicing platform to another servicing platform. This transition would not transfer accounts to another servicer, and instead would be internal to MOHELA.

175. While an individual borrower's account is being transitioned to the new platform, which is occurring on a rolling basis, MOHELA blocks all access to that borrower's records via its website for approximately two weeks.

176. Even after access is restored on the new platform, borrowers report that they cannot access historical documents and can only access documents from the date of platform transfer going forward.

6.      **The Need for Access to Records and Clear Communication Increases—While MOHELA Continues to Fail Borrowers**

177.    Despite widespread attention to MOHELA's servicing failures and calls for the company to improve or be held accountable, its failure to adequately communicate with borrowers has continued into the summer of 2024.

178.    At this time, major changes are occurring that have increased borrower confusion and the need for individualized assistance.

179.    First, on April 29, 2024, ED announced that it would transfer over one million borrower accounts away from MOHELA to other student loan servicers.  ED explained that MOHELA requested the transfer and that the transfer was being done to "ensure borrowers receive the best service and support[.]"

180.    Second, ED announced that beginning May 1, 2024, the administration of the PSLF program would transition away from MOHELA, as the exclusive servicer, to a group of federal contractors, including MOHELA.  As part of the transition, ED would pause PSLF processing for three months.

181.    MOHELA announced that during this time borrowers would not be able to access their PSLF records on their MOHELA accounts. The PSLF program administration transition would not immediately result in any borrowers' loans being transferred to another company for day-to-day servicing.

182.    These announcements were made in swift succession and were made around the same time as MOHELA announced its servicing platform transition.

183.    Given that each of these three changes—MOHELA's platform transition, the PSLF administration transition, and accounts being moved from MOHELA to other servicers—involved a transfer or transition of some kind, they caused confusion for many borrowers.

35

184.    MOHELA's use of call deflection has made this confusion worse.

185.    Borrowers have attempted to contact MOHELA but are met with the same unreasonably long call wait times that have persisted for over a year.

186.    Others have sought information online but cannot access their account or a clear and concise explanation.

187.    Borrowers who received notices about one of these actions cannot determine whether MOHELA will remain their student loan servicer.

188.    MOHELA's call deflection, understaffing, and poor training make it practically impossible for borrowers to speak with a live customer service representative who can give an individualized and accurate explanation of what is occurring.

189.    MOHELA's role as the dedicated PSLF servicer and its decision to proactively grow its portfolio distinguish it from the rest of ED's contractors.  And PSLF-eligible borrowers are particularly impacted by MOHELA's unlawful behavior.

190.    For example, Walter S. is an AFT member whose federal student loans are serviced by MOHELA.  He has worked in the Detroit Public Schools Community District since 2012.  MOHELA refuses to process his loan forgiveness under PSLF, falsely claiming he has not verified years of public service employment.  Despite Walter's contacting MOHELA numerous times and mailing in the required documents, the student loan servicer will not process his debt cancellation or even provide him with an accurate count of qualifying payments.  Walter is still awaiting loan forgiveness.  While he waits, his credit score is negatively impacted and he lives with the stress of remaining loans that may be eligible for forgiveness.

### 7.     MOHELA Knows or Should Know That Its Business Operations Are Unfair and Deceptive

191.    MOHELA's misconduct is the predictable result of MOHELA's own business decision actively to pursue and obtain a massive, complex student loan servicing contract worth tens of millions of dollars while implementing operational cost-cutting measures such as reduced staff.  Rather than ensuring student loan borrowers could successfully return to repayment after the COVID pandemic, MOHELA has derailed and continues to derail borrowers, undermining their long-term financial success and violating their legal rights.

192.    MOHELA knows or should know that its operations are inadequate and result in the systematic mishandling of borrowers' student loan accounts across the country.

193.    For example, according to the CFPB's consumer complaint database, between January 1, 2023, at which point the account transfer from PHEAA to MOHELA was complete, and July 1, 2024, consumers filed 13,150 complaints about federal student loans.  Of those complaints, ***nearly half*** (6,390) were made against MOHELA.  That is twice as many as the next most complained about servicer, Nelnet, which received 3,155 complaints during the same timeframe.  And that is despite the fact that, according to March 2024 data published by ED, MOHELA's portfolio is only about half the size of Nelnet's portfolio, at 8.65 million accounts compared to Nelnet's 15.35 million accounts.  The disproportionate number of consumer complaints makes it all too clear that MOHELA's dysfunction and poor customer service is out of step even with ED's other contracted student loan servicers.

194.    MOHELA knew the issues plaguing the student loan servicing industry and won a lucrative contract based on promises to comply with the law and to bring borrowers back into successful repayment.  But it has not.

195.    Instead, MOHELA has maintained and continues to maintain insufficient staff and fails to train them adequately on student loan servicing requirements and procedures.

196.    MOHELA maintains an inadequate auditing system.  Rather than employing measures to monitor its operations and loan servicing system adequately to identify errors and problems, it shifts the burden onto borrowers to identify issues and bring them to MOHELA's attention.  Then MOHELA erects barriers to obtaining a timely and successful resolution of the borrower's complaint by, for example, limiting available call center representatives and failing to train its staff.

197.    MOHELA fails to respond to borrower complaints adequately and to correct errors on borrowers' accounts.  When borrowers are able to submit complaints or raise questions about their accounts, MOHELA fails to properly investigate and resolve them.  When MOHELA discovers an error, it fails to conduct a proper root cause analysis to determine whether the issue is systemic and to correct it.

198.    MOHELA fails to meet its core responsibilities as a student loan servicer, such as accurately billing borrowers, processing IDR and PSLF applications, processing valid refund requests, and ensuring access to account records.

199.    It also makes affirmative misrepresentations to borrowers about information that it knows or should know, such as misrepresenting their opportunities under the Limited PSLF Waiver or IDR Account Adjustment or instructing them to recertify their IDR plans too early.

200.    Federal and state consumer protection laws require MOHELA, and all student loan servicers, to treat borrowers fairly.  By engaging in call deflection and creating a customer service system that makes it practically impossible for borrowers to seek assistance or, more concerningly, to have MOHELA's own errors corrected, the servicer has created a deeply unfair experience for

borrowers.  These harms are exacerbated by MOHELA's offer to help while routing borrowers into a customer service system that intentionally makes it practically impossible to obtain that help.

201.    Taken together, MOHELA's servicing errors and call deflection tactics suggest a decision to maximize revenues rather than to invest in the staff and infrastructure necessary to service more than 8 million borrowers' loans.  Borrowers and their families pay the price for this decision.

202.    This is particularly frustrating for borrowers because, in general, they do not get to pick their student loan servicer.  Borrowers have been effectively stuck with a company that cannot or will not meet their needs.  And this is especially true for public service workers pursuing PSLF, given that until recently MOHELA was the dedicated servicer for the PSLF program.

203.    Unable to turn to MOHELA for help with their accounts or for reliable information about the changes to the student loan system, borrowers have been left in the cold—forced to suffer the consequences of MOHELA's failures.

204.    AFT now brings this action on behalf of itself (Count I); its members (Count II); and the general public (Count III).

