# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN FEDERATION OF TEACHERS, | |
| *Plaintiff*, | Case No. 1:24-cv-02460-TSC |
| v. | **Oral Argument Requested** |
| HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI, | |
| *Defendant*. | |

## DEFENDANT'S MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 3

  I.   Statutory and Regulatory Background................................................................ 3

  II.  Factual Background ............................................................................................ 6

    A.   MOHELA ..................................................................................................... 6

    B.   AFT's Complaint ...................................................................................... 10

STANDARD OF REVIEW ............................................................................................... 13

ARGUMENT ...................................................................................................................... 14

  I.   MOHELA Is Immune from Suit. ..................................................................... 14

    A.   MOHELA Shares Missouri's Sovereign Immunity as an Arm of the State. ............... 14

      1.   Missouri Created MOHELA as a "Public Instrumentality" Performing "Essential Public Function[s]." .......................................................... 15

      2.   The State of Missouri Supervises and Controls MOHELA. .................... 17

      3.   MOHELA Affects the State Treasury in Multiple Respects. .................... 18

    B.   MOHELA Is Entitled to Immunity as a Matter of Comity. .......................... 20

  II.  AFT Lacks Standing. ........................................................................................ 22

    A.   AFT Did Not Suffer a Cognizable Direct Injury (Count I). .......................... 22

    B.   AFT Lacks Associational Standing To Assert a Claim on Behalf of Its Members (Count II). .......................................................................................... 25

    C.   AFT Lacks Standing To Assert a Claim on Behalf of the General Public (Count III). 28

  III.  AFT's Claims Are Preempted By The Higher Education Act......................... 28

    A.   The Higher Education Act Expressly Preempts AFT's Claims Insofar as They Challenge the Adequacy of MOHELA's Disclosures......................... 29

    B.   The Higher Education Act Conflicts with, and thus Preempts, AFT's Claims. .......... 31

      1.   AFT's Effort to Hold MOHELA Liable for a "Call Deflection Scheme" Directed by the Department Is Preempted. .......................................... 31

      2.   AFT's Claims Would Frustrate the HEA's Goal of Uniform Operation of Federal Student Loan Programs. .................................................... 32

  IV.  AFT Fails to State a Claim Under the D.C. Consumer Protection Procedures Act.......... 33

    A.   AFT Fails to Allege a Consumer-Merchant Relationship. .......................... 33

    B.   AFT Fails to Allege a Trade Practice. ......................................................... 35

    C.   AFT Cannot Seek CPPA Relief for Out-Of-State Borrowers. ..................... 37

    D.   Count III Is Improperly Pleaded. ................................................................ 38

CONCLUSION................................................................................................................... 39

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Hague,*
449 U.S. 302 (1981)................................................................................37

*Arizona v. United States,*
567 U.S. 387 (2012)................................................................................28

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)................................................................................13

*Baylor v. Mitchell Rubenstein & Assocs., P.C.,*
55 F. Supp. 3d 43 (D.D.C. 2014), *aff'd,* 857 F.3d 939 (D.C. Cir. 2017)..................9

*Baylor v. Mitchell Rubenstein & Assocs., P.C.,*
857 F.3d 939 (D.C. Cir. 2017)................................................................33

*\*Biden v. Nebraska,*
143 S. Ct. 2355 (2023)...........................................6, 7, 14, 17, 18, 20, 21

*\*Chae v. SLM Corp.,*
593 F.3d 936 (9th Cir. 2010) ......................................................29, 30, 32

*Cherry v. District of Columbia,*
330 F. Supp. 3d 216 (D.D.C. 2018)...........................................................22

*Coleman v. Clark,*
322 F. Supp. 3d 1 (D.D.C. 2018)..............................................................22

*Ctr. for Auto Safety v. Natl. Hwy. Traffic Safety Admin.,*
793 F.2d 1322 (D.C. Cir. 1986)................................................................26

*Ctr. for Sustainable Econ. v. Jewell,*
779 F.3d 588 (D.C. Cir. 2015)..............................................................26, 27

*DeBerry v. First Gov't Mortg. & Invs. Corp.,*
743 A.2d 699 (D.C. 1999) .....................................................................36

*Edmond v. Am. Educ. Servs.,*
No. 10 Civ. 0578 (JDB), 2010 WL 4269129 (D.D.C. Oct. 28, 2010).............34, 35

*Authorities chiefly relied upon are marked with asterisks.

*Fastov v. Christie's Int'l PLC*,
No. 1:97cv0578 (PLF), 2006 WL 8460194 (D.D.C. Mar. 1, 2006) ......................................37

*\*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)............................................................................................2, 23, 24, 27

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*,
535 U.S. 743 (2002)............................................................................................14, 20

*Fran. Tax Bd. of Cal. v. Hyatt*,
587 U.S. 230 (2019)..........................................................................................................14

*Franchise Tax Bd. of Cal. v. Hyatt*,
578 U.S. 171 (2016)..........................................................................................................21

*Frankeny v. Dist. Hosp. Partners, LP*,
225 A.3d 999 (D.C. 2020) ..............................................................................................36

*Geo Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) ...........................................................................................31

*Grayson v. AT&T Corp.*,
15 A.3d 219 (D.C. 2011) .................................................................................................37

*Henry v. United States*,
No. CV 20-3689 (CKK), 2021 WL 6619330 (D.D.C. Sept. 30, 2021) ............................15, 18

*Howard v. Riggs Nat'l Bank*,
432 A.2d 701 (1981) ........................................................................................................33

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977).........................................................................................................26

*James v. U.S. Postal Serv.*,
484 F. Supp. 3d 1 (D.D.C. 2020) .....................................................................................20

*Kaul v. Fed'n of State Med. Boards*,
No. 19-CV-3050 (TSC), 2020 WL 7042821 (D.D.C. Dec. 1, 2020)..........................16, 19, 20

*Kaul v. Fed'n of State Med. Boards*,
No. 19-CV-3050 (TSC), 2021 WL 1209211 (D.D.C. Mar. 31, 2021) ............................17, 18

*Khadr v. United States*,
67 F.4th 413 (D.C. Cir. 2023)..........................................................................................13

*Linsley v. FMS Inv. Corp.*,
2012 WL 1309840 (D. Conn. Apr. 17, 2012)...................................................................29

*Loan Syndications & Trading Ass'n v. SEC*,
    882 F.3d 220 (D.C. Cir. 2018) ..........................................................................36

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..........................................................................................13

*Merck Sharp & Dohme Corp. v. Albrecht*,
    587 U.S. 299 (2019) ..........................................................................................31

*Meza v. Renaud*,
    9 F.4th 930 (D.C. Cir. 2021) ............................................................................13

*Michaels v. NCO Fin. Sys., Inc.*,
    No. 16 Civ. 1339 (TFH), 2020 WL 2800664 (D.D.C. May 29, 2020), *aff'd*,
    2023 WL 3563079 (D.C. Cir. May 19, 2023) ..................................................35

*Missouri v. Biden*,
    112 F.4th 531 (8th Cir. 2024) ..............................................................4, 18, 19

*Missouri v. Biden*,
    2024 WL 3104514 (E.D. Mo. June 24, 2024) ....................................................5

*Morrow v. U.S.*,
    723 F. Supp. 2d 71 (D.D.C. 2010) ....................................................................13

*Nebraska v. Biden*,
    52 F.4th 1044 (8th Cir. 2022) ............................................................................17

*Nelson v. Great Lakes Educ. Loan Servs., Inc.*,
    928 F.3d 639 (7th Cir. 2019) .......................................................................29, 30

*Northwest Inc. v. Ginsberg*,
    572 U.S. 273 (2014) ..........................................................................................32

*P.R. Ports Auth. v. Fed. Mar. Comm'n*,
    531 F.3d 868 (D.C. Cir. 2008) ..........................................14, 15, 16, 17, 18, 19

*Pub. Utils. Comm'n of State of Cal. v. United States*,
    355 U.S. 534 (1958) ..........................................................................................31

*Ramirez v. Mo. Prosecuting Att'ys' & Circuit Att'ys' Ret. Sys.*,
    694 S.W.3d 432 (Mo. 2024) ..............................................................................21

*Rotunda v. Marriott Int'l, Inc.*,
    123 A.3d 980 (D.C. 2015) ................................................................................38

*Rotunda v. Marriott Int'l, Inc.*,
    No. 2011 CA 006829 B, 2013 WL 11015730 (D.C. Super. Ct. Oct. 31, 2013) ......................38

*Sabri v. United States*,
    541 U.S. 600 (2004) ........................................................................................19

*Shaw v. Marriott Int'l, Inc.*,
    605 F.3d 1039 (D.C. Cir. 2010) ...............................................................37, 38

*Sickle v. Torres Advanced Enter. Sols., LLC*,
    884 F.3d 338 (D.C. Cir. 2018) .................................................................28, 31

*Solomon v. Supreme Court of Fla.*,
    816 A.2d 788 (D.C. 2002) ...............................................................................21

*Stacy v. Truman Med. Ctr.*,
    836 S.W.2d 911 (Mo. 1992), *abrogated on other grounds by Southers v. City*
    *of Farmington*, 263 S.W.3d 603 (Mo. 2008) ...............................................21

*Student Loan Servicing All. v. District of Columbia*,
    351 F. Supp. 3d 26 (D.D.C. 2018) ..................................................................32

*Thomas v. Wash. Metro. Area Transit Auth.*,
    305 F. Supp. 3d 77 (D.D.C. 2018) ..................................................................13

*United Food & Commer. Workers Union Local 751 v. Brown Grp.*,
    517 U.S. 544 (1996) ........................................................................................26

*Ward v. D.C. Dep't of Youth Rehab. Servs.*,
    768 F. Supp. 2d 117 (D.D.C. 2011) ..................................................................9

*Wash. Metro. Area Transit Auth. v. Barksdale-Showell*,
    965 A.2d 16 (D.C. 2009) .................................................................................22

*Washkoviak v. Student Loan Mktg. Ass'n*,
    900 A.2d 168 (D.C. 2006) ...............................................................................37

*Winebarger v. Pa. Higher Educ. Assistance Agency*,
    411 F. Supp. 3d 1070 (C.D. Cal. 2019) ..........................................................34

**Constitution, Statutes and Regulations**

U.S. Const. amend. XI ............................................................................................14

20 U.S.C. § 1070(a) ................................................................................................3

20 U.S.C. § 1078(d) ................................................................................................6

20 U.S.C. § 1082(a)(1) ............................................................................................5

20 U.S.C. § 1082(*l*)(1) ......................................................................................6, 32

20 U.S.C. § 1087e(d)(1)(D) ..................................................................................4

20 U.S.C. § 1087e(m)(1)(A) ................................................................................5

20 U.S.C. § 1087e(m)(1)(B)(i) .............................................................................5

20 U.S.C. § 1087e(m)(3)(B)(i) .............................................................................5

20 U.S.C. § 1087f(b)(2) .......................................................................................5

20 U.S.C. § 1088(c) .............................................................................................7

20 U.S.C. § 1091a(a)(2)(B) ..................................................................................6

20 U.S.C. § 1091a(b)(1)–(3) ................................................................................6

20 U.S.C. § 1098g .......................................................................................2, 6, 29

College Cost Reduction and Access Act, Pub. L. No. 110-84, 121 Stat. 784 (2007).....................5

