## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**AMERICAN FEDERATION OF TEACHERS**,

        Plaintiff,

    v.

**THE HIGHER EDUCATION LOAN
AUTHORITY OF THE STATE OF MISSOURI**,

        Defendant.

Case No. 1:24-cv-2460-TSC
Judge Tanya S. Chutkan

## PLAINTIFF'S MOTION TO REMAND AND
## INCORPORATED MEMORANDUM OF LAW

Shennan Kavanagh (BBO #655174)
Jennifer Wagner* (WVSB #10639)
National Consumer Law Center
7 Winthrop Square, 4th Floor
Boston, MA 02110
617.542.8010
skavanagh@nclc.org
jwagner@nclc.org

Alpha Taylor (DC Bar #252602)
National Consumer Law Center
1001 Connecticut Ave., NW
Washington, D.C. 20036
202.452.6252
ataylor@nclc.org

Faith Gay (NY Bar # 2117117)
Lena Konanova (NY Bar # 4758942)
David A. Coon (NY Bar # 5538020)
Corey Stoughton (DC Bar # 472867)
Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000
fgay@selendygay.com
lkonanova@selendygay.com
cstoughton@selendygay.com
dcoon@selendygay.com

Persis Yu (DC Bar # 90014714)
Student Borrower Protection Center (a fiscally
sponsored project of the Shared Ascent Fund)
1025 Connecticut Ave NW, #717
Washington, D.C. 20036
(202) 618-1328
persis@protectborrowers.org

R. T. Winston Berkman-Breen
(NY Bar # 5559372)
Khandice Lofton* (OH Bar # 101015)
Student Borrower Protection Center (a fiscally
sponsored project of the Shared Ascent Fund)
40 Rector Street, 9th Floor
New York, NY 10006
winston@protectborrowers.org
khandice@protectborrowers.org

*Counsel for Plaintiff American Federation of
Teachers*

\* Application for admission *pro hac vice*
forthcoming

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF THE CASE.....................................................................................3

ARGUMENT ..............................................................................................................5

I.     MOHELA DOES NOT QUALIFY FOR REMOVAL UNDER THE FEDERAL OFFICER REMOVAL STATUTE..................................................................5

     A.     MOHELA's Contract Demonstrates MOHELA's Wrongful Conduct Is Not Directed By The Department Of Education.............................................6

     B.     MOHELA's Wrongful Conduct Does Not Relate To MOHELA's Duties Under Its Contract With The Department Of Education .......................................9

     C.     MOHELA Does Not Have A Colorable Federal Defense ....................................13

          1.     MOHELA's State Sovereign Immunity Argument Is Futile ....................13

               a.     MOHELA Is Financially Independent From Missouri..................14

               b.     Missouri Did Not Intend MOHELA To Be An Arm Of The State................................................................................................17

               c.     Missouri Has Minimal Control Over MOHELA ...........................18

               d.     Four District Courts, Including In The Eastern District Of Missouri, Have Found MOHELA Does Not Qualify For Sovereign Immunity.......................................................................19

          2.     MOHELA Is Not Entitled To Derivative Federal Sovereign Immunity...............................................................................................23

          3.     AFT's Claims Are Not Preempted By The HEA......................................26

               a.     AFT's Claims Are Not Expressly Preempted By The HEA..........27

               b.     AFT's Claims Do Not Conflict With The HEA ...........................30

II.     THERE IS NO FEDERAL QUESTION JURISDICTION .............................................33

     A.     No Federal Issue Is "Necessarily Raised" In AFT's Claims ................................34

     B.     Any Federal Issues Are Neither Substantial Nor Disputed ...................................36

C.      The Balance Of Federal And State Judicial Responsibilities Favors Remand ..................................................................................................................39

CONCLUSION .................................................................................................................41

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Alden v. Maine*,
　527 U.S. 706 (1999).........................................................................................................14

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO, Council 61 v. Missouri*,
　653 S.W.3d 111 (Mo. 2022) ...........................................................................................18

*Bender v. Jordan*,
　623 F.3d 1128 (D.C. Cir. 2010).......................................................................................37

*Biden v. Nebraska*,
　134 S. Ct. 2355 (2023)...............................................................................................16, 17

*Brady v. Roosevelt S.S. Co.*,
　317 U.S. 575 (1943).........................................................................................................23

*Brown v. United States*,
　327 F.3d 1198 (D.C. Cir. 2003).......................................................................................33

*Cabalce v. Thomas E. Blanchard & Assoc., Inc.*,
　797 F.3d 720 (9th Cir. 2015) .............................................................................................7

*California v. ARC Am. Corp.*,
　490 U.S. 93 (1989)......................................................................................................3, 40

*California v. Navient Corp. et al.*,
　Case No. CGC-18-567732 (Cal. Sup. Ct., San. Fran. Cty.).............................................35

*Campbell-Ewald Co. v. Gomez*,
　577 U.S. 153 (2016)...................................................................................................23, 24

*Caterpillar Inc. v. Williams*,
　482 U.S. 386 (1987)...........................................................................................................3

*Chae v. SLM Corp.*,
　593 F.3d 936 (9th Cir. 2010) ...........................................................................................30

*Cobb v. GC Servs., LP*,
　2016 WL 7155765 (S.D. W. Va. Dec. 7, 2016)................................................................7

*Coles v. Howard Univ.*,
　2023 WL 7156534 (D.D.C. Oct. 31, 2023) .....................................................................38

*College Loan Corp.* v. *SLM Corp.*,
　396 F.3d 588 (4th Cir. 2005)...........................................................................................38

*Collins v. Pension Benefit Guar. Corp.*,
   881 F.3d 69 (D.C. Cir. 2018) .................................................................................7

*Comm'ns Imp. Exp. S.A. v. Republic of the Congo*,
   757 F.3d 321 (D.C. Cir. 2014) ............................................................................31

*D.C. Ass'n of Chtd. Pub. Sch. v. Dist. of Columbia*,
   930 F.3d 487 (D.C. Cir. 2019) ............................................................................34

*\*District of Columbia v. Exxon Mobil Corp.*,
   89 F.4th 144 (D.C. Cir. 2023) .......................................................................*passim*

*\*Dykes v. Missouri Higher Educ. Loan Auth.*,
   2021 WL 3206691 (E.D. Mo. July 29, 2021) .............................................16, 19

*Empire HealthChoice Assurance, Inc. v. McVeigh*,
   547 U.S. 677 (2006) .....................................................................................36, 38

*Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*,
   776 F.3d 463 (7th Cir. 2015) ........................................................................40, 41

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
   373 U.S. 132 (1963) ............................................................................................40

*General Motors Corp. v. Abrams*,
   897 F.2d 34 (2d Cir. 1990) ..................................................................................27

*Genna v. Sallie Mae, Inc.*,
   2012 WL 1339482 (S.D.N.Y. Apr. 17, 2012) .....................................................28

*Goldfarb v. Va. State Bar*,
   421 U.S. 773 (1975) ............................................................................................39

*Good v. U.S. Dep't of Educ.*,
   2022 WL 2191758 (D. Kan. June 16, 2022) ...........................................20, 21, 22

*Gowens v. Capella University, Inc.*,
   2020 WL 10180669 (N.D. Ala. June 1, 2020) ........................................20, 21, 22

*Grable & Sons Metal Prods, Inc. v. Darue Eng'g & Mfg.*
   545 U.S. 308 (2005) ....................................................................................34, 36, 40

*\*Gunn v. Minton*,
   568 U.S. 251 (2013) .....................................................................................*passim*

*Hennessey v. Univ. of Kan. Hosp. Auth.*,
   53 F.4th 516 (10th Cir. 2022) ........................................................................20, 21

*Herman Miller v. Thom Rock Realty Co.*,
  46 F.3d 183 (2d. Cir. 1995)................................................................................23

*Hess v. Port Auth. Trans-Hudson Corp.*,
  513 U.S. 30 (1994).............................................................................................14

*Hilbert v. McDonnell Doughlas Corp.*,
  529 F. Supp. 2d 187 (D. Mass. 2008) ...............................................................13

*Holston v. Pa. Higher Educ. Assistance Agency*,
  2019 WL 4745051 (D.N.J. Sept. 30, 2019) .........................................................7

*Hyland v. Navient Corp.*,
  2019 WL 2918238 (S.D.N.Y. July 8, 2019) ................................................27, 28

*Jernigan v. City of Eufaula, Ala.*,
  123 F. Supp. 3d 1322 (M.D. Ala. 2015) ............................................................22

*K.M.C. Co. v. Irving Tr. Co.*,
  757 F.2d 752 (6th Cir. 1985) .............................................................................23

*In re KBR, Inc. Burn Pit Litig.*,
  744 F.3d 326 (4th Cir. 2014) .............................................................................24

*Kormendi/Gardner Partners v. Surplus Acquisition Venture, LLC*,
  606 F. Supp. 2d 114 (D.D.C. 2009) ..................................................................13

*Lang v. Pennsylvania Higher Educ. Assistance Agency*,
  610 Fed. App'x 158 (3d Cir. 2015).....................................................................15

*Lapides v. Bd. of Regents of Univ. Sys. of Ga.*,
  535 U.S. 613 (2002)............................................................................................14

*\*Lawson-Ross v. Great Lakes Higher Educ. Corp.*,
  955 F.3d 908 (11th Cir. 2020) ................................................................... *passim*

*Loper Bright Enter. v. Raimondo*,
  144 S. Ct. 2244 (2024)..................................................................................32, 33

*Massachusetts v. Pa. Higher Educ. Assistance Agency*,
  No. 1784-cv-02682-BLS2 (Mass. Super. Ct., Suff. Cty.)....................................35

*Mesa v. California*,
  489 U.S. 121 (1989)......................................................................................11, 13

*Miller v. Advantage Behav. Health Sys.*,
  677 Fed. App'x 556 (11th Cir. 2017) .................................................................22

*MobilizeGreen, Inc. v. Cmty. Found. for Nat'l Cap. Region,
    101 F. Supp. 3d 36 (D.D.C. 2015) .......................................................................6, 10

Morris v. Washington Metro. Area Transit Auth.,
    781 F.2d 218 (D.C. Cir. 1986) ..................................................................................21

*Nelson v. Great Lakes Educ. Loan Servs., Inc.,
    928 F.3d 639 (7th Cir. 2019) ...............................................................28, 29, 30, 38

New York v. Pa. Higher Educ. Assistance Agency,
    2020 WL 2097640 (S.D.N.Y. May 1, 2020) .......................................10, 11, 25, 28

Nigro v. Pa. Higher Educ. Assistance Agency,
    2020 WL 5369980 (M.D. Pa. Sept. 8, 2020) ...........................................................25

United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency,
    745 F.3d 131 (4th Cir. 2014) ............................................................................15, 18

Ohralik v. Ohio State Bar Ass'n,
    436 U.S. 447 (1978).................................................................................................39

One & Ken Valley Hous. Grp. v. Me. State Hous. Auth.,
    716 F.3d 218 (1st Cir. 2013)....................................................................................41

Oneok, Inc. v. Learjet, Inc.,
    575 U.S. 373 (2015).................................................................................................30

Organic Consumers Ass'n v. Hain Celestial Grp., Inc.
    285 F.Supp.3d 100 (D.D.C. 2018)...........................................................................36

*Pellegrino v. Equifax Info. Servs., LLC,
    709 F. Supp. 3d 206 (E.D. Va. 2024) .........................................................16, 17, 19

Pennsylvania v. Navient Corp.,
    354 F. Supp. 3d 529 (M.D. Pa. 2018)................................................................33, 39

Pennsylvania v. Navient Corp.,
    967 F.3d 273 (3d Cir. 2020).......................................................................... passim

Perkins v. Equifax Info. Servs., LLC,
    2020 WL 13120600 (W.D. Tex. May 1, 2020) .................................................16, 19

