# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN FEDERATION OF
TEACHERS,

*Plaintiff*,

v.

HIGHER EDUCATION LOAN
AUTHORITY OF THE STATE OF
MISSOURI,

*Defendant*.

Case No. 1:24-cv-02460-TSC

**ORAL ARGUMENT REQUESTED**

## DEFENDANT'S OPPOSITION TO REMAND

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

    A. MOHELA ................................................................................................... 3

    B. MOHELA's Contracts with the Department. .................................... 4

    C. Procedural Background............................................................................ 8

ARGUMENT ......................................................................................................... 9

I.   MOHELA Is Entitled To Remove Under the Federal Officer Removal Statute. .................. 9

    A. MOHELA Is "Acting Under" the Department. ............................................ 10

    B. AFT's Suit Is "For or Relating To" Acts MOHELA Took "Under Color Of" Federal Office. .................................................................................................... 15

    C. MOHELA's Federal Defenses Are Colorable. ............................................ 19

        1.  MOHELA's State Sovereign Immunity Defense Is Colorable.............................. 21

        2.  MOHELA's Derivative Federal Sovereign Immunity Argument Is Colorable....... 33

        3.  MOHELA's Federal Preemption Defenses Are Colorable.................................... 35

II.  MOHELA Is Entitled To Remove Because AFT's Suit Raises a Federal Question. ............. 39

CONCLUSION ...................................................................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Manypenny*,
451 U.S. 232 (1981)............................................................................................1

*Badilla v. Midwest Air Traffic Control Serv., Inc.*,
8 F.4th 105 (2d Cir. 2021) ...............................................................................20

*Bd. of Com'rs of the S.E. La. Flood Protec. Auth.-E. v. Tenn. Gas Pipeline Co., LLC*,
29 F. Supp. 3d 808 (E.D. La. 2014), *aff'd*, 850 F.3d 714 (5th Cir. 2017) .............................40

*Beaulieu v. Vermont*,
807 F.3d 478 (2d Cir. 2015).............................................................................21

*Bergemann v. R.I. Dep't of Env't Mgmt.*,
665 F.3d 336 (1st Cir. 2011).............................................................................21

*Betzner v. Boeing Co.*,
910 F.3d 1010 (7th Cir. 2018) ..........................................................................19

*\*Biden v. Nebraska*,
143 S. Ct. 2355 (2023)................................................................... *passim*

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988)..........................................................................................43

*Campbell-Ewald Co. v. Gomez*,
577 U.S. 153 (2016)..........................................................................................35

*Caris MPI, Inc. v. UnitedHealthcare, Inc.*,
108 F.4th 340 (5th Cir. 2024) ..............................................................19, 22, 29

*\*Chae v. SLM Corp.*,
593 F.3d 936 (9th Cir. 2010) ....................................................36, 38, 39, 42

*Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*,
996 F.3d 243 (4th Cir. 2021) ..............................................................19, 22, 36

*Cobb v. GC Servs., LP*,
2016 WL 7155765 (S.D. W. Va. Dec. 7, 2016)..................................................12

*Authorities chiefly relied upon are marked with asterisks.

*In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*,
790 F.3d 457 (3d Cir. 2015)........................................................................13

*Da Silva v. Att'y Gen. of the U.S.*,
948 F.3d 629 (3d Cir. 2020).......................................................................16

*\*District of Columbia v. Exxon Mobil Corp.*,
89 F.4th 144 (D.C. Cir. 2023) ...........................................................2, 15, 16

*Dykes v. Mo. Higher Educ. Loan Auth.*,
2021 WL 3206691 (E.D. Mo. July 29, 2021) ...............................................31, 32

*Filarsky v. Delia*,
566 U.S. 377 (2012).................................................................................14

*Georgia v. Meadows*,
88 F.4th 1331 (11th Cir. 2023) ....................................................................18

*Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*,
865 F.3d 1237 (9th Cir. 2017) ...............................................................10, 15

*Good v. U.S. Dep't of Educ.*,
2022 WL 2191758 (D. Kan. June 16, 2022), *appeal docketed*, No. 22-3286
(10th Cir.)......................................................................................22, 23, 24

*Gowens v. Capella Univ., Inc.*,
2020 WL 10180669 (N.D. Ala. June 1, 2020) ..............................................22, 23

*Graves v. 3M Co.*,
17 F.4th 764 (8th Cir. 2021) .....................................................................19, 20

*Gunn v. Minton*,
568 U.S. 251 (2013).......................................................................1, 39, 42, 43

*Gust, Inc., v. Alphacap Ventures, LLC*,
905 F.3d 1321 (Fed. Cir. 2018)...................................................................23

*Henry v. United States*,
Civ. No. 20-3689 (CKK), 2021 WL 6619330 (D.D.C. Sept. 30, 2021)..............30, 32

*Holston v. Pa. Higher Educ. Assistance Agency*,
2019 WL 4745051 (D.N.J. Sept. 30, 2019*) ...................................................12

*Isaacson v. Dow Chem. Co.*,
517 F.3d 129 (2d Cir. 2008)......................................................................10, 16

*New York ex rel. Jacobson v. Wells Fargo Natl. Bank, N.A.*,
　824 F.3d 308 (2d Cir. 2016)..................................................................................41

*\*Jefferson Cnty. v. Acker*,
　527 U.S. 423 (1999)...................................................................................... *passim*

*\*K&D LLC v. Trump Old Post Off. LLC*,
　951 F.3d 503 (D.C. Cir. 2020) ...................................................................... *passim*

*Kaul v. Fed'n of State Med. Bds.*,
　No. 19-CV-3050 (TSC), 2021 WL 1209211 (D.D.C. Mar. 31, 2021) ...................................28

*Kormendi/Gardner Partners v. Surplus Acquisition Venture, LLC*,
　606 F. Supp. 2d 114 (D.D.C. 2009) .......................................................................9

*Lapides v. Bd of Regents*,
　535 U.S. 613 (2002)........................................................................................21

*Lawson-Ross v. Great Lakes Higher Educ. Corp.*,
　955 F.3d 908 (11th Cir. 2020) ...........................................................................37

*Maryland v. Soper*,
　270 U.S. 9 (1926)...........................................................................................10

*Merck Sharp & Dohme Corp. v. Albrecht*,
　587 U.S. 299 (2019)........................................................................................38

*Mesa v. California*,
　489 U.S. 121 (1989)........................................................................................17

*MobilizeGreen, Inc. v. Cmty. Found. for Nat'l Cap. Region*,
　101 F. Supp. 3d 36 (D.D.C. 2015) ................................................................. *passim*

*Moore v. Elec. Boat Corp.*,
　25 F.4th 30 (1st Cir. 2022)...............................................................................34

*Morris v. WMATA*,
　781 F.2d 218 (D.C. Cir. 1986) ...........................................................................14

*Neal v. Ameron Int'l Corp.*,
　495 F. Supp. 3d 375 (M.D. La. 2020)...................................................................39

*Nebraska v. Biden*,
　52 F.4th 1044 (8th Cir. 2022) ...........................................................................32

*Nelson v. Great Lakes Educ. Loan Servs., Inc.*,
　928 F.3d 639 (7th Cir. 2019) ........................................................................36, 37

*NetworkIP, LLC v. FCC*,
    548 F.3d 116 (D.C. Cir. 2008) ........................................................................40

*New York v. Pennsylvania Higher Education Assistance Agency*,
    2020 WL 2097640 (S.D.N.Y. May 1, 2020) ...............................................17, 35

*Nigro v. Pa. Higher Educ. Assistance Agency*,
    2020 WL 5369980 (M.D. Pa. Sept. 8, 2020) ..............................................12, 35

*Old Dominion Elec. Coop. v. PJM Interconnection, LLC*,
    24 F.4th 271 (4th Cir. 2022) ............................................................................42

*Organic Consumers Association v. Hain Celestial Group, Inc.*,
    285 F. Supp. 3d 100 (D.D.C. 2018) ..................................................................40

*Pellegrino v. Equifax Info. Servs., LLC*,
    709 F. Supp. 3d 206 (E.D. Va. 2024) ...........................................................31, 32

*Perkins v. Equifax Info. Servs., LLC*,
    2020 WL 13120600 (W.D. Tex. May 1, 2020) ...............................................31, 32

*Process & Indus. Dev. Ltd. v. Fed. Republic of Nigeria*,
    962 F.3d 576 (D.C. Cir. 2020) ................................................................ *passim*

*\*Puerto Rico Ports Authority v. Federal Maritime Commission*,
    531 F.3d 868 (D.C. Cir. 2008) ................................................................ *passim*

*Ruppel v. CBS Corp.*,
    701 F.3d 1176 (7th Cir. 2012) ......................................................................10, 21

*Sawyer v. Foster Wheeler LLC*,
    860 F.3d 249 (4th Cir. 2017) ............................................................................35

*Schlaifer Nance & Co. v. Est. of Warhol*,
    194 F.3d 323 (2d Cir. 1999) .........................................................................20, 39

*Snuffer v. Great Lakes Educ. Loan Servs., Inc.*,
    2015 WL 13049342 (S.D. W.Va. Mar. 19, 2015) ..............................................12

*Stewart v. North Carolina*,
    393 F.3d 484 (4th Cir. 2005) ............................................................................21

*In re Stout*,
    231 B.R. 313 (Bankr. W.D. Mo. 1999) ...............................................................22

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,
    928 F.3d 42 (D.C. Cir. 2019) ...........................................................................34

*Walker v. Higher Educ. Loan Auth. of the State of Mo.*,
  2024 WL 3568576 (E.D. Cal. July 26, 2024), *appeal docketed*, No. 24-5259
  (9th Cir.) .................................................................................................................31

*\*Watson v. Philip Morris Cos.*,
  551 U.S. 142 (2007) ........................................................................................ *passim*

*Watters v. Wash. Metro. Area Transit Auth.*,
  295 F.3d 36 (2002) ..................................................................................................21

*\*Willingham v. Morgan*,
  395 U.S. 402 (1969) ........................................................................................ *passim*

*Yearsley v. W.A. Ross Const. Co.*,
  309 U.S. 18 (1940) ..................................................................................................13

**Statutes**

Pub. L. No. 110-84, 121 Stat. 784 (2007) ....................................................................5

Pub. L. No. 117-81, 135 Stat. 1541 (2021) ................................................................19

20 U.S.C. § 1082 ...........................................................................................38, 39, 42

20 U.S.C. § 1087a .........................................................................................................5

20 U.S.C. § 1087a *et seq.* ..........................................................................................10

20 U.S.C. § 1087e ....................................................................................................5, 40

20 U.S.C. § 1087f ...............................................................................................5, 11, 18

20 U.S.C. § 1088 ...........................................................................................................5

20 U.S.C. § 1098g .......................................................................................................36

28 U.S.C. § 1331 ...........................................................................................................8

28 U.S.C. § 1441 .......................................................................................................8, 39

28 U.S.C. § 1442 ............................................................................................... *passim*

D.C. Code § 28-3904(a) ...............................................................................................8

Mo. Rev. Stat. § 173.095 ...........................................................................................26

Mo. Rev. Stat. § 173.360 ...........................................................................3, 4, 26, 28

Mo. Rev. Stat. § 173.365 ......................................................................................26, 28

Mo. Rev. Stat. § 173.385 ................................................................................ *passim*

Mo. Rev. Stat. § 173.392 ................................................................................4

Mo. Rev. Stat. § 173.415 ................................................................................26

Mo. Rev. Stat. § 173.445 ................................................................................26

**Other Authorities**

34 C.F.R. § 668.2 ..........................................................................................5

34 C.F.R. § 685.219 ......................................................................................40

88 Fed. Reg. 47,370 (July 24, 2023)............................................................39

Alexandra Hegji, Cong. Rsch. Serv., R45931, *Federal Student Loans Made Through the William D. Ford Federal Direct Loan Program: Terms & Conditions for Borrowers* (2023) ...........................................................5

FSA, *The Next Generation of Loan Servicing* (Apr. 24, 2023) ...................14

## INTRODUCTION

"Congress has decided that federal officers, and indeed the Federal Government itself, require the protection of a federal forum." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). Therefore, when a plaintiff brings state-law claims against a federal officer, or contractor acting under a federal officer, for the exercise of official duties, the defendant's "right of removal is absolute." *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). So too when a plaintiff's claim necessarily raises a disputed, substantial issue of federal law, the resolution of which would not disrupt any federal-state balance. *Gunn v. Minton,* 568 U.S. 251, 258 (2013). Such statutorily mandated removal rights protect the federal government from interference by the States by "ensur[ing] a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties." *Manypenny*, 451 U.S. at 241–42.