## CAUSES OF ACTION

### Count I – Violation of the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*

#### (On behalf of AFT)

205.    AFT incorporates by reference each preceding paragraph as though fully set forth herein.

206.    AFT brings this Count against MOHELA on behalf of itself pursuant to D.C. Code § 28-3905(k)(1)(C).

207.    MOHELA is a "person" within the meaning of D.C. Code § 28-3901(a)(1) and provides services within the meaning of D.C. Code § 28-3901(a)(7) by providing loan servicing to borrowers with federal student loans, including to all borrowers pursuing public service loan forgiveness.  MOHELA's acts while servicing federal student loans are "trade practices" within the meaning of D.C. Code § 28-3901(a)(6).

208.    AFT is a "non-profit organization" within the meaning of D.C. Code § 28-3901(a)(14).

209.    It is a violation of the DCCPPA "for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived or damaged thereby[.]" D.C. Code § 28-3904.  The DCCPPA provides that, among other things, it is an unfair or deceptive trade practice to:

> …(e) misrepresent as to a material fact which has a tendency to mislead;
>
> (f) fail to state a material fact if such failure tends to mislead;
>
> (f-1) use innuendo or ambiguity as to a material fact, which has a tendency to mislead; …
>
> (u) represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

*Id*.

210.    MOHELA's practices of failing to comply with its basic responsibilities as a student loan servicer are unfair and deceptive in violation of the DCCPPA.

211.    MOHELA violates the DCCPPA by affirmatively misinforming AFT's members about the deadline to recertify their incomes, leading to confusion and to some members paying higher monthly payments than they owe.

212.    MOHELA further violates these provisions by falsely informing AFT's members that loan consolidation would cost them all their prior PSLF credit.

213.    MOHELA further violates these provisions by failing to send AFT's members timely bills, as well as by sending AFT's members inaccurate bills.

214.    MOHELA further violates these provisions by deducting payments from AFT's members' bank accounts without their affirmative consent to do so.

215.    MOHELA further violates these provisions by creating unprecedented backlogs of borrower complaints, AFT's members' IDR applications, and unprocessed PSLF forms submitted by AFT's members.

216.    MOHELA further violates these provisions by concocting a call deflection scheme to make it extremely difficult for AFT's members to contact MOHELA regarding loan servicing failures, and instead directing AFT's members to self-service options that are insufficient to meet their needs or are not functional.

217.    MOHELA further violates these provisions by failing to adequately staff its call centers and by failing to adequately train its customer service representatives.

218.    MOHELA further violates these provisions by failing to record accurately AFT's members' payments, refunds, and records.

219.    MOHELA further violates these provisions by misinforming AFT's members about their payment options.  Namely, MOHELA gives AFT's members incorrect information regarding their eligibility for certain programs and time-sensitive decisions to be made relating to their loans.

220.    MOHELA further violates these provisions by reporting to AFT's members the incorrect number of PSLF-qualifying payments they have made.

221.    MOHELA further violates these provisions by denying access to PSLF to AFT's members with eligible employment by failing to properly process employment certifications and by incorrectly representing eligibility for PSLF.

222.    Upon information and belief, ED did not instruct MOHELA to engage in these acts.

223.    These acts are unfair because they cause or are likely to cause substantial injury to borrowers, which the borrowers cannot reasonably avoid, and which is not outweighed by countervailing benefits to consumers or to competition.

224.    These acts are also deceptive because they mislead or are likely to mislead borrowers, borrowers' interpretations of these misleading acts are reasonable, and the misleading acts are material.

225.    The above conduct has harmed and continues to harm AFT in several ways.  As detailed above, AFT is required, in accordance with its mission, to respond to these violations and has expended significant resources in so responding.  These expenditures include $675,000 a year on an outside contractor to aid members with student loans; since January 2022, approximately $150,000 in staff time with at least thirty-five AFT employees having dedicated more than 2,500 hours to addressing student loan issues, including those caused by MOHELA's unlawful conduct; and tens of thousands of dollars to hold student debt clinics, costing more than $37,500 in 2024 alone.  Along with the financial harm, AFT's mission has been harmed as it has been forced to divert resources and attention that would otherwise have been spent focused on issues like collective bargaining; retirement security; healthcare; student learning conditions; and educators', public employees', and health care workers' working conditions.

**Count II – Violation of the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq*.**

**(On behalf of AFT Members)**

226.    AFT incorporates by reference each preceding paragraph as though fully set forth herein.

227.    AFT brings this Count against MOHELA on behalf of AFT's members whose federal student loans are serviced by MOHELA pursuant to D.C. Code § 28-3905(k)(1)(C).

228.    MOHELA is a "person" within the meaning of D.C. Code § 28-3901(a)(1) and provides services within the meaning of D.C. Code § 28-3901(a)(7) by providing loan servicing to borrowers with federal student loans, including to all borrowers pursuing public service loan forgiveness.  MOHELA's acts while servicing federal student loans are "trade practices" within the meaning of D.C. Code § 28-3901(a)(6).

229.    AFT is a "non-profit organization" within the meaning of D.C. Code § 28-3901(a)(14).

230.    It is a violation of the DCCPPA "for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived or damaged thereby[.]" D.C. Code § 28-3904.  The DCCPPA provides that, among other things, it is an unfair or deceptive trade practice to:

…(e) misrepresent as to a material fact which has a tendency to mislead;

(f) fail to state a material fact if such failure tends to mislead;

(f-1) use innuendo or ambiguity as to a material fact, which has a tendency to mislead; …

(u) represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

*Id.*

231.    MOHELA's practices of failing to comply with its basic responsibilities as a student loan servicer are unfair and deceptive in violation of the DCCPPA.

232.    MOHELA violates these provisions by affirmatively misinforming AFT's members about the deadline to recertify their incomes, leading to confusion and to some members paying higher monthly payments than they owe.

233.    MOHELA further violates these provisions by falsely informing AFT's members that loan consolidation would cost them all their prior PSLF credit.

234.    MOHELA further violates these provisions by failing to send AFT's members timely bills, as well as by sending AFT's members inaccurate bills.

235.    MOHELA further violates these provisions by deducting payments from AFT's members' bank accounts without their affirmative consent to do so.

236.    MOHELA further violates these provisions by creating unprecedented backlogs of borrower complaints, AFT's members' IDR applications, and unprocessed PSLF forms submitted by AFT's members.

237.    MOHELA further violates these provisions by concocting a call deflection scheme to make it extremely difficult for AFT's members to contact MOHELA regarding loan servicing failures, and instead directing AFT's members to self-service options that are insufficient to meet their needs or are not functional.

238.    MOHELA further violates these provisions by failing to adequately staff its call centers and by failing to adequately train its customer service representatives.

239.    MOHELA further violates these provisions by failing to record accurately AFT's members' payments, refunds, and records.

240.    MOHELA further violates these provisions by misinforming AFT's members about their payment options.  Namely, MOHELA gives AFT's members incorrect information regarding their eligibility for certain programs and time-sensitive decisions to be made relating to their loans.

241.    MOHELA further violates these provisions by reporting to AFT's members the incorrect number of PSLF-qualifying payments they have made.

242.     MOHELA further violates these provisions by denying access to PSLF to AFT's members with eligible employment by failing to properly process employment certifications and by incorrectly representing eligibility for PSLF.