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134
     Stat. 281 (2020)...........................................................................................8

D.C. Code § 11-101(2).......................................................................................14

D.C. Code § 28-3901(a)(2)(A)...........................................................................34

D.C. Code § 28-3901(a)(6).....................................................................3, 35, 36

D.C. Code § 28-3901(c)......................................................................................37

D.C. Code § 28-3904..........................................................................................36

D.C. Code § 28-3904(a)................................................................................1, 35

Mo. Rev. Stat. § 173.095 ......................................................................16, 19, 21

Mo. Rev. Stat. § 173.360 .......................................1, 6, 14, 15, 16, 17, 19, 21

Mo. Rev. Stat. § 173.365 ..............................................................................16, 17

Mo. Rev. Stat. § 173.385.1 ...............................................................................15

Mo. Rev. Stat. § 173.385.1(6)–(9) ...................................................................16

Mo. Rev. Stat. § 173.385.1(8) ......................................................................6, 18

Mo. Rev. Stat. § 173.385.1(13) ....................................................................6, 18

Mo. Rev. Stat. § 173.385.1(18)-(19)..................................................................6

Mo. Rev. Stat. § 173.385.2 .................................................................................19

Mo. Rev. Stat. § 173.387 ....................................................................................18

Mo. Rev. Stat. § 173.390 ....................................................................................18

Mo. Rev. Stat. § 173.392 ....................................................................................19

Mo. Rev. Stat. § 173.392.2 ...................................................................................7

Mo. Rev. Stat. § 173.415 ....................................................................................16

Mo. Rev. Stat. § 173.445 ....................................................................................16

Mo. Rev. Stat. § 537.600.1 .................................................................................21

34 C.F.R. § 668.2 .................................................................................................7

34 C.F.R. § 685.209(*l*) ........................................................................................4

34 C.F.R. § 685.219(e)(7) .....................................................................................5

80 Fed. Reg. 67,204 (Oct. 30, 2015) .....................................................................4

88 Fed. Reg. 43,820 (July 10, 2023) .....................................................................4

**Rules**

D.C. Super. Ct. R. Civ. P. 23-1(a) ......................................................................39

Fed. R. Civ. P. 12(b)(1) ......................................................................................13

Fed. R. Civ. P. 12(b)(6) ......................................................................................13

**Other Authorities**

Fed. Student Aid, Dep't of Educ. *Annual Report FY 2019* (Nov. 15, 2019),
   https://tinyurl.com/5dp9knep ..........................................................................7

Fed. Student Aid, Dep't of Educ. *Annual Report FY 2020* (Nov. 16, 2020),
   https://tinyurl.com/prpsh3v6 ..........................................................................7

Columbia Daily Tribune, *MOHELA to Provide $30M in Scholarships* (June 11,
   2011), https://tinyurl.com/44xvvfzb ..............................................................19

*Combined Public Service Loan Forgiveness (PSLF) Form Report*,
   https://tinyurl.com/2p8yb3zz (last visited Sept. 24, 2024) .................................9

*Combined Public Service Loan Forgiveness (PSLF) Form Report*
https://tinyurl.com/4vepeuuv (last visited Sept. 24, 2024) ........................................9

Fed. Student Aid, Dep't of Educ., *The Employer's Role in Public Service Loan Forgiveness*, https://tinyurl.com/msvhett9 (last visited Sept. 24, 2024)..................................5

Fed. Student Aid, Dep't of Educ., *Fed. Student Aid Portfolio Summary Q3 2024*, https://studentaid.gov/data-center/student (last visited Sept. 24, 2024) .............................3, 5

Fed. Student Aid, Dep't of Educ., *We're Streamlining Your Loan and Grant Web Experience*, https://tinyurl.com/b8mdtezy (last visited Sept. 24, 2024)................................11

Fed. Student Aid, Dep't of Educ., *Portfolio by Repayment Plan Q3 2024*, https://studentaid.gov/data-center/student (last visited Sept. 24, 2024) ...................................5

Defendant Higher Education Loan Authority of the State of Missouri hereby moves to dismiss this case pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## INTRODUCTION

The American Federation of Teachers ("AFT"), a labor union primarily representing educators, brings this case against the Higher Education Loan Authority of the State of Missouri ("MOHELA"), a public instrumentality and arm of the State of Missouri that contracts with the federal government to service federal student loans. AFT's allegations concern MOHELA's performance of its responsibilities as a loan servicer in the months after the COVID-related "payment pause" ended and tens of millions of borrowers needed to simultaneously restart monthly payments on their student loans. In its fifty-page Complaint, AFT alleges that MOHELA issued untimely and inaccurate bills, Dkt. 1-2 ("Compl.") ¶¶ 116–125; inadequately staffed its call centers, *id.* ¶¶ 156–188; did not process loan-forgiveness applications quickly enough, *id.* ¶¶ 142–144; and gave guidance to borrowers that was inaccurate or incomplete, *id.* ¶¶ 147–153. AFT alleges that these sundry allegations constitute unfair or deceptive trade practices, in violation of the D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3904(a).

AFT's claims fail for numerous independent reasons. As an initial matter, neither this Court nor any other has jurisdiction over these claims, which infringe upon the sovereign immunity MOHELA enjoys as an instrumentality and arm of the State of Missouri. MOHELA was established by the State as a "public instrumentality," performs "essential public function[s]," is under State control, and directs its revenues to fund line items in the State budget for the State's educational priorities. *See* Mo. Rev. Stat. § 173.360. Under the D.C. Circuit's arm-of-the-State test, MOHELA therefore enjoys the same immunity as the State of Missouri itself. MOHELA is also entitled to immunity under Missouri law, which D.C. courts respect as a matter of comity.

1

AFT also lacks Article III standing for its claims, which it brings on behalf of itself, its members, and the general public. AFT did not suffer any direct injury sufficient to have standing itself as an organization. Instead, it proposes the kind of diversion-of-resources theory of standing the Supreme Court unanimously rejected in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024). Nor can AFT claim associational standing. That doctrine requires, *inter alia*, that neither the claim asserted nor the relief requested require the participation of an association's individual members in the lawsuit—a requirement not met by claims that require evidence of individual members' experiences or that seek monetary damages. AFT's claims do both, alleging a hodgepodge of acts affecting different member-borrowers and seeking damages for each alleged violation of the CPPA. AFT thus cannot claim standing as an association. Finally, no theory of standing permits AFT to sue on behalf of the "general public."

AFT's claims also fail on the merits. The Higher Education Act expressly preempts state-law claims that would impose "disclosure requirements" on loan servicers. 20 U.S.C. § 1098g. That provision preempts AFT's allegations that MOHELA's communications with borrowers omitted pertinent information and that MOHELA had to provide certain information via live call center agents, rather than other means. AFT's claims are also preempted because they conflict with the Higher Education Act by seeking to impose D.C.-specific standards on a nationwide federal program Congress intended to be administered uniformly. Indeed, AFT's allegations directly take issue with federal guidance regarding how servicers should handle calls from borrowers, underscoring the federal-state conflict here.

Further, AFT's claims fail under the CPPA itself. First, the CPPA requires that the complained-of acts occur within the context of a consumer-merchant relationship. But, as courts have consistently held, student loan servicers and borrowers are not in such a relationship. Rather,

a federal loan servicer sells its services to the government, which would otherwise have to perform such functions itself. Second, the CPPA requires that the claims concern the defendant's involvement in a "trade practice," a term defined to refer to acts related to the "sale, lease or transfer, of consumer goods or services." D.C. Code § 28-3901(a)(6). AFT's claims, however, do not concern the *sale, lease, or transfer* of MOHELA's services to consumers. Nor could they, as such transactions occurred between MOHELA and the Department of Education well before the events at issue. Third, AFT's claims seek relief on behalf of borrowers with no nexus to the District of Columbia, but the CPPA does not reach extraterritorially and so claims lacking such a nexus must be dismissed. Finally, AFT's "general public" count must be dismissed also because AFT fails to allege it meets any of the applicable Rule 23 requirements.

These errors are fatal and warrant dismissal of AFT's Complaint.

<u>**STATEMENT OF FACTS**</u>

## I.   STATUTORY AND REGULATORY BACKGROUND

The Higher Education Act of 1965 ("HEA" or the "Act") was enacted to "assist in making available the benefits of postsecondary education to eligible students … in institutions of higher education." 20 U.S.C. § 1070(a). As amended, Title IV of the Act created several federal student loan programs, including the Federal Family Education Loan Program ("FFELP") and the William D. Ford Direct Student Loan ("Direct Loan") Program. The Direct Loan Program, as its name suggests, comprises loans in which the U.S. Department of Education ("Department") lends directly to borrowers and holds the loans thereafter. As of the most recent report from the National Student Loan Data System, the Department has $1.4 trillion in outstanding Direct Loans to 37.5 million borrowers. Fed. Student Aid, Dep't of Educ., *Fed. Student Aid Portfolio Summary Q3 2024*, https://studentaid.gov/data-center/student (last visited Sept. 24, 2024).

To increase the affordability of higher education, the HEA also directs the Department to offer certain income-driven repayment plans and loan forgiveness programs for Direct Loans.

***Repayment Plans.*** The HEA directs the Secretary to establish several repayment plans for borrowers, including "an income contingent repayment plan." 20 U.S.C. § 1087e(d)(1)(D). These plans, also known as income-driven repayment (IDR) plans, require borrowers to annually recertify their incomes. *See* 34 C.F.R. § 685.209(*l*). Previously, one of the four IDR plans was called REPAYE, or "Revised Pay As You Earn." *See* Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 80 Fed. Reg. 67,204, 67,204–05 (Oct. 30, 2015). REPAYE capped a borrower's monthly payment at 10% of the borrower's "discretionary income," defined as gross income exceeding 150% of the poverty line, and allowed for complete loan forgiveness after twenty or twenty-five years, depending on whether the loan was taken out for graduate or undergraduate study. *Id.* at 67,238.