Plaquemines Parish v. BP Am. Prod. Co.,
    103 F.4th 324 (5th Cir. 2024) ....................................................................................7

*Puerto Rico Ports Auth. v. Fed. Mar. Comm'n,
    531 F.3d 868 (D.C. Cir. 2008) .......................................................................14, 17, 21

*Regents of the Univ. of Calif. v. Doe*,
   519 U.S. 425 (1997) ........................................................................................13, 18

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) .........................................................................................32, 33

*Smith v. Collection Techs., Inc.*,
   2016 WL 1169529 (S.D. W. Va. Mar. 22, 2016) .....................................................7

*State v. Meadows*,
   88 F.4th 1331 (11th Cir. 2023) ..............................................................................9

*In re Stout*,
   231 B.R. 313 (Bankr. W.D. Mo. 1999).................................................................19

*\*Student Loan Servicing All. v. District of Columbia*,
   351 F. Supp. 3d 26 (D.D.C. 2018) ................................................................. *passim*

*Travis v. Navient Corp.*,
   460 F. Supp. 3d 269 (E.D.N.Y. 2020) ...................................................................33

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,
   928 F.3d 42 (D.C. Cir. 2019) ...........................................................................23, 24

*Walker v. MOHELA*,
   2024 WL 3568576 (E.D. Cal. July 26, 2024) ..................................................17, 19

*Walter E. Campbell Co. v. Hartford Fin. Servs. Grp., Inc.*,
   48 F. Supp. 3d 53 (D.D.C. 2014).........................................................................25

*Washington v. Navient Corp. et al.*,
   No. 17-2-01115-1 SEA (Wash. Sup. Ct., King Cty.)............................................35

*Watson v. Philip Morris Co.*,
   551 U.S. 142 (2007).........................................................................................5, 12

*Winters v. Diamond Shamrock Chemical Co.*,
   149 F. 3d 387 (5th Cir. 1998) ................................................................................6

**Constitution**

U.S. Const. amend. XI ...............................................................................14, 21, 22

**Statutes**

20 U.S.C. § 1078(d) .......................................................................................27

20 U.S.C. § 1083...............................................................................27, 28, 29

20 U.S.C. § 1087f(a)(1) ...........................................................................................9

20 U.S.C. § 1091a ...................................................................................................27

20 U.S.C. § 1095a(a) ..............................................................................................27

20 U.S.C. § 1098g ..............................................................................................27, 28

28 U.S.C. 1331 .........................................................................................................5

28 U.S.C. § 1442(a)(1) ..................................................................................... *passim*

28 U.S.C. § 1447(c) ..................................................................................................1

42 U.S.C. § 1437(f) ................................................................................................40

D.C. Code § 28-3901 ............................................................................................1, 5

D.C. Code § 28-3904 ..............................................................................................29

Mo. Rev. Stat. § 173.360 ........................................................................................18

Mo. Rev. Stat. § 173.385.1 ..........................................................................16, 17, 18

Mo. Rev. Stat. § 173.385.2 ......................................................................................16

Mo. Rev. Stat. § 173.386 ..................................................................................15, 17

Mo. Rev. Stat. § 173.410 ..................................................................................15, 17

Mo. Rev. Stat. § 173.425 ..................................................................................15, 17

24 Pa. Cons. Stat. § 5101 ........................................................................................15

24 Pa. Cons. Stat. § 5104 (1.1) (iii) ........................................................................15

24 Pa. Cons. Stat. § 5105.10 ...................................................................................15

**Other Authorities**

*Federal Preemption and Joint Federal-State Regulation and Oversight of the
Department of Education's Federal Student Loan Programs and Federal
Student Loan Servicers*, 88 Fed. Reg. 47370, 47372 (July 24, 2023)................39, 40

*U.S. Department of Education Announces Withholding of Payment to Student
Loan Servicer as Part of Accountability Measures for Harmed Borrowers*,
(Oct. 30, 2023), https://www.ed.gov/about/news/press-release/us-department-
of-education-announces-withholding-of-payment-to-student-loan-servicer-as-
part-of-accountability-measures-for-harmed-borrowers.........................................26

*U.S. Department of Education Increases Servicer Performance, Transparency,*
  *and Accountability Before Loan Payments Restart*, (Oct. 15, 2021)
  https://www.ed.gov/about/news/press-release/us-department-of-education-
  increases-servicer-performance-transparency-and-accountability-before-loan-
  payments-restart ................................................................................................................. 8

*U.S. Department of Education's Office of Federal Student Aid Awards New*
  *Contracts to Five companies to Serve Borrowers, Reduce Delinquency, and*
  *Improve Accountability*, (Apr. 24, 2023)
  https://www.ed.gov/about/news/press-release/us-department-of-educations-
  office-of-federal-student-aid-awards-new-contracts-to-five-companies-to-
  serve-borrowers-reduce-delinquency-and-improve-accountability ........................................... 8

U.S. Dep't of Education, *New Interpretation to Encourage State Collaboration on*
  *Student Loan Servicing,* Oct. 31, 2023, https://www.ed.gov/news/press-
  releases/new-interpretation-encourage-state-collaboration-student-loan-
  servicing ....................................................................................................................... 32

U.S. Dep't of Education, *Payment Count Adjustments Toward Income-Driven*
  *Repayment and Public Service Loan Forgiveness Programs*,
  https://studentaid.gov/announcements-events/idr-account-adjustment ................................... 37

Plaintiff American Federation of Teachers ("AFT") hereby respectfully moves to remand the above-captioned action to the Superior Court of the District of Columbia pursuant to 28 U.S.C. § 1447(c).  Pursuant to Local Civil Rule 7(c), a proposed Order is filed herewith.

## PRELIMINARY STATEMENT

This Court lacks subject matter jurisdiction over this action.  AFT's complaint, which details MOHELA's unfair and deceptive practices in violation of the District of Columbia Consumer Protection Procedures Act ("DCCPPA"), D.C. Code § 28-3901 *et seq*., brings no federal claims.  And although MOHELA services student loans owned by the federal government, AFT's claims under District of Columbia law do not raise any issues of federal law that could provide a basis for federal court jurisdiction.  Instead, AFT alleges that MOHELA services student loans in a manner that violates the most basic requirements of any financial services company servicing any type of loan, thus breaching the minimum standards for interacting with consumers required by the District of Columbia.  Removing this action improperly deprives D.C. courts of their entitlement to adjudicate matters arising exclusively under D.C. law and AFT of its right as Plaintiff to select the forum for its claims.  MOHELA has no valid basis for removal.

First, MOHELA is not a "federal officer" entitled to federal subject matter jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  MOHELA's abuses were not at the direction of the federal government, and MOHELA's federal contract expressly warrants that MOHELA does not act as the federal government when servicing federal loans.  Similarly, MOHELA's servicing misconduct does not relate to MOHELA's purported status as a federal officer because student loan servicing is not a duty or a function of the federal government.  In fact, MOHELA's gross misconduct (including, for example, providing borrowers with inaccurate information regarding their loans and failing to process borrowers' applications for loan forgiveness)—was *contrary* to MOHELA's federal obligations and hindered the government's

mission.  MOHELA cannot claim the mantle of a federal officer when it performs non-federal functions in a manner that is unauthorized by its federal contracts and hinders federal policy.

MOHELA does not qualify for federal officer removal for the independent reason that it fails to assert any colorable federal defense.  MOHELA cannot colorably claim that it enjoys Missouri's sovereign immunity because it is a financially independent, self-sufficient organization operating outside the state's control (nor does MOHELA explain how it can be both an "arm of the state" of Missouri *and* a federal officer at the same time).  Likewise, MOHELA cannot colorably claim derivative sovereign immunity as a federal contractor because it has expressly waived such immunity in its federal contracts, and because derivative sovereign immunity does not protect contractor actions that, like MOHELA's alleged actions here, were unauthorized by the government.  MOHELA's additional meritless assertion that AFT's claims are preempted by the Higher Education Act ("HEA") has been repeatedly rejected by courts and thus cannot form a colorable federal defense.

Second, there is no federal question jurisdiction over AFT's claims, which arise "exclusively under District of Columbia law, [and] presumptively must be heard in the District's courts."  *District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 154 (D.C. Cir. 2023).  AFT's claims do not necessarily raise any federal issue because they are grounded solely in MOHELA's violations of the District of Columbia's consumer protection laws, not any federal laws, regulations, or other obligations.  Moreover, any federal issues adjacent to AFT's claims necessarily are not substantial because MOHELA's noncompliance with District of Columbia consumer protection laws does not implicate issues of importance to the federal system as a whole. By contrast, the District of Columbia has a strong interest in having its own courts adjudicate this action, which is premised on the District of Columbia's core power to protect its citizens' welfare

from unfair or deceptive business practices.  Consumer protection has long been considered a core component of states' powers to protect the health, safety, and general welfare of their residents, which has traditionally been regulated by states.  *See, e.g.*, *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989).  Forcing AFT to adjudicate its consumer protection claims under the DCCPPA in federal court would upset the historical balance of judicial responsibilities, underscoring the inappropriateness of removal here.

AFT, as the plaintiff, is "the master of the claim" and is entitled to choose for its claims to be adjudicated in state court "by exclusive reliance on state law."  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  AFT has made that choice here by bringing claims that exclusively rely on the District of Columbia's consumer protection statute, and MOHELA—which serves consumers in the District of Columbia and is bound by the District's laws—cannot escape the jurisdiction of the District's courts by attempting to rewrite AFT's complaint as invoking federal jurisdiction where there is none.

Because the Court lacks subject matter jurisdiction, it should grant AFT's motion to remand this case to the Superior Court of the District of Columbia.

## STATEMENT OF THE CASE

AFT, a District of Columbia–based union representing 1.8 million educators, healthcare professionals, and public employees, filed this action against MOHELA in the Superior Court of the District of Columbia under the DCCPPA to ensure that AFT's student loan borrower members and the general public would no longer have to endure unfair and deceptive student loan servicing by MOHELA.

MOHELA, one of the nation's largest student loan servicers, subjects borrowers to a labyrinthine system of deceit, misinformation, costly delays, and egregious customer service.  ECF No. 1-2 ("Complaint" or "Compl.") ¶¶ 116–90.  For example, MOHELA has failed to send timely

bills to some borrowers, while sending inaccurate bills to others. *Id.* ¶116–25. The results for borrowers are not minor inconveniences but missed payments and unintentional delinquency—serious financial consequences for borrowers, especially those living paycheck to paycheck. *Id.* MOHELA's misinformation also leads to higher payments and more accrued interest for borrowers, a debt crushing them for years. *Id.* ¶¶ 132–34. Of note, this misconduct has been repeatedly repudiated by the United States Department of Education ("ED"), including through public admonishments, *id.* ¶ 117, and withheld payments, *id.* ¶ 119.

MOHELA's misconduct additionally has prevented borrowers from receiving the benefit of debt relief programs created by Congress and the White House. MOHELA has failed to process more than a million applications for Public Service Loan Forgiveness ("PSLF"), *id.* ¶ 144, a program enacted by Congress to forgive the student debt of teachers, first responders, members of the military, and other public servants after ten years of payments. When MOHELA does get around to processing PSLF applications, it regularly rejects them wrongfully. *Id.* ¶ 190. MOHELA has also stymied the Biden Administration's effort to implement the Saving on A Valuable Education ("SAVE") plan to reduce the burden of student debt. *Id.* ¶¶ 126–40, 147-50.

MOHELA's pattern of abuse and deception is compounded by its "Call Deflection" scheme, whereby borrowers are frequently unable to contact customer service and instead are directed to a website rife with inaccurate information. *Id.* ¶¶ 156–72. Even when borrowers can reach a customer service representative, they are regularly met with employees unable to accurately answer borrowers' questions. *Id.* ¶ 169.