This case concerns the manner in which Defendant Higher Education Loan Authority of the State of Missouri ("MOHELA"), a federal contractor that is an instrumentality and arm of the State of Missouri, carried out responsibilities vital to implementing a major federal government program. MOHELA holds contracts with the U.S. Department of Education ("Department") to service federally-owned student loans originated under the Direct Loan program, the Department's flagship higher-education assistance program. In a complaint originally filed in D.C. Superior Court, Plaintiff American Federation of Teachers ("AFT") alleges that in servicing federal student loans under those contracts, MOHELA engaged in conduct constituting unfair or deceptive trade practices under the District of Columbia's Consumer Protection Procedures Act. MOHELA removed the case to this Court, and AFT now moves to remand.

MOHELA's removal was proper. To begin with, MOHELA meets every element required to remove under the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1). *First*, MOHELA "acted under" the direction of the Department because it "help[s] carry out" the Department's

duties to operate the federal Direct Loan program and multiple loan-forgiveness and income-driven repayment plans thereunder. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007). Even AFT never suggests that those programs could operate without MOHELA's loan servicing. *Second*, AFT's claims are "for or related to" MOHELA's official acts for the Department because the "circumstances that gave rise" to those claims all involve MOHELA's performance as a federal loan servicer, *K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503, 508 (D.C. Cir. 2020), and AFT's claims are "connected or associated" with MOHELA's contractual obligations to the Department, *District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 155–56 (D.C. Cir. 2023). *Third*, MOHELA has colorable federal defenses because its defenses of state sovereign immunity, derivative federal sovereign immunity, and preemption are "at least possible" and not "obviously meritless." *Process & Indus. Dev. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 583 (D.C. Cir. 2020). In addition, MOHELA is separately entitled to federal question removal because, although AFT does not bring its claims directly under federal law, those claims rely on the assertion that MOHELA violated its obligations to the federal government. AFT has thus made disputed federal questions dispositive in this case.

AFT's motion identifies no basis for remand. With respect to federal officer removal, AFT misstates every element's applicable legal standard. It contends that a contractor "acts under" a federal superior only if the superior "directed" the specific conduct at issue, Dkt. 27 ("Mot.") at 7; that claims are "for or relating to" acts under color of federal office only if the specific conduct at issue was done "at the behest of or in coordination with" the federal government, Mot. 10; and that, rather than having to show that its defenses are merely "colorable," MOHELA must show that its defenses ultimately will succeed, such that they are not "futile," Mot. 13. At each step, AFT ignores the standards set forth in binding Supreme Court and D.C. Circuit precedent and invents

ratcheted-up standards that would effectively require MOHELA to "win [its] case before [it] can have it removed"—a notion the Supreme Court has rejected. *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999). Indeed, "one of the most important reasons for removal is to have the validity of [federal defenses] tried in a federal court." *Willingham*, 395 U.S. at 407. AFT's concocted standards, and the many other factual and legal errors undergirding its arguments, implicitly acknowledge that under the appropriate standards, MOHELA's removal was proper.

With respect to federal question removal, AFT's arguments are likewise meritless. Although AFT depicts its Complaint as bringing fact-bound state-law claims of no federal importance, in reality it brings broad claims on behalf of the general public premised on the notion that MOHELA is systematically violating its federal contracts. In effect, through this litigation, AFT seek to redefine the duties of federal loan servicers. AFT's claims thus necessarily raise substantial, disputed federal questions about MOHELA's obligations as a loan servicer.

Each of MOHELA's removal grounds independently warrants denying AFT's motion.

## BACKGROUND

### A.    MOHELA

The State of Missouri established MOHELA in 1981 as a "public instrumentality"—specifically, a nonprofit government corporation—intended to finance higher education and to "support the efforts of public colleges and universities to create and fund capital projects." Mo. Rev. Stat. § 173.360. To achieve those ends, Missouri law authorizes MOHELA to "service student loans for any owner thereof, regardless of whether such student loans are originated in this state or out of this state" and to "create, acquire, contribute to, or invest in any type of financial aid program that provides grants and scholarships to students." *Id.* § 173.385.1(18)-(19). Missouri law provides that the exercise by MOHELA of such powers "shall be deemed to be the performance of an essential public function." *Id.* § 173.360.

As a State instrumentality, MOHELA is subject to the State's supervision and control. Five of its seven Board Members are appointed by the Governor and confirmed by the Missouri Senate, while the other two are high-ranking State officials. *See id.* All are removable by the Governor for cause. *Id.* MOHELA also must "provide annual financial reports to the Missouri Department of [Higher] Education, detailing its income, expenditures, and assets." *Biden v. Nebraska*, 143 S. Ct. 2355, 2366 (2023) (citing Mo. Rev. Stat. § 173.445). And Missouri law places strict limits on how MOHELA can raise capital or make investments. *See* Mo. Rev. Stat. § 173.385.1(8), (13).

Missouri relies on MOHELA in several respects to help fund its higher education priorities. First, the State routinely draws on MOHELA's revenues to fund specific line items in the State budget. *See, e.g.*, Dkt. 26-1 Exs. A–M (Appropriations Bills reflecting State budget line items for which MOHELA has provided monies); *id.* Ex. N (MOHELA Resolution approving transfer of $30 million to fund section 3.050 of the 2011 Appropriations Bill). Second, MOHELA has a statutory obligation to contribute $350 million to a fund in the State treasury that supports Missouri's higher education spending, *see* Mo. Rev. Stat. §§ 173.392.2, 173.385.2, of which over $100 million remains outstanding, *see* Dkt. 26-1 ¶ 8. And third, MOHELA's net revenues "help fund education in Missouri." *Biden*, 143 S. Ct. at 2366; *see* Dkt. 31 at 7–8 (State of Missouri's amicus brief explaining that the state relies on significant contributions from MOHELA to support public higher education). All told, MOHELA has provided more than "$230 million for development projects at Missouri colleges and universities and almost $300 million in grants and scholarships for Missouri students." *Biden*, 143 S. Ct. at 2366 (citing MOHELA's FY 2022 Financial Statement); *see* Dkt. 26-1 ¶¶ 4–9.

## B.    MOHELA's Contracts with the Department.

Title IV of the Higher Education Act of 1965 ("HEA") directs the Secretary of Education to establish the William D. Ford Direct Student Loan Program to use federal funds to lend directly

to students. *See* 20 U.S.C. § 1087a. The HEA also directs the Secretary to establish several repayment plans for borrowers, including various income-driven repayment ("IDR") plans. 20 U.S.C. § 1087e(d)(1)(D). Congress has also amended the HEA to create the Public Service Loan Forgiveness ("PSLF") Program, under which the Department must cancel the loan balances owed by borrowers under certain conditions. *See* Pub. L. No. 110-84, 121 Stat. 784, 800–01 (2007) (codified at 20 U.S.C. § 1087e(m)). The Department administers these programs through its Federal Student Aid ("FSA") office.

The Direct Loan program is huge. It is "the single largest source of federal financial assistance to support students' postsecondary educational pursuits" and, as of last year, there was more than $1.4 trillion outstanding on those loans. Alexandra Hegji, Cong. Rsch. Serv., R45931, *Federal Student Loans Made Through the William D. Ford Federal Direct Loan Program: Terms & Conditions for Borrowers*, at 1 (2023). Accordingly, rather than require the Department to administer this massive program singlehandedly, Congress authorized it to contract with third parties when "practicable" to service the federal government's Direct Loans and manage IDR plans and the PSLF Program. *See* 20 U.S.C. § 1087f(a). Loan servicers are not parties to the underlying loan contracts. Nor are they involved in originating Direct Loans. Rather, once loans are funded by the Department, a servicer manages the status of loan accounts, sends out billing statements, and provides information to borrowers on the Department's behalf. *See* Dkt. 1-2 ("Compl.") ¶ 69; 20 U.S.C. § 1088(c); 34 C.F.R. § 668.2.

MOHELA holds two of the Department's loan servicing contracts. The primary contract covering the loans at issue in this dispute was awarded in 2011 and is currently in the process of winding down. *See* Declaration of Jennifer Farmer ("Farmer Decl.") ¶¶ 4–5, 12–14. This contract, known as the "Direct Loan" or "DL" Contract, obligates MOHELA "to manage all types of Title

IV student aid obligations, including, but not limited to, servicing of outstanding debt." Dkt. 1-3 ("DL Contract") at 30.[1] The 60-page contract sets forth dozens of "high-level federal servicer requirements" and incorporates by reference additional detailed requirements, governing all aspects of MOHELA's work. *See, e.g.*, *id.* at 36 ("The servicers shall have the ability to service ... loans as required by statutory and regulatory guidelines."), 37 (providing that the "servicer shall incorporate a system of internal controls consistent with federal laws, regulations, policies, and authoritative guidance," and specifying that such "laws, regulations, and guidance" include, but are not limited to, nine specific items). The contract also gives the Department the right "at any time, by written order," to "make changes within the general scope of this contract," including to the "[d]escription of services performed." DL Contract at 6. The DL Contract has been modified several times, including by a series of modifications beginning in 2021 through which MOHELA was made the interim administrator of the PSLF Program starting on July 1, 2022. Dkt. 1-4 ("PSLF Amendment").

In addition to directing MOHELA's activities through requirements set forth in the contract itself, the DL Contract provides that MOHELA is "responsible for maintaining a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur." DL Contract at 31. Pursuant to that provision, MOHELA was required to conform its practices to any guidance issued by the Department. FSA has issued dozens of documents setting forth detailed requirements governing MOHELA's performance under the DL Contract. Farmer Decl. ¶ 16. It was also subject to ongoing direction and supervision by the Department in the form of "quarterly monitoring

---

[1] Because the DL Contract contains non-consecutively numbered attachments, MOHELA herein uses the pagination stamped at the top of Dkt. 1-3 for pincites to the DL Contract.

reviews … including … walkthroughs" and "annual program compliance reviews." *Id.* at 39. All of MOHELA's Direct Loan servicing from 2011 to April 1, 2024 occurred pursuant to the DL Contract. Farmer Decl. ¶¶ 11, 14.

In 2023, MOHELA was awarded a second servicing contract by the Department, known as the Unified Servicing and Data Solution ("USDS") Contract. *See* Dkt. 27-2 at 9 ("USDS Contract"). Like the DL Contract, the 83-page USDS Contract imposes scores of contractual requirements governing MOHELA's performance, *id.* at 9–34, and further directs that MOHELA "shall comply with all applicable Federal and State rules, laws, regulations, and Department guidelines," *id.* at 10. Attachments to the USDS Contract specify additional detailed requirements governing MOHELA's loan servicing. *See* Farmer Decl. Ex. C.

Before MOHELA could begin servicing loans under the USDS Contract, the contract required MOHELA to complete certain "tasks and deliverables" necessary "to become performance ready," including launching a new "servicing system" provided by Fiserv Solutions, LLC. USDS Contract at 34. The Fiserv servicing system replaced the older system MOHELA used in servicing loans under the DL Contract. Farmer Decl. ¶¶ 8–9. MOHELA completed all the work necessary to become "performance ready" in March 2024. *Id.* ¶¶ 10–11. Accordingly, that month, the Department issued a "Task Order" directing MOHELA to begin servicing borrowers' loans under the USDS Contract on April 1, 2024. *Id.* ¶ 11. Thereafter, MOHELA gradually transferred millions of borrowers' accounts from the older servicing system to the Fiserv platform, completing that process in October 2024. *Id.* ¶¶ 12–13. During that transition period, MOHELA continued to service loans on the older system under the DL Contract; only once an account was transferred to the Fiserv system did MOHELA begin to service the account's loans under the USDS Contract. *Id.* ¶¶ 13–14.