243.     Upon information and belief, ED did not instruct MOHELA to engage in these acts.

244.     These acts are unfair because they cause or are likely to cause substantial injury to borrowers, which the borrowers cannot reasonably avoid, and which is not outweighed by countervailing benefits to consumers or to competition.

245.     These acts are also deceptive because they mislead or are likely to mislead borrowers, borrowers' interpretations of these misleading acts are reasonable, and the misleading acts are material.

246.     The above conduct has harmed and continues to harm AFT's members in several ways, including by: forcing them to make payments on debt that should no longer exist and increasing their interest costs; delaying their receipt of loan forgiveness; depriving them of a means to resolve issues concerning their loans; forcing them to pay debts they do not owe and causing their loans to fall into delinquency; prolonging the time they spend indebted and forcing them to incur thousands of dollars in unnecessary costs to avoid default; negatively impacting their credit scores; and making it harder for them to access the relief to which they are entitled under PSLF and IDR.

## Count III – Violation of the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq*.

### (On behalf of the general public)

247.     AFT incorporates by reference each preceding paragraph as though fully set forth herein.

45

248.     AFT brings this Count against MOHELA on behalf of members of the general public whose federal student loans are serviced by MOHELA ("the general public") pursuant to D.C. Code § 28-3905(k)(1)(C).

249.     MOHELA is a "person" within the meaning of D.C. Code § 28-3901(a)(1) and provides services within the meaning of D.C. Code § 28-3901(a)(7) by providing loan servicing borrowers with federal student loans, including to all borrowers pursuing public service loan forgiveness.  MOHELA's acts while servicing federal student loans are "trade practices" within the meaning of D.C. Code § 28-3901(a)(6).

250.     AFT is a "non-profit organization" within the meaning of D.C. Code § 28-3901(a)(14).

251.     It is a violation of the DCCPPA "for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived or damaged thereby[.]" D.C. Code § 28-3904.  The DCCPPA provides that, among other things, it is an unfair or deceptive trade practice to:

…(e) misrepresent as to a material fact which has a tendency to mislead;

(f) fail to state a material fact if such failure tends to mislead;

(f-1) use innuendo or ambiguity as to a material fact, which has a tendency to mislead; …

(u) represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

*Id.*

252.     MOHELA's practices of failing to comply with its basic responsibilities as a student loan servicer are unfair and deceptive in violation of the DCCPPA.

253.    MOHELA violates these provisions by affirmatively misinforming the general public about the deadline to recertify their income, leading to confusion and to some members paying higher monthly payments than they owe.

254.    MOHELA further violates these provisions by falsely informing the general public that loan consolidation would cost them all their prior PSLF credit.

255.    MOHELA further violates these provisions by failing to send the general public timely bills, as well as by sending the general public inaccurate bills.

256.    MOHELA further violates these provisions by deducting payments from the general public's bank accounts without their affirmative consent to do so.

257.    MOHELA further violates these provisions by creating unprecedented backlogs of borrower complaints, the general public's applications, and unprocessed PSLF forms submitted by the general public.

258.    MOHELA further violates these provisions by concocting a call deflection scheme to make it extremely difficult for the general public to contact MOHELA regarding loan servicing failures, and instead directing the general public to self-service options that are insufficient to meet their needs or are not functional.

259.    MOHELA further violates these provisions by failing to adequately staff its call centers and by failing to adequately train its customer service representatives.

260.    MOHELA further violates these provisions by failing to record accurately the general public's payments, refunds, and records.

261.    MOHELA further violates these provisions by misinforming the general public about their payment options.  Namely, MOHELA gives the general public incorrect information

regarding their eligibility for certain programs and time-sensitive actions they should or should not take relating to their loans.

262.   MOHELA further violates these provisions by reporting to the general public the incorrect number of PSLF-qualifying payments they have made.

263.   MOHELA further violates these provisions by denying access to PSLF to the general public with eligible employment by failing to properly process employment certifications and by incorrectly representing eligibility for PSLF.

264.   Upon information and belief, ED did not instruct MOHELA to engage in these acts.

265.   These acts are unfair because they cause or are likely to cause substantial injury to borrowers, which the borrowers cannot reasonably avoid, and which is not outweighed by countervailing benefits to consumers or to competition.

266.   These acts are also deceptive because they mislead or are likely to mislead borrowers, borrowers' interpretations of these misleading acts are reasonable, and the misleading acts are material.

267.   The above conduct has harmed and continues to harm the general public in several ways, including by: forcing PSLF borrowers to make payments on debt that should no longer exist and increasing those borrowers' interest costs; delaying borrowers' receipt of loan forgiveness; postponing when otherwise eligible borrowers receive loan cancellation; depriving borrowers of a means to resolve disputes concerning their loans; forcing borrowers to pay debts they do not owe and causing their loans to fall into delinquency; prolonging the time borrowers spend indebted and forcing them to incur thousands of dollars in unnecessary costs to avoid default; and making it harder for borrowers to access the relief promised by PSLF and IDR.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendant and in favor of Plaintiff, and grant the following relief:

*First*, a declaration that Defendant's conduct violates the DCCPPA;

*Second*, treble damages, or $1,500 per violation, whichever is greater, to Plaintiff; or, in the alternative, an award of actual damages to Plaintiff in an amount to be determined at trial;

*Third*, appropriate injunctive relief against Defendant to remedy the systemic deficiencies that have harmed Plaintiff, its members, and the general public;

*Fourth*, punitive damages;

*Fifth*, pre- and post-judgment interest;

*Sixth*, additional relief as may be necessary to restore Plaintiff, Plaintiff's members and the general public to their rightful positions;

*Seventh*, an award of Plaintiff's reasonable attorneys' fees and costs;

*Eighth*, any other relief which the court determines proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 22, 2024                    Respectfully submitted,


                                        /s/ Adam Gould
Shennan Kavanagh* (BBO #655174)         Faith Gay* (NY Bar # 2117117)
Jennifer Wagner* (WVSB #10639)          Lena Konanova* (NY Bar # 4758942)
National Consumer Law Center            David A. Coon* (NY Bar # 5538020)
7 Winthrop Square, 4th Floor            Corey Stoughton** (DC Bar # 472867)
Boston, MA 02110                        Adam Gould (DC Bar # 1754569)
617.542.8010                            Selendy Gay PLLC
skavanagh@nclc.org                      1290 Avenue of the Americas
jwagner@nclc.org                        New York, NY 10104
                                        (212) 390-9000
Alpha Taylor (DC Bar #252602)           fgay@selendygay.com
National Consumer Law Center            lkonanova@selendygay.com
1001 Connecticut Ave., NW               cstoughton@selendygay.com
Washington, DC 20036                    dcoon@selendygay.com
202.452.6252                            agould@selendygay.com
ataylor@nclc.org
                                        Persis Yu (DC Bar # 90014714)
                                        Student Borrower Protection Center (a fiscally
                                        sponsored project of the Shared Ascent Fund)
                                        1025 Connecticut Ave NW, #717
                                        Washington, D.C. 20036
                                        (202) 618-1328
                                        persis@protectborrowers.org

                                        R. T. Winston Berkman-Breen*
                                        (NY Bar # 5559372)
                                        Khandice Lofton* (OH Bar # 101015)
                                        Student Borrower Protection Center (a fiscally
                                        sponsored project of the Shared Ascent Fund)
                                        40 Rector Street, 9th Floor
                                        New York, NY 10006
                                        winston@protectborrowers.org
                                        khandice@protectborrowers.org


                                        * Application for admission *pro hac vice*
                                        forthcoming
                                        **Reinstatement from inactive status pending

50

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

American Federation of Teachers
_____
Plaintiff

vs.