On July 10, 2023, the Department released the new "Saving on a Valuable Education" (SAVE) plan to replace REPAYE. *See* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43,820 (July 10, 2023). The SAVE plan significantly reduces the payments required from borrowers. For undergraduate loans, for example, the SAVE plan redefines "discretionary income" as income exceeding 225% of the poverty line, caps borrowers' monthly payments at 5% of discretionary income, and waives any remaining accrued interest. *Id.* at 43,820. In addition, the SAVE plan permits loans to be forgiven in as little as 10 years. *Id.* at 43,891, 43,902–03. The Eighth Circuit has held that the Department lacked statutory authority for the SAVE plan and has enjoined the interest waiver, 225% threshold, and loan-forgiveness provisions. *See Missouri v. Biden*, 112 F.4th 531, 537–38 (8th Cir. 2024) (per curiam). Nevertheless, before that injunction,

4

several portions of the plan were implemented, including interest waivers for certain borrowers. *See Missouri v. Biden*, 2024 WL 3104514, at *5–6 (E.D. Mo. June 24, 2024). Roughly eight million borrowers are enrolled in the SAVE plan. Fed. Student Aid, Dep't of Educ., *Portfolio by Repayment Plan Q3 2024*, https://studentaid.gov/data-center/student (last visited Sept. 24, 2024).

**Public Service Loan Forgiveness.** In 2007, Congress created the Public Student Loan Forgiveness (PSLF) program, under which the Department must cancel the balance of interest and principal owed by borrowers under certain conditions. *See* Pub. L. No. 110-84, 121 Stat. 784, 800– 01 (2007) (codified at 20 U.S.C. § 1087e(m)). First, the borrower must have made 120 monthly payments on the eligible loan. 20 U.S.C. § 1087e(m)(1)(A). Second, the borrower must be employed in a "public service job" and have made those payments while "employed in a public service job." *Id.* § 1087e(m)(1)(B)(i). The term "public service job" comprises a wide array of fields, including "public education." *Id.* § 1087e(m)(3)(B)(i). When a borrower meets these criteria, the borrower may apply for loan forgiveness under the PSLF program. The application is initially processed by the loan servicer, but the borrower's public service employer must certify the qualifying employment and, ultimately, the Department must determine whether the borrower qualifies for loan forgiveness. *See* 34 C.F.R. § 685.219(e)(7); Fed. Student Aid, Dep't of Educ., *The Employer's Role in Public Service Loan Forgiveness*, https://tinyurl.com/msvhett9 (last visited Sept. 24, 2024).

To handle the burden of administering these massive loan programs, the Department may enter into contracts for "the servicing and collection of loans made or purchased." 20 U.S.C. § 1087f(b)(2). The Department may also "prescribe … regulations applicable to third party servicers," *id.* § 1082(a)(1), and must, "in consultation with … third party servicers" and other stakeholders, develop "standardized forms and procedures," for, *inter alia*, loan servicing, *id.*

§ 1082(*l*)(1). To further ensure standardization across these programs, Congress included several express preemption provisions applicable to the FFELP and the Direct Loan Program. *See, e.g.*, 20 U.S.C. §§ 1078(d), 1091a(a)(2)(B), 1091a(b)(1)–(3), 1098g. Section 1098g, in particular, provides that such loans "shall not be subject to any disclosure requirements of any State law." *Id.* § 1098g.

## II.   FACTUAL BACKGROUND

### A.   MOHELA

1. The State of Missouri established MOHELA in 1981 as a "public instrumentality"—specifically, a nonprofit government corporation—intended to finance higher education and to "support the efforts of public colleges and universities to create and fund capital projects." Mo. Rev. Stat. § 173.360. To achieve those ends, Missouri law authorizes MOHELA, as relevant here, to "service student loans for any owner thereof" and to "create, acquire, contribute to, or invest in any type of financial aid program that provides grants and scholarships to students." *Id.* § 173.385.1(18)-(19). Missouri law provides that "the exercise by [MOHELA] of the powers conferred" on it by the Missouri code "shall be deemed to be the performance of an essential public function." *Id.* § 173.360.

As a State instrumentality, MOHELA is subject to the State's supervision and control. Five of its seven Board Members are appointed by the Governor and confirmed by the Missouri Senate, while the remaining two are high-ranking State officials. *See id.* All are removable by the Governor for cause. *Id.* MOHELA also must "provide annual financial reports to the Missouri Department of [Higher] Education, detailing its income, expenditures, and assets." *Biden v. Nebraska*, 143 S. Ct. 2355, 2366 (2023) (citing Mo. Rev. Stat. § 173.445). And Missouri law places strict limits on how MOHELA can raise capital or make investments. *See* Mo. Rev. Stat. § 173.385.1(8), (13).

Missouri relies on MOHELA in several respects to help fund its higher education priorities. First, MOHELA's net revenues "help fund education in Missouri." *Biden*, 143 S. Ct. at 2366. Pursuant to the authorities noted above, MOHELA has provided more than "$230 million for development projects at Missouri colleges and universities and almost $300 million in grants and scholarships for Missouri students." *Id.* (citing MOHELA's FY 2022 Financial Statement); *see* Decl. of Karen Lenk ¶ 4–9. Second, the State routinely draws on MOHELA's revenues to fund items in the State budget. *See, e.g.,* Lenk Decl. Exs. A–M (Appropriations Bills reflecting State budget line items for which MOHELA has provided monies); *id.* Ex. N (MOHELA Resolution approving transfer of monies to fund section 3.050 of the 2011 Appropriations Bill). Third, MOHELA has a statutory obligation to contribute $350 million to a fund in the State treasury that supports Missouri's higher education spending, *see* Mo. Rev. Stat. §§ 173.392.2, 173.385(2), of which over $100 million remains outstanding, *see* Lenk Decl. ¶ 8.

In 2011, the Department selected MOHELA to service Direct Loans on a national basis. Compl. ¶ 1. As a loan servicer, MOHELA is not itself a party to the loans. Nor is it involved in originating the loans. Rather, once loans are funded by the Department, MOHELA manages the status of loan accounts, sends out billing statements, and provides information to borrowers. *See id.* ¶ 69; 20 U.S.C. § 1088(c); 34 C.F.R. § 668.2. Four other entities also service Direct Loans on the Department's behalf. MOHELA has historically been among the best-scoring loan servicers pursuant to metrics employed by the Department to determine loan servicing allocations. *E.g.*, Fed. Student Aid, Dep't of Educ., *Annual Report FY 2020*, at 147 (Nov. 16, 2020), https://tinyurl.com/prpsh3v6; Fed. Student Aid, Dep't of Educ., *Annual Report FY 2019*, at 97 (Nov. 15, 2019), https://tinyurl.com/5dp9knep.

7

2. As part of the initial response to the COVID-19 pandemic, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020). In what has become known as the "payment pause," the CARES Act paused student loan payments, collections, and the accrual of interest for certain federal loans during the pandemic. *See* CARES Act § 3513(a)–(b). Each month during the payment pause counted toward the total number of months needed for loan forgiveness under federal income-contingent repayment plans and the PSLF program. CARES Act § 3513(c). The payment pause officially ended on September 1, 2023. Compl. ¶ 70. Interest accrual restarted that month, and payments restarted in October 2023. *Id.* ¶ 99.

During the payment pause, the Department further modified the terms of IDR plans and the PSLF program through administrative actions known, respectively, as the IDR Account Adjustment and Limited PSLF Waiver. *See id.* ¶¶ 76, 94, 95. In both cases, the Department relaxed the criteria for qualifying for loan forgiveness under the programs, making many borrowers newly eligible for loan forgiveness and bringing others closer to that point. *See id.*

These various changes to the Direct Loan Program coincided with significant shifts in the loan-servicer landscape. During the payment pause, several loan servicers opted against renewing their contracts with the Department, requiring the Department to find new servicers for about a third of the borrower population. *Id.* ¶¶ 73–74. The departing servicers included the Pennsylvania Higher Education Assistance Agency ("PHEAA"), which had been the exclusive servicer handling the processing role for the PSLF program. *Id.* ¶ 75. In 2022, the Department asked MOHELA to take over the PSLF processing function on an interim basis, *id.* ¶ 39, and separately transferred to MOHELA millions of loans previously serviced by PHEAA, *id.* ¶ 74. In April 2023, the Department awarded MOHELA a new 10-year servicing contract that took effect in spring 2024.

*Id.* ¶ 40. According to Department figures, in just the first twelve months during which MOHELA was the exclusive PSLF processor, approximately four times the number of PSLF discharges were processed as had been processed in all the years before MOHELA took over. *See* https://tinyurl.com/4vepeuuv (last visited Sept. 24, 2024) (Department report showing that as of June 30, 2022, 164,555 borrowers' PSLF discharges were processed); https://tinyurl.com/2p8yb3zz (last visited Sept. 24, 2024) (Department report showing that as of June 30, 2023, 670,000 borrowers' PSLF discharges were processed).

Predictably, the confluence of the IDR Account Adjustment, PSLF Limited Waiver, SAVE plan rollout, and end of the payment pause exponentially increased the workload of MOHELA and other servicers. Anticipating these burdens, the Department issued guidance to all student loan servicers called the "Return to Repayment Playbook" ("Playbook"). *See* Dkt. 1-5; *see also* Compl. ¶ 159 (discussing "Return to Repayment 'Playbook'").[1] The Playbook instructed servicers to implement a number of policies and procedures to better manage the anticipated burdens. As relevant here, the Playbook repeatedly instructed servicers to use "call deflection" "to promote borrower self-service." Dkt. 1-5 at 3. "Call deflection" refers to measures that direct borrowers to resources to help them determine the answers to their questions themselves, without needing to tie up call center phone lines. Compl. ¶ 159.

---

[1] On a motion to dismiss, this Court may consider documents such as the Playbook that were "incorporated by reference in the Complaint" or "upon which the plaintiff's complaint necessarily relies." *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011). The content of the Playbook "controls over the bare allegations in the complaint." *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 55 F. Supp. 3d 43, 49 (D.D.C. 2014), *aff'd,* 857 F.3d 939 (D.C. Cir. 2017).

### B.      AFT's Complaint

AFT is a labor union whose members include "1.8 million pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals." *Id.* ¶ 16. AFT has 5,000 members who reside in the District of Columbia. *Id.* ¶ 17.

AFT alleges that, starting in the payment pause and continuing through the present, MOHELA has engaged in various acts and omissions constituting unfair and deceptive acts or practices, in violation of the CPPA. AFT's allegations fall into four basic categories.

*Call center and website.* As noted, the Department issued a "Playbook" directing loan servicers to engage in "call deflection" to cope with the high call volumes anticipated with the end of the payment pause. AFT, however, alleges that MOHELA "*concoct[ed]* a call deflection scheme" to "divert[] callers to MOHELA's website, [the Department's] website, or other self-service features, rather than connecting callers with a live customer service representative." Compl. ¶¶ 159, 216, (emphasis added); *see also id.* ¶¶ 156–172, 177–188, 237, 258. AFT also alleges that borrowers had difficulty obtaining information from MOHELA's website and Twitter account, *id.* ¶¶ 161–162, 167, and accessing their accounts during a website migration in 2024, *id.* ¶¶ 173–176. According to AFT, these activities resulted in "long wait times," *id.* ¶ 166, and unnecessary payments, some of which were later refunded, *id.* ¶¶ 168, 171. AFT does not allege that MOHELA's contract with the Department required a call back within any particular timeframe, nor does its Complaint mention the call-back feature offered to borrowers.