All of these abuses are precisely what the District of Columbia's legislators sought to prevent—and to provide recourse for victims of—with the passage of the DCCPPA. The purpose of the law is to "assure that a just mechanism exists to remedy *all* improper trade practices and

deter the continuing use of such practices," to promote "fair business practices throughout the community," and to "educate consumers to demand high standards and *seek proper redress of grievances*." D.C. Code § 28-3901(b) (emphasis added). To promote this purpose, the law "shall be construed and applied liberally" and establishes "an enforceable right to truthful information" from those conducting business in the District of Columbia. D.C. Code § 28-3901(c). MOHELA has flagrantly and repeatedly flouted the District of Columbia's law, and for the reasons explained below, it must be held accountable in the District of Columbia's courts.

## ARGUMENT

MOHELA's Notice of Removal asserts two bases for subject matter jurisdiction in this court: the federal officer removal statute, 28 U.S.C. § 1442(a)(1), and federal question jurisdiction under 28 U.S.C. § 1331. ECF No. 1 ("Notice of Removal") ¶¶ 6, 23. Neither provides a valid basis for removal.

## I.   MOHELA DOES NOT QUALIFY FOR REMOVAL UNDER THE FEDERAL OFFICER REMOVAL STATUTE

The federal officer removal statute provides for removal to federal court of a "civil action . . . against or directed to . . . any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). The purpose of Section 1442(a) "is to protect the federal government from the interference with its operations that would ensue" if state courts adjudicated claims against officers and agents of the federal government exercising federal authority. *Watson v. Philip Morris Co.*, 551 U.S. 142, 150 (2007). Pursuant to the federal officer removal statute, removal is permitted only when the defendant is sued for actions "connected or associated with acts under color of federal office." *Exxon*, 89 F.4th at 155 (internal quotation marks and citations omitted).

Thus, removal under Section 1442(a)(1) is only available to a federal contractor if it demonstrates all of the following elements: (1) it "is a 'person' within the meaning of the statute," (2) it "acted under the direction of a federal officer," (3) it is being sued for actions "relating to" its federal officer status, and (4) it "has a colorable federal defense to the plaintiff's claims." *MobilizeGreen, Inc. v. Cmty. Found. for Nat'l Cap. Region*, 101 F. Supp. 3d 36, 41 (D.D.C. 2015) (internal quotation marks and citations omitted).  "[I]t is the defendant's burden to establish the existence of federal jurisdiction over the controversy." *Winters v. Diamond Shamrock Chemical Co.*, 149 F. 3d 387, 397 (5th Cir. 1998).

MOHELA is not entitled to remove this action under the federal officer removal statute for three independently fatal reasons: (1) it was not acting under the direction of ED while engaging in the conduct AFT challenges; (2) AFT's complaint is not based on actions that relate to any federal officer status; and (3) MOHELA does not have any colorable federal defenses to AFT's claims.

## A.   MOHELA's Contract Demonstrates MOHELA's Wrongful Conduct Is Not Directed By The Department Of Education

MOHELA asserts that, because it has a contract with ED, the unfair and deceptive servicing of loans that AFT challenges constitute actions under color of federal office.  Notice of Removal ¶¶ 10–15.  That is incorrect.  Merely having a contract with the federal government does not establish that a contractor is acting under the color of federal office; instead, courts answer that question by looking to the terms of the federal contracts themselves.  *See, e.g.*, *Exxon*, 89 F.4th at 156 (commercial relationship between Exxon and the government, governed by a contract with the Navy, was insufficient to establish Exxon was acting under color of federal office); *MobilizeGreen*, 101 F. Supp. 3d at 42–44 (examining contract between defendant and U.S. Forest Service and concluding defendant was not acting under color of federal office); *see also*

*Plaquemines Parish v. BP Am. Prod. Co.*, 103 F.4th 324, 339 (5th Cir. 2024) ("[I]n cases involving private federal contractors, courts look to the contents of the relevant federal contracts in determining whether the challenged conduct was 'connected or associated with' acts taken under color of federal office.").[1]  When the terms of a federal contract explicitly state that the contractor is not acting under color of federal office, federal officer removal is unavailable.  *See, e.g.*, *Collins v. Pension Benefit Guar. Corp.*, 881 F.3d 69, 72 (D.C. Cir. 2018) ("It is a commonplace of contract law that we will give the parties' agreement the meaning they have given it themselves."); *see also Cabalce v. Thomas E. Blanchard & Assoc., Inc.*, 797 F.3d 720, 723–24 (9th Cir. 2015) (quoting extensively from relevant contract when determining contractor was not eligible for federal officer removal, including noting that contractor was "an independent contractor" and "was responsible for all damages" resulting from its fault or negligence).

Here, MOHELA's contract with ED demonstrates in plain language that the conduct at issue is not directed by ED; removal is therefore inappropriate.  MOHELA's servicing relationship with ED is governed by a Unified Servicing and Data Solutions contract ("USDS contract"), which became effective on April 25, 2023.  *See* Ex. 1; *see also* Declaration of Alpha Sahr Taylor in

---

[1] The out-of-circuit district court decisions upon which MOHELA relies for its blanket proposition that courts routinely deny remand motions in cases where student loan servicers have a contract with ED are inapposite.  Notice of Removal ¶ 13.  For example, in *Holston v. Pa. Higher Educ. Assistance Agency*, 2019 WL 4745051 (D.N.J. Sept. 30, 2019), the plaintiff was a *pro se* litigant who did not challenge removal.  In *Cobb v. GC Servs., LP*, 2016 WL 7155765 (S.D. W. Va. Dec. 7, 2016), the plaintiff did not dispute the student loan servicer's assertion that it was acting in accordance with its federal contract in its collection activities.  And in *Smith v. Collection Techs., Inc.*, 2016 WL 1169529 (S.D. W. Va. Mar. 22, 2016), the plaintiff conceded that the servicer was required to garnish plaintiff's wages under its contract.  *Id.* at *4 ("Plaintiff's case hinges on his allegation that while the garnishment may have been initially lawful under [the government's] directive, [defendant] acted outside the scope of that directive by continuing to garnish wages despite the borrower's request for loan rehabilitation.").

Support of Plaintiff's Motion to Remand.[2]  That contract reflects ED's and MOHELA's agreement

that MOHELA is not acting as a federal officer at ED's direction in servicing student loans:

> [MOHELA] acknowledges that it is not the U.S. Department of
> Education, and is not acting as the U.S. Government under this
> Contract. As such [it] acknowledges that any claim or defense of
> Sovereign Immunity or Qualified Immunity is not applicable to
> work performed under the Contract and any Task Order issued under
> the Contract.

Ex. 1 at 12.

The USDS Contract thus ensures that MOHELA cannot use its contractual relationship

with the federal government to prevent borrowers from holding MOHELA accountable in state

courts.  Moreover, the contract makes clear that MOHELA's violations of D.C. law are not directed

by ED—to the contrary, it requires that MOHELA "shall comply with all . . . State rules, laws,

[and] regulations." *Id.* at 10.

Thus, a close review of the federal contract belies MOHELA's argument that it is acting

under a federal officer when it violates state law.  That is sufficient to defeat MOHELA's attempted

removal under Section 1442(a)(1).

---

[2] MOHELA's Notice of Removal attaches a contract that was originally entered into in 2011, ECF
No. 1-3, but that contract expires in December 2024.  U.S. Dep't of Educ., *U.S. Department of
Education's Office of Federal Student Aid Awards New Contracts to Five Companies to Serve
Borrowers, Reduce Delinquency, and Improve Accountability*, Apr. 24, 2023,
https://www.ed.gov/about/news/press-release/us-department-of-educations-office-of-federal-
student-aid-awards-new-contracts-to-five-companies-to-serve-borrowers-reduce-delinquency-
and-improve-accountability ("To maintain stability as the new loan servicing environment gets
underway, FSA will extend the legacy servicer contracts through December 2024.").

Moreover, MOHELA neglects to inform the Court that the 2011 contract was amended in 2021 to
"expressly prohibit loan servicers from shielding themselves from lawsuits brought to hold the
companies accountable in court for poor servicing practices."  U.S. Dep't of Educ., *U.S.
Department of Education Increases Servicer Performance, Transparency, and Accountability
Before Loan Payments Restart*, Oct. 15, 2021, https://www.ed.gov/about/news/press-release/us-
department-of-education-increases-servicer-performance-transparency-and-accountability-
before-loan-payments-restart.

Similarly, there is no support for MOHELA's conclusory assertion that its misconduct was directed by ED because its communications with borrowers were supposedly "made on the Department's behalf" and "closely monitor[ed]" by ED.  Notice of Removal ¶ 15.  The document MOHELA cites in support of those assertions does not state that loan servicers speak on ED's behalf, *see* ECF No. 1-5, and as discussed above, MOHELA's contracts with ED demonstrate the opposite by providing that MOHELA "is not the U.S. Department of Education, and is not acting as the U.S. Government under [its] Contract."  Ex. 1 at 12.

### B.   MOHELA's Wrongful Conduct Does Not Relate To MOHELA's Duties Under Its Contract With The Department Of Education

An independent reason to reject MOHELA's removal attempt based on Section 1442(a)(1) is that MOHELA is not being sued for actions "relating to" any federal officer status.  As an initial matter, MOHELA's servicing misconduct is not "related to" any purported federal officer status because Congress made clear that servicers, not ED, shall service federal student loans.  *See* 20 U.S.C. § 1087f(a)(1) ("The Secretary *shall*, to the extent practicable, award contracts for origination, servicing, and collection [of student loans]." (emphasis added)).  Where a federal officer's "role does not include" the performance of some act, that act does not relate to the officer's "official authority" for the purposes of federal office removal.  *State v. Meadows*, 88 F.4th 1331, 1343, 1349 (11th Cir. 2023) (holding that conduct in violation of state law did not relate to federal official's duties).  Here, Congress intended that ED would not service federal student loans itself, but instead would outsource servicing to private actors who contractually agree that they are "not the U.S. Department of Education, and [are] not acting as the U.S. Government" when servicing those loans, 20 U.S.C. § 1087f(a)(1); Ex. 1 at 12.  Accordingly, servicing federal student loans does not "relat[e] to any act under color of [federal] office."  *Exxon*, 89 F.4th at 155 (cleaned up).

Even if servicing federal student loans were a federal duty, MOHELA's challenged misconduct does not relate to MOHELA's contract with ED in the manner required for federal officer removal because it was not undertaken at the behest of or in coordination with the federal government—instead, MOHELA's actions are contrary to its contractual obligations, and actively hinder ED's mandate to financially assist student borrowers.

Claims that a federal contractor has made unlawful misrepresentations cannot satisfy the "relating to" prong of Section 1442(a)(1) where, as here, there is not "any allegation the [contractor] engaged in these misrepresentations at the behest of or in coordination with federal officers." *Exxon*, 89 F.4th at 156 (holding that "relating to" requirement for federal officer removal was not satisfied and rejecting federal officer removal in part on that basis); *see also MobilizeGreen*, 101 F. Supp. 3d at 42–43 (rejecting federal officer removal in part because contractor did not allege that its challenged actions were directed by Congress or the supervising agency).  MOHELA suggests that the "relating to" prong turns simply on whether MOHELA's servicing misconduct generally relates to its contractual obligations with ED, but that is wrong: to satisfy the requirements of federal officer removal, the specific misconduct forming the basis of AFT's claims must have been done "at the behest of or in coordination with federal officers." *Exxon*, 89 F.4th at 156 (citing *Minnesota v. Am. Petroleum Inst.*, 63 F.4th 703, 715 (8th Cir. 2023)).