###### C.    Procedural Background

AFT initiated this action in D.C. Superior Court on July 22, 2024. Dkt. 1 at 1. AFT's allegations concern MOHELA's performance of its responsibilities as a federal loan servicer in the months after the Department's COVID-related "payment pause" ended in October 2023 and borrowers needed to restart monthly payments on their student loans. AFT's 50-page Complaint alleges that MOHELA has failed "to fulfill its responsibilities as a student loan servicer." Compl. ¶ 70; *see also id.* ¶ 198. More specifically, AFT alleges that, when payments restarted, MOHELA sent bills to borrowers with unspecified inaccuracies or sent them late or not at all, *id.* ¶¶ 116–125; did not process loan-forgiveness applications quickly enough, *id.* ¶¶ 142–144; gave guidance to borrowers that was inaccurate or incomplete, *id.* ¶¶ 147–153; concocted a "call deflection scheme" that diverted borrowers from call centers to MOHELA's website or other self-service features, which were "incomplete and inoperable" and thus unable to "meet all borrowers' needs," *id.* ¶¶ 158–160; and, as part of the alleged call deflection scheme, inadequately staffed its call centers and inadequately trained its call center agents, leaving borrowers with long wait times and agents unable to give them sought-after information, *id.* ¶¶ 147, 156–158, 165. AFT alleges that these acts constitute unfair or deceptive trade practices, in violation of the D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3904(a).

MOHELA removed this case to federal court on August 26, 2024 on grounds of federal officer removal, under 28 U.S.C. § 1442(a)(1), and federal question removal, under 28 U.S.C. §§ 1331, 1441(a). *See* Dkt. 1 (Notice of Removal). On September 25, 2024, AFT moved to remand, *see* Dkt. 27 ("Mot."), and MOHELA moved to dismiss, *see* Dkt. 26 ("MTD"). MOHELA's motion to dismiss raises numerous grounds for dismissal, including state sovereign immunity and preemption. MOHELA also invokes those defenses, together with federal derivative sovereign immunity, as the federal defenses supporting its federal officer removal. *See* Dkt. 1 ¶¶ 17–21.

## ARGUMENT

### I.    MOHELA Is Entitled To Remove Under the Federal Officer Removal Statute.

The Federal Officer Removal Statute authorizes removal of any civil action brought in state court against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or any agency thereof … for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Under § 1442(a), a federal contractor such as MOHELA can remove an action if it can show that: (1) it was "'acting under' an officer of the United States by demonstrating that the conduct at issue occurred while [it] was assisting or carrying out the duties of the federal officer"; (2) "the conduct at issue was 'under color of such office' by demonstrating a causal connection between the conduct and asserted official authority"; and (3) it "can allege a colorable federal defense" to the plaintiff's claims. *Kormendi/Gardner Partners v. Surplus Acquisition Venture, LLC*, 606 F. Supp. 2d 114, 119 (D.D.C. 2009).[2] Removal under § 1442(a)(1) serves "important" interests in protecting the federal government's operations from State interference by ensuring that federal officers and those acting under them have a federal forum for colorable federal defenses. *Willingham*, 395 U.S. at 406–07. The Court thus "must construe the statute liberally in favor of removal" and credit the defendant's "theory of the case for purposes of … the removal inquiry." *K&D*, 951 F.3d at 506.

As set forth below, MOHELA satisfies each element required for removal. AFT's contrary arguments rest on basic errors about the standards governing removal under § 1442(a)(1). AFT gets wrong the standard for "acting under," *see infra* Part I.A, for whether claims are "for or relating to" acts under color of federal office, *see infra* Part I.B, and for a "colorable" federal

---

[2] The contractor must also be a "person." *See MobilizeGreen, Inc. v. Cmty. Found. for Nat'l Cap. Region*, 101 F. Supp. 3d 36, 41 (D.D.C. 2015). Here, AFT does not dispute that MOHELA is a "person," as "corporations are deemed 'persons' under the [removal] statute." *Id.*

defense, *see infra* Part I.C. At each step, AFT ratchets up the standard so that MOHELA must "virtually … win [its] case before [it] can have it removed"—the very showing the Supreme Court has held is unnecessary for removal. *Acker*, 527 U.S. at 431 (cleaned up). The removal inquiry is "concerned with *who* makes the ultimate determination, not *what* that determination will be." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1182 (7th Cir. 2012) (emphases added). Judged under the appropriate removal standards, MOHELA is entitled to have the ultimate determination made in federal court.

### A.  MOHELA Is "Acting Under" the Department.

AFT's Complaint arises from MOHELA's alleged actions in performing under contracts with the Department. In performing under those contracts, MOHELA was (and is) "acting under" the Department. "The words 'acting under' are broad …." *Watson*, 551 U.S. at 147. To satisfy the "acting under" requirement, a person's actions "must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Id.* at 152. The relationship also "typically" subjects the person "to the instruction, direction, or guidance of" the federal superior. *Id.* at 151–52. Because the federal government frequently contracts with third parties to help carry out its responsibilities, federal contractors are frequently found to be "acting under" a federal officer. *See, e.g.*, *Maryland v. Soper*, 270 U.S. 9, 22 (1926) (chauffeur of federal prohibition agents); *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 136–37 (2d Cir. 2008) (military contractor); *Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1247 (9th Cir. 2017) (administrator of Federal Employee Health Benefit plan). MOHELA, likewise, plainly satisfies these standards.

To begin with, MOHELA "help[s] carry out" the Department's "duties or tasks." *Watson*, 551 U.S. at 152. Congress charged the Department with establishing and operating a Direct Loan program and multiple loan-forgiveness and income-driven repayment plans. *See* 20 U.S.C.

§ 1087a *et seq.* Congress recognized that operating such programs would require servicing the loans and other administrative responsibilities, but rather than making the Department singlehandedly shoulder that massive burden, Congress authorized it to contract with third parties to perform those tasks. *See id.* § 1087f; *accord* Compl. ¶ 66. Pursuant to that authority, the Department has hired MOHELA to service a portion of outstanding Direct Loans and to administer certain loan forgiveness programs. *See* DL Contract at 30 (charging MOHELA with "manag[ing] all types of Title IV student aid obligations"); *see also* PSLF Amendment at 4; Compl. ¶¶ 38–39. The essential nature of MOHELA's role to the Department's ability to discharge its duties distinguishes this case from *MobilizeGreen*, in which the contractor's role was "ancillary to the [agency's] mandate." 101 F. Supp. 3d at 42; *contra* Mot. 6. Rather, like a military contractor who "help[s] the Government to produce an item that it needs" in the form of equipment or other materiel necessary for national security, *Watson*, 551 U.S. at 153–54, MOHELA supplies services—namely, servicing loans and administering loan forgiveness and repayment programs—that the Department needs to operate the Direct Loan, IDR, and PSLF programs.

MOHELA is also "subject to [the Department's] instruction, direction, [and] guidance" in supplying those services. *Watson*, 551 U.S. at 152. MOHELA's contracts contain a multitude of requirements governing MOHELA's performance of all aspects of its obligations. For example, the DL Contract lists 70 "high-level" requirements for loan servicers, some of which incorporate by reference more detailed sets of requirements. *See* DL Contract at 36–41, 47. Similarly, the PSLF contract addendum includes five pages listing *over 100* separate "PSLF Requirements" governing every aspect of the program, and those requirements themselves reference a "PSLF Processing Manual" that "includes more detailed requirements for counting payments, employment certifications, etc." PSLF Amendment at 4–9. Furthermore, MOHELA's contracts make clear that

11

MOHELA is subject to *ongoing* direction and supervision by the Department. MOHELA's DL Contract, for example, subjects MOHELA to "quarterly monitoring reviews … including walkthroughs" and "annual program compliance reviews," DL Contract at 39, and mandates that MOHELA's services comply with "all federal and state laws and regulations" as well as supplemental "requirements" issued by FSA—*i.e.*, Department guidance, *id.* at 31; *see also* USDS Contract at 10–12, 34 (imposing similar requirements).

Precisely because federal student loan servicers assist the Department with its tasks and remain subject to the Department's oversight and control, every case to consider the question has found such servicers are "acting under" the Department for purposes of federal officer removal. *See, e.g.*, *Nigro v. Pa. Higher Educ. Assistance Agency*, 2020 WL 5369980, at *4 (M.D. Pa. Sept. 8, 2020); *Holston v. Pa. Higher Educ. Assistance Agency*, 2019 WL 4745051, at *2 (D.N.J. Sept. 30, 2019*)*; *Cobb v. GC Servs., LP*, 2016 WL 7155765, at *2 (S.D. W. Va. Dec. 7, 2016); *Snuffer v. Great Lakes Educ. Loan Servs., Inc.*, 2015 WL 13049342, at *2 (S.D. W.Va. Mar. 19, 2015). AFT's entire 41-page motion does not cite a single case to the contrary—because there are none. Instead, AFT simply criticizes the quality of the briefing in those cases. Mot. 7 n.1. But federal courts have an independent obligation to ensure removals under § 1442(a) are proper because removal is a matter of subject matter jurisdiction. *See* 28 U.S.C. § 1442(c); *MobilizeGreen*, 101 F. Supp. 3d at 44.

Beyond those criticisms, AFT offers two main arguments why MOHELA is not "acting under" the Department. *First*, AFT suggests that to satisfy this element, the "conduct at issue" must have been "directed by [the Department]." Mot. 7. But this position is inconsistent with the Supreme Court's decision in *Watson* and would, in defiance of other Supreme Court decisions, effectively require a contractor to demonstrate that it is entitled to government contractor immunity

or derivative sovereign immunity just to be able to remove. *See supra* at 10; *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20 (1940) (establishing federal contractor immunity where "the work which the contractor has done … was all authorized and directed by the Government of the United States."). In any event, the question of whether a contractor acted under a federal officer is conceptually distinct from whether the federal officer directed the conduct. *See In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 470 (3d Cir. 2015) ("[W]e disagree that the [defendant] is required to allege that the complained-of conduct itself was at the behest of a federal agency. It is sufficient for the 'acting under' inquiry that the allegations are directed at the relationship between the [defendant] and the [federal officer or agency]."). And even if AFT's standard were correct, MOHELA was "directed by" the Department to undertake some of the conduct AFT complains about, such as call deflection. *See infra* at 34; *see also K&D*, 951 F.3d at 506 (requiring court to credit the defendant's "theory of the case for purposes of … the removal inquiry").

*Second*, AFT argues that MOHELA agreed in the USDS Contract that it is not "acting under" the Department. Mot. 7–8. There are two problems with this argument. One is that the USDS Contract does not say that. In the provision AFT cites, MOHELA "acknowledge[d] that it is not the U.S. Department of Education, and is not acting as the U.S. Government under this Contract. As such, [MOHELA] acknowledge[d] that any claim or defense of Sovereign Immunity or Qualified Immunity is not applicable to work performed under the Contract." USDS Contract at 12; *see* Mot. 8. The standard for federal officer removal, however, is "acting *under*" a federal superior, not "acting *as*" the Government. *See Watson*, 551 U.S. at 151 ("In this context, the word 'under' must refer to what has been described as a relationship that involves acting in a certain capacity, considered in relation to one holding a superior position or office."). There is no basis

for reading "acting *as*" to mean "acting under," particularly given that this provision purports to waive certain immunities and thus must be narrowly construed. *See Morris v. WMATA*, 781 F.2d 218, 221 (D.C. Cir. 1986) ("[W]e will find waiver only where stated by the most express language or by such overwhelming implications from the [text] as [will] leave no room for any other reasonable construction."). Moreover, the very fact that the Department inserted language in the USDS Contract (and in a modification to the DL Contract[3]) waiving qualified immunity suggests that contractors have the status of federal officers, as the doctrine of qualified immunity applies only to government officers. *See Filarsky v. Delia*, 566 U.S. 377, 390 (2012).