_____
The Higher Education Loan Authority of the State of Missouri
_____
Defendant

Case Number _____ 2024-CAB-004575

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Adam Gould
_____
Name of Plaintiff's Attorney

1290 Avenue of the Americas
_____
Address
New York, NY 10104

(212) 390-9058
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date _____ 7/23/2024

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828로 전화주십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME_.

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
Sección de Acciones Civiles
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

American Federation of Teachers
_____
Demandante

contra

Número de Caso: _____

The Higher Education Loan Authority of the State of Missouri
_____
Demandado

# CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Adam Gould                                                    *SECRETARIO DEL TRIBUNAL*
_____
Nombre del abogado del Demandante

1290 Avenue of the Americas                     Por: _____
_____
Dirección                                                                    Subsecretario
New York, NY 10104

(212) 390-9058                                          Fecha _____
_____
Teléfono

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

만일 번역을 원하시면 (202) 879-4828로 전화주십시오        የሚተረጎም ከፈለጉ ለማግኘት  (202) 879-4828  ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

# Superior Court of the District of Columbia

## CIVIL DIVISION - CIVIL ACTIONS BRANCH
### INFORMATION SHEET

American Federation of Teachers
_____
Plaintiff(s)

vs

The Higher Education Loan Authority of the State of Missouri
_____
Defendant(s)

Case Number: _____ **2024-CAB-004575**

Date: July 22, 2024 _____

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| **Name:** *(Please Print)* <br> Adam Gould | **Relationship to Lawsuit** <br> ☑ Attorney for Plaintiff |
| **Firm Name:** <br> Selendy Gay PLLC | ☐ Self (Pro Se) |
| **Telephone No.:** (212) 390-9058    **DC Bar No.:** 1754569 | ☐ Other: _____ |

**TYPE OF CASE:**   ☐ Non-Jury    ☐ 6 Person Jury    ☑ 12 Person Jury

**Demand:** $ Damages in excess of $10,000 to be proven at trial    Other: Equitable relief _____

**PENDING CASE(S) RELATED TO THE ACTION BEING FILED**

Case No.:_____ Judge: _____ Calendar #:_____

Case No.:_____ Judge: _____ Calendar #:_____

---

**NATURE OF SUIT:**    *(Check One Box Only)*

**CONTRACT**
☐ Breach of Contract
☐ Breach of Warranty
☐ Condo/Homeowner Assn. Fees
☐ Contract Enforcement
☐ Negotiable Instrument

**COLLECTION/INS. SUB**
☐ Debt Collection
☐ Insurance Subrogation
☐ Motion/Application for Judgment by Confession
☐ Motion/Application Regarding Arbitration Award

**EMPLOYMENT DISPUTE**
☐ Breach of Contract
☐ Discrimination
☐ Wage Claim
☐ Whistle Blower
☐ Wrongful Termination

---

**REAL PROPERTY**
☐ Condo/Homeowner Assn. Foreclosure
☐ Declaratory Judgment
☐ Drug Related Nuisance Abatement

☐ Ejectment
☐ Eminent Domain
☐ Interpleader

☐ Other
☐ Quiet Title
☐ Specific Performance

☐ **FRIENDLY SUIT**
☐ **HOUSING CODE REGULATIONS**
☐ **QUI TAM**
☐ **STRUCTURED SETTLEMENTS**

---

**ADMINISTRATIVE PROCEEDINGS**
☐ Administrative Search Warrant
☐ App. for Entry of Jgt. Defaulted Compensation Benefits
☐ Enter Administrative Order as Judgment
☐ Libel of Information
☐ Master Meter
☐ Petition Other

☐ Release Mechanics Lien
☐ Request for Subpoena

**MALPRACTICE**
☐ Medical – Other
☐ Wrongful Death

**AGENCY APPEAL**
☐ Dangerous Animal Determination
☐ DCPS Residency Appeal
☐ Merit Personnel Act (OEA)
☐ Merit Personnel Act (OHR)
☐ Other Agency Appeal

☐ **APPLICATION FOR INTERNATIONAL FOREIGN JUDGMENT**

# Information Sheet, Continued

**CIVIL ASSET FORFEITURE**
- ☐ Currency
- ☐ Other
- ☐ Real Property
- ☐ Vehicle

**NAME CHANGE/VITAL RECORD AMENDMENT**
- ☐ Birth Certificate Amendment
- ☐ Death Certificate Amendment
- ☐ Gender Amendment
- ☐ Name Change

**TORT**
- ☐ Abuse of Process
- ☐ Assault/Battery
- ☐ Conversion
- ☐ False Arrest/Malicious Prosecution
- ☐ Libel/Slander/Defamation
- ☐ Personal Injury
- ☐ Toxic Mass
- ☐ Wrongful Death (Non-Medical Malpractice)

**GENERAL CIVIL**
- ☐ Accounting
- ☐ Deceit (Misrepresentation)
- ☐ Fraud
- ☐ Invasion of Privacy
- ☐ Lead Paint
- ☐ Legal Malpractice
- ☐ Motion/Application Regarding Arbitration Award
- ☐ Other - General Civil

- ☐ Product Liability
- ☐ Request for Liquidation
- ☐ Writ of Replevin
- ☐ Wrongful Eviction

**CIVIL I/COMPLEX CIVIL**
- ☐ Asbestos

**MORTGAGE FORECLOSURE**
- ☐ Non-Residential
- ☐ Residential

**STATUTORY CLAIM**
- ☐ Anti – SLAPP
- ☑ Consumer Protection Act
- ☐ Exploitation of Vulnerable Adult
- ☐ Freedom of Information Act (FOIA)
- ☐ Other

**TAX SALE FORECLOSURE**
- ☐ Tax Sale Annual
- ☐ Tax Sale Bid Off

**VEHICLE**
- ☐ Personal Injury
- ☐ Property Damage

☐ **TRAFFIC ADJUDICATION APPEAL**

☐ **REQUEST FOR FOREIGN JUDGMENT**

| /s/ Adam Gould | 07/22/2024 |
|---|---|
| Filer/Attorney's Signature | Date |

CV-496/February 2023



**Superior Court of the District of Columbia**
**Civil Division - Civil Actions Branch**
**500 Indiana Ave NW, Room 5000, Washington DC 20001**
**202-879-1133 | www.dccourts.gov**

**Case Number:** 2024-CAB-004575

**Case Style:** American Federation of Teachers v. The Higher Education Loan Authority of the State of Missouri

### INITIAL ORDER

| Initial Hearing Date: | Initial Hearing Time: | Courtroom Location: |
|---|---|---|
| Friday, 10/25/2024 | 9:30 AM | Remote Courtroom 100 |

**Please see attached instructions for remote participation.**

Your case is assigned to Associate Judge Maurice Ross.