*Billing.* AFT alleges that when the payment pause ended, borrowers should have received bills 21 days in advance of their payment due dates, but some did not. *Id.* ¶¶ 116, 213, 234, 255.

Some borrowers allegedly missed payments as a result. *Id.* ¶ 116. AFT also alleges that an unspecified number of borrowers received inaccurate bills, *id.* ¶¶ 116-118, though it does not explain the nature of the alleged inaccuracy. In addition, AFT alleges that an unspecified number of borrowers who had been on autopay before the payment pause had their bank accounts automatically debited when payments resumed, despite the Department's instruction that borrowers needed to reauthorize autopay. *Id.* ¶ 125. The Department has withheld $7.2 million in payments related to the allegedly late bills, *id.* ¶ 119, though MOHELA has contested that decision.

*Application processing.* AFT also complains about the processing of SAVE plan applications, PSLF applications, and refunds. AFT alleges that "MOHELA failed to review and approve [SAVE plan] applications in a timely manner," potentially prolonging higher monthly payments for borrowers. *Id.* ¶ 132. AFT also alleges that MOHELA has processed PSLF applications and refunds too slowly (even though the Department, not MOHELA, issues all refunds) and, in one instance, in accordance with the wrong guidelines. *Id.* ¶¶ 133, 136, 142–143, 215, 236, 257. According to AFT, as of July 22, 2024, MOHELA had "over 1 million outstanding PSLF applications" to process. *Id.* ¶ 144. *But see* Fed. Student Aid, Dep't of Educ., *We're Streamlining Your Loan and Grant Web Experience*, https://tinyurl.com/b8mdtezy (last visited Sept. 24, 2024) (announcement by Department's Federal Student Aid office that third-party servicers such as MOHELA ceased processing PSLF applications on May 1, 2024). In any event, AFT does not allege MOHELA violated any legally-binding deadlines. Nor does AFT allege any facts as to the nature of the processing hold-up, such as whether the forms are awaiting employer certification or a final decision by the Department.

*Communications to borrowers.* AFT alleges that MOHELA representatives gave borrowers inaccurate or incomplete information, including as to (a) whether borrowers needed to

apply for the SAVE plan and which year's income to state in the application, *see id.* ¶¶ 130–131; (b) when to recertify their incomes for the SAVE plan, *see id.* ¶¶ 147–150, 211, 232, 253; and (c) whether to consolidate their loans, *see id.* ¶¶ 152–153, 212, 233, 254. AFT alleges that, at least in some cases, these errors led to higher payments or deterred borrowers from taking advantage of loan relief opportunities. *See id.* ¶¶ 131, 149–150, 153.

Based on these allegations, AFT asserts three different claims under the CPPA, which differ only in whose injury AFT seeks to redress. AFT asserts Count I on behalf of itself. *Id.* ¶¶ 205–225. AFT alleges that, due to MOHELA's actions, AFT has had to "expend[] significant resources" on advocacy for and assistance to its members, including hiring "an outside contractor to aid members with student loans," directing its employees to "addres[s] student loan issues," and "hold[ing] student debt clinics," and that this has forced AFT to "divert resources and attention that would otherwise have been spent focused on issues like collective bargaining." *Id.* ¶ 225. AFT asserts Count II on behalf of its members. *Id.* ¶¶ 226–246. AFT alleges that MOHELA's actions caused AFT members "to make payments on debt that should no longer exist" and delayed "their receipt of loan forgiveness," among other alleged injuries. *Id.* ¶ 246. Finally, AFT brings Count III on behalf of the "general public." *Id.* ¶¶ 247–267. AFT alleges the same harms to the "general public" as to its members. *Id.* ¶ 267.

For all three claims, AFT seeks declaratory relief; injunctive relief; monetary relief, including treble damages, statutory penalties, or actual damages; punitive damages; and "additional relief as may be necessary to restore Plaintiff, Plaintiff's members and the general public to their rightful positions." Compl. Prayer for Relief.

AFT initially sued MOHELA in D.C. Superior Court on July 22, 2024. MOHELA timely removed the case to this Court on August 26, 2024. *See* Dkt. 1.

**STANDARD OF REVIEW**

Under Rule 12(b)(1), a party may move to dismiss a claim over which the court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "In deciding a motion to dismiss based upon lack of subject matter jurisdiction, a Court is not limited to the allegations set forth in the complaint, but may consider materials outside the pleadings." *Morrow v. United States*, 723 F. Supp. 2d 71, 76 (D.D.C. 2010). Furthermore, when presented with multiple jurisdictional defects, the court "may consider jurisdictional questions in any order that" the court "deem[s] prudent." *Meza v. Renaud*, 9 F.4th 930, 933 (D.C. Cir. 2021) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584-85 (1999)). The same is true for other non-jurisdictional, non-merits "threshold grounds for denying audience to a case on the merits." *Khadr v. United States*, 67 F.4th 413, 418 (D.C. Cir. 2023), *cert. denied,* 144 S. Ct. 2573 (2024) (cleaned up).

Under Rule 12(b)(6), a party may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Conclusory allegations are not entitled to an assumption of truth, and even those allegations pled with factual support need only be accepted to the extent that they plausibly give rise to an entitlement to relief." *Morrow,* 723 F. Supp. 2d at 77–78. "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Thomas v. Wash. Metro. Area Transit Auth.*, 305 F. Supp. 3d 77, 82 (D.D.C. 2018).

13

<u>ARGUMENT</u>

I.    **MOHELA IS IMMUNE FROM SUIT.**

    A.    **MOHELA Shares Missouri's Sovereign Immunity as an Arm of the State.**

AFT's claims fail at the threshold because MOHELA is entitled to state sovereign immunity as a "public instrumentality" of the State of Missouri. Mo. Rev. Stat. § 173.360. As the Supreme Court recently explained in holding that an injury to MOHELA constitutes an injury to the State of Missouri for standing purposes, MOHELA is a "public instrumentality of the State," was established to perform an "essential public function," is "subject to the State's supervision and control," and "help[s] fund education in Missouri" by providing "$230 million for development projects at Missouri colleges and universities and almost $300 million in grants and scholarships for Missouri students." *Biden*, 143 S. Ct. at 2366. For these and additional reasons, MOHELA shares in Missouri's sovereign immunity, and AFT's claims accordingly should be dismissed.

"[U]nder long-standing Supreme Court precedent, the Constitution has been interpreted to encompass a principle of state sovereign immunity and to largely shield States from suit without their consent." *P.R. Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 871–72 (D.C. Cir. 2008). This immunity applies to proceedings in federal court, *see, e.g.*, U.S. Const. amend. XI; state court, *see Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 243 (2019); and Article I tribunals, such as D.C. Superior Court, *see Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760-61 (2002); D.C. Code § 11-101(2) (establishing Superior Court "pursuant to article I of the Constitution").

"Even where, as here, the State itself is not a named party, sovereign immunity bars suits against an arm of the State." *P.R. Ports*, 531 F.3d at 872. The D.C. Circuit has established a three-part test to determine whether an entity is an arm of the State, examining "(1) the State's intent as

to the status of the entity, including the functions performed by the entity; (2) the State's control over the entity; and (3) the entity's overall effects on the state treasury." *Id.* at 873. No single factor is controlling. *See id.* at 874. Where "the first two [factors] weigh in favor of" arm-of-the-State status, however, the entity's effect on the State treasury "is irrelevant." *Henry v. United States*, No. CV 20-3689 (CKK), 2021 WL 6619330, at \*6 (D.D.C. Sept. 30, 2021).

MOHELA satisfies each of these three prongs.

### 1. Missouri Created MOHELA as a "Public Instrumentality" Performing "Essential Public Function[s]."

To begin, each of the four factors the D.C. Circuit has identified as relevant to assessing Missouri's intent as to MOHELA's status indicates that MOHELA is an arm of the State. Missouri's intent turns on (1) whether Missouri law "expressly characterizes" MOHELA "as a governmental instrumentality rather than as a local governmental or non-governmental entity"; (2) whether MOHELA "performs state governmental functions"; (3) whether MOHELA "is treated as a governmental instrumentality for purposes of other [Missouri] laws"; and (4) Missouri's "representations" about MOHELA's status. *P.R. Ports*, 531 F.3d at 874.

*First*, Missouri law expressly characterizes MOHELA as a "public instrumentality," Mo. Rev. Stat. § 173.360, and "body politic," *id.* § 173.385.1(1). Thus, as in *Puerto Rico Ports*, where the enabling act of the entity at issue described it as a "government instrumentality," the first factor presents an "easy inquiry." 531 F.3d at 875. Such "statutory language plainly demonstrates [Missouri's] intent to create a governmental instrumentality of the [State] and thus strongly suggests that [MOHELA] is an arm of the [State] entitled to sovereign immunity." *Id.*

*Second*, MOHELA performs State governmental functions. Through the exercise of its statutory authorities to finance higher education, issue bonds, purchase loans guaranteed by the federal government, transfer assets to a fund of the State treasury, and contribute to financial aid

programs that provide grants and scholarships to students, *see* Mo. Rev. Stat. § 173.385.1(6)–(9), (19), MOHELA has "support[ed] the efforts of public colleges and universities to create and fund capital projects," *id.* § 173.360. Furthermore, MOHELA's enabling statute expressly deems MOHELA's exercise of its powers "to be the performance of an essential public function." *Id.*; *see also id.* § 173.095 ("[T]he general assembly of the state of Missouri declares that state assistance to postsecondary students will benefit the state economically and culturally and is a public purpose of great importance."). Thus, as in *Puerto Rico Ports*, where the enabling act indicated that the entity at issue performed its functions to promote "the general welfare" and to increase "commerce and prosperity" for the benefit "of the people of Puerto Rico," 531 F.3d at 875, this factor too "points in the direction of arm-of-the-[State] status," *id.* at 876.

*Third*, MOHELA's "internal operations are governed by [State] laws that apply to [State] agencies generally." *Id*; *see Kaul v. Fed'n of State Med. Bds.,* No. 19-CV-3050 (TSC), 2020 WL 7042821, at *14 (D.D.C. Dec. 1, 2020) (finding arm-of-State status where entity was "subject to laws that apply to [State] agencies generally"). Under MOHELA's enabling statute, "[t]he proceedings and actions of the authority shall comply with all statutory requirements respecting the conduct of public business by a public agency." Mo. Rev. Stat. § 173.365. Additionally, MOHELA's property, income, bonds, and activities are exempt from State taxation, *see id.* § 173.415; MOHELA must "annually file" with the Missouri Department of Higher Education a report detailing its income, expenditures, and assets, *id.* § 173.445; and MOHELA has no private owners or shareholders. Under *Puerto Rico Ports*, each of these factors supports arm-of-the-State status. *See P.R. Ports*, 531 F.3d at 876.