MOHELA cannot satisfy that requirement here, where there is no credible argument that MOHELA's egregious misconduct and misrepresentations were done at the behest of ED.  The court's decision denying derivative sovereign immunity to a federal student loan servicer in *New York v. Pa. Higher Educ. Assistance Agency*, 2020 WL 2097640, at *7 (S.D.N.Y. May 1, 2020), is instructive.  There, the servicer "contend[ed] that [ED] directs various aspects of its performance" in servicing loans, but it could "not point to any evidence that in performing the

complained-of conduct, it simply followed [ED's] instructions." *Id.*  For example, the servicer did

not argue that ED "instructed it to incorrectly report to borrowers the number of PSLF-qualifying

payments borrowers made, to provide incorrect monthly payment amounts in IDR plans, to fail to

recertify applications in a timely fashion, or any of the other conduct that forms the basis of" the

plaintiff's claims—and "[s]uch an argument would strain credulity." *Id.*  So too here: MOHELA

does not argue that ED "authoriz[ed], much less direct[ed]," the alleged misconduct, *id.*, and in

fact MOHELA's unlawful misrepresentations and numerous servicing failures were directly

contrary to the purpose of ED's contract, *see supra* § I.B.  Federal officer removal is therefore

inappropriate.  *Exxon*, 89 F.4th at 156; *cf. Mesa v. California*, 489 U.S. 121, 123–24 (1989) (postal

workers who violated state traffic laws while delivering mail were not entitled to federal officer

removal).

     The federal contracts' descriptions of MOHELA's contractual duties make clear that its

wrongful acts were in direct defiance of its responsibilities to ED.  For example, even in the

outdated contract MOHELA attaches to its Notice of Removal (*see supra* n.2), ED expressly states

that MOHELA will not get paid when its servicing falls below minimum acceptable standards,

thus drawing a line between servicing under the contract and misconduct outside the scope of the

contract:

> Invoicing and Non-Compliance - Borrowers whose loans are not be-
> ing serviced in compliance with the Requirements, Policy and Pro-
> cedures for servicing federally held debt due to the fault of the ser-
> vicer (e.g. correct interest calculations, correct balances, interest de-
> termination and calculations, notice sent properly, proper due dili-
> gence, etc.), will not be billable to the Government from the initial
> point of non-compliance. Any funds that have been invoiced for
> these borrowers and paid shall be returned to the Government via a
> credit on the next invoice.

ECF No. 1-3 at 15–16.  The contract's illustrative list of unauthorized conduct encompasses the

misconduct alleged in the complaint, including that MOHELA: failed to send billing statements

properly, *e.g.*, Compl. ¶¶ 116–17; incorrectly calculated payment obligations, *e.g.*, *id*. ¶¶ 118, 198; sent incorrect written notices relating to borrowers' Income Driven Repayment ("IDR") plan applications, *e.g.*, *id.* ¶¶ 148–49; and failed to conduct appropriate audits and root cause analyses to identify errors on borrower accounts, *e.g.*, *id*. ¶¶ 196–97.

That MOHELA's challenged conduct is unconnected to and outside of its federal authority is further demonstrated by the fact that its challenged conduct hinders the government's mission to help students afford tuition costs for higher education.  The purpose of the removal statute "is to protect the Federal Government from . . . interference with its operations."  *Watson*, 551 U.S. at 150.  MOHELA provides no support for the idea that the same statute protects an actor that is interfering with the government's mission—especially in the egregious manner detailed in AFT's Complaint.  AFT alleges, among other things, that MOHELA fails to communicate essential information to borrowers and is unresponsive to consumer inquiries and complaints.  *E.g.*, Compl. ¶¶ 5, 117, 146, 154 (MOHELA failed to train its employees, provide them with accurate call scripts, or even simply to respond to inquiries in a manner that could meet borrowers' needs); *id.* ¶ 117 (MOHELA failed to send billing statements on time to 2.5 million borrowers); *id.* ¶ 122 (borrowers' bills contained errors and they struggled to reach knowledgeable MOHELA representatives who could resolve their concerns).  For another example, AFT alleges that MOHELA used the wrong guidelines to calculate payments, causing 280,000 borrowers to make excessive payments.  *E.g.*, Compl. ¶ 133.  Further, AFT alleges that, rather than automatically transitioning borrowers from the Revised Pay As You Earn plan to the SAVE plan, MOHELA instructed some already-enrolled borrowers to apply for the SAVE plan in order to access the plan's benefits, causing them to get off track with their loan payments.  *E.g.*, Compl. ¶ 130.

Because these actions were directly contrary to ED's mission, they are not connected or associated with acts under color of federal office.

### C. MOHELA Does Not Have A Colorable Federal Defense

Even if MOHELA could satisfy Section 1442(a)(1)'s other requirements—and it cannot for the reasons discussed above—federal officer removal would still be unavailable because MOHELA lacks a colorable federal defense. "[F]ederal officer removal must be predicated on the allegation of a colorable federal defense." *Mesa*, 489 U.S. at 129; *see also Kormendi/Gardner Partners v. Surplus Acquisition Venture, LLC*, 606 F. Supp. 2d 114, 119 (D.D.C. 2009) (granting motion to remand when federal contractor defense was not colorable). Mere "conclusory" assertions "are not sufficient to demonstrate a colorable federal defense." *Hilbert v. McDonnell Doughlas Corp.*, 529 F. Supp. 2d 187, 192 (D. Mass. 2008).

Although MOHELA invokes three purported federal defenses—state sovereign immunity, derivative federal sovereign immunity as a federal contractor, and preemption, *see* Notice of Removal ¶¶ 17–21—each fails to satisfy the colorability test because any assertion of those defenses would be futile. There is no federal defense that MOHELA can use to shield itself from accountability for its violations of D.C. law alleged in AFT's Complaint.

### 1. MOHELA's State Sovereign Immunity Argument Is Futile

MOHELA argues that it is "an arm of the state of Missouri and thus enjoys sovereign immunity from AFT's claims." Notice of Removal ¶ 17. MOHELA's state sovereign immunity defense is not colorable.

"When deciding whether a state instrumentality may invoke the State's immunity, [the Supreme Court's] cases have inquired into the relationship between the State and the entity in question," with "considerable importance" placed on "the question whether a money judgment against a state instrumentality or official would be enforceable against the State." *Regents of the*

*Univ. of Calif. v. Doe*, 519 U.S. 425, 430–31 (1997).  Accordingly, the test for whether an entity

is an arm of the state, and thus entitled to that state's immunity, requires examination of three

factors: (1) the entity's financial independence and effects on the state treasury, (2) the state's

intention as to the entity, including its functions, and (3) the state's control over the entity.  *Puerto*

*Rico Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 873 (D.C. Cir. 2008).  All three factors show

that MOHELA is not an "arm of the state" of Missouri and is therefore not entitled to Missouri's

sovereign immunity.  Several district courts—including the Eastern District of Missouri—have

correctly held as much.

### a.    MOHELA Is Financially Independent From Missouri

"The impetus for the Eleventh Amendment [is] the prevention of federal-court judgments

that must be paid out of a State's treasury."  *Hess v. Port Auth. Trans-Hudson Corp*., 513 U.S. 30,

48 (1994).[3]  The Supreme Court therefore recognizes "the vulnerability of the State's purse as the

most salient factor" in determining whether a party is entitled to state sovereign immunity.  *Id.*

When an entity has "anticipated and actual financial independence," and a "long history of paying

its own way," it is not entitled to sovereign immunity.  *Id.* at 49.

MOHELA is not entitled to state sovereign immunity because it is, and has always been,

financially independent from Missouri and self-sustaining.  MOHELA's assets are not "part of the

---

[3] "[U]nder long-standing Supreme Court precedent [including *Alden v. Maine*, 527 U.S. 706 (1999)], the Constitution has been interpreted to encompass a principle of state sovereign immunity and to largely shield States from suit without their consent."  *Puerto Rico Ports Auth*., 531 F.3d at 871–72.  "Eleventh Amendment Immunity" specifically concerns money damages judgments in federal courts, but it is also used as "convenient shorthand" for the broader doctrine of state sovereign immunity concerned with the protection of states' "allocation of scarce resources among competing needs" under *Alden*, 527 U.S. at 713, 751.  While MOHELA waived any Eleventh Amendment immunity by removing to federal court, *see Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 619–20 (2002), MOHELA is apparently asserting sovereign immunity based on *Alden v. Maine*, *see* Notice of Removal ¶ 17, which is not colorable for the reasons stated herein.

revenue of the state"; none of MOHELA's assets "shall be required to be deposited into the state treasury" or "subject to appropriation by the general assembly"; and its assets shall "remain under the exclusive control and management of" MOHELA, Mo. Rev. Stat. § 173.425;  none of MOHELA's assets can "be used for the payment of debt incurred by" Missouri, Mo. Rev. Stat. § 173.386; and Missouri is not liable for MOHELA's debts, Mo. Rev. Stat. § 173.410.

Analogous facts were critical in the Third Circuit's and Fourth Circuit's denials of state sovereign immunity to the Pennsylvania Higher Education Assistance Agency ("PHEAA"), a former servicer of federal student loans.  *See Lang v. Pennsylvania Higher Educ. Assistance Agency*, 610 Fed. App'x 158, 161–62 (3d Cir. 2015) (denying sovereign immunity because PHEAA controlled its own finances and "would be responsible for paying a judgment against it"); *United States ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 138–39 (4th Cir. 2014) (denying sovereign immunity because Pennsylvania was not liable for PHEAA's debts and PHEAA's finances were segregated from the state's).  The same reasoning demonstrates that MOHELA is not entitled to state sovereign immunity here.[4]

MOHELA argues that it "affects the state treasury because, among other reasons, its profits help fund education in Missouri: 'MOHELA has provided $230 million for development at Missouri Colleges and universities and almost $300 million in grants and scholarships.'"  Notice of Removal ¶ 18.  That argument fails for two principal reasons.  First and most glaringly: any obligation of MOHELA to transfer assets to the state's education fund expired in September 2013.

---

[4] PHEAA, like MOHELA, was organized under state law and was deemed "a public corporation and government instrumentality."  24 Pa. Cons. Stat. § 5101.  Like MOHELA, its board consisted of gubernatorial appointees and state officials.  *Oberg*, 745 F.3d at 139.  And, like MOHELA, it grew to service federal student loans nationwide. *See, e.g.*, *Lang*, 610 Fed. App'x at 159, 162.  The two organizations shared additional similarities: PHEAA, like MOHELA, controlled its own finances; was authorized to enter into contracts in its own name, 24 Pa. Cons. Stat. § 5104 (1.1) (iii); and its contributions to the state treasury were voluntary, 24 Pa. Cons. Stat. § 5105.10.

Mo. Rev. Stat. § 173.385.2.[5]   MOHELA does not provide any evidence of when the various contributions were made and thus does not establish that *any* contributions have been made since September 2013.   At a minimum, there is nothing to support the application of state sovereign immunity to MOHELA today.   Second, even if there have been contributions since 2013, those contributions are merely voluntary and, in MOHELA's Notice of Removal, unquantified. MOHELA offers no support for its apparent position that any organization can obtain state sovereign immunity simply by making voluntary contributions to state universities, a result that would defy all logic.   To the contrary, courts have recognized that any contributions MOHELA voluntarily provided to Missouri are "too attenuated to invoke the protections of sovereign immunity," and denied MOHELA state sovereign immunity on that basis.   *Perkins v. Equifax Info. Servs., LLC*, 2020 WL 13120600, at *4 (W.D. Tex. May 1, 2020).

Courts have repeatedly recognized that MOHELA's financial independence "weigh[s] heavily against finding that MOHELA is an arm of the state" and therefore denied it the protections of sovereign immunity.   *Pellegrino v. Equifax Info. Servs., LLC*, 709 F. Supp. 3d 206, 215 (E.D. Va. 2024); *id.* at 217 (observing that MOHELA has "control over how to spend its substantial, independently generated revenues, which for 2023 amounted to $358.6 million"); *see also Dykes v. Missouri Higher Educ. Loan Auth.*, 2021 WL 3206691 (E.D. Mo. July 29, 2021) (holding MOHELA was not entitled to sovereign immunity when "the enabling statute shows that the legislature intended to create a self-sustaining and financially independent agency.").[6]   The same result follows here.