The other problem with AFT's reliance on the USDS Contract is that this agreement governed hardly any of MOHELA's loan servicing work during the period covered by the Complaint. Though MOHELA entered into the USDS Contract in 2023, it did not begin servicing loans under that contract until April 1, 2024, Farmer Decl. ¶¶ 7, 12, 14, well after the October 2023 "Return to Repayment" on which AFT's allegations focus, *see, e.g.*, Compl. ¶¶ 116–176; *see also* FSA, *The Next Generation of Loan Servicing* (Apr. 24, 2023), https://tinyurl.com/yw6za23p (announcing inauguration of USDS Contract while acknowledging that servicing under the USDS Contract would not "go live" until "spring 2024"). Before April 1, 2024, MOHELA serviced loans exclusively under the DL Contract. Farmer Decl. ¶ 14. And even after April 1, MOHELA continued servicing loans under the DL Contract until October 2024 as it transitioned borrowers from the older loan-servicing platform to the Fiserv platform approved for the USDS Contract. *Id.* ¶¶ 13–14. Thus, even if AFT's construction of the USDS Contract were correct—though it is not—

---

[3] AFT mentions this modification waiving qualified immunity in its motion but vastly overstates the scope of that waiver. *See* Mot. 8 n.2 (claiming the amendment blankety "prohibit[s] loan servicers from shielding themselves from lawsuits"). The amendment itself makes clear the waiver applies only to the defense of qualified immunity. *See* Farmer Decl. Ex. D at 3.

almost all the allegations in AFT's Complaint involve servicing under the DL Contract, which does not contain the language on which AFT premises its argument.

### B. AFT's Suit Is "For or Relating To" Acts MOHELA Took "Under Color Of" Federal Office.

MOHELA meets the second element of federal officer removal because AFT's claims are "for or relating to" acts under "color of [federal] office." 28 U.S.C. § 1442(a)(1). A suit is "for" such acts if there is a "causal connection between the charged conduct and asserted official authority." *Acker*, 527 U.S. at 431. And a suit "relat[es] to" such acts if "acts taken under color of federal office are 'connected or associated' with the conduct at issue in the case." *Exxon Mobil*, 89 F.4th at 155–56 (explaining that Congress added "or relating to" to § 1442(a)(1) to "broaden[]" the statute). This is a "low bar" that MOHELA's removal clears. *Goncalves*, 865 F.3d at 1245.

First, there is plainly a "causal connection between the charged conduct and asserted official authority." *Acker*, 527 U.S. at 431. The "charged conduct" against MOHELA encompasses failing to timely bill some borrowers and inaccurately billing others, *see* Compl. ¶¶ 116–125; failing to accurately and timely process IDR, PSLF, and refund applications, *see id.* ¶¶ 126–144; providing borrowers with inadequate or inaccurate information, *see id.* ¶¶ 145–155; inadequately staffing call centers and training call center staff, *see id.* ¶¶ 156–172; and blocking access to borrower account information, *see id.* ¶¶ 173–176. Each of those categories relates to MOHELA's performance under its Department contracts. *See generally* DL Contract at 36–41; Farmer Decl. Ex. C (Attachment 1 to USDS Contract); *see also* Compl. ¶ 69 (listing MOHELA's "essential responsibilities" as a servicer). Indeed, MOHELA could not have had any involvement in servicing Direct Loans had it not been hired by the Department for that purpose. Because the "circumstances that gave rise" to AFT's claims are MOHELA's discharge of its contractual duties to the Department, *K&D*, 951 F.3d at 508 (cleaned up), there is a "causal connection" between the

"charged conduct" and MOHELA's "asserted official authority," such that AFT's claims are "for" MOHELA's acts under "color of [federal] office," *Acker*, 527 U.S. at 431.

Second, and for the same reasons, MOHELA's contractual obligations to the Department are "'connected or associated' with the conduct at issue in the case." *Exxon Mobil*, 89 F.4th at 155–56; *see Da Silva v. Att'y Gen. of the U.S.*, 948 F.3d 629, 635–36 (3d Cir. 2020) (explaining that "connected to" is an "expansive" term meaning "having a casual or logical relationship"). MOHELA's performance of those obligations gives rise to, and is the subject of, AFT's claims. AFT's claims thus "relat[e] to" MOHELA's acts as a Department contractor.

AFT resists these conclusions mainly by misstating the applicable legal standard as to the second element of federal officer removal. AFT argues that the specific misconduct forming the basis of its claims must have been done "at the behest of or in coordination with federal officers." Mot. 10 (citing *Exxon Mobil*, 89 F.4th at 156). But *Exxon Mobil* does not adopt that standard; rather, it adopts the "connected or associated with" test described above. 89 F.4th at 155–56. The "at the behest of or in coordination" language is simply *one* way the D.C. Circuit suggested a defendant could prove that its role as a federal contractor was "sufficiently 'related to' the [plaintiff's] suit." *Id.* at 156. The court also suggested that a defendant could make this showing if the "alleged misrepresentations reference[]" the subjects of various federal contracts. *Id.* That is just what AFT's allegations do here. *See* Compl. ¶¶ 69–70.

Moreover, *Exxon Mobil* is clear that "the statute does *not* require a causal connection between acts taken under color of federal office and the *basis for the action*." 89 F.4th at 155 (emphasis added); *accord Isaacson*, 517 F.3d at 137–38 ("To show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack … occurred while Defendants were performing their official duties."). AFT thus plucks the "at the behest of or in coordination

with" language completely out of context to make *Exxon Mobil* appear to adopt a standard that it expressly does not.[4]

If that were not problematic enough, the Supreme Court has *twice* rejected AFT's purported standard. In *Willingham*, the Supreme Court explained that, to satisfy the second removal prong, it is "sufficient for [defendants] to have shown that their relationship to [plaintiff] derived solely from their federal duties." 395 U.S. at 408-09. The plaintiff there, like AFT here, argued that the defendants' actions were unauthorized and unlawful, but that made no difference. "If the question raised is whether [the defendants] were engaged in some kind of 'frolic of their own' in relation to [the plaintiff], then they should have the opportunity to present their version of the facts to a federal, not a state, court. This is exactly what the removal statute was designed to accomplish." *Id.* at 409. "[O]nce [the defendants] had shown that their only contact with [the plaintiff] occurred … while they were performing their duties, we believe that they had demonstrated the required 'causal connection.'" *Id.* The same conclusion applies here, where MOHELA's only contacts with Direct Loan borrowers occurred while it was performing its contractual duties to the Department.[5]

---

[4] AFT cites four other cases in support of this standard, Mot. 10–12, but those cases are so far afield that they only underscore the imaginary nature of AFT's preferred standard. *MobilizeGreen* decided the removal question on the first "acting under" element and did not reach the "for or relating to" prong. 101 F. Supp. 3d at 44. *Watson* likewise addressed only the first element, not the second, and the language AFT quotes from *Watson* about removal "protect[ing] the Federal Government from ... interference with its operations," Mot. 12, refers to interference by *states*, not to instances where *federal contractors* depart from the terms of their contracts. 551 U.S. at 142, 147. *Mesa v. California*, 489 U.S. 121 (1989), similarly, turned not on the second element but on the third—*i.e.*, the need for a colorable federal defense. *Id.* at 123–24. And *New York v. Pennsylvania Higher Education Assistance Agency*, 2020 WL 2097640, at *7 (S.D.N.Y. May 1, 2020), did not consider removal at all. Instead, it decided the wholly separate question of whether the defendant enjoyed derivative federal sovereign immunity.

[5] Even accepting AFT's purported standard for the sake of argument, MOHELA still would satisfy it. The alleged "call deflection scheme," which takes up the largest share of AFT's Compliant, *see* Compl. ¶¶ 156-73, 184-88, 200-01, *was* "at the behest" of the Department. *See* Dkt. 26 at 9, 31.

Similarly, in *Acker*, two federal judges refused to pay a county occupational tax because they believed the tax was an impermissible licensing scheme, and, when the county brought a collections action, the judges sought removal. *See* 527 U.S. at 432. The county argued that removal was inappropriate because the tax-collection suit was not "*for* an act under color of office" but simply for failing to pay the tax, which was "neither required by the responsibilities of their offices nor undertaken in the course of job performance." *Id.* at 432. The Supreme Court disagreed. The county's suit was "for an act under color of office" because "[t]he circumstances that gave rise to the tax liability" were that the judges acted under color of office within the county, not that their office required them to violate the county's tax laws. *Id.* As the Court concluded, "demanding an airtight case on the merits in order to show the required causal connection"—as AFT effectively seeks to do here—would "defeat the purpose of the removal statute." *Id.*

AFT also argues that its claims do not relate to actions MOHELA took "under color of federal office" because "Congress made clear that servicers, not [the Department], shall service federal student loans." Mot. 9. AFT's logic appears to be that because the Department *must* delegate loan servicing tasks, such tasks are not "under color of federal office." That is doubly incorrect. First, AFT's premise is wrong. The Department's obligation to award loan servicing contracts is not absolute but rather depends on whether such an award is "practicable." 20 U.S.C. § 1087f(a)(1); *see also id.* § 1087f(b)(2) ("The Secretary *may* enter into contracts for the servicing and collection of loans." (emphasis added)). AFT's own allegation that the Department "transitioned the administration of the PSLF program from MOHELA to the federal government," Compl. ¶ 42, belies its argument that the Department is not responsible for servicing loans.[6]

---

[6] This distinguishes this case from *Georgia v. Meadows*, 88 F.4th 1331 (11th Cir. 2023), the only case AFT cites for this argument. Mot. 9. There, the Eleventh Circuit noted that the interference by former White House Chief of Staff Mark Meadows with the outcome of the 2020 election was

Second, a requirement that an agency attempt to hire third-parties does not mean the third parties do not act "under color of federal office." Indeed, the Fourth Circuit has rejected that precise argument. *See Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 253 (4th Cir. 2021) (holding DOD contractor could remove even though "DOD is required by law to enter into contracts for the provision of healthcare services to TRICARE members"). AFT's argument would similarly preclude removal for defense contractors. *Cf.* National Defense Authorization Act for Fiscal Year 2022, Pub. L. No. 117-81, § 112, 135 Stat. 1541, 1567 (2021) (authorizing DOD to enter multiyear contracts for Apache helicopters). And it would mean that no student loan servicer is ever acting "under color of federal office"—a conclusion at odds with every court to consider the issue. *See supra* at 12.

### C.  MOHELA's Federal Defenses Are Colorable.

Finally, MOHELA's removal under § 1442(a) was proper because MOHELA has asserted colorable federal defenses. The D.C. Circuit, albeit not in the removal context, has suggested that a defense is "colorable" if it is "at least possible" and not "obviously meritless." *Process & Indus.*, 962 F.3d at 583. Other circuits have defined colorable under § 1442(a)(1) in similar terms as "plausible," *Graves v. 3M Co.*, 17 F.4th 764, 771 (8th Cir. 2021); *Express Scripts*, 996 F.3d at 254; *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018), or as not "immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous," *Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340, 346 (5th Cir. 2024) (cleaned up).

---

not under color of office because the Chief of Staff role "does not include influencing which candidate prevails." *Id.* at 1346. Here, by contrast, MOHELA's responsibilities do include sending bills to borrowers, providing customer service, and processing PSLF and other applications. *Meadows* is also distinguishable because it is a criminal case, the removal of which requires "a more detailed showing," *id.*, because of the "more compelling state interest in conducting criminal trials in state courts," *Willingham*, 395 U.S. at 409 n.4.

The common thread running through these standards is that a federal defense need *not* be "clearly sustainable" for removal to be proper because a federal officer is not required "virtually to win his case before he can have it removed." *K&D*, 951 F.3d at 506 (cleaned up). Rather, "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *Acker*, 527 U.S. at 431. Indeed, reflecting the importance of that interest, removal is proper so long as "a colorable federal defense exists as to *some* claims." *MobilizeGreen*, 101 F. Supp. 3d at 41 (emphasis added); *accord Graves*, 17 F.4th at 771.