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby ORDERED as follows:

1)  This case is assigned to the judge and calendar designated above. All future filings in this case shall bear the calendar number and judge's name along with the case number in the caption.

2)  Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of the summons, the complaint, and this Initial Order. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4.

3)  Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

4)  At the time stated above, all counsel and unrepresented parties shall participate in a hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients before the hearing whether the clients are agreeable to binding or non-binding arbitration. This order is the only notice that parties and counsel will receive concerning this hearing.

5)  If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference once, with the consent of all parties, to either of the two succeeding days when the calendar is called. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date. No other continuance will be granted except upon motion for good cause shown.

6)  Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order.  Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Anita M. Josey-Herring

**To Join by Computer, Tablet, or Smartphone:**

1) Copy and Paste or Type the link into a web browser and enter the Webex Meeting ID listed below.

   Link: dccourts.webex.com/meet/ctb100

   Meeting ID: 129 846 4145

2) When you are ready, click "Join Meeting".

3) You will be placed in the lobby until the courtroom clerk gives you access to the hearing.

**Or to Join by Phone:**

1) Call 202-860-2110 (local) or 844-992-4726 (toll-free)

2) Enter the Webex Meeting ID listed above followed by "##"

**Resources and Contact Information:**

1) For best practices on how to participate in Webex Meetings, click here https://www.webex.com/learn/best-practices.html.

2) For technical issues or questions, call the Information Technology Division at 202-879-1928 and select option 2.

3) For case questions, call the Civil Actions Branch Clerk's Office at 202-879-1133.

## ACCESSIBILITY AND LANGUAGE ACCESS

**Persons with Disabilities:**

If you have a disability as defined by the American Disabilities Act (ADA) and you require an accommodation, please call 202-879-1700 or email ADACoordinator@dcsc.gov . The D.C. Courts does not provide transportation service.

**Interpreting and Translation Services**:

The D.C. Courts offers free language access services to people having business with the court who are deaf or who are non-English speakers. Parties to a case may request free translations of court orders and other court documents. To ask for an interpreter or translation, please contact the Clerk's Office listed for your case. For more information, visit https://www.dccourts.gov/language-access.

**Servicios de interpretación y traducción:**

Los Tribunales del Distrito de Columbia ofrecen servicios gratuitos de acceso al idioma a las personas sordas o que no hablan inglés que tienen asuntos que atender en el tribunal. Las partes de un caso pueden solicitar traducciones gratuitas de las órdenes judiciales y otros documentos del tribunal. Para solicitar un intérprete o una traducción, póngase en contacto con la Secretaría de su caso.

Para más información, visite https://www.dccourts.gov/language-access.

El acceso al idioma es importante para los Tribunales del Distrito de Columbia. Puede dar su opinión sobre los servicios de idiomas visitando https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access.

**የቃልና የጽሑፍ ትርጓሜ አገልግሎቶች:**

የዲ.ሲ. ፍርድ ቤቶች መስማት ለተሳናቸውና የእንግሊዝኛ ቋንቋ ተናጋሪ ላልሆኑ በፍርድ ቤቱ ጉዳይ ላላቸው ሰዎች ነጻ የቋንቋ ተደራሽነት አገልግሎቶች ያቀርባል። ተከራካሪ ወገኖች የፍርድ ቤት ትእዛዞችና ሌሎች የፍርድ ቤት ሰነዶች በነጻ እንዲተረጎሙላቸው መጠየቅ ይችላሉ። የቃል ወይም የጽሑፍ ትርጓሜ ለመጠየቅ እባክዎን በመዝገብዎ የተዘረዘሩትን የጸሀፊ ቢሮ (ክለርክ'ስ ኦፊስ) ያናግሩ። ለተጨማሪ መረጃ https://www.dccourts.gov/language-access ይጎብኙ።

የቋንቋ ተደራሽነት ለዲ.ሲ. ፍርድ ቤቶች አስፈላጊ ነው። የቋንቋ አገልግሎቶች በተመለከተ አስተያየትዎን https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access በመጎብኘት መስጠት ይችላሉ።

# Tips for Attending Remote Hearings - Civil Division

*Your court hearing may be held remotely. This means that you will participate by phone or by video conference instead of coming to the courthouse. Here are some tips on how to prepare.*

## How do I know if I have a remote hearing?

The Court will contact you to tell you that your hearing is remote. They may contact you by sending you an email, letter in the mail, or by calling you.



## How do I take part in a remote hearing?

The Court will give you step-by-step instructions on how to take part in the remote hearing.

If you lose your written notice, call the Civil Actions Clerk's Office for instructions at:

 202-879-1133

## Is there anything that I should do before the day of the hearing?

- Let the court know immediately if you cannot join a hearing because you do not have a phone or computer.

  Civil Actions Clerk's Office: 202-879-1133

- You may want to contact an attorney for legal help.
- You can also find the list of legal services providers at www.dccourts.gov/services/represent-yourself by clicking on the link that says, "List of Legal Service Providers for Those Seeking an Attorney or Legal Advice".
- Evidence: if you want the judge to review photos or documents, ask the judge how to submit your evidence.
- Witnesses: tell the judge if you want a witness to testify at your hearing.
- Accommodations & Language Access: let the court know if you need an interpreter or other accommodation for your hearing.

## Tips for the Hearing



- Join the hearing a few minutes early!
- Charge your computer or phone and make sure you have enough minutes to join the call. Find a private and quiet space. If possible, be alone in a room during the hearing. Try to limit distractions as much as possible. If others are in the room with you, ask if they can be quiet during the hearing.
- Mute your microphone when you are not talking. Mute all sounds on your phone or computer.
- Say your name before you speak so the record is clear. Be prepared to identify your role in the hearing (e.g., observer, plaintiff, defendant, witness, etc.).
- Speak slowly and clearly so everyone hears what you are saying.
- Pause before speaking in case there is a lag. Use a headset or headphones if you can. This will free up your hands and sound better.
- Try not to talk over anyone else. Only one person can speak at a time. If you talk while someone else is talking, the judge will not be able to hear you.
- Have all your documents for the hearing in front of you. Have a pen and paper to take notes.
- If you are not ready for your hearing or want to speak with an attorney, you can ask the judge to postpone your hearing for another date.
- If your sound or video freezes during the hearing, use the chat feature or call the Clerk's Office to let them know that you are having technical issues.

## Special Tips for Video Hearings
**(Click here for more information)**



- Download the court's hearing software, WebEx, in advance and do a test run! The Court will provide you with a WebEx link in advance of the hearing.
- Set up the camera at eye level. If you are using your phone, prop it up so you can look at it without holding it.
- Look at the camera when you speak and avoid moving around on the video.
- Wear what you would normally wear to court.
- Sit in a well-lit room with no bright lights behind you.
- If possible, find a blank wall to sit in front of. Remember the judge will be able to see everything on your screen, so pick a location that is not distracting.



# District of Columbia Courts

# Tips for Using DC Courts Remote

The DC Courts have **remote hearing sites** available in various locations in the community to help persons who may not have computer devices or internet service at home to participate in scheduled remote hearings.  The Courts are committed to enhancing access to justice for all.