*Finally*, Missouri has represented MOHELA to be an arm of the State. In *Biden v. Nebraska*, Missouri argued that "MOHELA is a state-created and state-controlled public entity

that performs essential public functions for the State. As such, MOHELA is part of Missouri." Brief for Respondents at 12, *Biden v. Nebraska*, 143 S. Ct. 2355 (2023) (No. 22-506). The State further explained that MOHELA is part of Missouri's government because the State created MOHELA by special law, established MOHELA's powers, made MOHELA report to a State agency, preserved its authority over MOHELA's assets, and retained the right to abolish MOHELA. *Id*. at 17. This factor thus also favors arm-of-the-State status. *See Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022) (per curiam) ("Given [the Missouri] statutory framework, MOHELA may well be an arm of the State of Missouri under the reasoning of our precedent.").

### 2.    The State of Missouri Supervises and Controls MOHELA.

MOHELA also satisfies the second prong of the arm-of-the-State test because, as the Supreme Court recently acknowledged, it "is subject to the State's supervision and control." *Biden,* 143 S. Ct. at 2366. In assessing the State's control, the Court should look "primarily at how the directors and officers of [MOHELA] are appointed." *P.R. Ports,* 531 F.3d at 877. Also relevant are whether those directors and officers are compensated, how they may be removed, and other indicia of control by the State. *See id.* at 877–78.

Here, numerous provisions of MOHELA's enabling statute demonstrate the State's control over MOHELA. Under that statute, MOHELA's board consists of two State officials and five members appointed by the Governor and approved by the Senate. Mo. Rev. Stat. § 173.360. "Members of the authority … receive no compensation for services …." *Id.* § 173.365. And the Governor may remove any of the Board members for cause. *Id*. These factors "weigh[] heavily" for recognizing MOHELA as an arm of the State. *P.R. Ports*, 531 F.3d at 877 (considering similar factors); *Kaul v. Fed'n of State Med. Bds.*, No. 19-CV-3050 (TSC), 2021 WL 1209211, at *9

(D.D.C. Mar. 31, 2021) (finding support for arm-of-the-State status where "the governor may remove any member of the board for good cause" (cleaned up)).

Other provisions further demonstrate that MOHELA is "directly answerable to the State." *Biden*, 143 S. Ct. at 2366 (cleaned up). Missouri law limits MOHELA's investments, Mo. Rev. Stat. § 173.385.1(13), Stafford loan originations, *id.* § 173.387, and bond issues, *id.* § 173.390. It requires MOHELA to obtain approval from the Missouri Department of Higher Education to sell certain loans. *See id.* § 173.385.1(8). It further requires MOHELA to "provide annual financial reports to the Missouri Department of [Higher] Education, detailing its income, expenditures, and assets." *Biden*, 143 S. Ct. at 2366 (citing Mo. Rev. Stat. § 173.445). And, fundamentally, Missouri law "sets the terms of [MOHELA's] existence, and only the State can abolish MOHELA and set the terms of its dissolution." *Id.* (cleaned up).

For all of these reasons, it is clear that "the State . . . controls MOHELA," *id.*, and that the second prong of the arm-of-the-State test favors immunity.

### 3. MOHELA Affects the State Treasury in Multiple Respects.

Because the first two prongs of the arm-of-the-State test favor immunity, the Court need not reach the third prong to find MOHELA entitled to immunity. *See Henry*, 2021 WL 6619330, at *6. Regardless, MOHELA also satisfies the third prong of the test, which examines MOHELA's "financial relationship with the [State] and its overall effects on the [State's] treasury." *P.R. Ports*, 531 F.3d at 878. The State draws on and ultimately controls MOHELA's revenues in several ways that demonstrate that a judgment against MOHELA would also affect the State treasury.

First, as the Supreme Court has recognized, MOHELA's "profits help fund education in Missouri." *Biden*, 143 S. Ct. at 2366. MOHELA has provided over "$230 million for development projects at Missouri colleges and universities and almost $300 million in grants and scholarships

for Missouri students*." Id.*; *see* Lenk Decl. ¶¶ 8–9. By providing "assistance to postsecondary students," these expenditures advance what the Missouri legislature has declared a "public purpose of great importance," Mo. Rev. Stat. § 173.095, and an "essential public function," Mo. Rev. Stat. § 173.360. And because "[m]oney is fungible," *Sabri v. United States*, 541 U.S. 600, 606 (2004), these expenditures necessarily free up funds in the State treasury for other public priorities.

Second, the Missouri Legislature routinely relies on MOHELA for direct contributions to the State treasury to supplement other sources of revenue. Each year, MOHELA is responsible for funding millions of dollars in line items in the State's budget for such programs as the Academic Scholarship Fund, the Access Missouri Financial Assistance Fund, and the A+ Schools Fund. *See* Lenk Decl. ¶¶ 4–7 & Exs. A–M (Appropriations Bills). MOHELA's contributions to the State treasury have been particularly important in "mak[ing] up for State funding cuts." *Id.* Ex. N (MOHELA Resolution 061011.03). For example, in 2011, MOHELA transferred $30 million to the State treasury because the State's budget "banked on MOHELA making the money transfer." Columbia Daily Tribune, *MOHELA to Provide $30M in Scholarships* (June 11, 2011), https://tinyurl.com/44xvvfzb.

Third, MOHELA has an outstanding statutory financial obligation to the State of Missouri. MOHELA is required by law to give $350 million to the Lewis and Clark Discovery Fund, Mo. Rev. Stat. § 173.385.2, which resides in the State treasury, *see id.* § 173.392. MOHELA has yet to satisfy more than $100 million of this obligation. *See* Lenk Decl. ¶ 8. This statutory obligation manifests the State's ultimate control over MOHELA's finances and demonstrates that, unlike a non-governmental, independent corporation, MOHELA "is not financially autonomous." *Kaul*, 2020 WL 7042821, at *12.

To be sure, Missouri is not directly liable for judgments against MOHELA and, to that extent, MOHELA is different from the entity at issue in *Puerto Rico Ports*. *See P.R. Ports*, 571 F.3d at 879–80. But "there is no bright line for determining the point at which a State's responsibility for an entity's funds, debts, or judgments suffices to weigh in favor of arm-of-the-state status," *P.R. Ports,* 531 F.3d at 880 n.9. The fact remains that MOHELA not only "was created by the State to further a public purpose, is governed by state officials and state appointees, reports to the State, and may be dissolved by the State," *Biden*, 143 S. Ct. at 491, but the State, both in law and in practice, relies on MOHELA's revenues as a source of funding both for the State treasury specifically and for State public policy priorities generally. Like the entity at issue in *Kaul*, MOHELA's financial decisions are subject to "the controlling powers of [its State-appointed Board], the concerns of the state treasurer, and the review of [other state officials]." 2020 WL 7042821, at *12. Thus, this final factor weighs in MOHELA's favor.

*     *     *

Because all three factors favor immunity, MOHELA is an arm of the State of Missouri and is therefore immune from AFT's claims.[2]

### B.    MOHELA Is Entitled to Immunity as a Matter of Comity.

MOHELA is also immune from suit under state law because it enjoys sovereign immunity under Missouri law and, as a matter of comity, D.C. courts respect the immunity of other State

---

[2] MOHELA's entitlement to sovereign immunity means that this Court lacks jurisdiction not only due to that immunity but also due to the doctrine of derivative jurisdiction. Under that doctrine, if the court from which a case is removed "lacks subject matter jurisdiction over a suit, the federal court likewise lacks jurisdiction over the suit upon removal." *James v. U.S. Postal Serv.*, 484 F. Supp. 3d 1, 4 (D.D.C. 2020). Because MOHELA's sovereign immunity applies with equal force in D.C. Superior Court, *see S.C. State Ports*, 535 U.S. at 760–61, that court lacks jurisdiction over AFT's claims, and thus there was no jurisdiction "to 'derive' … upon the removal of this action," *James*, 484 F. Supp. 3d at 4. In such circumstances, the federal court must dismiss. *See id.*

entities. *See Solomon v. Supreme Court of Fla.*, 816 A.2d 788, 790 (D.C. 2002); *see also Franchise Tax Bd. of Cal. v. Hyatt*, 578 U.S. 171, 176 (2016) (holding that Full Faith and Credit Clause required Nevada to grant another State's agencies the same immunity its own agencies enjoy).

Under Missouri law, "sovereign immunity is the rule and applies to all suits against public entities." *Ramirez v. Mo. Prosecuting Att'ys' & Cir. Att'ys' Ret. Sys.*, 694 S.W.3d 432, 436 (Mo. 2024) (en banc); *see also* Mo. Rev. Stat. § 537.600.1. An entity is considered a "public entity" if it (1) is "formed by the government" itself, (2) is "controlled by and directly answerable to one or more public officials, public entities, or the public itself," and (3) performs a "service traditionally performed by the government." *Stacy v. Truman Med. Ctr.*, 836 S.W.2d 911, 919 (Mo. 1992) (en banc), *abrogated on other grounds by Southers v. City of Farmington*, 263 S.W.3d 603 (Mo. 2008). The second element is the "most critical" requirement, and when the first two elements are satisfied, "it is difficult to envision" an entity that would not also meet the third requirement. *Id.*

Here, MOHELA meets each element. It was formed by the Missouri legislature. *See* Mo. Rev. Stat. § 173.360. It is "controlled by and directly answerable" to the Governor and Missouri Department of Higher Education for the same reasons the Supreme Court held MOHELA is "subject to the State's supervision and control" and "'directly answerable' to the State." *Biden*, 143 S. Ct. at 2366; *see supra* at 17–18. And it performs the traditional governmental service of promoting higher education in the State—a service the Missouri General Assembly has deemed an "essential public function." Mo. Rev. Stat. § 173.360; *see id.* § 173.095 (deeming assistance to postsecondary students a "public purpose of the highest importance"). MOHELA is therefore a public entity entitled to sovereign immunity under Missouri law.

That immunity should be respected in this proceeding as a matter of comity. Under D.C. law, "District of Columbia courts should recognize the sovereign immunity of a sister state so long

as the other state's rules are sufficiently harmonious to those governing the District's immunity in District of Columbia courts." *Coleman v. Clark*, 322 F. Supp. 3d 1, 6 (D.D.C. 2018) (cleaned up). Such harmony is present here. The District enjoys sovereign immunity in D.C. courts for its discretionary functions—a category that would include the actions at issue here. *See Cherry v. District of Columbia*, 330 F. Supp. 3d 216, 228 (D.D.C. 2018) (contrasting discretionary functions with "ministerial acts" that involve "mere obedience to orders"). Furthermore, the District has extended sovereign immunity to public entities analogous to MOHELA, such as the Washington Metro Area Transit Authority, an interstate compact agency formed by Maryland, Virginia, and D.C. *See Wash. Metro. Area Transit Auth. v. Barksdale-Showell*, 965 A.2d 16, 20 (D.C. 2009). MOHELA's state-law immunity provides an additional ground for dismissal of AFT's claims.