---

[5] Today, MOHELA is permitted to remit assets to a state fund for educational purposes but is not required to do so.  Mo. Rev. Stat. § 173.385.1(9).

[6] MOHELA cites the following language from *Biden v. Nebraska*, 134 S. Ct. 2355, 2366 (2023) to show that "MOHELA affects the state treasury": "MOHELA has provided $230 million for development projects at Missouri colleges and universities and almost $300 million in grants and

**b.     Missouri Did Not Intend MOHELA To Be An Arm Of The State**

Missouri statutes conclusively establish that MOHELA is not, and was never intended to

be, an arm of the State.  Those statutes provide:

- MOHELA can sue and be sued in its own name, Mo. Rev. Stat. § 173.385.1(3);

- MOHELA's assets are not part of the state of Missouri's revenue and cannot be used
  for the payment of Missouri's debts, *id.* §§ 173.386, 173.425; and

- Missouri, in turn, cannot be liable for MOHELA's debts, *id.* § 173.410.

Further demonstrating that Missouri did not intend MOHELA to be an arm of the state is

the fact that MOHELA does not "perform[] governmental functions."  *See Puerto Rico Ports Auth.*,

531 F.3d at 870 (finding sovereign immunity where the party's responsibilities included

"managing Puerto Rico's ports and airports and regulating navigation in Puerto Rico's harbors").

Rather than perform any Missouri state functions, MOHELA services student loans nationwide,

generating the lion's share of its revenue from out-of-state loans.  Compl. ¶ 44.  MOHELA's

competitors are other national student loan servicers and it employs hundreds of individuals across

the country, including in Pennsylvania, Texas, Florida, Nebraska, Utah, and Washington, D.C.

Compl. ¶ 32.  MOHELA is thus functioning in the manner the state intended: as an independent

entity pursuing its own aims with its own funds.  While MOHELA baldly asserts that "Missouri

---

scholarships."  Notice of Removal ¶ 18.  But *Biden* was not about whether MOHELA was an arm
of the state; rather, it considered whether Missouri had *standing* to challenge a policy that would
purportedly cause harm to MOHELA.  The fact that harm to MOHELA could, in an attenuated
manner sufficient to confer injury-in-fact standing, create a traceable harm to Missouri does not
mean that MOHELA is an arm of the state entitled to sovereign immunity.  The Supreme Court
itself acknowledged that "a public corporation can count as part of the State for some but not other
purposes."  134 S. Ct. at 2368 n.3.  Courts have correctly rejected MOHELA's previous attempts
to use the language from *Biden* to support sovereign immunity.  *See Walker v. MOHELA*, 2024
WL 3568576, at *4 (E.D. Cal. July 26, 2024) (denying sovereign immunity and noting "[t]he *Biden*
decision does not support MOHELA's argument that it has no separate legal identity from the
State of Missouri.  The Supreme Court did not hold MOHELA to be the State of Missouri for all
purposes."); *see also Pellegrino*, 709 F. Supp. 3d at 212 (similar).

intends for MOHELA to be an arm of the state, designating it as such in law," Notice of Removal ¶ 18, there is no support for that conclusory statement.  The language "arm of the state" is found nowhere in the relevant statute; rather, in the statute MOHELA cites, Mo. Rev. Stat. § 173.360, the law refers to MOHELA as "a public instrumentality."  That says nothing about whether MOHELA is entitled to immunity; the Supreme Court has recognized that "a state instrumentality" may not be entitled to immunity.  *Regents of the Univ. of Calif.*, 519 U.S. at 429-31.  The statutory substance, not the use of specific labels, is what matters.  And here, the substance of Missouri law establishes that MOHELA is an independent entity.

### c.      Missouri Has Minimal Control Over MOHELA

MOHELA's independence from Missouri is not only financial—it is operational as well. MOHELA's board members are appointed by the governor, but they serve five-year terms and can be removed only for cause, after notice and hearing.  Mo. Rev. Stat. § 173.360.  That separates MOHELA from most Missouri state employees, who are removable at will by the state and therefore directly under the control of the state.  *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO, Council 61 v. Missouri*, 653 S.W.3d 111, 116–17 (Mo. 2022).  In addition, MOHELA is empowered to enter into its own contracts with other entities, independent of state authorization or control.  Mo. Rev. Stat. § 173.385.1(15).

As the Fourth Circuit observed when examining PHEAA, a near mirror image of MOHELA, *see supra* n.4: "PHEAA has the power to enter into contracts, sue and be sued, and purchase and sell property in its own name, all of which suggest operational autonomy."  *Oberg*, 745 F.3d at 139.  All the same is true of MOHELA.  Its operational independence—coupled with its financial autonomy—set it firmly outside Missouri's control.

> **d.    Four District Courts, Including In The Eastern District Of Missouri, Have Found MOHELA Does Not Qualify For Sovereign Immunity**

In recent years, several district courts have ruled that MOHELA does not qualify for state sovereign immunity.  *See Walker*, 2024 WL 3568576; *Pellegrino*, 709 F. Supp. 3d 206; *Dykes*, 2021 WL 3206691; *Perkins*, 2020 WL 13120600.  These decisions—employing, respectively, the "arm of the state" tests of the Ninth, Fourth, Eighth, and Fifth Circuits that closely track this Circuit's—all came to that conclusion for the same reason as discussed above: MOHELA does not qualify for state sovereign immunity given MOHELA's independence, particularly its financial independence, from Missouri.  *See Walker*, 2024 WL 3568576, at *8 (holding MOHELA is not an arm of the state and highlighting "MOHELA's financial independence from the State under Missouri law and the lack of any obligation for Missouri to pay MOHELA's debts); *Pellegrino*, 709 F. Supp 3d at 215, 219 (holding "MOHELA is not an arm of the state" and noting "the most significant factor" is that "MOHELA continues to operate as financially segregated from any State funds"); *Dykes*, 2021 WL 3206691, at *4 (holding "MOHELA is not an arm of the state" and highlighting MOHELA's financial independence); *Perkins*, 2020 WL 13120600, at *3, *5 (holding that "MOHELA cannot demonstrate that, under the balance of equities, this lawsuit is in reality a suit against the state itself," and emphasizing that financial independence is the most important factor).  These emphatic, repeated denials of the same "arm of the state" arguments that MOHELA advances here demonstrate that the defense is not colorable.

Instead of grappling with these decisions—or even acknowledging their existence—MOHELA points to two cases in which MOHELA was found to enjoy state sovereign immunity.[7]

---

[7] MOHELA points to a third case, *In re Stout*, 231 B.R. 313, 317 (Bankr. W.D. Mo. 1999), but that case carries no persuasive weight: it contained minimal legal analysis and was explicitly rejected by a sister court within the same Circuit in 2021 in *Dykes*, 2021 WL 3206691, at *4 n.3.

Notice of Removal ¶ 19.  Neither case supports the colorability of a sovereign immunity defense here, because (1) the legal tests applied in those cases to determine whether an entity is an "arm of the state" are materially different from the controlling test in this Circuit, meaning those decisions provide no meaningful counterweight to the persuasive authority of cases applying the analogous tests of the Fourth, Fifth, Eighth, and Ninth Circuits; and (2) the reasoning in each decision is deeply flawed, such that neither case constitutes persuasive authority.

The two cases on which MOHELA relies, *Good v. U.S. Dep't of Educ.*, 2022 WL 2191758 (D. Kan. June 16, 2022), and *Gowens v. Capella University, Inc.*, 2020 WL 10180669 (N.D. Ala. June 1, 2020), were decided based on the Tenth Circuit's and Eleventh Circuit's "arm of the state" tests, respectively.  These tests are distinguishable from the D.C. Circuit's in critical ways, including giving outsized weight to the formalistic use of certain terms in the establishing legislation and giving insufficient weight to the question of who bears ultimate responsibility for adverse judgments.

The Tenth Circuit test, for example, does not examine the entity's function when assessing the legislature's intent, but instead "conduct[s] a formalistic survey to ascertain whether the entity is identified as an agency of the state."  *Hennessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 528 (10th Cir. 2022) (citing *Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007). That test allows statutory language merely describing an entity as a "public instrumentality" to weigh in favor of sovereign immunity, regardless of what the entity actually does and its connections to the State.

Furthermore, the Tenth Circuit test considers in the first instance not financial independence and liability for judgments, but rather "the amount of state funding the entity receives and whether the entity has the ability to issue bonds or levy taxes on its own behalf."

*Hennessey*, 53 F.4th at 533.  The test asks, too, if the entity is "concerned primarily with local or state affairs" and "the autonomy accorded the entity under state law." *Id.* at 528.  Only if those four factors "conflict and point in different directions," does the Tenth Circuit "proceed to the second step and consider … the impact of a judgment on the state treasury." *Id.*  This is a significant and, in this case, material departure from the law that would govern this Court's determination of state sovereign immunity.  Controlling D.C. Circuit authority holds that the impact on the state treasury of an adverse judgment is critical and must be considered in any "arm of the state" analysis; it is not a tiebreaker but the threshold element of the test.  *See, e.g.*, *Puerto Rico Ports Auth.*, 531 F.3d at 879 ("We *must* consider . . . a State's overall responsibility for funding the entity or paying the entity's debts or judgments." (emphasis added)); *Morris v. Washington Metro. Area Transit Auth.*, 781 F.2d 218, 227 (D.C. Cir. 1986) (finding WMATA was entitled to sovereign immunity when "a judgment against the Authority will have a direct impact on the state treasuries [of Maryland and Virginia]").

MOHELA's reliance on *Good*, 2022 WL 2191758, which applied the Tenth Circuit's test, is thus misplaced.  Yet even under the more lenient Tenth Circuit test, the *Good* court conceded that "the consideration whether the state is responsible for a judgment is an important one" and found "that this factor weighs against a finding of Eleventh Amendment immunity." *Id.* at *4.  But the court then inexplicably found this critical factor was outweighed by others (primarily the formalistic factors discussed above) without providing an explanation or citing a single authority to support the position other than *Gowens*, the other case on which MOHELA relies, which is equally unpersuasive.

*Gowens* was decided under the Eleventh Circuit's "arm of the state" test, which is likewise distinguishable.  *See* 2020 WL 10180669, at *2.  That test asks (1) how state law defines the entity,

(2) the degree of control the state has over the entity, (3) whether the entity generates its own revenue, and (4) who is responsible for judgments against the entity.  *Jernigan v. City of Eufaula, Ala.*, 123 F. Supp. 3d 1322, 1327 (M.D. Ala. 2015).[8]  And, like the Tenth Circuit, the Eleventh Circuit gives special weight to the legislature's use of certain labels in creating the entity.  *Miller v. Advantage Behav. Health Sys.*, 677 Fed. App'x 556, 559 (11th Cir. 2017) ("While the terms 'public agency' and 'public corporation' are too vague to tip the balance toward arm-of-the-State status, entities considered 'instrumentalities' of the State presumptively share in the State's Eleventh Amendment immunity.").  There is no basis for such "immunity by magic words" in Supreme Court precedent, and the D.C. Circuit does not recognize any.

Even at its most generous to MOHELA, the Eleventh Circuit's test results in a split decision, with two factors pointing in each direction.  But *Gowens* did not just apply a different test than this Circuit's, it applied that test incoherently: despite conceding that MOHELA was directly liable for a judgment against it, the court speculated that "there is a potential that the State of Missouri would be functionally liable for a judgment against MOHELA," noting that MOHELA makes certain contributions to state coffers.  2020 WL 10180669, at *4.  As noted above, any such contributions by MOHELA are voluntary and cannot be distinguished from the economic contributions of any private entity that could make no claim to being an arm of the state.  Two weakly reasoned district court decisions using materially different tests than this Circuit's do not create a colorable defense—especially when, as here, the defense has been repeatedly rejected under tests similar to the controlling test here.