AFT's brief nowhere defines colorability. Instead, AFT asks the Court to skip past the question of whether MOHELA's federal defenses are colorable and reach the ultimate determination by declaring them "futile." Mot. 13. But AFT cites no authority for making futility the lodestar for removal, and never even defines what makes a defense futile as opposed to merely non-meritorious. *Cf. id.* (asserting that "[t]here is no federal defense that MOHELA can use to shield itself from accountability").

In any event, AFT is focused on the wrong question. In evaluating whether a given defense is colorable, the court "take[s] no position on the merits of [the] defense" at all. *K&D*, 951 F.3d at 507. A court thus may find a defense colorable even if it is ultimately unsuccessful. *See, e.g.*, *Acker*, 527 U.S. at 431 ("[T]hat argument, although we ultimately reject it, … presents a colorable federal defense"); *Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 120 (2d Cir. 2021) ("[D]efendants need only raise a 'colorable defense,' even if we reject that defense."); *see also Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 337 (2d Cir. 1999) (finding an argument colorable even when binding precedent foreclosed it because "a claim that fails as a matter of law is not necessarily lacking any basis at all"). The correct question at this stage thus is not whether MOHELA can "use [its federal defenses] to shield itself" from liability. Mot. 13.

Rather, the correct question is whether MOHELA's defenses are colorable such that they entitle it to have the merits of those defenses evaluated in a federal forum. *See Ruppel*, 701 F.3d at 1182 (explaining that the removal inquiry is "concerned with who makes the ultimate determination, not what that determination will be"). And the correct answer to that question is that they are. As set forth below, MOHELA's three asserted federal defenses—state sovereign immunity, derivative sovereign immunity, and preemption—each provide a colorable defense to at least some of AFT's claims and thus satisfy the third element for removal under § 1442(a)(1).

### 1. MOHELA's State Sovereign Immunity Defense Is Colorable.

MOHELA's state sovereign immunity defense is colorable for at least three reasons. First, multiple courts have held that MOHELA is entitled to state sovereign immunity. Second, both the Supreme Court and the State of Missouri itself have recognized that MOHELA is a part or arm of the State of Missouri. And third, MOHELA more than plausibly meets each prong of the D.C. Circuit's arm-of-the-State test for determining whether an entity is entitled to state sovereign immunity.[7] Each of these reasons independently suffices to demonstrate that MOHELA's state sovereign immunity defense is "at least possible" and not "obviously meritless." *Process & Indus.*, 962 F.3d at 583. This is all that MOHELA needs to show for removal to be proper.

---

[7] While AFT is correct that MOHELA invokes the full extent of state sovereign immunity, AFT is wrong that MOHELA has waived any Eleventh Amendment immunity by removing this case to federal court. *See* Mot. 14 n. 3. The *Lapides* holding cited by AFT was explicitly limited "to the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings." *Lapides v. Bd of Regents*, 535 U.S. 613, 617 (2002). Here, MOHELA has not explicitly waived immunity in D.C. Superior Court. The D.C. Circuit has declined to apply the "narrow holding" of *Lapides* in these circumstances. *See Watters v. Wash. Metro. Area Transit Auth.*, 295 F.3d 36, 42 n.13 (2002) (holding that "the narrow holding of *Lapides* does not apply" when the states "have not waived immunity from" the claims at issue "in their own courts"); *accord Beaulieu v. Vermont*, 807 F.3d 478, 486 (2d Cir. 2015); *Bergemann v. R.I. Dep't of Env't Mgmt.*, 665 F.3d 336, 343 (1st Cir. 2011); *Stewart v. North Carolina*, 393 F.3d 484, 490 (4th Cir. 2005). In any event, AFT rightly does not argue that MOHELA's removal waived the broader sovereign immunity States enjoy under the Constitution.

### a.    Multiple Courts Have Held that MOHELA Enjoys Sovereign Immunity.

Three federal courts have already held that MOHELA is an arm of the State of Missouri and therefore entitled to share in Missouri's sovereign immunity. *See Gowens v. Capella Univ., Inc.,* 2020 WL 10180669, at \*4 (N.D. Ala. June 1, 2020); *Good v. U.S. Dep't of Educ.*, 2022 WL 2191758, at \*4 (D. Kan. June 16, 2022), *appeal docketed*, No. 22-3286 (10th Cir.); *In re Stout*, 231 B.R. 313, 317 (Bankr. W.D. Mo. 1999). Where MOHELA has already prevailed *on the merits* on this defense three times, there is no basis for considering this defense "obviously meritless," *Process & Indus.*, 962 F.3d at 583, or "wholly insubstantial and frivolous," *Caris*, 108 F.4th at 346, and thus not colorable. If, as the Fourth Circuit has stated, it is "[i]nstructive[]" that two other courts have found a defense *colorable*, *Express Scripts*, 996 F.3d at 255, surely it is instructive that three other courts have found MOHELA's sovereign immunity defense *meritorious*.[8]

Focusing on *Good* and *Gowens*, AFT counters that those cases were decided under arm-of-the-State tests that "materially" differ from the D.C. Circuit's test. *See* Mot. 20–21. AFT, however, significantly overstates the differences among the arm-of-the-State tests. As the table below demonstrates, the tests in the Tenth and Eleventh Circuits, under which *Good* and *Gowens* were decided, are quite similar to the test set forth in *Puerto Rico Ports Authority v. Federal Maritime Commission*, 531 F.3d 868 (D.C. Cir. 2008):

---

[8] AFT suggests in passing, and without citing any authority, that there is something incongruous about MOHELA being "both an 'arm of the state' of Missouri *and* a federal contractor at the same time." Mot. 2. Given that the HEA expressly contemplates that "State agencies" may be servicers, 20 U.S.C. § 1087f(a)(2), this suggestion is meritless.

| D.C. Circuit | 11th Circuit[9] | 10th Circuit[10] |
|---|---|---|
| (1) The State's intent as to the status of the entity, including the functions performed by the entity. | (1) How state law defines the entity. | (1) The character of the defendant under state law.<br><br>(4) Whether the defendant is concerned primarily with state or local affairs. |
| (2) The State's control over the entity. | (2) What degree of control the State maintains over the entity. | (2) The autonomy of the defendant under state law. |
| (3) The entity's overall effects on the state treasury. | (3) Where the entity derives its funds.<br><br>(4) Who is responsible for judgments against the entity. | (3) The defendant's finances. |

To be sure, the tests are not identical. But the fact that some minor distinctions may exist among the tests is far from enough to show that *Good* and *Gowens* should be so completely disregarded that, notwithstanding their sovereign immunity rulings, the Court deems that defense "wholly insubstantial" or "frivolous" and therefore uncolorable. *Cf. Gust, Inc., v. Alphacap Ventures, LLC*, 905 F.3d 1321, 1329 (Fed. Cir. 2018) ("[T]he domain of colorable arguments is broader when the law is unsettled.").

The same can be said of AFT's attacks on the reasoning in *Good* and *Gowens*, which AFT criticizes as "deeply flawed" because the decisions give "outsized weight" to how legislation describes MOHELA and "insufficient weight to the question of who bears ultimate responsibility

---

[9] *See Gowens*, 2020 WL 10180669, at *2 (citing *Manders v. Lee*, 338 F.3d 1304, 1309 (11th Cir. 2003)).

[10] *See Good*, 2022 WL 2191758, at *2 (citing *Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007)).

for adverse judgments." Mot. 20. Merits aside, these criticisms are a far cry from establishing that MOHELA's sovereign immunity defense is not colorable. Indeed, AFT cites no authority supporting the idea that such criticisms establish that MOHELA's defense—not to mention the two federal decisions adopting it—is "obviously meritless." *Process & Indus.*, 962 F.3d at 583.

Moreover, AFT's criticisms are wrong. AFT faults the Tenth Circuit for "allow[ing] statutory language merely describing an entity as a 'public instrumentality' to weigh in favor of sovereign immunity." Mot. 20; *see id.* at 22 (levying similar criticism at Eleventh Circuit test). Yet the D.C. Circuit's test involves an identical inquiry. *See P.R. Ports*, 531 F.3d at 875 ("In assessing Puerto Rico's intent as to this special-purpose public corporation, we first examine whether Commonwealth law expressly characterizes PRPA as a governmental instrumentality…."). AFT also faults the Tenth Circuit for the order in which it considers the relevant factors, Mot. 20–21, but it ignores that *Good* still considered each factor AFT says is "critical," *id.* at 21; *see Good*, 2022 WL 2191758, at *4. Thus, even if the Court ultimately disagrees with *Good* and *Gowens*, AFT provides no basis for disregarding those cases as persuasive authority that MOHELA's sovereign immunity defense is at least colorable. *Contra* Mot. 20.

> **b.    Both the Supreme Court and the State of Missouri Recognize that MOHELA Is Part of Missouri.**

MOHELA's sovereign immunity defense is colorable also because the Supreme Court and State of Missouri have recognized that MOHELA is "part of Missouri." *Biden*, 143 S. Ct. at 2366.

In *Biden*, the Supreme Court considered whether an injury to MOHELA constituted an injury to Missouri for standing purposes. Holding that it did, the Supreme Court made determinations directly relevant to each prong of the D.C. Circuit's arm-of-the-State test. *First*, that test considers the State's "intent with respect to" the entity, based in part on whether the state "expressly characterizes" the entity "as a governmental instrumentality" and whether the entity

"performs state governmental functions." *P.R. Ports*, 531 F.3d at 874. *Biden* held that "[b]y law and function, MOHELA is an instrumentality of Missouri" and "perform[s] the 'essential public function' of helping Missourians access student loans needed to pay for college." 143 S. Ct. at 2366) (citation omitted). *Second*, the D.C. Circuit's test considers the State's "control" over the entity, based "primarily [on] how the director and officers of [the entity] are appointed." *P.R. Ports*, 531 F.3d at 877. *Biden* held that MOHELA "is subject to the State's supervision and control," primarily because its board "consists of two state officials and five members appointed by the Governor and approved by the Senate," all of whom the Governor can remove for cause. 143 S. Ct. at 2366. *Third*, the D.C. Circuit's test considers the entity's "financial relationship with the [State] and its overall effects on the [State's] treasury." *P.R. Ports*, 531 F.3d at 878. *Biden* held that MOHELA's "profits help fund education in Missouri," to the tune of hundreds of millions of dollars. 143 S. Ct. at 2366.

AFT relegates its discussion of *Biden* to a footnote, in which it seeks to downplay the decision's significance because it was about standing, not about whether MOHELA is an arm of the State for immunity purposes. Mot. 16–17 n.6. But AFT again loses sight of the relevant legal standard. The issue is not whether *Biden* is *dispositive* of MOHELA's immunity defense. Rather, it is whether *Biden* shows that the defense is *colorable*. Regardless of how the Court ultimately resolves MOHELA's immunity defense, the close parallels between *Biden*'s determinations and each prong of the D.C. Circuit's arm-of-the-State test demonstrate that MOHELA's defense is, at the very least, plausible.

The amicus brief filed by the State of Missouri in this case only reinforces that conclusion. *See* Dkt. 31. As in *Puerto Rico Ports*, Missouri has "emphatically declar[ed] that [MOHELA] is an arm of the [State] entitled to sovereign immunity." 531 F.3d at 876; *see* Dkt. 31 at 4 (explaining

that "[e]ach factor" of the arm-of-the-State test "supports a finding that MOHELA is entitled to sovereign immunity"). This "further indicates" that MOHELA "is in fact an arm of the [State] entitled to sovereign immunity." *P.R. Ports*, 531 F.3d at 876. That meets the colorable standard.