There are six remote access sites throughout the community which will operate: **Monday – Friday, 8:30 am – 4:00 pm.**

**The remote site locations are:**



| | |
|---|---|
| **Remote Site - 1**<br>Balance and Restorative Justice Center<br>1215 South Capitol Street, SW<br>Washington, DC 20003 | **Remote Site - 4**<br>Balance and Restorative Justice Center<br>920 Rhode Island Avenue, NE<br>Washington, DC 20018 |
| **Remote Site - 2**<br>Balance and Restorative Justice Center<br>1110 V Street, SE<br>Washington, DC 20020 | **Remote Site - 5**<br>Reeves Center<br>2000 14th Street, NW, 2nd Floor<br>Community Room<br>Washington, DC 20009 |
| **Remote Site - 3**<br>Balance and Restorative Justice Center<br>118 Q Street, NE<br>Washington, DC 20002 | **Remote Site - 6**<br>Reeves Center<br>2000 14th Street, NW, Suite 300N<br>Office of the Tenant Advocate<br>Washington, DC 20009<br>*** No walk-ins at this location*** |

If you want to use a remote site location for your hearing, call **202-879-1900** or email DCCourtsRemoteSites@dcsc.gov **at least 24 hours before your hearing to reserve a remote access computer station**.  If you require special accommodations such as an interpreter for your hearing, please call **202-879-1900 at least 24 hours in advance of your hearing so the Courts can make arrangements**.

**\*You should bring the following items when you come to your scheduled site location\***

1. Your **case number** and any **hyperlinks** provided by the Courts for your scheduled hearing.
2. Any documents you need for the hearing (evidence), including exhibits, receipts, photos, contracts, etc.
3. Materials for notetaking, including pen and paper.

**\*Safety and security measures are in place at the remote sites.**

**Contact information to schedule your remote access computer station:**
Call:  **202-879-1900**
Email:  DCCourtsRemoteSites@dcsc.gov



# Consejos para usar los sitios de audiencia remota de los Tribunales de DC

Los Tribunales de DC disponen de **sitios de audiencia remota** en distintos centros de la comunidad para ayudar a que las personas que no tienen dispositivos informáticos o servicio de Internet en su casa puedan participar en audiencias remotas programadas. Los Tribunales honran el compromiso de mejorar el acceso de toda la población a la justicia.

En toda la comunidad hay seis sitios de acceso remoto que funcionarán de l**unes a viernes, de 8:30 am a 4:00 pm**.

Los centros de acceso remoto son:



**Sitio Remoto - 1**
Balance and Restorative Justice Center
1215 South Capitol Street, SW
Washington, DC 20003

**Sitio Remoto - 2**
Balance and Restorative Justice Center
1110 V Street, SE
Washington, DC 20020

**Sitio Remoto - 3**
Balance and Restorative Justice Center
118 Q Street, NE
Washington, DC 20002

**Sitio Remoto - 4**
Balance and Restorative Justice Center
920 Rhode Island Avenue, NE
Washington, DC 20018

**Sitio Remoto - 5**
Reeves Center
2000 14th Street, NW, 2nd Floor
Community Room
Washington, DC 20009

**Sitio Remoto - 6**
Reeves Center
2000 14th Street, NW, Suite 300N
Office of the Tenant Advocate
Washington, DC 20009
*No se puede entrar sin cita previa*

Si desea usar un sitio remoto para su audiencia, llame al **202-879-1900** o envíe un mensaje de correo electrónico a DCCourtsRemoteSites@dcsc.gov **al menos 24 horas antes de la audiencia, para reservar una estación de computadora de acceso remoto. Si** necesita adaptaciones especiales, como un intérprete para la audiencia, llame **al 202-879-1900 al menos 24 horas antes de la audiencia para que los Tribunales puedan hacer los arreglos necesarios.**

**\*Cuando concurra al sitio programado debe llevar los siguientes artículos\***

1. Su **número de caso** y todos los **hipervínculos** que le hayan proporcionado los Tribunales para la audiencia programada.
2. Cualquier documento que necesite para la audiencia (prueba), incluidos documentos probatorios, recibos, fotos, contratos, etc.
3. Materiales para tomar nota, como papel y lápiz.

**\*Los sitios de acceso remoto cuentan con medidas de seguridad y protección.**

**Información de contacto para programar su estación de computadora de acceso remoto:**
Teléfono: **202-879-1900**
Correo electrónico: DCCourtsRemoteSites@dcsc.gov

eFiled
7/26/2024 3:30:12 PM
Superior Court
of the District of Columbia

IN THE SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF
TEACHERS


     Plaintiff,

v.

THE HIGHER EDUCATION LOAN     Civil Action No. 2024-CAB-004575
AUTHORITY OF THE STATE OF     Next Event: Initial Hearing
MISSOURI     Date: 10/25/2024 at 9:30 AM


     Defendant.

## PLAINTIFF'S OPPOSED MOTION FOR CERTIFICATION AND ASSIGNMENT TO CIVIL I CALENDAR

Plaintiff American Federation of Teachers ("AFT") respectfully requests entry of an order pursuant to Superior Court Rule of Civil Procedure 40-II(b) recommending to Presiding Judge Todd E. Edelman that this case be designated to a Civil I calendar.  AFT—who is bringing claims on its behalf, its members' behalf, and on behalf of the general public—alleges a widespread and pervasive pattern of misconduct on the part of one of the nation's largest student-loan servicers, the Higher Education Loan Authority of the State of Missouri ("MOHELA").  Given the breadth and the nationwide implications of AFT's allegations, this case is likely to lead to heavy motion practice, a contentious discovery process, and a lengthy, witness- and exhibit-laden trial.  Designation to a Civil I calendar will help ensure that this complex case is litigated in an efficient manner.

## I.     Background

On July 22, 2024, AFT filed a complaint against MOHELA bringing claims under the Consumer Protection Procedures Act, D.C. Code §§ 28-3901 *et seq.* ("DCCPPA"), on behalf of

itself, its members, and the general public (the "<u>Complaint</u>" or "<u>Compl.</u>").  AFT's Complaint out-

lines MOHELA's sprawling pattern of unfair and deceptive practices and the ways those practices

inflict serious and ongoing harm on AFT, its members, and the general public.  The Complaint

seeks remedies under the DCCPPA including monetary damages and injunctive relief.

AFT is a membership organization representing 1.8 million pre-K through 12th-grade

teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher

education faculty and professional staff; federal, state, and local government employees; and

nurses and other healthcare professionals.  Compl. ¶ 16.

Defendant MOHELA is one of the largest student loan servicers in the United States, with

a portfolio comprised of over 8 million borrowers.  *Id.* ¶¶ 32, 193.

AFT alleges that MOHELA has, in several complicated and profoundly harmful ways, sys-

tematically misled, deceived, and treated unfairly consumers whose student loans it services.  For

example, as described in the Complaint:

- MOHELA failed to send billing statements to 2.5 million borrowers, causing 800,000 of them to fall into delinquency on their loan payments, as found by the Department of Education ("<u>ED</u>").  *Id.* ¶ 117.

- As also found by ED, MOHELA has billed some borrowers for an incorrect amount and put other borrowers back into repayment who should have been in forbearance while debt relief applications were pending, trapping some borrowers in forbearance and causing automatic payments to be deducted from others' bank accounts.  *Id.* ¶¶ 118, 123, 124.