## II.     AFT LACKS STANDING.

AFT's claims also fail due to lack of standing. AFT asserts three claims under the CPPA: Count I on its own behalf, Count II on its members' behalf, and Count III on the general public's behalf. AFT lacks standing to pursue any of these counts.

### A.     AFT Did Not Suffer a Cognizable Direct Injury (Count I).

AFT lacks standing for Count I because it did not suffer a cognizable injury from MOHELA's alleged misconduct. In Count I, AFT asserts that MOHELA's actions harmed it in three respects. First, AFT alleges that it is required by its mission to counsel its members on how to navigate the problems MOHELA allegedly created, and has spent significant time and money doing so. *See* Compl. ¶ 225. Second, AFT alleges it has spent money "researching and publicizing MOHELA's misdeeds and collecting data from members" about how MOHELA's alleged actions have affected them. *See id.* ¶¶ 25–28. Third, AFT alleges that MOHELA's alleged actions have

harmed AFT's "mission" because it has had to divert resources "that would otherwise have been spent" on other issues important to AFT. *See id.* ¶ 225.

None of these alleged harms establishes an injury sufficient for standing. Indeed, earlier this year, the Supreme Court unanimously held that these kinds of self-imposed injuries cannot confer standing. In *FDA v. Alliance for Hippocratic Medicine*, a group of physicians and medical associations sought to challenge two FDA decisions relaxing the requirements for obtaining the abortion drug mifepristone. *See* 602 U.S. 367, 375–78 (2024). As relevant here, the medical associations claimed standing "based on their incurring costs to oppose FDA's actions." *Id.* at 394. Specifically, the associations contended that FDA had "'caused' the associations to conduct their own studies on mifepristone so that the associations [could] better inform their members and the public about mifepristone's risks" and had "'forced' the associations to 'expend considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id.* "[A]ll of that," the associations further argued, "ha[d] caused [them] to spend 'considerable resources' to the detriment of other spending priorities." *Id.*

A unanimous Supreme Court rejected this theory of standing. It held that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id*. The Court explained that allowing an organization to "manufacture its own standing in that way … would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar to oppose those policies." *Id.* at 394–95. The Court rebuffed "such an expansive theory of standing." *Id.* at 395.

*Alliance for Hippocratic Medicine* forecloses AFT's organizational injury theories. AFT does not—and cannot—allege that MOHELA injured it directly, as it is not a recipient of student

loans. Instead, as in *Alliance for Hippocratic Medicine*, AFT claims standing based on "incurring costs to oppose [MOHELA's] actions." *Id.* at 394. Indeed, AFT's allegations of injury read almost as though AFT modeled them on those the Supreme Court found insufficient. AFT claims that MOHELA's alleged actions "required" it to spend time and money on debt clinics, investigations of MOHELA, congressional testimony, events, reports, and other "advocacy campaigns." Compl. ¶¶ 23–28, 225. But *Alliance for Hippocratic Medicine* expressly rejected a bid for standing based on allegations that FDA "'caused' the associations to conduct their own studies on mifepristone" and "'forced' the associations to 'expend considerable time, energy, and resources'" on public advocacy and education. 602 U.S. at 394. AFT also alleges that MOHELA's actions "forced [it] to divert resources and attention that would otherwise have been spent focused on [other] issues." Compl. ¶ 225. But, again, *Alliance for Hippocratic Medicine* held that an organization cannot claim standing from having "spen[t] 'considerable resources' to the detriment of other spending priorities." 602 U.S. at 394. Finally, AFT alleges that it "is unable to assure the economic stability and dignity of its members" because of MOHELA's actions. Compl. ¶ 30. But *Alliance for Hippocratic Medicine* rejected that theory too, holding that standing requires a plaintiff to "show far more than simply a setback to the organization's abstract social interests." 602 U.S. at 394 (cleaned up).

       *Alliance for Hippocratic Medicine* controls this case. Here, as there, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.*

       Furthermore, this Court has already rejected strikingly similar allegations of injury from AFT. In *Weingarten v. Devos*, AFT sued the Department of Education for allegedly denying PSLF

applications in a manner inconsistent with due process. 468 F. Supp. 3d 323, 326, 331–32 (D.D.C. 2020). Foreshadowing this case, AFT alleged that the Department's actions "directly conflict[ed] with" AFT's "organizational mission" and "caused" AFT "to redirect its resources from other projects to assist its members in seeking and obtaining the loan forgiveness to which they are statutorily entitled." *Id.* at 334. This Court, however, rejected AFT's claim of organizational standing because AFT failed to "identify any organizational activities the Department's actions have impeded *directly*." *Id.* (emphasis added). The Court explained that AFT's "allegation that it has had to redirect its resources from other projects" was insufficient because the organization must allege that "something about the challenged action itself—rather than the organization's response to it—makes the organization's task more difficult." *Id.* (cleaned up). The Court also held that AFT's "allegation that the Department's actions directly conflict with its organizational mission [was] plainly insufficient because organizations that merely allege that their mission has been compromised have not suffered an injury-in-fact." *Id.* at 334.

The same reasoning applies here. AFT again claims organizational standing based not on the "challenged action itself" but on AFT's "response to it," as well as on alleged harm to "its organizational mission." *Id.* This Court should therefore again conclude that AFT "has failed to assert organizational standing." *Id.*

### B. AFT Lacks Associational Standing To Assert a Claim on Behalf of Its Members (Count II).

AFT lacks standing for Count II, which it brings on behalf of its members, because its allegations do not establish associational standing. To establish associational standing, an organization must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither

the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

AFT lacks associational standing because Count II requires the participation of individual members in two respects. *First*, individual participation is necessary because Count II seeks monetary damages. Courts have "required individual participation in a suit when necessary for damage determinations." *Ctr. for Auto Safety v. Natl. Hwy. Traffic Safety Admin.*, 793 F.2d 1322, 1329 n.44 (D.C. Cir. 1986). Indeed, the *Hunt* test "ha[s] been understood to preclude associational standing when an organization seeks damages on behalf of its members." *United Food & Com. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 554 (1996). Yet Count II does just that. AFT's prayer for relief seeks "treble damages, or $1,500 per violation, whichever is greater," or, "in the alternative, an award of actual damages to Plaintiff." Compl. Prayer for Relief. This alone precludes AFT from establishing associational standing.

*Second*, Count II itself requires individual participation. Courts have required individual participation when "the claims pursued … require the consideration of the individual circumstances of any aggrieved member of the organization." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015). *Weingarten* again illustrates this principle. There, the Court held that AFT could not establish associational standing because resolving AFT's due process claim would require "testimony from various [AFT] members whose experiences evidence the Department's violations" and because "the complaint itself demonstrate[d] that this case requires substantial … participation" of individual members given that it contained many "detailed allegations about the distinctly different types and different amounts of process that each applicant received." 468 F. Supp. 3d at 335 (cleaned up). As a result, the court could not "evaluate" AFT's

legal claims "without evaluating the particular, fact-specific experiences of numerous individual members." *Id.*

Count II suffers from the same defects. For example, under the heading "MOHELA Fails to Bill *Some* Borrowers and Inaccurately Bills *Others*," Compl. at 23 (emphases added), AFT alleges over just eight paragraphs that MOHELA harmed at least six separate groups of borrowers: those billed "for an incorrect amount," those put "back into repayment who should have been in forbearance," those "who wished to make payments on their loans but were stuck in forbearance," those who "remained in repayment but believed that their bills contained errors," those who had "incorrect amounts … withdrawn from their bank accounts," and those whose accounts were automatically debited even though "they had never authorized MOHELA to debit their bank account." Compl. ¶¶ 118–125. Numerous other allegations similarly involve acts allegedly affecting subsets of borrowers. *E.g.*, *id.* ¶¶ 132, 135, 137, 139, 140, 152, 167–169. AFT's Prayer for Relief again drives the point home, seeking "additional relief as may be necessary to restore … Plaintiff's members … to their rightful positions." *Id.* Prayer for Relief.

Count II is thus far from a claim focusing on a "uniform constitutional deficiency," *Weingarten*, 468 F. Supp. 3d at 335, or a "pure question of law" of the sort that does not require "consideration of the individual circumstances of any aggrieved member of the organization[]," *Jewell*, 779 F.3d at 597. Instead, it rests on a hodgepodge of "detailed allegations about the distinctly different types and different amounts of" harm to AFT members. *Weingarten*, 468 F. Supp. 3d at 335. Count II is therefore a quintessential claim in which "a specific factual setting is needed to illuminate the issues," *Ctr. for Auto Safety*, 793 F.2d at 1329 n.44, and thus a claim for which AFT lacks associational standing.

C.   **AFT Lacks Standing To Assert a Claim on Behalf of the General Public (Count III).**

Finally, AFT lacks standing as to Count III, which it brings on behalf of the general public. Such a claim violates the most basic standing requirement that the injury be particularized to the plaintiff. *See, e.g.*, *All. for Hippocratic Med.*, 602 U.S. at 381 (noting that, for standing purposes, an injury "must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance"). Indeed, the purpose of Article III standing is "screen[ing] out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381. "Vindicating 'the public interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive,'" not private parties. *Id.* at 382 (quoting *Lujan*, 504 U.S. at 576).

III.   **AFT'S CLAIMS ARE PREEMPTED BY THE HIGHER EDUCATION ACT.**

The Supremacy Clause vests in Congress the power to preempt state law. *See Arizona v. United States*, 567 U.S. 387, 399 (2012). "Congress's preemption of state law can take two forms: express or implied." *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 346 (D.C. Cir. 2018). "Express preemption arises when the federal statute itself announces its displacement of state law through 'an express preemption provision.'" *Id.* (quoting *Arizona*, 567 U.S. at 399). "Implied preemption supplants state law not through an explicit statutory provision, but through the substantive nature and reach of the federal regulatory scheme that Congress adopts." *Id.* One form of implied preemption is "conflict preemption," which occurs when "federal and state law clash in a way that makes compliance with both state and federal law … impossible, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 347 (cleaned up). AFT's CPPA claims are preempted both expressly and impliedly by the HEA.

28

A.      **The Higher Education Act Expressly Preempts AFT's Claims Insofar as They Challenge the Adequacy of MOHELA's Disclosures.**

Under the HEA, "[l]oans made, insured, or guaranteed pursuant to a program authorized by Title IV of the Higher Education Act of 1965"—which include the Direct and FFELP Loans at issue here—"shall not be subject to any disclosure requirements of any State law." 20 U.S.C. § 1098g. To determine whether § 1098g applies, courts look at the substance of the claim. *See Chae v. SLM Corp.*, 593 F.3d 936, 943 (9th Cir. 2010). A state-law claim is preempted both where the plaintiff "seek[s] specific disclosures" and where the plaintiff simply seeks to hold the defendant servicer liable for failing to disclose information. *Id.*; *see also Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 650 (7th Cir. 2019) (claims "that require proof that defendant failed to disclose information" are preempted by 20 U.S.C. § 1098g).