---

[8] Notably, the *Good* court itself specifically noted that "the Eleventh Circuit's four-factor test … is more like the Tenth Circuit's four-factor test than the Eighth Circuit's two-factor test." 2022 WL 2191758, at *4 n.38. Here, the Fourth, Fifth, Eighth, and Ninth Circuit tests are more like the D.C. Circuit's than the Tenth and Eleventh's.

### 2.      MOHELA Is Not Entitled To Derivative Federal Sovereign Immunity

MOHELA next asserts that, "as a federal contractor, [it] enjoys a derivative federal sovereign immunity that bars AFT's claims."  Notice of Removal ¶ 20.  MOHELA argues its misconduct was undertaken "on behalf of the Department," *id.*, but this claim is also futile for multiple reasons and therefore is not colorable.

"[G]overnment contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States."  *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 583 (1943).  This so-called derivative sovereign immunity, "unlike the sovereign's, is not absolute."  *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016).  Whereas the federal government cannot be sued without its consent or having waived its sovereign immunity, government contractors only obtain derivative immunity by following the government's "explicit instructions."  *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 69 (D.C. Cir. 2019).

First, MOHELA's contract with ED waived any derivative federal sovereign immunity defense.  Derivative federal sovereign immunity is a waivable affirmative defense.  *Id.* at 70.  And it is well established that contracting parties can, through contractual provisions, forfeit rights to which they would otherwise be entitled; that is true even for privileges protected by the Constitution.  *See, e.g.*, *Herman Miller v. Thom Rock Realty Co.*, 46 F.3d 183, 189 (2d. Cir. 1995) (right to jury trial can be waived by contract); *K.M.C. Co. v. Irving Tr. Co.*, 757 F.2d 752, 755 (6th Cir. 1985) (same).

Here, MOHELA's contract with ED is clear that MOHELA waived any derivative sovereign immunity defense.  In a provision entitled "Contractor Acknowledgment," the USDS Contract states:

> USDS Servicer acknowledges that it is not the U.S. Department of Education, and is not acting as the U.S. Government under this Contract. As such, the USDS Servicer Acknowledges that *any claim or defense* of Sovereign Immunity or Qualified Immunity is not applicable to worked performed under the contract and any Task Order issued under the Contract.

Ex. 1 at 12. (emphasis added).  Thus, even if MOHELA's misconduct was pursuant to its contract with ED (which it was not, *see supra* § I.A.2), the expansive language used in this waiver—"*any claim or defense of sovereign immunity*"—makes clear that MOHELA may not invoke immunity on the basis of its relationship with the federal government.

Second, even if MOHELA's derivative immunity defense was not foreclosed by this waiver, which it is, it would fail on the merits because derivative immunity categorically does not protect contractor actions that are contrary to law.  Derivative sovereign immunity "applies only when [1] a contractor takes actions that are 'authorized and directed by the Government of the United States,' and [2] 'performed pursuant to the Act of Congress' authorizing the agency's activity."  *Breach Litig.*, 928 F.3d at 68–69 (citing *Campbell-Ewald Co.*, 577 U.S. at 167).  Thus, a contractor "is entitled to derivative sovereign immunity only if it adhered to the terms of its contract with the government."  *In re KBR, Inc. Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014). "To claim immunity, [the contractor] ha[s] to establish 'compliance with all federal directions.'" *Breach Litig.*, 928 F.3d at 70 (quoting *Campbell-Ewald Co*, 577 U.S. at 167 n.7).

To illustrate, in *Campbell-Ewald*, a marketing firm hired by the Navy was not immune when it sent a text message as part of an advertising campaign to a person who had not expressly consented to receive such texts—a violation of the Telephone Consumer Protection Act.  577 U.S. at 166.  The Court specifically noted that the Navy approved the company's proposal "conditioned on sending the messages only to individuals who had 'opted in' to receipt of marketing solicitations on topics that included service in the Navy."  *Id.* at 157.  The defendant's failure to comply with

the Navy's instructions was sufficient to deprive it of derivative sovereign immunity.  *Id.* at 168–69.

Pursuant to this same principle, student loan servicers have been denied the protection of derivative sovereign immunity when accused of violating the law and contractual obligations, just like MOHELA.  *See, e.g.*, *Nigro v. Pa. Higher Educ. Assistance Agency*, 2020 WL 5369980, at *1–3, *6 (M.D. Pa. Sept. 8, 2020) (denying derivative immunity where borrower alleged servicer failed to document interest payments, improperly increased principal owed, and "wrongfully initiated administrative forbearances," among other things).  For example, in denying a loan servicer's claim to derivative immunity, the court in *New York v. PHEAA* emphasized that the servicer did "not argue that [ED] instructed it to incorrectly report to borrowers the number of PSLF-qualifying payments borrowers made, to provide incorrect monthly payment amounts in IDR plans, to fail to recertify applications in a timely fashion, or any of the other conduct that forms the basis of the [] Complaint."  2020 WL 2097640 at *7 (noting also that "[s]uch an argument would strain credulity").

MOHELA lacks derivative federal sovereign immunity for similar reasons.  AFT's allegations demonstrate MOHELA's systemic violation of government directives.  *See, e.g.*, Compl. ¶¶ 129–30, 148–49.  Those allegations must be accepted as true in assessing AFT's motion for remand.  *Walter E. Campbell Co. v. Hartford Fin. Servs. Grp., Inc.*, 48 F. Supp. 3d 53, 55 (D.D.C. 2014).  In fact, some of MOHELA's glaring breaches alleged in AFT's Complaint have been formally recognized by ED and even resulted in penalties.  ED itself has found MOHELA non-compliant with federal legal requirements and the explicit instructions in MOHELA's contract.  Citing "gross servicing failures" and MOHELA's "fail[ure] to meet its basic obligation[s]," in October 2023, ED took the dramatic step of withholding $7.2 million in

payments to MOHELA.[9]  Since that time, MOHELA has continued to misrepresent borrowers' repayment options, prohibited them from accessing their account information, and employed a pernicious call deflection scheme.  *See, e.g.*, Compl. ¶¶ 210–21.  These are only a few of numerous examples of MOHELA running afoul of federal regulations and express directions.  *See* Compl. ¶¶ 116–204.

For all of these reasons, MOHELA's assertion of derivative sovereign immunity would be futile and thus cannot form a colorable defense.

### 3.    AFT's Claims Are Not Preempted By The HEA

As its final defense, MOHELA argues that AFT's DCCPPA claims are preempted by the "HEA, its implementing regulations, and Department contracts entered into pursuant to the HEA." Notice of Removal ¶ 21.  This defense, too, is futile for two main reasons: the claims here are not expressly preempted and the claims do not conflict with the HEA.

As the Supremacy Clause vests the power to preempt state law in Congress, "Congressional purpose … is the 'ultimate touchstone in every preemption case.'"  *Student Loan Servicing All. v. District of Columbia*, 351 F. Supp. 3d 26, 46 (D.D.C. 2018) ("SLSA") (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)).  "To identify the domain expressly preempted by Congress, [courts] read the words of a statute … in their context and with a view to their place in the overall statutory scheme."  *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 288 (3d Cir. 2020) (cleaned up).

---

[9] U.S. Dep't of Educ., *U.S. Department of Education Announces Withholding of Payment to Student Loan Servicer as Part of Accountability Measures for Harmed Borrowers*, Oct. 30, 2023, https://www.ed.gov/about/news/press-release/us-department-of-education-announces-withholding-of-payment-to-student-loan-servicer-as-part-of-accountability-measures-for-harmed-borrowers (last visited Sept. 25, 2024).

### a.    AFT's Claims Are Not Expressly Preempted By The HEA

The HEA expressly preempts state law in only six categories—state usury laws,[10] state statutes of limitations,[11] state infancy defenses,[12] state laws that might restrict administrative wage garnishments,[13] state laws that might prevent collection of "reasonable collection costs" on a defaulted federal student loan,[14] and state "disclosure requirements" relating to federal student loans.[15]  None of AFT's claims falls into those categories.

"Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area."  *General Motors Corp. v. Abrams*, 897 F.2d 34, 41–42 (2d Cir. 1990).  No such intention exists here.  MOHELA asserts that AFT's claims are preempted by Section 1098g of HEA, Notice of Removal ¶ 21, but that is wrong: "the language of § 1098g does not express the clear and manifest purpose of Congress to preempt [] claims" seeking to hold federal loan servicers liable for affirmative misrepresentations to borrowers, like AFT's claims here.  *Hyland v. Navient Corp.*, 2019 WL 2918238, at *6 (S.D.N.Y. July 8, 2019) (cleaned up).  Although "disclosure" is not defined in the HEA, several circuits have held that 20 U.S.C. § 1098g preempts only those state mandatory disclosure laws that compel the furnishing of information covered by 20 U.S.C. § 1083, which details what information about the loan must be shared with borrowers.  *See Pennsylvania v. Navient Corp.*, 967 F.3d at 289 (citing

---

[10] 20 U.S.C. § 1078(d) (providing that state law limits, and some federal law limits, on interest do not apply to loans insured by the United States or a guaranty agency under the HEA, as long as the rate does not exceed any HEA limits).

[11] 20 U.S.C. § 1091a(a).

[12] 20 U.S.C. § 1091a(b)(2).

[13] 20 U.S.C. § 1095a(a).

[14] 20 U.S.C. § 1091a(b)(1).

[15] 20 U.S.C. § 1098g.

*Lawson-Ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908, 917 (11th Cir. 2020) and *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 647–48 (7th Cir. 2019); *see also Lawson-Ross*, 955 F.3d at 917 (HEA "preempts only state law that imposes disclosure requirements.").

"There is nothing in the HEA that standardizes or coordinates how a customer service representative of a third-party loan servicer . . . shall interact with a customer . . . in the day-to-day servicing of his loan." *Genna v. Sallie Mae, Inc.*, 2012 WL 1339482, at *8 (S.D.N.Y. Apr. 17, 2012).   Here, the issue is not disclosure requirements—for example, a state requiring that MOHELA disclose to borrowers more information about interest rates than ED requires to be disclosed[16]—but rather MOHELA's voluntary misrepresentations to borrowers.

In addressing whether claims based on unfair and deceptive conduct are preempted by Section 1098g, federal courts, closely examining Congressional purpose, have correctly held on numerous occasions that state law claims based on federal student loan servicers' misrepresentations are not preempted by federal law.   *See Pennsylvania v. Navient Corp.*, 967 F.3d at 277; *Lawson-Ross*, 955 F.3d at 916–23; *Nelson*, 928 F.3d at 642; *New York v. PHEAA*, 2020 WL 2097640, at *15; *Hyland*, 2019 WL 2918238, at*6-8.   In all of those cases, the courts held that borrowers' misrepresentation claims, which alleged virtually identical patterns of misconduct as AFT does, were not preempted.   *Pennsylvania v. Navient*, 967 F.3d at 277; *Lawson-Ross*, 955 F.3d at 911 ("[The servicer's] voluntary, personalized, affirmative misrepresentations in the form of advice about whether an individual borrower was on track to qualify for the PSLF Program was

---

[16] Specifically, Section 1083 "principally requires the servicer to disclose information about the loan itself, including: the original principal amount of the loan, the borrower's current outstanding balance, the loan's interest rate, the fees the borrower has been charged, the total amount paid in interest on the loan, and the aggregate total amount the borrower has paid on the loan." *Lawson-Ross*, 955 F.3d at 917.

different in kind from any disclosure required by this subsection or any other provision of the HEA"); *Nelson*, 928 F.3d at 652.