### c.   MOHELA Plausibly Meets Each Prong of the Arm-of-the-State Test.

Two federal district court opinions recognizing MOHELA's sovereign immunity, a Supreme Court decision concluding MOHELA is "part of Missouri" for reasons directly relevant to its arm-of-the-State status, and an amicus brief from the State of Missouri arguing that MOHELA is an arm of the State ought to be sufficient to establish that MOHELA's sovereign immunity defense is colorable. Even setting all that aside and analyzing MOHELA's arm-of-the-State status anew, however, MOHELA's defense readily clears the colorable bar. MOHELA's motion to dismiss explained at length why its sovereign immunity defense is not merely colorable but dispositive under *Puerto Rico Ports*' three-pronged test. *See* MTD at 14–20. To avoid repetition, MOHELA summarizes those arguments here and focuses mainly on explaining why AFT's counterarguments are wrong.

***State's Intent Regarding MOHELA.*** As discussed *supra* at 24–25, MOHELA satisfies each of the four elements relevant to ascertaining Missouri's intent as to MOHELA's status. *See* MTD at 14–16. First, Missouri law "expressly characterizes" MOHELA "as a governmental instrumentality rather than as a local governmental or non-governmental entity." *P.R. Ports*, 531 F.3d at 874; *see* Mo. Rev. Stat. §§ 173.360, 173.385.[11] Second, MOHELA "performs state governmental functions." *P.R. Ports*, 531 F.3d at 874; *see* Mo. Rev. Stat. §§ 173.360, 173.385, 173.095. Third, MOHELA "is treated as a governmental instrumentality for purposes of other [Missouri] laws." *P.R. Ports*, 531 F.3d at 874; *see* Mo. Rev. Stat. §§ 173.365, 173.415, 173.445.

---

[11] The statutes are attached hereto as an addendum.

Finally, as noted above, the State of Missouri has made "representations" that MOHELA "is an arm of the [State] entitled to sovereign immunity." *P.R. Ports*, 531 F.3d at 876; *see* Dkt. 31 at 4.

None of AFT's contrary arguments that MOHELA "was never intended to be[] an arm of the State" has merit, let alone shows that MOHELA's position is so "obviously meritless" as to be uncolorable. *Process & Indus.*, 962 F.3d at 583. AFT first cites Missouri statutes establishing that MOHELA can sue and be sued in its own name; that MOHELA's assets are separate from State revenue and cannot be used for Missouri's debts; and that Missouri is not liable for MOHELA's debts. Mot. 17. AFT omits, however, that all those points were equally true of the entity at issue in *Puerto Rico Ports*, and the D.C. Circuit still held *on the merits* that that entity enjoys sovereign immunity. *See P.R. Ports*, 531 F.3d at 879, 881.

AFT's reliance on the fact that Missouri law does not expressly deem MOHELA an "arm of the state" fails for the same reason. Mot. 18. Again, that was equally true of the entity in *Puerto Rico Ports*. There, the court held that the fact that Puerto Rico law described the entity as a "'government instrumentality of the Commonwealth of Puerto Rico' … plainly demonstrates Puerto Rico's intent to create a governmental instrumentality." 531 F.3d at 875. Here, Missouri law similarly describes MOHELA as a "public instrumentality" and "body politic." Mo. Rev. Stat. §§ 173.360, 173.385. AFT's assertion that Missouri law "says nothing about whether MOHELA is entitled to immunity," Mot. 18, flies in the face of controlling precedent.

Finally, AFT asserts that MOHELA does not "perform[] governmental functions" because it services loans "nationwide." Mot. 17. But AFT completely fails to acknowledge that *Biden* held precisely the opposite. *See Biden*, 143 S. Ct. at 2366; *supra* at 24–25. And *Biden* reached that holding because Missouri law is explicit: MOHELA's exercise of its powers, which include "servic[ing] student loans …, regardless of whether such student loans are originated in this state

or out of this state," "shall be deemed to be the performance of an essential public function." Mo. Rev. Stat. §§ 173.360, 173.385.1(18).

**State Supervision and Control.** As *Biden* recognized, and as MOHELA has explained in its motion to dismiss, numerous provisions of Missouri law demonstrate that MOHELA "is subject to the State's supervision and control." *Biden*, 143 S. Ct. at 2366; *see* MTD at 17–18. Under Missouri law, MOHELA's governing board consists of two State officials and five members appointed by the Governor and approved by the Senate, *see* Mo. Rev. Stat. § 173.360; board members receive no compensation, *see id.* § 173.365; the Governor may remove any board member for cause, *see id.* § 173.360; and MOHELA is "directly answerable to the State" in several other ways, *Biden*, 143 S. Ct. at 2366 (cleaned up). *Puerto Rico Ports* held that such factors "weigh[] heavily" in favor of arm-of-the-State status. 531 F.3d at 877.

One could read AFT's discussion of this prong, however, and not know that *Puerto Rico Ports* or *Biden* exists. Rather than addressing controlling precedent, AFT instead cites a Fourth Circuit decision that held that a different loan servicer was not subject to state control because it could enter into contracts, sue and be sued, and purchase and sell property in its own name. Mot. 18 (citing *U.S. ex. rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 139 (4th Cir. 2014)). What AFT neglects to mention—again—is that all those points were equally true of the entity in *Puerto Rico Ports*, but the D.C. Circuit gave them no weight in the "control and supervision" analysis and ultimately held the entity to be immune. *See* 531 F.3d at 877–79.

AFT also argues that MOHELA is outside State control because the Governor can remove board members only for cause, not at will. Mot. 18. Yet this Court has held, on the merits, that an entity whose board members could be removed by the governor for "good cause" is subject to "significant control" by the State and is entitled to sovereign immunity. *See Kaul v. Fed'n of State*

*Med. Bds.*, No. 19-CV-3050 (TSC), 2021 WL 1209211, at *9 (D.D.C. Mar. 31, 2021). In any event, it strains credibility to suggest that the distinction between for-cause and at-will removal means MOHELA's defense is "wholly insubstantial or frivolous" and thus not colorable. *Caris*, 108 F.4th at 346.

      ***Financial Relationship with State and Overall Effects on State Treasury.*** The State of Missouri draws on and ultimately controls MOHELA's revenues in several ways, such that a judgment against MOHELA would adversely affect the State Treasury. *See* MTD at 18–20. MOHELA has provided over "$230 million for development projects at Missouri colleges and universities and almost $300 million in grants and scholarships for Missouri students." *Biden*, 143 S. Ct. at 2366. In addition, each year, MOHELA is responsible for funding millions of dollars in line items in the State's budget for various public education funds. *See* MTD at 19. And, by law, MOHELA must provide $350 million to the Treasury's Lewis and Clark Discovery Fund, Mo. Rev. Stat. § 173.385.2, more than $100 million of which remains outstanding, *see* MTD at 19. Thus, the State of Missouri has warned that "[a] damages award against MOHELA would imperil its ability to uphold the instrumentalit[y's] ability to further disburse funds into the State Treasury." Dkt. 31 at 8.

      AFT's arguments concerning this prong again omit any mention of the governing standard under *Puerto Rico Ports*. *See* Mot. 14–16. Instead, AFT concocts a new standard of whether MOHELA is "financially independent from Missouri," Mot. 14, which appears nowhere in *Puerto Rico Ports* and is inconsistent with the D.C. Circuit's more holistic inquiry into an entity's "financial relationship with [the State] and its overall effects on the [State's] Treasury." *P.R. Ports*,

531 F.3d at 878.[12] It is telling that, once again, AFT must conjure a new legal standard to argue that MOHELA's sovereign immunity defense is futile.

In any event, for the reasons summarized above, MOHELA is not financially independent of the State of Missouri. AFT's contrary arguments rest upon mistaken factual premises.

*First*, AFT contends that "any obligation of MOHELA to transfer assets to the [Lewis and Clark Discovery Fund] expired in September 2013." Mot. 15–16 (citing Mo. Rev. Stat. § 173.385.2). Not true. As Section 173.385.2 says, MOHELA was required to transfer the $350 million to the State Treasury fund by 2013 "unless otherwise approved by the authority and the commissioner of the office of administration." Mo. Rev. Stat. § 173.385.2. MOHELA has received extensions under the statute, *see, e.g.*, Dkt. 26-15 at 2–3, but, as the State of Missouri has explained in this very case, "still owes $105 million" towards this obligation, Dkt. 31 at 8.

*Second*, AFT complains that "MOHELA does not provide any evidence of when the various contributions were made." Mot. 16. In connection with its motion to dismiss, however, MOHELA submitted a declaration from its Controller attesting that MOHELA transferred $230 million in 2007 and approximately $15 million the following year. *See* Dkt. 26-1 ¶ 8.

*Finally*, AFT asserts that MOHELA "does not establish that *any* contributions have been made since September 2013." Mot. 16. But the same declaration by MOHELA's Controller details how, "[f]or the last ten years, MOHELA has authorized transfers to the Missouri treasury to fund

---

[12] AFT invokes *Puerto Rico Ports* to argue that the third prong of the arm-of-the-State test is "critical" and "the threshold element of the test." Mot. 21. Leaving aside the oddity of describing the third prong of a test as "the threshold element," AFT overstates the third prong's importance. As another judge of this Court has held, where "the first two [factors] weigh in favor of" arm-of-the-State status, the entity's effect on the State treasury "is irrelevant." *Henry v. United States*, Civ. No. 20-3689 (CKK), 2021 WL 6619330, at *6 (D.D.C. Sept. 30, 2021).

the amounts designated by State Appropriations Bills," and further demonstrates that those transfers total tens of millions of dollars. *See* Dkt. 26-1 ¶¶ 4–7.

The true facts of MOHELA's financial relationship to the State belie AFT's claim that MOHELA's contributions "are voluntary and cannot be distinguished from the economic contributions of any private entity that could make no claim to being an arm of the state." Mot. 22. What private entity annually transfers millions of dollars to the State Treasury to fund specific line items in State Appropriations Bills? What private entity is subject to a statutory obligation, specific to that entity, to transfer to the State hundreds of millions of dollars to fund higher education programs? AFT's strained analogies, bad facts, and invented legal standards do nothing to undermine the plausibility, and thus colorability, of MOHELA's sovereign immunity defense.

### d. Cases Addressing MOHELA's Sovereign Immunity Defense on the Merits, Under Different Tests, and Based on Different Records Do Not Show that the Defense Is Not Colorable.

Lastly, AFT emphasizes that several district courts have held that MOHELA does not qualify for state sovereign immunity. Mot. 19–20.[13] None of the cases, however, addressed whether MOHELA's sovereign immunity defense was colorable. Rather, each adjudicated the issue on the merits—a distinction AFT nowhere acknowledges. The question of whether MOHELA's defense is dispositive is completely different from whether it is colorable, *i.e.*, "plausible," not "obviously meritless," or not "wholly insubstantial or frivolous." *Supra* at 19. These cases therefore shed no light on the question at hand.

---

[13] *See Walker v. Higher Educ. Loan Auth. of the State of Mo.*, 2024 WL 3568576 (E.D. Cal. July 26, 2024), *appeal docketed*, No. 24-5259 (9th Cir.); *Pellegrino v. Equifax Info. Servs., LLC,* 709 F. Supp. 3d 206 (E.D. Va. 2024); *Dykes v. Mo. Higher Educ. Loan Auth.*, 2021 WL 3206691 (E.D. Mo. July 29, 2021); *Perkins v. Equifax Info. Servs.*, *LLC,* 2020 WL 13120600 (W.D. Tex. May 1, 2020).

Even setting aside that fatal defect in AFT's argument, the cases all are out-of-circuit and were decided under different arm-of-the-State tests, different records, or both. Notwithstanding AFT's unsupported assertion that the cases come from circuits whose tests "closely track this Circuit's," Mot. 19, three of the four cases come from courts in the Fourth, Fifth, and Eighth Circuits, which, unlike the D.C. Circuit, require the financial factor to predominate and eschew any broader analysis of the entity's "overall effects" on the state treasury. *Compare P.R. Ports*, 531 F.3d at 873 (rejecting idea that the "inquiry now focuses largely if not entirely on the entity's financial impact"), *with Perkins,* 2020 WL 13120600, at *2 ("Overriding all these other factors, however, is the paramount second factor—the 'money factor.'"); *Pellegrino,* 709 F. Supp. 3d at 213 ("Whether a judgment against an entity would have to be paid from the state's treasury is the most salient factor in Eleventh Amendment determinations") (cleaned up); *and Dykes*, 2021 WL 3206691, at *2 (noting that the "more important[]" of the two factors is "whether a money judgment against the agency will be paid with state funds.");[14] *see also Henry*, 2021 WL 6619330, at *6 (holding it unnecessary under D.C. Circuit's test even to reach the financial factor where the first two factors support immunity).