- MOHELA has failed to accurately and timely process applications for loan relief pro-grams, resulting in unnecessarily higher monthly payments and excessive interest ac-crual.  *Id.* ¶ 132.

- MOHELA has misled borrowers concerning crucial information, including by instruct-ing borrowers to recertify certain information well in advance of any deadline to do so—misconduct that unnecessarily raised borrowers' payments.  *Id.* ¶¶ 148–50.

- MOHELA has concocted a call-deflection scheme to make it virtually impossible for consumers to contact MOHELA regarding loan servicing failures (*id.* ¶¶ 158, 159); when borrowers are able to reach representatives, the representatives have not been

adequately trained and often are unable to provide borrowers with the information they need. *Id.* ¶¶ 146, 195.

- MOHELA has prevented borrowers from accessing their own account information by discontinuing its mobile app, relied on by countless borrowers, and by internally transferring borrowers' accounts between MOHELA platforms, during which time borrowers' information is inaccessible; even after a borrower's account becomes available, the borrower cannot access historical documents. *Id.* ¶¶ 173–75.

AFT has had to expend hundreds of thousands of dollars to respond to MOHELA's misconduct and misinformation, including by engaging an outside contractor to aid its members with student loans; addressing student loan issues; and holding student debt clinics. *Id.* ¶ 225. Because of MOHELA's misconduct, AFT's mission has been harmed, "as it has been forced to divert resources and attention" away from "issues like collective bargaining; retirement security; healthcare; student learning conditions; and educators', public employees', and health care workers' working conditions." *Id.* AFT's members with student loans serviced by MOHELA have also been harmed by MOHELA's conduct, including because MOHELA has forced them to make payments on debt that should no longer exist; increased their interest costs; delayed their receipt of loan forgiveness; deprived them of a means to resolve issues concerning their loans; forced them to pay debts they do not owe; caused their loans to fall into delinquency; prolonged the time they spend indebted; forced them to incur thousands of dollars in unnecessary costs to avoid default; negatively impacted their credit scores; and made it harder for them to access debt relief to which they are entitled. *Id.* at ¶ 246. Members of the general public with student loans serviced by MOHELA have been harmed in a similar fashion. *See id.* at ¶ 267.

## II.   Relief Requested

AFT requests that this Court enter an order recommending to Presiding Judge Edelman that this case be designated to a Civil I calendar. Superior Court Rule of Civil Procedure 40-II(b) provides that, "[o]n motion of a party . . . a judge assigned to a case may recommend to the

Presiding Judge that the case be designated to a Civil I calendar." In considering whether to designate a case to a Civil I calendar, the Presiding Judge may consider:

1.      The estimated length of trial;

2.      The number of witnesses that may appear;

3.      The number of exhibits that may be introduced;

4.      The nature of the factual and legal issues involved;

5.      The extent to which discovery may require supervision by the court;

6.      The number of motions that may be filed in the case; or

7.      Any other relevant factors.

*See* Superior Court Rule 40-II(c). Each factor weighs in favor of designating this case to a Civil I calendar.

***Trial Length***. Most trials in Superior Court are three to five days long.[1] As discussed below, in light of the pervasiveness and breadth of MOHELA's wrongdoing alleged in the Complaint; the fact that AFT is bringing claims on behalf of itself, its members, and the general public based on unlawful conduct that has harmed those constituencies in varied ways; the anticipated large number of trial witnesses; and the anticipated large volume of trial exhibits, AFT expects that trial in this case will require significantly more time than most Superior Court trials.

***Number of Witnesses***. AFT anticipates that it will call a large number of witnesses in order to present comprehensive testimony regarding the broad range of misconduct alleged in the Complaint. Because AFT is bringing claims on behalf of itself, its members, and the general public, AFT anticipates that it will need to present testimony at trial from AFT officers and employees, AFT members whose loans are serviced by MOHELA, members of the general public whose loans

---

[1] District of Columbia Courts, *About Jury Duty*, https://www.dccourts.gov/jurors/about-your-jury-duty (last visited Jul. 26, 2024).

4

are serviced by MOHELA, and MOHELA officers and employees.  AFT anticipates that such witnesses will testify to a wide range of factual issues relevant to AFT's claims, including:

- MOHELA's provision of inaccurate information and misinformation to borrowers;

- MOHELA's practices regarding billing borrowers and accounting for payments, correcting errors on borrowers' student loan accounts, and issuing refunds;

- MOHELA's customer service, including its call-deflection scheme, staffing levels, and training of its staff;

- MOHELA's blocking of borrowers' ability to access account information and historic loan documents;

- AFT's efforts to combat MOHELA's misconduct, and the resources AFT has dedicated to doing so;

- The harm inflicted by MOHELA on AFT's ability to effectuate its mission;

- The harm inflicted by MOHELA on AFT's members; and

- The harm inflicted by MOHELA on members of the general public.

Each of these topics may require a unique witness.  In addition, AFT anticipates that it may introduce expert testimony regarding complex issues underlying AFT's claims, such as the relevant history and administration of the federal student loan programs entrusted to MOHELA.

AFT additionally anticipates that MOHELA will present a defense case at trial, including by calling its own witnesses to address the allegations raised in the Complaint.

***Number of Exhibits***.  Given the broad range of misconduct alleged in the Complaint and the fact that AFT is bringing claims on behalf of itself, its members, and the general public, AFT anticipates extensive fact discovery and a correspondingly voluminous number of trial exhibits relevant to AFT's claims.  Such exhibits will likely include documents concerning, for example: MOHELA's representations to borrowers; MOHELA's policies, procedures, and training materials; borrowers' account statements, payment history, enrollment in loan repayment plans, and

communications with MOHELA; and AFT's diversion of resources to addressing MOHELA's misconduct.

_**Nature of Factual and Legal Issues Involved**_.  AFT's case concerns a complex pattern of misconduct that has caused varied harm to AFT, its members, and the general public, which will require extensive factual development to further uncover the ways in which MOHELA's misconduct has violated provisions of the DCCPPA.  As detailed above, MOHELA's wrongdoing ranges from improperly deducting money from borrowers' bank accounts, to providing incorrect information to borrowers regarding their repayment options, to utilizing a pernicious call-deflection scheme to keep borrowers in the dark about the status of their loans.  Each of these unfair and deceptive practices, along with the many others employed by MOHELA, involves an array of specific bad acts.

AFT also anticipates that MOHELA will attempt to evade liability by deploying complex legal defenses, as it has done in other suits concerning analogous issues (including by arguing that MOHELA is an arm of the state immunized from suit by the Eleventh Amendment of the U.S. Constitution[2]).

_**Extent to Which Discovery May Require Supervision**_.  AFT anticipates that the Court's supervision will be necessary during the discovery process.  For example, because AFT's claims will require extensive discovery from MOHELA regarding its internal business practices—including document discovery and deposition testimony regarding the many categories of failures and misconduct alleged in the Complaint—MOHELA is likely to vigorously resist providing such necessary discovery.  For example, MOHELA may claim that relevant document files are the property

---

[2] _See_ Defendant MOHELA's Memorandum in Support of its Motion to Dismiss Plaintiffs' Complaint, _Morgan v. MOHELA_, No. 4:24-cv-00147-CDP (E.D. Mo. Mar. 12, 2024), ECF No. 20.

of ED and are not able to be produced. The parties are thus likely to require motion practice before the Court in order to resolve discovery disputes.