The Ninth Circuit's decision in *Chae* illustrates how § 1098g applies. There, the plaintiffs claimed that the defendant loan servicer violated California's Unfair Competition Law "by using billing statements and coupon books that trick borrowers into thinking that interest is being calculated via the installment method," despite actually using a less favorable method. 593 F.3d at 942. The plaintiffs also charged that the loan servicer's "billing statements and standardized loan applications 'misrepresent[] that the student loans confer rights, responsibilities, and obligations, which do not exist." *Id.* The Ninth Circuit, however, concluded that these supposed misrepresentations were merely "re-styled improper-disclosure claims" and were thus preempted. *Id.* In the student loan context, the Court explained, "the state-law prohibition on misrepresenting a business practice is merely the converse of a state-law requirement that alternate disclosures be made." *Id.* at 943 (cleaned up); *see also Linsley v. FMS Inv. Corp.*, 2012 WL 1309840, at *6 (D. Conn. Apr. 17, 2012) (Plaintiff "may not avoid preemption by relabeling his otherwise-preempted claim as one of misrepresentation and not improper disclosure.").

Here, AFT has raised numerous allegations that are, in effect, preempted disclosure claims:

*Call center and website*. AFT's allegations about MOHELA's call center, website, app, and Twitter account are all "improper-disclosure claims." AFT faults each of these platforms for failing to provide borrowers with the information they sought. *See* Compl. ¶¶ 156–186. According to AFT, borrowers seeking information from call centers encountered "unreasonably long wait times" and agents who were unable to answer their questions. *Id.* ¶¶ 166–171, 183. AFT further alleges that borrowers encountered similar difficulties obtaining information online and via Twitter, and that these difficulties were exacerbated when MOHELA discontinued its mobile app. *See id.* ¶¶ 167, 173–176, 186. These issues allegedly left borrowers with information "insufficient to meet their needs," "caused confusion," and led some borrowers to make unnecessary payments. *Id.* ¶¶ 171, 183, 216, 237, 258. Boiled down, all these allegations are claims that MOHELA "failed to disclose information" and are therefore preempted. *Nelson*, 928 F.3d at 650.

*Communications with borrowers*. Many of AFT's allegations regarding MOHELA's communications with borrowers are likewise "re-styled improper-disclosure claims." *Chae*, 593 F.3d at 942. These allegations claim that MOHELA provided inaccurate information regarding the transition from REPAYE to SAVE, *see* Compl. ¶ 130; the correct timing for income recertification for IDR plans, *see id.* ¶¶ 148–150; and the consequences of consolidating loans, *see id.* ¶¶ 152–153; *see also id.* ¶ 154 (faulting MOHELA for not engaging in "outreach to maximize participation in the IDR Account Adjustment"). As in *Chae*, these allegations are "merely the converse of a state-law requirement that alternate disclosures be made," 593 F.3d at 943 (cleaned up), and are therefore preempted.

*Billing Statements*. AFT's claims challenging the language in MOHELA's billing statements are likewise "re-styled improper-disclosure claims." *Chae*, 539 F.3d at 942. AFT

alleges vague "inaccura[cies]" in the billing statements. Compl. ¶¶ 116–117. These allegations effectively fault MOHELA for failing to disclose pertinent information and thus are preempted.

## B.     The Higher Education Act Conflicts with, and thus Preempts, AFT's Claims.

AFT's claims are also preempted because, if accepted, they would make "compliance with … federal law impossible" and would "stan[d] as an obstacle to the accomplishment and execution of the full purposes and objectives of [the Higher Education Act]." *Sickle*, 884 F.3d at 347.

### 1.     AFT's Effort to Hold MOHELA Liable for a "Call Deflection Scheme" Directed by the Department Is Preempted.

AFT asserts that MOHELA violated the CPPA "by concocting a call deflection scheme" in which borrowers were directed to "self-service options," such as website FAQs, and away from call centers. Compl. ¶¶ 216, 237, 258; *see also id.* ¶¶ 156–172, 184–190, 200–201. Yet MOHELA implemented call deflection *at the direction of the Department*. Where, as here, it is impossible "to comply with both state and federal requirements," the state requirements are preempted. *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 303 (2019) (cleaned up).

Here, the Department's Return to Repayment Playbook directed MOHELA and other loan servicers to use "call deflection," a phrase appearing thirteen times throughout the document. *See* Dkt. 1-5 at 3. MOHELA was required to implement this guidance under the terms of its Department contract, which mandates that MOHELA's services comply with "all federal and state laws and regulations" as well as supplemental "requirements" issued by the Office of Federal Student Aid—*i.e.*, Department guidance. Dkt. 1-3 at 28 (Direct Loan Servicer Contract); *see also id.* Att. A-2 at 2 ("The servicer shall incorporate a system of internal controls consistent with federal laws, regulations, policies and authoritative guidance."). State laws like the CPPA are preempted to the extent they conflict with obligations such as these in federal contracts. *E.g.*, *Pub. Utils. Comm'n of State of Cal. v. United States*, 355 U.S. 534, 544 (1958); *Geo Grp., Inc. v.*

*Newsom*, 50 F.4th 745, 762 (9th Cir. 2022). AFT cannot use state law to effectively veto how the Department chooses to manage federal loan programs. *See Student Loan Servicing All. v. District of Columbia*, 351 F. Supp. 3d 26, 62–64 (D.D.C. 2018).

### 2.   AFT's Claims Would Frustrate the HEA's Goal of Uniform Operation of Federal Student Loan Programs.

AFT's claims are also preempted because they would obstruct the uniform administration of federal student loan programs. Congress intended that the Direct Loan, FFELP, and PSLF programs "operate uniformly," *Chae*, 593 F.3d at 944, as evidenced by 20 U.S.C. § 1082(*l*)(1), which directs the Department to develop "*standardized* forms and procedures" for servicing and other activities respecting such loans. *Id.* (emphasis added). Indeed, § 1082 is titled "Uniform administrative and claims procedures."

AFT's claims threaten this uniformity by seeking to impose *unique* "forms and procedures" specifically in D.C. *Id.* AFT's allegations that MOHELA failed to "Timely Process Important Borrower [income-derived repayment], PSLF, and Refund Applications," Compl. at 25; *see id.* ¶¶ 126–144, for example, effectively seek to impose deadlines on MOHELA's application processing even though federal law avoids setting such deadlines. *Cf. Chae*, 593 F.3d at 948 ("If federal law … gives up to sixty days for repayment, to say that state law … requires a prompter repayment period is in conflict."). Similarly, AFT's allegations as to the information and timing of MOHELA's billing statements would create rules for such statements that apply only in D.C. Compl. ¶¶ 116–117.

More broadly, allowing state-law claims against federal student loan servicers would leave those servicers—and, by extension, the Department—"faced with a baffling patchwork of rules" across the fifty states and District of Columbia. *Northwest Inc. v. Ginsberg*, 572 U.S. 273, 288 (2014). Because that result is squarely at odds with the HEA's purpose of *standardizing* the

procedures by which federal loans are serviced and loan forgiveness opportunities are afforded to borrowers, the HEA preempts such claims.

## IV.   AFT FAILS TO STATE A CLAIM UNDER THE D.C. CONSUMER PROTECTION PROCEDURES ACT.

Finally, AFT's claims fail under the CPPA itself. AFT brushes past essential elements and pleading requirements for CPPA claims and ignores the statute's basic territorial limitations. These failures provide further grounds for dismissal.

### A.   AFT Fails to Allege a Consumer-Merchant Relationship.

AFT fails to state a claim under the CPPA because it fails to allege a consumer-merchant relationship between borrowers and MOHELA. The CPPA "was designed to police trade practices arising only out of consumer-merchant relationships." *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (1981). A viable CPPA claim thus requires pleading the existence of a consumer-merchant relationship within which the alleged unfair or deceptive trade practices occurred. *See Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 949 (D.C. Cir. 2017) (affirming dismissal for failure to allege actions "within the context of a consumer-merchant relationship, as required by the CPPA").

AFT does not allege facts showing this necessary element of its claims. AFT tries to fit the relationship between borrowers and MOHELA into the consumer-merchant category by stating that MOHELA "provid[es] loan servicing to borrowers with federal student loans." Compl. ¶¶ 207, 228, 249. But the commercial transaction involving loan servicing occurs between MOHELA and the *Department*, which purchases those services from MOHELA. MOHELA and federal student loan borrowers have no commercial relationship. The Department makes loans directly to borrowers, and there is no allegation that MOHELA is involved in loan origination. *See id.* ¶ 48. It is only after a loan has been issued that MOHELA enters the picture as the servicer, performing

a role the Department would otherwise have to perform itself. *See id.* ¶¶ 66–67. The borrower neither chooses nor contracts with MOHELA, and MOHELA does not sell its loan management services to borrowers. *See id.* ¶ 10 (noting borrower's servicer is "designated" by the government). Thus, borrowers neither "purchase" nor "provide the economic demand" for MOHELA's services. D.C. Code § 28-3901(a)(2)(A) (definition of consumer under CPPA).

For this reason, courts have consistently dismissed CPPA claims by borrowers against student loan servicers. First, in *Edmond v. American Education Services*, No. 10 Civ. 0578 (JDB), 2010 WL 4269129 (D.D.C. Oct. 28, 2010), this Court dismissed a borrower's CPPA claim against the loan servicer PHEAA. The borrower claimed that the loan servicer "erroneously reported his accounts delinquent to three credit reporting agencies, … denied his request for forbearance, … and subjected him … to 'shrill, harassing and predatory acts' in its attempt to collect the debt." *Id.* at *1. Explaining that CPPA claims apply only where "there exists [a] consumer-merchant relationship," the Court dismissed the claim because "plaintiff is not a consumer seeking relief as against a merchant with whom he contracted for services." *Id.* at *4. Rather, the loan at issue was "extended by Bank of America," who contracted with the plaintiff-consumer. *Id.*

The Central District of California also dismissed CPPA claims brought by borrowers who obtained loans under the Direct Loan Program and were enrolled in PSLF-eligible IDR plans. *Winebarger v. Pa. Higher Educ. Assistance Agency*, 411 F. Supp. 3d 1070, 1079-80 (C.D. Cal. 2019). Alleging that PHEAA incorrectly tallied their PSLF-eligible payments, borrowers sued PHEAA under the CPPA and other statutes. *Id.* at 1080. The Court dismissed the CPPA claims because "[l]iability under the CPPA is limited to merchants," and "[l]oan servicers, such as PHEAA, are not 'merchants' and, thus, are not subject to liability under the CPPA." *Id.* at 1093–94 (citing *Mushala v. U.S. Bank, N.A.*, No. 18 Civ. 1680 (JDB), 2019 WL 1429523 (D.D.C. Mar.