Those courts distinguished between statements required by 20 U.S.C. § 1083 and misrepresentations servicers voluntarily made: "[S]tate law causes of action arising out of affirmative misrepresentations" impose no disclosure requirements and are therefore not preempted. *Lawson-Ross*, 955 F.3d at 917. In *Lawson-Ross*, for example, the Eleventh Circuit found no preemption when the defendant loan servicer provided inaccurate information about PSLF. *Id.* at 911, 913. Here, the DCCPPA does not require MOHELA to make any representations it is not otherwise required to; it merely requires that whatever representations MOHELA makes be accurate. Thus, there is no preemption where AFT alleges that MOHELA made, and continues to make, outrageous, avoidable, and voluntary misrepresentations about borrowers' repayment options and outstanding obligations, and serious errors in processing borrowers' loans. *See* Compl. ¶¶ 116–204.

That AFT's claims are not preempted is further demonstrated by the statutory provisions that form the basis of AFT's claims. *See, e.g.*, Compl ¶ 209. AFT seeks to enforce D.C. Code § 28-3904, which prohibits "unfair or deceptive" practices. The statute provides an illustrative and non-exhaustive list of practices that are unlawfully unfair or deceptive. These practices include Sections 28-3904(e), (f), (f-1), & (u), which respectively prohibit misrepresentations, failures to state a material fact if to do so tends to mislead, the misleading use of innuendo or ambiguity, and the false representation that a transaction complies with earlier promises. Three of these provisions exclusively address affirmative nonfactual statements; the fourth prohibits lying by omission. AFT's claims based on those provisions are not preempted.

MOHELA argues to the contrary, citing *Chae v. SLM Corp.*, 593 F.3d 936, 950 (9th Cir. 2010). In *Chae*, the Court held that claims alleging a student loan servicer failed to disclose certain information in specific ways were preempted by HEA. Specifically, the plaintiff alleged that Sallie Mae's method of calculating interest—which is dictated by federal statute—violated California state law, and including the interest rate on the billing statement was a misleading and deceptive practice. *Id.* at 940–41. The court in *Chae* found that plaintiff's claims were preempted because, unlike AFT, that plaintiff sought to force disclosure of information regarding how interest on the loans was being calculated—a disclosure that was not required by federal law. *Id.* at 942–43. *Chae* did not deal with affirmative misrepresentations. The Third, Seventh, and Eleventh Circuits each have distinguished and cabined *Chae* as narrowly applying to mandatory state disclosure laws. *Pennsylvania v. Navient*, 967 F.3d at 290–93; *Nelson*, 928 F.3d at 649–50; *Lawson-Ross*, 955 F.3d at 919–22. Here, just like in *Navient Corp.*, *Nelson*, and *Lawson-Ross* (among other cases), AFT is not attempting to force MOHELA to make certain disclosures; instead, its claims seek to prevent MOHELA from providing misinformation to borrowers, through claims based on the same type of state law that courts routinely conclude is not preempted by the HEA. MOHELA's reliance on *Chae* therefore falls flat.

### b.    AFT's Claims Do Not Conflict With The HEA

MOHELA further claims, without supporting authority, that AFT's claims "seek to enforce obligations that conflict with the HEA, Department regulations, and/or Department contracts and are thus preempted." Notice of Removal ¶ 21. MOHELA fails to specify any actual conflict, which is fatal to its argument. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (conflict preemption requires a showing that "compliance with both state and federal law is impossible or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (cleaned up)). MOHELA demonstrates no such conflict; instead,

MOHELA only offers conclusory statements: "For example, the HEA and its implementing regulations and guidance preempt AFT's claims that MOHELA failed to send AFT's members timely bills, created an unlawful backlog of borrower complaints and applications, and unlawfully relied on self-service customer service options." Notice of Removal ¶ 21. That fails to identify any specific government requirement or how AFT's claims conflict with any such purported requirements in a manner that warrants preemption.

The caselaw MOHELA cites elsewhere in its removal papers makes clear that AFT's claims are not preempted. MOHELA points, for example, to *Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 326 (D.C. Cir. 2014), which noted that "state laws are preempted when they conflict with federal law," and found the Federal Arbitration Act did *not* preempt a D.C. law providing a longer period for enforcing a foreign judgment. Here, MOHELA does not even purport to identify any conflict between federal law and the DCCPPA. MOHELA cites to no provision of the HEA, or its "implementing regulations and guidance," for the proposition that MOHELA is required to commit the misconduct upon which AFT's claims are premised, and therefore shows no way in which the District of Columbia's prohibition of these acts conflicts with federal law.

Additionally, MOHELA does not and cannot argue that AFT's claims for unfair business practices are preempted. There are no provisions of the HEA or its implementing regulations that expressly preempt state protections against unfair business practices and, again, MOHELA has not identified any specific instances of conflict between ED's obligations and allegations by AFT of unfair practices. MOHELA's unfair conduct is not limited to its false representations—it ranges from derelict customer service, to failing to process applications for relief, to failing to allow borrowers consistent access to their accounts, *see supra* § I.A–B. Nothing in the HEA requires

MOHELA to take those actions, and so nothing in the HEA conflicts with the District of Columbia's prohibition of them.

The futility of MOHELA's preemption argument is further underscored by ED's formal position that state consumer protection claims like AFT's are not preempted by federal law.[17] ED's position is entitled to deference because it is well-reasoned, formally adopted, and generally consistent with earlier positions. *SLSA*, 351 F. Supp. 3d at 46; *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

Under the *Skidmore* doctrine, which urges courts to heed the substantiated positions of expert agencies, "'interpretations and opinions' of the relevant agency, 'made in pursuance of official duty' and 'based upon … specialized experience,' 'constitute[] a body of experience and informed judgment to which courts and litigants [can] properly resort for guidance,' even on legal questions." *Loper Bright Enter. v. Raimondo*, 144 S. Ct. 2244, 2259 (2024) (citing *Skidmore*, 323 U.S. at 140). The Supreme Court continued: "The weight of such a judgment in a particular case … would depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.*[18]

ED's interpretation of federal law possesses all of the indicia of persuasiveness that *Skidmore* and its progeny note. ED arrived at this position after engaging the public through formal notice-and-comment rulemaking; it also supported its interpretation with extensive, well-

---

[17] U.S. Dep't of Educ., *New Interpretation to Encourage State Collaboration on Student Loan Servicing,* Oct. 31, 2023, https://www.ed.gov/news/press-releases/new-interpretation-encourage-state-collaboration-student-loan-servicing. In fact, ED *encouraged* states to enforce those state laws against federal student loan servicers where appropriate. *Id.*

[18] *Loper Bright* left in place the *Skidmore* deference doctrine, citing it favorably throughout its opinion. *See Loper Bright*, 144 S. Ct. at 2259, 2262, 2265, 2267.

researched reasoning that comported with earlier ED policy. *Id.*; *see also SLSA*, 352 F. Supp. 3d at 50. As such, this Court should defer to ED's interpretation of HEA and related laws. *See also Brown v. United States*, 327 F.3d 1198, 1200 (D.C. Cir. 2003), as amended (May 6, 2003) (granting the Treasury Department's statutory interpretation *Skidmore* deference where it considered various possibilities, engaged in well-reasoned policymaking, and reflected the Department's special expertise).

This interpretation contrasts favorably with the brief and unsupported aberration in federal interpretation during the Trump Administration, which took the position in state suits against servicers that the HEA preempted state consumer protection laws, including borrowers' bills of rights, as applied to servicers. Courts in this district, along with other district courts, *see, e.g.*, *Travis v. Navient Corp.*, 460 F. Supp. 3d 269, 282 (E.D.N.Y. 2020), *Pennsylvania v. Navient Corp.*, 354 F. Supp. 3d 529, 552–53 (M.D. Pa. 2018), have declined to give that guidance any deferential weight, as it represented a "retroactive, ex-post rationalization of [the Department's] policy changes" and stood in stark contrast to prior ED statements and policies. *SLSA,* 352 F. Supp. 3d at 50. For precisely these reasons, the restoration of the ED's well-supported position is entitled to *Skidmore* deference.

## II.    THERE IS NO FEDERAL QUESTION JURISDICTION

AFT's consumer protection claims against MOHELA arise exclusively under District of Columbia law. Compl. ¶¶ 205–67. These claims presumptively must be heard in the District of Columbia's courts. *Exxon*, 89 F.4th 144 at 154. Yet, MOHELA asserts federal question jurisdiction over AFT's state-law claims, arguing that "the Complaint nevertheless falls in the category of cases in which federal jurisdiction still exists." Notice of Removal ¶ 23. It argues that AFT's claims require the Court to "address meaningful federal law" and that any interpretations thereof would affect the interests of thousands of federal student loan borrowers. *Id.* ¶ 28. For

these reasons, it argues, AFT's claims satisfy the Supreme Court's test for federal question jurisdiction over state-law claims.  MOHELA is incorrect.

Federal courts only have jurisdiction over state-law claims in a "special and small" category of cases where disputed federal issues comprise a substantial and necessary part of resolving plaintiffs' claims and resolving those issues in federal court would not run afoul of federalism principles.  *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Empire HealthChoice Assurance, Inc.* v. *McVeigh*, 547 U.S. 677, 699 (2006)).  As explained below, AFT's action against MOHELA is not one of those cases, because it centers on state-law claims that can be resolved without resolving issues of federal law.  Removing this action would violate fundamental principles of federalism by depriving District of Columbia courts of their right to adjudicate and apply District law to entities operating in the District and violating the rights of consumers in the District.

The Supreme Court in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), set out the threshold requirements a litigant must meet to establish federal jurisdiction over state-law claims, which were subsequently distilled into a four-part test in *Gunn*: "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  568 U.S. at 258. MOHELA cannot satisfy this test here, and so this case must be remanded.

### A.    No Federal Issue Is "Necessarily Raised" In AFT's Claims

A federal issue is "necessarily raised" if it is "an essential part of [the plaintiff's] affirmative claim[.]"  *D.C. Ass'n of Chtd. Pub. Sch. v. Dist. of Columbia*, 930 F.3d 487, 491 (D.C.

Cir. 2019).  The pleadings on their face must explicitly turn on a predicate federal law question, resolution of which is essential to determining liability.  *Exxon*, 89 F.4th at 155.[19]

In its Notice of Removal, MOHELA argues that AFT's claims will necessarily require litigating what constitutes student loan servicers' "responsibilities" under federal law and require the Court "to interpret … the requirements of the PSLF Program under federal law."  Notice of Removal ¶ 25 (citing Compl. ¶¶ 239–46).  Not so.  The Complaint alleges that MOHELA "is unable to fulfill its responsibilities as a student loan servicer."  Compl. ¶ 70.  The complaint does not, however, ground liability for failing to meet those responsibilities in federal law, like the HEA, PSLF program requirements, any other federal law, or even MOHELA's contract with ED.  To the contrary, AFT's claims under the DCCPPA turn on whether MOHELA's abusive business practices violate the standards for consumer protection set by that District law (which they do).  The DCCPPA does not require as a condition precedent a showing that a defendant has violated another state or federal law, or any federal contract.[20]  MOHELA's argument amounts to the same sort of "repackaging" of plaintiff's pleadings to engineer the appearance of a federal question that the D.C. Circuit rejected in *Exxon*, 89 F.4th at 155.

Moreover, even if a fulsome understanding of some of MOHELA's alleged misconduct may lead a court to consider MOHELA's noncompliance with federal law, whether servicing

_____

[19] Although MOHELA has raised purported questions of sovereign immunity, derivative federal sovereign immunity, and preemption with respect to AFT's claims, Notice of Removal ¶¶ 17–21, it is black-letter law that an anticipated federal defense is insufficient to convey federal question jurisdiction.  *Exxon*, 89 F.4th at 155.