Furthermore, none of those courts had before them the same detailed evidence presented here regarding MOHELA's ongoing annual authorizations and transfers of funds to the Treasury to provide monies for specific items in State Appropriations Bills. *See supra* at 4. Indeed, one of the cases AFT cites, *Perkins*, recognized that the analysis would be different if there were evidence of ongoing transfers of funds from MOHELA to the Treasury. *See* 2020 WL 13120600, at *3-4.

---

[14] AFT neglects to mention that in *Dykes*, the district court entered judgment in MOHELA's favor on different state sovereign immunity grounds, and the plaintiff ultimately dismissed his appeal. More recently, the Eighth Circuit observed: "Given [its] statutory framework, MOHELA may well be an arm of the State of Missouri under the reasoning of our precedent." *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022).

Here, MOHELA has submitted evidence of exactly that, *see generally* Dkt. 26-1 (Controller declaration), further undercutting *Perkins*' persuasive force.

*    *    *

Ultimately, to assail MOHELA's sovereign immunity defense, AFT must ignore controlling D.C. Circuit authority, relevant Supreme Court precedent, applicable Missouri law, and the governing standard for colorability. This demonstrates the absence of any valid basis for holding MOHELA's sovereign immunity defense not colorable.

### 2.  MOHELA's Derivative Federal Sovereign Immunity Argument Is Colorable.

AFT contends that MOHELA's derivative federal sovereign immunity defense is uncolorable because (1) MOHELA supposedly waived that defense and (2) none of AFT's allegations concern behavior directed by the government. Mot. 23–26. Neither argument is correct.

*First*, AFT's waiver argument does not actually apply to most of MOHELA's servicing activities at issue in the Complaint. AFT's waiver argument rests on language in MOHELA's USDS Contract waiving "any claim or defense of Sovereign Immunity" for "work performed under the Contract." USDS Contract at 12. MOHELA, however, did not begin servicing any loans under that contract until April 1, 2024. *See* Farmer Decl. ¶¶ 7, 12, 14. Before then, MOHELA serviced all loans under the 2011 DL Contract, which did not contain such a waiver. *See id.* ¶ 14. And even after that date, MOHELA continued servicing loans under the DL Contract until October 2024 as it transitioned Direct Loans from an older servicing platform to the newer one being used under the USDS Contract. *See id.* ¶¶ 12–14. Thus, all of AFT's allegations concerning servicing issues associated with the Return to Repayment in October 2023 concern loans serviced under the DL Contract. Even alleged misconduct after April 1, 2024 likely involves loans serviced under the DL Contract. Because that contract does not waive derivative federal sovereign immunity, that defense remains available to MOHELA.

33

*Second*, AFT's allegations in fact do concern behavior directed by the Department. *Contra* Mot. 24–25. Much of AFT's Complaint centers on call deflection, which was "authorized and directed" by the Department. *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 69 (D.C. Cir. 2019). The Department issued guidance to all student loan servicers called the "Return to Repayment Playbook" ("Playbook"). *See* Dkt. 1-5; *see also* Compl. ¶ 159 (discussing "Return to Repayment 'Playbook'"). The Playbook instructed servicers to implement a number of policies and procedures to better manage the anticipated burdens from Return to Repayment. As relevant here, the Playbook repeatedly instructed servicers to use "call deflection" "to promote borrower self-service." Dkt. 1-5 at 3. MOHELA was required to implement this guidance under the terms of its Department contract, which mandates MOHELA's compliance with "all federal and state laws and regulations" as well with as supplemental "requirements" issued by FSA—*i.e.*, Department guidance. DL Contract at 31; *see also id.* at 37 ("The servicer shall incorporate a system of internal controls consistent with federal laws, regulations, policies and authoritative guidance.").

The Department thus required MOHELA to undertake actions AFT claims were unlawful—*i.e.* the so-called "pernicious call deflection scheme." Mot. 26. As a result, MOHELA is entitled to assert derivative sovereign immunity for those claims. *See Moore v. Elec. Boat Corp.*, 25 F.4th 30, 37 (1st Cir. 2022) (finding derivative sovereign immunity defense colorable where defendant "proffered evidence colorably show[ing] that it acted at the direction of the Navy, which authorized [the defendant's] actions" (cleaned up)). The fact that AFT also brings some claims as to which derivative sovereign immunity may not apply makes no difference. As noted above, a federal officer may remove an entire case if the officer alleges a colorable federal defense as to *any* of the plaintiff's claims. *K&D*, 951 F.3d at 507; *MobilizeGreen*, 101 F. Supp. 3d at 41.

34

Finally, the three cases AFT cites in support of its derivate sovereign immunity arguments highlight AFT's basic confusion about the applicable legal standard. *See* Mot. 24–25 (citing *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016); *Nigro*, 2020 WL 5369980; *New York*, 2020 WL 2097640). Two of the cases did not address whether a derivative sovereign immunity defense was colorable for purposes of removal: *Campbell-Ewald* was decided at summary judgment, *see* 577 U.S. at 159, while *New York* involved a motion to dismiss, *see* 2020 WL 2097640, at *1. The third case, *Nigro*, considered both whether removal was proper and whether to dismiss on derivative sovereign immunity grounds. *See* 2020 WL 5369980, at *4–6. Yet AFT cites only the portion addressing the motion to dismiss, *see* Mot. 25, which, like *Campbell-Ewald* and *New York*, sheds no light on the only relevant question at this stage: whether MOHELA's derivative immunity defense is colorable.

AFT's failure to cite the portion of *Nigro* discussing removal is particularly striking given that *Nigro* squarely rejected AFT's argument here. There, as here, the plaintiff argued that derivative sovereign immunity was inapplicable because the complaint alleged the defendant had "violated federal law and violated its contractual obligations as a servicer of Nigro's federal loans." *Nigro*, 2020 WL 5369980, at *6. Yet *Nigro* expressly stated that "although the court ultimately finds that [the defendant] is not entitled to derivative sovereign immunity, that doctrine still qualifies as a colorable federal defense because it is legitimate and can reasonably be asserted in this case." 2020 WL 5369980, at *4. AFT offers no reason that conclusion is not applicable here.

### 3. MOHELA's Federal Preemption Defenses Are Colorable.

Finally, MOHELA has asserted colorable preemption defenses under the Higher Education Act. As set forth in greater detail in MOHELA's motion to dismiss, *see* MTD 28–33, MOHELA invokes three separate preemption defenses, each of which cover at least some of AFT's claims and thus satisfy the "colorable federal defense" prong. *See Sawyer v. Foster Wheeler LLC*, 860

F.3d 249, 257 (4th Cir. 2017) ("[R]emoval need not be justified as to all claims asserted in the plaintiffs' complaint; rather, the defense need only apply to one claim to remove the case.").

*First*, the HEA expressly preempts state law claims "that require proof that defendant failed to disclose information." *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 650 (7th Cir. 2019); *see* 20 U.S.C. § 1098g ("Loans made, insured, or guaranteed pursuant to a program authorized by title IV of the Higher Education Act of 1965 shall not be subject to any disclosure requirements of any State law."). A state-law claim is preempted both where the plaintiff "seek[s] specific disclosures" and where it simply seeks to hold the defendant liable for failing to disclose information. *Chae v. SLM Corp.*, 593 F.3d 936, 943 (9th Cir. 2010). Here, AFT brings a variety of improper disclosure claims. It alleges that MOHELA's call center, website, app, and Twitter account failed to provide borrowers with the information they sought, *see* Compl. ¶¶ 146, 156–186; that MOHELA provided inaccurate information regarding a variety of issues connected to IDR plans, *see id.* ¶¶ 130, 148–150; and that MOHELA is responsible for "inaccura[cies]" in certain billing statements, *see id.* ¶¶ 116–17; *see generally* MTD at 29–31.

AFT argues that § 1098g does not preempt its claims because that provision does not preempt claims "seeking to hold federal loan servicers liable for affirmative misrepresentations to borrowers." Mot. 27. As an initial matter, that proposition is the subject of a circuit split. While some courts have adopted that more limited view, *e.g.*, *Nelson*, 928 F.3d at 650, the Ninth Circuit has recognized that alleged misrepresentations may be "re-styled improper-disclosure claims" preempted by the HEA, *see Chae*, 593 F.3d at 943; *see generally See* MTD at 29–31. The D.C. Circuit has not addressed the issue, but the existence of a split demonstrates that a preemption defense is at least colorable even as to the misrepresentations AFT alleges. *Cf. Express Scripts*, 996 F.3d at 255 (finding it "instructive" that two federal courts had deemed a defense colorable).

In any event, even accepting AFT's narrower view of preemption, MOHELA's express preemption defense is colorable because AFT's claims are not based only on alleged misrepresentations. *Contra* Mot. 28–29. Rather, AFT repeatedly alleges that MOHELA's representations were insufficient, not inaccurate. AFT has alleged that MOHELA "withholds information from borrowers," Compl. at 28, and that MOHELA's call center, website, app, and Twitter account failed to provide borrowers with the information they sought, *see id.* ¶¶ 156–186. According to AFT's Complaint, MOHELA "failed … to respond to inquiries in a manner that could meet borrowers' needs," *id.* ¶ 146; failed to staff call centers at levels "necessary to meet borrowers' needs," *id.* ¶ 159; created "incomplete or inoperable" alternatives to call centers, including "online features" that allegedly were not "available," *id.* ¶¶ 161–162; left borrowers "practically unable to contact MOHELA customer service representatives due to unreasonable call wait times and dropped calls," *id.* ¶ 165; and inadequately trained call center staff such that they "lacked knowledge of the Waiver and/or Adjustment opportunities, seemed unfamiliar with the student loan system, and generally could not answer borrowers' questions," *id.* ¶ 169.

None of these allegations concerns a misrepresentation, distinguishing this case from the sorts of "voluntary, personalized affirmative misrepresentations" that the cases cited by AFT held were not preempted. *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908, 917 (11th Cir. 2020); *accord Nelson*, 928 F.3d at 648–49; *see* Mot. 28 (citing *Lawson-Ross* and *Nelson*). Rather, this is a case in which AFT has "alleged that [MOHELA] had a duty to inform [borrowers] of whether they qualified for the PSLF Program" and other IDR-related opportunities—precisely the allegations *Lawson-Ross* recognized "might well be preempted." 955 F.3d at 918. Thus, even if AFT were correct that *Chae*'s preemption ruling applies only to plaintiffs seeking "to force

37

disclosure of information," Mot. 30—though nothing in *Chae* suggests that limited reading—AFT's allegations seek to do just that.

*Second*, MOHELA also has a colorable implied preemption defense because AFT's effort to hold MOHELA liable for a "call deflection scheme" that the Department itself directed would make it impossible "to comply with both state and federal requirements." *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 303 (2019) (cleaned up); *see* MTD 30–31. The Department's Return to Repayment Playbook directed MOHELA and other loan servicers to use "call deflection," Dkt. 1-5 at 3, the very strategy for managing large call volumes that AFT says is unlawful under the CPPA, *see* Compl. ¶¶ 156–172. AFT does not contest that MOHELA was obligated to follow Department guidance, *see* DL Contract at 31, nor does its remand motion address this conflict, waiving any such argument.