**_Anticipated Number of Motions to be Filed_**. AFT anticipates that the parties will file several dispositive motions requiring the Court to resolve complex legal and factual issues. For example, as noted above, MOHELA has previously moved to dismiss a complaint regarding analogous issues on purported grounds including sovereign immunity, federal preemption, and failure to state a claim upon which relief can be granted.[3] MOHELA is likely to file a motion to dismiss raising similar issues in this case, and one or both of the parties may further submit motions for summary judgment after the close of discovery.

**_Other Relevant Factors_**. This case concerns a scandal that has taken center stage in the national debate over student loan forgiveness and servicing practices. For just one example, the United States Senate (specifically the Senate Committee on Banking, Housing, and Urban Affairs) recently held a hearing to investigate MOHELA's pattern of neglect and misconduct.[4] The substantial public interest in this litigation, and the likelihood of continued attention from the news media and political actors, will only increase the complexity involved in managing this case, further supporting designation to a Civil I calendar.

## III.  Conclusion

For the foregoing reasons, AFT respectfully requests that this Court enter an order recommending to Presiding Judge Edelman that this case be designated to a Civil I calendar.

---

[3] *See* Footnote 2, *supra*.

[4] *MOHELA's Performance as a Student Loan Servicer Before the S. Comm. on Banking, Housing, and Urban Affairs*, 118th Cong. (2024) (statement of Sen. Elizabeth Warren).

Dated: July 26, 2024

Respectfully submitted,

/s/ Adam Gould

| | |
|---|---|
| Shennan Kavanagh* (BBO #655174) | Faith Gay* (NY Bar # 2117117) |
| Jennifer Wagner* (WVSB #10639) | Lena Konanova* (NY Bar # 4758942) |
| National Consumer Law Center | David A. Coon* (NY Bar # 5538020) |
| 7 Winthrop Square, 4th Floor | Corey Stoughton (DC Bar # 472867) |
| Boston, MA 02110 | Adam Gould (DC Bar # 1754569) |
| 617.542.8010 | Selendy Gay PLLC |
| skavanagh@nclc.org | 1290 Avenue of the Americas |
| jwagner@nclc.org | New York, NY 10104 |
| | (212) 390-9000 |
| Alpha Taylor (DC Bar #252602) | fgay@selendygay.com |
| National Consumer Law Center | lkonanova@selendygay.com |
| 1001 Connecticut Ave., NW | cstoughton@selendygay.com |
| Washington, DC 20036 | dcoon@selendygay.com |
| 202.452.6252 | agould@selendygay.com |
| ataylor@nclc.org | |

Persis Yu (DC Bar # 90014714)
Student Borrower Protection Center (a fiscally
sponsored project of the Shared Ascent Fund)
1025 Connecticut Ave NW, #717
Washington, D.C. 20036
(202) 618-1328
persis@protectborrowers.org

R. T. Winston Berkman-Breen*
(NY Bar # 5559372)
Khandice Lofton* (OH Bar # 101015)
Student Borrower Protection Center (a fiscally
sponsored project of the Shared Ascent Fund)
40 Rector Street, 9th Floor
New York, NY 10006
winston@protectborrowers.org
khandice@protectborrowers.org

* Application for admission *pro hac vice*
forthcoming

## RULE 12-I CERTIFICATION

Pursuant to Superior Court Rule 12-I, AFT certifies that it made a good faith effort to discuss this motion with MOHELA to determine whether there is any opposition to the relief sought, but AFT has not received a response to its outreach.  Specifically, at 4:41 p.m. ET on July 24, 2024, counsel for AFT emailed MOHELA's general counsel (as well as a law firm currently serving as counsel to MOHELA in a pending federal court action, Thompson Coburn LLP), requesting that MOHELA provide its position on the requested relief by 11:00 a.m. ET on July 25, 2024.[5]  At 3:07 p.m. ET on July 25, 2024, counsel for AFT again emailed MOHELA's general counsel and Thompson Coburn LLP, reiterating AFT's request for MOHELA's position on the requested relief and requesting a response by 3:00 p.m. ET on July 26, 2024.  As of the time of filing, MOHELA has not responded to AFT's outreach.

Dated: July 26, 2024

/s/ Adam Gould
Adam Gould (DC Bar # 1754569)
Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000
agould@selendygay.com

---

[5] In its outreach to MOHELA, AFT attached courtesy copies of the initial order, complaint, summons, and information sheet.  Those documents were served on MOHELA's registered agent pursuant to Superior Court Rule of Civil Procedure 4 on July 25, 2024.

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2024, counsel for AFT caused a copy of the foregoing Plaintiff's Opposed Motion for Certification and Assignment to Civil I Calendar and the Proposed Order Granting Plaintiff's Opposed Motion for Certification and Assignment to Civil I Calendar to be served on Defendant via certified mail, return receipt requested, to the following address:

> The Higher Education Loan Authority of the State of Missouri
> C/O Scott Lause, General Counsel
> 633 Spirit Drive
> Chesterfield, MO 63005-1243

Dated: July 26, 2024

/s/ Adam Gould
Adam Gould (DC Bar # 1754569)
Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000
agould@selendygay.com

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | | |
|---|---|---|
| AMERICAN FEDERATION OF TEACHERS, | ) | |
| | ) | |
| | ) | |
| Plaintiff(s), | ) | Civil Action No. 2024 CAB 004575 |
| | ) | |
| v. | ) | Judge Maurice A. Ross |
| | ) | Civil II – Calendar 6 |
| THE HIGHER EDUCATION LOAN | ) | |
| AUTHORITY OF THE STATE OF | ) | |
| MISSOUR, | ) | Next Court Date:  **Nov. 25, 2024 @ 9:30am** |
| | ) | Remote Initial Scheduling Conf. |
| Defendant(s). | ) | |

## ORDER GRANTING CONSENT MOTION TO EXTEND TIME FOR FILING RESPONSIVE PLEADING

Upon consideration of the *Consent Motion to Extend Time for Filing Responsive Pleading*, for good cause shown, and the entire record herein, it is this **19ᵗʰ** day of August 2024, hereby:

**ORDERED** that the *Consent Motion to Extend Time for Filing Responsive Pleading* is **GRANTED**; and it is further

**ORDERED** that any Responsive Pleading due in this Court shall now be due **Monday, August 26, 2024**.

**IT IS SO ORDERED.**

_____
Judge Maurice A. Ross
Superior Court of the District of Columbia

Copies to:

Daniel J. Feith, Esquire (D.C. Bar No. 1028433)
Benjamin M. Mundel, Esquire (D.C. Bar. No. 1018144)
Jeremy D. Rozansky, Esquire (D.C. Bar No. 90009027)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C. 20005
(202) 736-8048
dfeith@sidley.com
bmundel@sidley.com
jrozansky@sidley.com
**Counsel for Defendant MOHELA**

Adam Michael Gould
Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000
agould@selendygay.com
**Counsel for Plaintiff**