29, 2019), which held that a home-loan borrower "did not become a consumer of the [residential loan] services … by owing money under the Note or being subject to the foreclosure proceeding").

Most recently, another judge of this Court dismissed CPPA claims brought by a borrower of private student loans. *Michaels v. NCO Fin. Sys., Inc.*, No. 16 Civ. 1339 (TFH), 2020 WL 2800664 (D.D.C. May 29, 2020), *aff'd*, 2023 WL 3563079, at *2 (D.C. Cir. May 19, 2023). The borrower claimed that the loans' servicer and subservicer violated the CPPA when they filed a debt collection lawsuit against her. This Court dismissed the CPPA claim, however, because the servicer and subservicer "did not provide [the borrower] with any goods or services, and their actions did not occur in the context of a consumer-merchant relationship." *Id.* at *8.

In all relevant senses, this case is like *Edmonds*, *Winebarger*, and *Michaels*. In each case, a federal student loan borrower brought a CPPA claim against a servicer. And in each, the court concluded that the borrower had failed to state a claim under the CPPA because such borrowers are not "consumers" who purchase the servicer's loan management services. The same conclusion is warranted here.

### B.       AFT Fails to Allege a Trade Practice.

A CPPA plaintiff also must allege that the defendant "engage[d] in an unfair or deceptive *trade practice*." D.C. Code § 28-3904(a) (emphasis added). The phrase "trade practice" is defined by the CPPA as "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, *a sale, lease or transfer*, of consumer goods or services." *Id.* § 28-3901(a)(6) (emphasis added).

AFT attempts to satisfy the "trade practice" requirement by stating in its Complaint that "MOHELA's acts while servicing federal student loans are 'trade practices' within the meaning of D.C. Code § 28-3901(a)(6)," and that the relevant "consumer good or service" is loan servicing.

Compl. ¶¶ 207, 228, 249. But none of the acts alleged in the Complaint are trade practices within the meaning of the CPPA because none of the alleged acts "create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a *sale, lease or transfer*" of loan services. D.C. Code § 28-3901(a)(6).

As explained above, AFT's Complaint concerns MOHELA's *performance* as a loan servicer, including its communications with borrowers, billing practices, procedures for handling borrower questions, call center staffing, and processing of loan forgiveness applications. None of this conduct concerns a "sale, lease or transfer" of loan services. Indeed, all this conduct necessarily occurred *after* MOHELA's "sale, lease, or transfer" of its loan management services *to the Department*, not to borrowers. *See DeBerry v. First Gov't Mortg. & Invs. Corp.*, 743 A.2d 699, 701 (D.C. 1999) (giving terms "sale" and "lease" ordinary meaning); *see also Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 221 (D.C. Cir. 2018) (construing the term "transfers" in the statutory phrase "transfers, sells, or conveys" in light of neighboring words to require change of ownership). Because the acts AFT complains of occurred after that sale, those acts cannot be said to "create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate" that sale. D.C. Code § 28-3901(a)(6).

The CPPA's focus on a "sale, lease, or transfer" is closely related to the requirement that any alleged "unfair or deceptive trade practices" be *material*. *See generally* D.C. Code § 28-3904. "[A] misrepresentation or omission is 'material' if a reasonable person 'would attach importance to its existence or nonexistence *in determining his or her choice of action in the transaction*' or 'the maker of the representation knows or has reason to know' that the recipient likely 'regard[s] the matter as important in determining his or her choice of action.'" *Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999, 1005 (D.C. 2020) (quoting *Saucier v. Countrywide Home Loans*, 64

A.3d 428, 442 (D.C. 2013)) (emphasis added). Put another way, the CPPA does not create liability for all deceptive or unfair acts but only for those material to a "sale, lease, or transfer, of consumer goods or services," among other requirements. *E.g.*, *Grayson v. AT&T Corp.*, 15 A.3d 219, 251 (D.C. 2011) (en banc) ("[Plaintiff] makes no showing through his allegations or reasonable inferences from them that [defendants' actions are] … material to the *decision to purchase*…" (emphasis added)). Here, however, there was no cognizable transaction respecting MOHELA's services. AFT does not allege that borrowers had any choice or involvement in selecting MOHELA as the servicer of their loans. AFT's inability to connect its allegations to the "sale, lease, or transfer" of MOHELA's loan management services is fatal to its claims.

## C.     AFT Cannot Seek CPPA Relief for Out-Of-State Borrowers.

At a minimum, AFT's CPPA claims must be dismissed to the extent they seek relief related to borrowers outside the District of Columbia. The CPPA "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received *in the District of Columbia*." D.C. Code § 28-3901(c) (emphasis added). The CPPA therefore does not operate extraterritorially. *See Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1045 (D.C. Cir. 2010); *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180–81 (D.C. 2006); *Fastov v. Christie's Int'l PLC*, No. 1:97cv0578 (PLF), 2006 WL 8460194, at *9 (D.D.C. Mar. 1, 2006). Nor could it. *See Allstate Ins. Co. v. Hague*, 449 U.S. 302, 310–11 (1981) (plurality opinion) ("[I]f a State has only an insignificant contact with the parties and the occurrence or transaction, application of its law is unconstitutional.").

AFT nevertheless attempts to apply the CPPA extraterritorially. Its claims appear to rely on the experiences of borrowers across its 1.8 million members nationwide. Compl. ¶¶ 17, 32. Yet insofar as any cognizable "services … [were] received in the District of Columbia," D.C. Code

§ 28-3901(c), such services could have been received only by borrowers among the 5,000 AFT members allegedly residing in D.C., *see* Compl. ¶ 17. Only the claims on behalf of those D.C.-based borrowers could be cognizable under the CPPA. *See Shaw*, 605 F.3d at 1045 (concluding Michigan-based plaintiff "cannot state a claim under the CPPA" against a Maryland-based defendant where "nothing related to the dispute between the two occurred in the District of Columbia."); *Rotunda v. Marriott Int'l, Inc.*, No. 2011 CA 006829 B, 2013 WL 11015730, at *4 (D.C. Super. Ct. Oct. 31, 2013) (excluding "Nonresidents of the District of Columbia" from the CPPA claim).

### D.    Count III Is Improperly Pleaded.

Finally, Count III must be dismissed because AFT fails to plead the necessary allegations for a claim on behalf of the "general public." *See* Compl. ¶ 248 (asserting Count III "on behalf of members of the general public whose federal student loans are serviced by MOHELA"). It is well-established that to bring a suit for damages on behalf of the "general public," an individual plaintiff must meet the D.C. Superior Court Rule of Civil Procedure 23 prerequisites to be a class representative, which mirror those contained in the Federal Rules. *See Rotunda v. Marriott Int'l, Inc.*, 123 A.3d 980, 988–89 (D.C. 2015). That is because an action on behalf of the general public poses the same "unique challenges to procedural fairness and administration" as a class action. *Id.* at 989. Noting the "grave due process concerns" that would arise in the absence of Rule 23 procedures, the D.C. Court of Appeals has held that those procedures apply to CPPA actions brought under D.C. Code § 28–3905(k)(1)(B)–(C). *Id.* at 986.

AFT's failure to plead allegations establishing that it meets the Rule 23 requirements is fatal to its claim. Among other failures, AFT neglects the same requirements in D.C. Superior Court Rule of Civil Procedure 23-I that led to dismissal of the claim in *Rotunda*. *See id.* at 982.

Those requirements include pleading "a reference to the portion or portions of Rule 23, under which the suit is claimed properly to be maintainable as a class action" and "appropriate allegations justifying the claim," like "the size (or approximate size) and definition of the alleged class," "the basis on which the plaintiff claims to be an adequate representative of the class," and "the alleged questions of law and fact claimed to be common to the class." D.C. Super. Ct. R. Civ. P. 23-I(a). All such allegations must be "under a separate heading styled 'Class Action Allegations.'" *Id.* AFT does none of this. As a result, Count III should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss should be granted and AFT's Complaint should be dismissed.  To the extent the Court reaches the merits of AFT's claims and dismisses, such dismissal should be with prejudice.


Dated: September 25, 2024          Respectfully submitted,

<u>/s/ Daniel J. Feith</u>
Daniel J. Feith (D.C. Bar No. 1028433)
Benjamin M. Mundel (D.C. Bar No. 1018114)
Brooke E. Boyd (D.C. Bar No. 1721284)
Jeremy D. Rozansky (D.C. Bar No. 90009027)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
T: (202) 736-8000
F: (202) 736-8711
dfeith@sidley.com

*Counsel for MOHELA*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 25, 2024, I caused the foregoing to be filed using the

Court's CM/ECF system, which will send electronic notifications to all counsel of record.

<u>/s/ Daniel J. Feith</u>
Daniel J. Feith

40

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FEDERATION OF TEACHERS,<br><br>               *Plaintiff*,<br><br>  v.<br><br>HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI,<br><br>               *Defendant*. | Case No. 1:24-cv-2460-TSC |

[PROPOSED] <u>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**</u>

This matter having come before the Court on Defendant Higher Education Loan Authority of the State of Missouri's Motion to Dismiss the Complaint, and the Court having fully considered the Motion:

IT IS HEREBY ORDERED THAT:

1.     Defendant's Motion is GRANTED.

2.     Plaintiff American Federation of Teachers's claims are dismissed in their entirety [with prejudice].

Entered this ___ day of _____, 2024

 

_____
Hon. Tanya S. Chutkan
United States District Judge

Pursuant to Local Civil Rule 7(k), Defendant Higher Education Loan Authority of the

State of Missouri appends the following list of attorneys who are to be notified of its entry:

Faith Gay
Lena Konanova
David A. Coon
Corey Stoughton
Adam Gould
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
fgay@selendygay.com
lkonanova@selendygay.com
cstoughton@selendygay.com
dcoon@selendygay.com
agould@selendygay.com


Persis Yu
STUDENT BORROWER PROTECTION CENTER
1025 Connecticut Ave NW, #717
Washington, DC 20036
persis@protectborrowers.org


R. T. Winston Berkman-Breen
Khandice Lofton
STUDENT BORROWER PROTECTION CENTER
40 Rector Street, 9th Floor
New York, NY 10006
winston@protectborrowers.org
khandice@protectborrowers.org


Shennan Kavanagh
Jennifer Wagner
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th Floor
Boston, MA 02110
skavanagh@nclc.org
jwagner@nclc.org

Alpha Taylor
NATIONAL CONSUMER LAW CENTER
1001 Connecticut Ave. NW
Washington, DC 20036
ataylor@nclc.org

*Counsel for Plaintiff*

Daniel J. Feith
Benjamin M. Mundel
Brooke E. Boyd
Jeremy D. Rozansky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
dfeith@sidley.com
bmundel@sidley.com
brooke.boyd@sidley.com
jrozansky@sidley.com

*Counsel for Defendant*