[20] The fact that the loans at issue are federal student loans is irrelevant and does not itself establish the existence of a federal legal question.  Cases involving federal student loans are routinely heard in state courts.  *See, e.g.*, *Washington v. Navient Corp. et al*., No. 17-2-01115-1 SEA (Wash. Sup. Ct., King Cty.); *Massachusetts v. Pa. Higher Educ. Assistance Agency*, No. 1784-cv-02682-BLS2 (Mass. Super. Ct., Suff. Cty.); *California v. Navient Corp. et al*., Case No. CGC-18-567732 (Cal. Sup. Ct., San Fran. Cty.).

standards or the PSLF Program, such a relationship between state claims and federal law has never been held sufficient to confer federal jurisdiction, and to hold otherwise would be a radical departure from past precedent.  As the D.C. Circuit only recently reaffirmed, "[t]he fact that a lawsuit will likely turn on a federal question is generally insufficient to confer federal jurisdiction if the plaintiff proceeds under a state-law cause of action." *Exxon*, 89 F.4th at 149.  The federal question generally must be dispositive of liability for the state law claim to fall into the narrow category of exceptions to the presumption against federal courts resolving state law questions.  *Id.* There is no such question here.

The case that MOHELA cites in support of its contention that AFT's claims necessarily raise federal issues does little for its cause.  The court in *Organic Consumers Ass'n v. Hain Celestial Grp., Inc*. did not conduct any *Gunn* analysis of the facts therein, as no parties contested the case's removal to federal court on the basis of federal question jurisdiction; the court merely noted in a footnote that the claims satisfied the standard in *Grable*.  285 F. Supp. 3d 100, 102 n.2 (D.D.C. 2018).  Such a conclusory determination in a case where federal question jurisdiction was not even disputed fails to rebut AFT's fact-specific arguments against federal question jurisdiction here.

### B.    Any Federal Issues Are Neither Substantial Nor Disputed

To the extent AFT's claims do implicate questions of federal law (which they do not), they are not "substantial" in the sense that they neither hold broad significance to the federal system as a whole nor are determinative of federal questions in other cases, nor are they disputed.  To confer federal question jurisdiction over a state-law claim, a reviewing court must "look[] to the importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 252.  The federal issue at stake must be likely to be determinative in numerous other cases. *McVeigh,* 547 U.S. at 700.

36

Further, "federal question jurisdiction is disfavored for cases that are 'fact-bound and situation-specific' or which involve substantial questions of state as well as federal law." *Bender v. Jordan*, 623 F.3d 1128, 1130 (D.C. Cir. 2010) (quoting *McVeigh*, 547 U.S. at 701). AFT's state-law claims are "fact-bound and situation-specific," and are rooted in state law and, as such, should remain in state courts.

Critically, there is no outcome of this case that would alter the federal student loan system's legal framework. AFT does not challenge any aspect of the HEA or ED's regulations pursuant to that act, nor has AFT named the federal government in its lawsuit. To the extent that any of AFT's claims reference federal law, they cannot be construed as raising substantial or disputed federal issues. For example, with respect to AFT's allegation that MOHELA improperly denied borrowers credit toward PSLF—which MOHELA invokes as its basis for jurisdiction, Notice of Removal ¶ 26—any judicial determination in favor of AFT, its members, or the general public would only have the effect of awarding those borrowers relief and enjoining ongoing violations. It would not change the contours of the PSLF program itself. To the extent any borrower's PSLF credit would be adjusted, as a condition of settlement or otherwise, it would only be adjusted to reflect actual eligibility under federal law that had been improperly denied by MOHELA, not to adjust PSLF program rules or otherwise to impose a different interpretation of PLSF eligibility. In short, any case outcome would not have broad-sweeping effects on the federal student loan system.

To provide a concrete example: AFT alleges that MOHELA misrepresented to a borrower that she would lose her PSLF credit if she consolidated her loan. Compl. ¶ 152. To confirm that this was an affirmative misrepresentation, a court need only review ED's borrower-facing webpage about the IDR Account Adjustment, which is also described in AFT's complaint. *See* Federal Student Aid, U.S. Dep't of Educ., *Payment Count Adjustments Toward Income-Driven Repayment*

*and Public Service Loan Forgiveness Programs*, https://studentaid.gov/announcements-events/idr-account-adjustment (last visited Sept. 25, 2024) (encouraging borrowers to consolidate and explaining that they will retain PSLF credit); *see also* Compl. ¶¶ 95–97.  MOHELA may dispute whether it gave inaccurate advice, but it cannot seriously dispute the content of ED's webpage is an accurate representation of ED's rules.  A state court's simple application of law and fact to make this determination would not have any substantial effect on federal law.  *See McVeigh*, 547 U.S. at 701 (finding no federal jurisdiction necessary to apply relevant federal law in state court proceeding); *see*, *e.g.*, *Coles v. Howard Univ.*, 2023 WL 7156534, at *3 (D.D.C. Oct. 31, 2023) (finding no federal question jurisdiction because "even if the same disclosure of personal health information that allegedly violated . . . state laws also allegedly violated HIPAA, that does not transform HIPAA into an 'essential element' of those state claims").  AFT's claims can thus be resolved without meaningfully disturbing or affecting federal law.

MOHELA further argues that AFT's claims raise substantial federal issues because holding student loan servicers accountable for violations of state consumer protection laws "could interfere with the uniformity of federal law by creating a patchwork of requirements grounded in state consumer protection statutes."  Notice of Removal ¶ 26.  However, MOHELA has not established either that the federal government has an interest in uniformity in this field or that compliance with state consumer protection law jeopardizes that interest.  Nor can it, as federal courts have already found there is no federal interest in maintaining uniformity in federal student loan servicing under the HEA.  *See*, *e.g.*, *Pennsylvania* v. *Navient Corp.*, 967 F.3d at 293 (finding no legislative support for uniformity for student loans under the HEA); *Lawson-Ross*, 955 F.3d at 921–22 (same); *Nelson*, 928 F.3d at 651 (same); *College Loan Corp.* v. *SLM Corp.*, 396 F.3d 588, 597 (4th Cir. 2005) (same).  The courts also reasoned that, "[e]ven if we assume that uniformity is a purpose of

the HEA, [claims about affirmative misrepresentations by loan servicers] would not conflict with that purpose." *Lawson-Ross,* 955 F.3d at 922–23; *see also Pennsylvania v. Navient*, 354 F. Supp. 3d at 553, *aff'd,* 967 F.3d 273 (3d Cir. 2020) (any existing uniformity "is not harmed by prohibiting unfair or deceptive conduct in the operation of those programs that is not explicitly permitted by the HEA"). The federal government itself has disavowed both that it has an interest in uniformity and that compliance with state consumer protection laws jeopardizes federal uniformity of federal student loan servicers. *See* U.S. Dep't of Educ., *Federal Preemption and Joint Federal-State Regulation and Oversight of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers*, 88 Fed. Reg. 47370, 47372 (July 24, 2023) (hereinafter "Preemption Interpretation"). AFT's claims therefore do not raise substantial or disputed federal issues.

### C.     The Balance Of Federal And State Judicial Responsibilities Favors Remand

The final requirement under *Gunn* concerns the appropriate "balance of federal and state judicial responsibilities." *Gunn*, 568 U.S. at 264 (citing *Grable*, 545 U.S. at 314). As was the case in *Gunn*, that balance favors adjudication of AFT's claims in state court.

In *Gunn*, which involved a state legal malpractice claim, the Supreme Court affirmed states' strong interest in regulating and maintaining standards for licensed professionals, including attorneys. *See* 568 U.S. at 264. In doing so, the Court cited several additional cases supporting this long-held state interest. *See*, *e.g.*, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978) ("In addition to its general interest in protecting consumers and regulating commercial transactions, the State bears a special responsibility for maintaining standards among members of the licensed professions."); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975) ("We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they

have broad power to establish standards for licensing practitioners and regulating the practice of professions.").

This rationale applies with equal force to AFT's consumer protection claims under the DCCPPA. As with licensed professionals, consumer protection has long been considered a core component of states' powers to protect the health, safety, and general welfare of their residents, which has traditionally been regulated by states. *See ARC*, 490 U.S. at 101; *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146 (1963); *SLSA*, 351 F. Supp. 3d at 47. Allowing AFT's claims, which are composed solely of consumer protection claims under the DCCPPA, to be adjudicated in federal court would upset the historical balance of judicial responsibilities.

Other factors also favor a finding that allowing AFT's claims to be reviewed in federal court would disrupt this balance. First, the fact that there are no substantial federal issues raised by AFT's claims favors remanding those claims to state court. *Gunn*, 568 U.S. at 252. Second, where there is no federal cause of action—or here, where no federal law is invoked at all—it is reasonable to infer that Congress did not intend to confer jurisdiction on federal courts. *Grable*, 545 U.S. at 318. Finally, and relatedly, the lack of preemption of AFT's claims supports a finding that Congress did not intend for federal courts to exercise jurisdiction over those claims. *Id.*; *see also* Preemption Interpretation.

The two out-of-circuit cases that MOHELA cites do nothing to support its position. *See* Notice of Removal ¶ 27 (citing *One & Ken Valley Hous. Grp. v. Me. State Hous. Auth.*, 716 F.3d 218, 224–26 (1st Cir. 2013); *Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 466–69 (7th Cir. 2015)). Both cases involved the application of federal law, namely, the United States Housing Act of 1937, 42 U.S.C. § 1437(f)—creating the flagship Section 8 housing program—and the U.S. Department of Housing and Urban Development's implementing

guidance.  *One Valley*, 716 F.3d at 220-26; *Evergreen*, 776 F.3d at 464–69.  The legal questions presented in those cases threatened the viability of the Section 8 program itself.  *One Valley*, 716 F.3d at 225 ("The outcomes of the legal questions in these cases … could require the agencies to scale back the scope of the Section 8 program."); *Evergreen*, 776 F.3d at 468 ("In the aggregate, these cases have the potential to substantially influence the scope and success of the Section 8 program.").  Here, by contrast, MOHELA's misconduct does not turn on any questions of federal law or regulation.  Moreover, the outcome of this litigation will not jeopardize the viability of any federal program.  In fact, by holding MOHELA accountable for its misconduct, AFT is furthering ED's mission of financially assisting student borrowers.

For the foregoing reasons, MOHELA cannot demonstrate that AFT's claims satisfy the four *Gunn* requirements.  As the Court lacks federal question jurisdiction over AFT's state-law claims, the case should be remanded.

## **<u>CONCLUSION</u>**

For the foregoing reasons, AFT respectfully requests that the Court remand this action to the Superior Court of the District of Columbia.

Dated: September 25, 2024                    Respectfully submitted,


                                             _/s/ Faith Gay_____
Shennan Kavanagh (BBO #655174)              Faith Gay (NY Bar # 2117117)
Jennifer Wagner* (WVSB #10639)              Lena Konanova (NY Bar # 4758942)
National Consumer Law Center                David A. Coon (NY Bar # 5538020)
7 Winthrop Square, 4th Floor                Corey Stoughton (DC Bar # 472867)
Boston, MA 02110                            Selendy Gay PLLC
617.542.8010                                1290 Avenue of the Americas
skavanagh@nclc.org                          New York, NY 10104
jwagner@nclc.org                            (212) 390-9000
                                             fgay@selendygay.com
                                             lkonanova@selendygay.com
Alpha Taylor (DC Bar #252602)               cstoughton@selendygay.com
National Consumer Law Center                dcoon@selendygay.com
1001 Connecticut Ave., NW
Washington, D.C. 20036
202.452.6252                                Persis Yu (DC Bar # 90014714)
ataylor@nclc.org                            Student Borrower Protection Center (a fiscally
                                             sponsored project of the Shared Ascent Fund)
                                             1025 Connecticut Ave NW, #717
                                             Washington, D.C. 20036
                                             (202) 618-1328
                                             persis@protectborrowers.org

                                             R. T. Winston Berkman-Breen
                                             (NY Bar # 5559372)
                                             Khandice Lofton* (OH Bar # 101015)
                                             Student Borrower Protection Center (a fiscally
                                             sponsored project of the Shared Ascent Fund)
                                             40 Rector Street, 9th Floor
                                             New York, NY 10006
                                             winston@protectborrowers.org
                                             khandice@protectborrowers.org


                                             * Application for admission _pro hac vice_
                                             forthcoming