*Third*, MOHELA has a colorable defense that AFT's claims are preempted as an obstacle to achieving the purposes of the HEA. Congress intended that the Direct Loan and PSLF programs "operate uniformly," *Chae*, 593 F.3d at 944, as evidenced by the Department's obligation under the HEA to develop "*standardized* forms and procedures" for servicing and other activities respecting such loans. 20 U.S.C. § 1082(*l*)(1) (emphasis added). AFT's claims threaten this uniformity by seeking to impose *unique* procedures specific to D.C. For example, AFT's allegations that MOHELA failed to "timely process important borrower IDR, PSLF, and refund applications," Compl. at 25; *see id.* ¶¶ 126–144, effectively seek to impose deadlines on MOHELA's application processing even though federal law sets no such deadlines. *Cf. Chae*, 593 F.3d at 948 ("If federal law … gives up to sixty days for repayment, to say that state law … requires a prompter repayment period is in conflict.").

AFT claims that this defense is not colorable because, in 2023, the Department issued a non-binding interpretive rule stating that "the HEA places no emphasis on maintaining uniformity in Federal student loan servicing." 88 Fed. Reg. 47,370, 47,372 (July 24, 2023); *see* Mot. 31–33. But AFT offers no authority that a non-binding interpretive rule can so definitively settle a matter as to render different interpretations uncolorable. Nor is there any basis for that view. To the contrary, if an argument can be colorable even if foreclosed by binding precedent, *see Schlaifer Nance*, 194 F.3d at 337, then the Department's non-binding rule surely has virtually no impact on whether MOHELA's defense is colorable. And, again, the fact that the Ninth Circuit held that § 1082(*l*)(1) "is a clear command for uniformity," *Chae*, 593 F.3d at 945, affirmatively demonstrates that MOHELA's defense—which relies on the same provision—is at least colorable. *Cf. Neal v. Ameron Int'l Corp.*, 495 F. Supp. 3d 375, 386 (M.D. La. 2020) (explaining that "a defense is color[able]" under § 1442(a)(1) "when the removing party's entitlement to it is subject to reasonable debate").

## II.    MOHELA Is Entitled To Remove Because AFT's Suit Raises a Federal Question.

Independent of MOHELA's federal officer status, MOHELA's removal of this case was valid under 28 U.S.C. § 1441 because the case (1) necessarily raises a (2) disputed, (3) substantial issue of federal law, (4) the resolution of which would not disrupt any federal-state balance. *See Gunn,* 568 U.S. at 258.

***Necessarily Raised.*** AFT's claims "necessarily raise" federal issues because they turn on allegations that MOHELA "fail[ed] to comply with its basic responsibilities as a student loan servicer," responsibilities that AFT acknowledges are set by federal law and federal contracts, Compl. ¶¶ 6, 69–72, 210, 231, 252, and that MOHELA's conduct harmed borrowers who were "eligible" for PSLF or IDR-related relief, *id.* ¶¶ 142, 189–190, 219–221. Thus, as framed by AFT, its claims will require the parties to litigate, and the Court to interpret, both the "responsibilities"

of student loan servicers as defined by federal law and the eligibility requirements for the PSLF Program and various IDR plans, as well as how those requirements apply to any borrowers at issue in this case. *See* 20 U.S.C. § 1087e(d)(1)(D), (m); 34 C.F.R. § 685.219. This case is thus like *Organic Consumers Association v. Hain Celestial Group, Inc.*, 285 F. Supp. 3d 100 (D.D.C. 2018), in which the court recognized federal question jurisdiction over removed CPPA claims that alleged that the defendant's products were misrepresented as "organic" and that therefore required interpreting the Organic Food Production Act of 1990. *Id.* at 103 n.2.[15]

AFT contends that its Complaint does not "ground liability" in questions of federal law because the CPPA "does not require as a condition precedent a showing that a defendant has violated another state or federal law, or any federal contract." Mot. 35. That may be true generally, but it is not true here for two reasons. *First*, it is AFT that has tied its CPPA claims to federal law, alleging that "MOHELA's practices of failing to comply with its basic responsibilities as a student loan servicer"—responsibilities AFT never disputes are governed by federal law—"are unfair and deceptive in violation of the [CPPA]." Compl. ¶¶ 210, 231, 252; *see Bd. of Com'rs of the S.E. La. Flood Protec. Auth.-E. v. Tenn. Gas Pipeline Co., LLC*, 29 F. Supp. 3d 808, 854 (E.D. La. 2014) (finding that Plaintiff's choice to "turn[] to federal law to establish the standard of care … 'necessarily raises' what duties th[o]se laws impose upon Defendants"), *aff'd*, 850 F.3d 714 (5th Cir. 2017). For example, AFT alleges that MOHELA "misinform[ed] AFT's members about their payment options," giving them "incorrect information regarding their eligibility for certain

---

[15] AFT attempts to downplay *Organic Consumers* on the ground that the court there "did not conduct any *Gunn* analysis of the facts therein, as no parties contested the case's removal to federal court." Mot. 36. But AFT overlooks that federal courts "must" ensure they have subject matter jurisdiction, even if no party "contest[s]" it, because as "court[s] of limited jurisdiction," federal courts "are forbidden … from acting beyond [their] authority." *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008).

programs." Compl. ¶ 240; *see id.* ¶ 189. Adjudicating that claim will necessarily require interpreting federal law regarding program eligibility requirements and applying it to the specific circumstances of any given borrower. *See New York ex rel. Jacobson v. Wells Fargo Natl. Bank, N.A.,* 824 F.3d 308, 317 (2d Cir. 2016) (finding a federal issue "necessarily raised" when a plaintiff needed to prove that a statement was false by demonstrating it was incorrect under federal law).

*Second*, AFT seeks "actual damages" or penalties "per violation." Compl. at 49. Such relief necessarily will require interpreting the eligibility requirements for PSLF and IDR plans and determining the number of borrowers who met those requirements but were unable to fully obtain the available relief due to MOHELA's alleged misconduct—all matters governed by federal law.

***Disputed and Substantial.*** AFT asserts that any federal issues are "not disputed," Mot. 36, but never supports that assertion because it cannot. For example, MOHELA certainly disputes that it has "fail[ed] to comply with its basic responsibilities as a student loan servicer" under federal law and its federal contracts. Compl. ¶ 210. MOHELA thus satisfies the second *Gunn* prong.

As to the third prong, AFT attempts to depict the federal issues in this case as insubstantial by characterizing its claims as "fact-bound," "situation-specific," and limited to affected borrowers. Mot. 37. Hardly. AFT brings a claim on behalf of the "general public," Compl. ¶ 248, which seemingly comprises the "millions of student borrowers across the country" whose loans MOHELA services, *id.* ¶ 45. Furthermore, all of AFT's claims bring broad, programmatic challenges to the manner in which MOHELA performed its responsibilities, including as to how MOHELA ran its call centers, operated its social media accounts and website, and processed PSLF applications. *See id.* ¶¶ 141–144, 156–172. AFT's suggestion that its claims allege only discrete instances of misconduct affecting individual borrowers, *see* Mot. 37 (citing Compl. ¶ 152), is false. In practice, its claims seek to dictate how MOHELA discharges its responsibilities under its federal

contracts, interfering with the Department's power to define its relationship with its contractors. These stakes make the federal questions at issue here substantial. *See Old Dominion Elec. Coop. v. PJM Interconnection, LLC,* 24 F.4th 271, 281 (4th Cir. 2022) ("a claim that seeks to alter the terms of the relationship" defined with the "force of federal law" "presents a federal question").

MOHELA also satisfies the substantiality prong because state adjudication of the federal issues here would "undermine the development of a uniform body of [federal] law." *Gunn*, 568 U.S. at 252 (cleaned up). With over $1.4 trillion in Direct Loans outstanding, the questions of how servicers must discharge their responsibilities have massive implications for the federal government and threaten to interfere with the uniformity of federal law by creating a patchwork of requirements for servicers grounded in state consumer protection statutes. AFT counters that the federal government has no "interest in uniformity in this field." Mot. 38. But as the Ninth Circuit has recognized, the HEA's requirement that the Department "prescribe *standardized* forms and procedures regarding … servicing," 20 U.S.C. § 1082(*l*)(1)(F) (emphasis added), "is a clear command for uniformity," *Chae*, 593 F.3d at 945. Even if "claims about affirmative misrepresentations by loan servicers would not conflict with that purpose" of uniformity, as AFT contends, Mot. 39 (cleaned up), AFT's claims sweep far more broadly, *see supra* at 35–36.

***Federal-State Balance***. Finally, AFT tries to cast this case as a run-of-the-mill consumer protection suit within States' traditional police powers, analogizing it to the legal malpractice claims *Gunn* held were within States' "special responsibility." Mot. 39–40 (citing *Gunn*, 568 U.S. at 264). But AFT fails to recognize that this case implicates two areas the Supreme Court has "found to involve … 'uniquely federal interests'": the "rights of the United States under its contracts," which are "governed exclusively by federal law," and "the civil liability of federal officials," including independent contractors performing under federal contracts, "for actions taken

in the course of their duty." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504–05 (1988). Given these interests, a federal forum here would not disrupt the "balance of federal and state judicial responsibilities." *Gunn*, 568 U.S. at 264 (cleaned up).

## CONCLUSION

For the foregoing reasons, the Court should deny AFT's motion to remand.


Dated: November 4, 2024                    Respectfully submitted,

                                           /s/ Daniel J. Feith
                                           Daniel J. Feith (D.C. Bar No. 1028433)
                                           Benjamin M. Mundel (D.C. Bar No. 1018114)
                                           Brooke E. Boyd (D.C. Bar No. 1721284)
                                           Jeremy D. Rozansky (D.C. Bar No. 90009027)
                                           SIDLEY AUSTIN LLP
                                           1501 K Street, N.W.
                                           Washington, DC 20005
                                           T: (202) 736-8000
                                           F: (202) 736-8711
                                           dfeith@sidley.com

                                           *Counsel for MOHELA*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2024, I caused the foregoing to be filed using the

Court's CM/ECF system, which will send electronic notifications to all counsel of record.

<u>/s/ Daniel J. Feith</u>
Daniel J. Feith

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FEDERATION OF TEACHERS,<br><br>                     *Plaintiff*,<br><br>   v.<br><br>HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI,<br><br>                    *Defendant*. | Case No. 1:24-cv-2460-TSC |

[PROPOSED] <u>**ORDER DENYING PLAINTIFF'S MOTION TO REMAND**</u>

This matter having come before the Court on Plaintiff American Federation of Teachers' Motion to Remand, and the Court having fully considered the Motion and the opposition by Defendant Higher Education Loan Authority of the State of Missouri:

IT IS HEREBY ORDERED THAT:

1.      Plaintiff's Motion is DENIED.

Entered this ___ day of _____, 2024

 

 

_____
Hon. Tanya S. Chutkan
United States District Judge

Pursuant to Local Civil Rule 7(k), Defendant Higher Education Loan Authority of the

State of Missouri appends the following list of attorneys who are to be notified of its entry:

Faith Gay
Lena Konanova
David A. Coon
Corey Stoughton
Adam Gould
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
fgay@selendygay.com
lkonanova@selendygay.com
cstoughton@selendygay.com
dcoon@selendygay.com
agould@selendygay.com


Persis Yu
STUDENT BORROWER PROTECTION CENTER
1025 Connecticut Ave NW, #717
Washington, DC 20036
persis@protectborrowers.org


R. T. Winston Berkman-Breen
Khandice Lofton
STUDENT BORROWER PROTECTION CENTER
40 Rector Street, 9th Floor
New York, NY 10006
winston@protectborrowers.org
khandice@protectborrowers.org


Shennan Kavanagh
Jennifer Wagner
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th Floor
Boston, MA 02110
skavanagh@nclc.org
jwagner@nclc.org

Alpha Taylor
NATIONAL CONSUMER LAW CENTER
1001 Connecticut Ave. NW
Washington, DC 20036
ataylor@nclc.org

*Counsel for Plaintiff*

Daniel J. Feith
Benjamin M. Mundel
Brooke E. Boyd
Jeremy D. Rozansky
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
dfeith@sidley.com
bmundel@sidley.com
brooke.boyd@sidley.com
jrozansky@sidley.com

*Counsel for Defendant*