### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN FEDERATION OF TEACHERS**<br><br>Plaintiff,<br><br>v.<br><br>**THE HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI**,<br><br>Defendant. | Civil Action No. 24-cv-2460 (TSC) |

### <u>MEMORANDUM OPINION</u>

On July 22, 2024, Plaintiff American Federation of Teachers ("AFT"), a District of Columbia–based labor union representing 1.8 million public school teachers, health care workers, and other public service workers, sued Defendant Higher Education Loan Authority of the State of Missouri ("MOHELA") in the Superior Court for the District of Columbia.  Def.'s Notice of Removal ("Def.'s Notice"), Compl., Ex. A ¶¶ 1, 9, ECF No. 1-2.  Plaintiff alleges that MOHELA violated the D.C. Consumer Protection Procedures Act ("CCPA"), D.C. Code § 28-3901 *et seq*., through its administration of federal student loans under a contract with the U.S. Department of Education ("Department").  Compl. ¶¶ 205–267.

On August 26, 2024, MOHELA removed the case to this court under the federal officer removal statute, 28 U.S.C. § 1442, and federal question jurisdiction, 28 U.S.C. § 1331.  Def.'s Notice ¶¶ 6, 23.  On September 25, 2024, Plaintiff moved to remand the case to D.C. Superior Court, Pl.'s Mot. to Remand ("Pl.'s Mot."), ECF No. 27, and Defendant moved to dismiss, Def.'s Mot. to Dismiss, ECF No. 26.  Based on the parties' briefing, relevant statutory provisions, and

case law, and for the reasons discussed below, the court will DENY Plaintiff's motion to remand and DENY without prejudice Defendant's motion to dismiss.

## I.    BACKGROUND

In 1965, Congress enacted the Higher Education Act ("HEA") to increase educational opportunities and "assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education," including access to grants and loans. 20 U.S.C. § 1070(a). Under the HEA, the Secretary of Education must "carry out programs to achieve the purposes" of the HEA. *Id.* § 1070(b).

Title IV of the HEA established different types of federal student loans, including the William D. Ford Federal Direct Loan Program ("Direct Loan Program"), which allows the federal government to provide student loans directly to borrowers. The HEA allows a range of repayment plans, including income-driven repayment ("IDR") options, *id.* §§ 1087a, 1087e(d)(1)(D), and specifies the terms and conditions attached to federal loans, including interest rates, loan fees, repayment plans, and consequences of default, *see id.* §§ 1077, 1080, 1087e, 1087dd.

On September 27, 2007, Congress amended the HEA to create the Public Service Loan Forgiveness ("PSLF") Program—a program overseen by the Department's Federal Student Aid ("FSA") Office and one that obligates the Department to cancel the remaining student loan debt of eligible borrowers who meet certain public service and repayment conditions. *See* Pub. L. No. 110–84, 121 Stat. 784, 800–01 (2007) (codified at 20 U.S.C. § 1087e(m)). Under the HEA, Congress authorized the Department to contract with third parties to service federal direct loans and to administer IDR plans and the PSLF Program. *See* 20 U.S.C. § 1087f(a).

In 1981, the State of Missouri established MOHELA under the Missouri Higher Education Loan Authority Act, Title XI, Chapter 173, Section 173.350 to 173.445 of the Missouri Revised

Statutes. Mo. Rev. Stat. § 173.350–173.445. MOHELA was established as "a public instrumentality and body corporate" designed to "support the efforts of public colleges and universities to create and fund capital projects." Mo. Rev. Stat. § 173.360. Missouri law authorizes MOHELA to "service student loans for any owner thereof, regardless of whether such student loans are originated in this state or out of this state" and to "create, acquire, contribute to, or invest in any type of financial aid program that provides grants and scholarships to students." *Id.* § 173.385.1(18)–(19).

Pursuant to its authority under 20 U.S.C. § 1087a, the Department's FSA Office initiated two principal contracts with MOHELA. The first, Contract No. ED-FSA-11-D-0012 ("Direct Loan Contract") was awarded on September 27, 2011, and has been modified periodically. *See* Compl., Ex. B, ECF No. 1-3; Compl., Ex. C, ECF No. 1-4; Decl. of Jennifer Farmer ("Farmer Decl.") ¶ 4, ECF No 37-1. The second, Contract No. 91003123D0004 ("USDS Contract"), was awarded on April 25, 2023, and is set expire on March 14, 2024. Def.'s Opp'n to Pl.'s Mot. to Remand ("Def.'s Opp'n") Ex. A, ECF No. 37-2; Farmer Decl. ¶ 4.

On July 22, 2024, Plaintiff sued MOHELA in the Superior Court for the District of Columbia. Plaintiff's allegations concern MOHELA's conduct as a federal student loan servicer in the months after the Department's COVID-related "payment pause" ended in October 2023. Plaintiff alleges that MOHELA failed "to fulfill its responsibilities as a student loan servicer," because it "misleads and misinforms borrowers, fails to process applications for PSLF and income-driven repayment plans in a timely manner or entirely, fails to provide refunds, miscalculates balances, over-charges borrowers, fails to respond to borrower inquiries and denies borrowers information to which they are entitled." Compl. ¶ 5.

Plaintiff brings three causes of action against MOHELA for violating the CCPA, D.C. Code § 28-3905(k)(1)(C): Count I is on behalf of AFT as an entity, Count II is on behalf of AFT members whose federal student loans are serviced by MOHELA, and Count III is on behalf of members of the public whose federal student loans are also serviced by MOHELA. Compl. ¶¶ 205–267.

On August 26, 2024, MOHELA removed the case to this court, pursuant to the federal officer removal statute, 28 U.S.C. § 1442, and federal question jurisdiction, 28 U.S.C. § 1331. Def.'s Notice ¶¶ 6, 23. Plaintiff now moves to remand the case to D.C. Superior Court, arguing that MOHELA has no valid basis for removal and this court lacks subject matter jurisdiction. Pl.'s Mot. at 1. Defendant also moved to dismiss. On September 3, 2024, the court stayed briefing on the motion to dismiss pending resolution of the motion to remand. Sept. 3, 2024 Min. Order.

## II.    LEGAL STANDARD

Federal courts have limited jurisdiction, which exists when "a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002). The federal officer removal statute, 28 U.S.C. § 1442, provides an exception to the well-pleaded complaint rule by permitting removal to federal court even when a complaint would otherwise fall short of the federal jurisdictional requirements. *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999); *see K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020). The federal officer removal statute authorizes removal of any civil action brought in state court against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Courts construe the statute

liberally in favor of removal. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *Trump Old Post Off.*, 951 F.3d at 506.

### III.    ANALYSIS

To establish federal jurisdiction under the federal officer removal statute, MOHELA must show that it (1) is a "person" within the meaning of § 1442(a)(1), (2) acted under the direction of a federal officer, (3) is being sued for actions relating to its federal officer status; and (4) has a colorable federal defense to Plaintiff's claims. *See MobilizeGreen, Inc. v. Cmty. Found. for Nat'l Cap. Region*, 101 F. Supp. 3d 36, 41 (D.D.C. 2015) (quotation marks and citations omitted); *District of Columbia. v. Exxon Mobil Corp.*, 89 F.4th 144, 155 (D.C. Cir. 2023). Plaintiff argues that MOHELA fails to meet these requirements and is not entitled to removal under the statute. Because Plaintiff does not dispute that MOHELA is a "person" for purposes of § 1442, *see* Pl.'s Mot. at 6, the court only analyzes the second, third, and fourth factors. Upon review, and for the reasons explained below, the court finds that MOHELA is entitled to removal to this court under the federal officer removal statute.[1]

### A.  <u>MOHELA Satisfies the Federal Officer Removal Statute Requirements</u>

### 1.  **MOHELA Acted Under the Direction of the Federal Government**

Plaintiff argues that MOHELA's contract with the federal government does not establish that it was "acting under" color of federal office and that, in fact, the plain language of the contract reflects an agreement that MOHELA is not acting as a federal officer at the Department's direction in servicing student loans. Pl.'s Mot. at 6–7. MOHELA responds that the Complaint arises out of

---

[1] MOHELA argues that federal question jurisdiction, 28 U.S.C. § 1331, provides a second independent basis for jurisdiction. Def.'s Notice at 9. Because the court concludes that removal is proper under the federal officer removal statute, the court does not decide whether removal is appropriate under federal question jurisdiction.

MOHELA's alleged actions in performing under contracts with the Department, and that in performing under those contracts, MOHELA was (and is) "acting under" the Department in that it helps the Department carry out its duties and tasks. Def.'s Opp'n at 10. The court agrees with MOHELA on this factor.

As an initial matter, the court agrees with Plaintiff that having a contract with the federal government does not by itself establish that a contractor is acting under color of federal office. *MobilizeGreen*, 101 F. Supp. 3d at 42. And though MOHELA points out that it is subject to the Department's ongoing direction and supervision, that is also not enough to show that MOHELA is "acting under" a federal official. *Watson*, 551 U.S. at 156. But the court agrees with MOHELA that Plaintiff urges an unduly heightened standard by arguing that MOHELA must demonstrate that the Department directed the conduct at issue. *See* Pl.'s Mot. at 9. That is not the appropriate test.

The Supreme Court has recognized that the "acting under" language in § 1442(a)(1) is to be construed broadly. *Watson*, 551 U.S. at 147; *Willingham v. Morgan*, 395 U.S. 402, 406–07 (1969). The Court has described "acting under" as a relationship that involves "acting in a certain capacity, considered in relation to one holding a superior position or office" and which also typically involves "subjection, guidance, or control." *Watson*, 551 U.S. at 151 (citations omitted).

In *Watson*, the Supreme Court rejected a cigarette manufacturer's argument that it "acted under" the federal government because it was subject to intense federal regulation in testing and marketing cigarettes in accordance with Federal Trade Commission regulations. 551 U.S. at 152. The Supreme Court held that a regulated corporation does not "act under" a federal officer simply because its activities are monitored and subject to government regulations. *Id.* Indeed, "the help or assistance necessary to bring a private person within the scope of the statute does *not* include

simply *complying* with the law." *Id.* The Court explained that "acting under" "must involve an effort to *assist,* or to help *carry out,* the duties or tasks of the federal superior." *Id.*

In a case in this district, *MobilizeGreen,* an organization contracted with the United States Forest Service to "help build the next generation of environmental leaders, stewards, and volunteers . . . through a new national program." 101 F. Supp. 3d at 42 (citation and quotation marks omitted). The court rejected the organization's argument that it was "acting under" the Forest Service because it had a "partnership relationship" with the agency under the contract and the "complained-of acts" were performed under "comprehensive and detailed regulations." *Id.*

The court found that the organization was not "assisting or helping to carry out the duties or tasks" of the agency but was instead helping to implement an outreach program that "was perhaps beneficial but ancillary to the Forest Service's mandate" to manage certain acres of land and to help improve land stewardship. *Id.* (emphasis omitted). The court noted that the contract did not indicate that the agency "would have independently undertaken the [project] without the involvement of [the organization]." *Id.* at 43. The court concluded that successful execution of the project could have benefited the Forest Service but "such accomplishments do not satisfy the statute's 'acting under' requirement, which requires direction to fulfill an agency's specific purpose." *Id.*

Here, MOHELA operates under two contracts with the federal government that subject it to strict regulations, with its activities closely supervised and monitored. *See* Farmer Decl. ¶¶ 4, 15–16; USDS Contract, ECF No. 27-2 at 34 (MOHELA must complete certain "tasks and deliverables" necessary "to become performance ready"); *id.* at 10 (MOHELA must "comply with all applicable Federal and State rules, laws, regulations, and Department guidelines"); *id.* at 9–10 (MOHELA "shall adapt and adhere to changes in FSA's operating environment. [MOHELA] shall

adhere to FSA's Change Management Process. . . . Performance testing results are a requirement of this effort"); Direct Loan Contract at 3 (MOHELA "shall create PSLF reports and provide the reports to FSA").

Although MOHELA's contract imposes numerous "requirements governing MOHELA's performance of all aspects of its obligations," Def.'s Opp'n at 11, those provisions, as explained above, are insufficient to bring it within the scope of the federal officer removal statute. Instead, the court looks to whether MOHELA's assistance to the federal government "goes beyond simple compliance with the law" and helps the government "fulfill other basic governmental tasks." *Watson* 551 U.S. at 156. In other words, the court must determine whether MOHELA's activities assist or help carry out the duties or tasks of the Department. It finds that it does.

Congress charged the Department with establishing and operating a Direct Loan program and multiple loan-forgiveness and IDR plans. Recognizing that operating such programs requires loan servicing and other administrative responsibilities, Congress authorized the Department to contract with third parties to carry out those functions. In doing so, MOHELA "helps *carry out* the [Department's] duties or tasks," *Watson*, 551 U.S. at 152, something that, "in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 153. This case is unlike *MobilizeGreen*, in which the program "was perhaps beneficial but ancillary" to the government's mandate. By contrast, servicing federal student loans directly advances the Department's mandate to "mak[e] available the benefits of postsecondary education to eligible students . . . in institutions of higher education." *See* 20 U.S.C. § 1087f(a). MOHELA's work with the Department was, and is, essential to the Department's congressionally mandated duty to increase educational opportunities through access to loans and grants, and its role directly advances a core federal objective.

Consistent with this statutory framework, the USDS Contract provides:

> FSA administers all phases of the Federal student financial aid programs from a student's submission of the Free Application for Federal Student Aid (FAFSA®) through retirement of student loan debt. Federal Student loans have become a core component of postsecondary education financing. FSA directly manages servicing for more than 35 million non-defaulted Federal student loan borrowers with a total value over $1.25 trillion. This contract supports the following FSA goals: Provide all federally managed borrowers with complete account management capabilities on StudentAid.gov; Reduce the disruption of account transfers; and Increase accountability for servicers via clear, measurable service-level agreements.

USDS Contract at 9.

Plaintiff urges the court to focus on the plain language of the USDS contract,[2] which it contends "explicitly states that the contractor is not acting under color of federal office" and that "the conduct at issue is not directed by the Department." Pl.'s Mot. at 7. It argues that the contract "ensures that MOHELA cannot use its contractual relationship with the federal government to prevent borrowers from holding MOHELA accountable in state courts." *Id.*

The court disagrees with Plaintiff's interpretation of the contract language. The relevant clause states:

> USDS Servicer acknowledges that it is not the U.S. Department of Education, and is *not acting as* the U.S. Government under this Contract. As such the USDS Servicer acknowledges that any claim or defense of Sovereign Immunity or Qualified Immunity is not applicable to work performed under the Contract and any Task Order issued under the Contract.

USDS Contract at 12 (emphasis added).

---

[2] The parties dispute which contract—the Direct Loan Contract or the USDS Contract—governs the allegations in the Complaint. *See* Def.'s Opp'n at 14–16. Because the Direct Loan Contract does not contain the language upon which Plaintiff relies, the court evaluates Plaintiff's argument by reference to the USDS Contract.

The contract's plain language makes clear that MOHELA is not "acting as" the U.S. Government, which is not the same as "acting under" the U.S. Government, contrary to Plaintiff's position. Having reviewed the relevant clause, the court rejects Plaintiff's contention that it "explicitly states that the contractor is not acting under color of federal office." Pl.'s Mot. at 7. Similarly, the court rejects Plaintiff's argument that the contract "makes clear that MOHELA's violations of D.C. law are not directed" by the Department, both because the contract requires MOHELA to "comply with all . . . State rules, laws, [and] regulations" and because MOHELA allegedly acted contrary to those laws. *See Watson*, 551 U.S. at 153 ("[A] private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'").

In sum, because MOHELA assists the federal government in fulfilling its governmental task of providing assistance to student loan borrowers, Plaintiffs' claims against MOHELA are based on actions that MOHELA took while acting under a federal office.[3]

### 2. This Suit Involves Actions MOHELA Took Under Color of Federal Authority

Plaintiff next argues that MOHELA is not being sued for actions "relating to" any federal officer status. First, it contends that servicing federal student loans is not a federal duty. Pl.'s Mot. at 9–10. Second, Plaintiff argues that even if it was a federal duty, MOHELA's challenged misconduct does not "relate to" its contract with the Department because "it was not undertaken

---

[3] Other courts have reached a similar conclusion that student loan servicers are "acting under" the Department for purposes of § 1442. *See Nigro v. Pennsylvania Higher Educ. Assistance Agency*, No. 1:19-CV-02000, 2020 WL 5369980, at *4 (M.D. Pa. Sept. 8, 2020) (finding student loan servicer was "acting under" the Department because the complaint alleged it serviced loans pursuant to a federal contract); *Cobb v. GC Servs., LP*, No. CV 3:16-3764, 2016 WL 7155765, at *2 (S.D.W. Va. Dec. 7, 2016) (holding loan servicer was "acting under" the Department because it performed loan servicing and collection activities the Department would otherwise have to carry out itself).

at the behest of or in coordination with the federal government," and its actions are "contrary to its contractual obligations and actively hinder [the Department's] mandate to financially assist student borrowers."  *Id.* at 10.  MOHELA responds that its contractual obligations to the Department are "connected or associated" with the conduct at issue in the case and its performance of those obligations gives rise to, and is the subject of, Plaintiffs' claims.  Def.'s Opp'n at 16 (citation and quotation marks omitted).

Though it is a close call, the court, as it must, construes the statute liberally in favor of removal, *see Watson*, 551 U.S. at 147; *Trump Old Post Off.*, 951 F.3d at 506, and finds that MOHELA satisfies this statutory requirement because at least some of its acts taken under color of federal office are connected or associated with the conduct at issue in this case.

The parties rely on different tests for this element, so the court first clarifies the correct standard.  The Supreme Court previously interpreted the federal officer removal statute to require a "causal connection between the charged conduct and asserted official authority."  *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) (cleaned up).  But as the D.C. Circuit explained in *District of Columbia v. Exxon Mobil Corp.*, Congress amended and broadened the statute in 2011 to allow removal of suits "for *or relating to*" any act under color of such office.  89 F.4th 144, 155 (D.C. Cir. 2023); Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545, 545.  The statute therefore does not require a causal connection between acts taken under color of federal office and the basis for the action—it is enough that acts taken under color of federal office are "connected or associated" with the conduct at issue in the case.  *Exxon Mobil Corp.*, 89 F.4th at 155 (citation and quotation marks omitted); *Trump Old Post Off.*, 951 F.3d at 507.

In *District of Columbia v. Exxon Mobil Corp.*, the District of Columbia sued several energy companies, alleging that they violated the CCPA by making material misstatements to the public through advertisements about their products' effects on the climate. 640 F. Supp. 3d 95, 109–10 (D.D.C. 2022), *aff'd*, 89 F.4th 144 (D.C. Cir. 2023). The district court found that the federal officer removal statute did not apply. *Id.* The D.C. Circuit affirmed, holding that the suit was not sufficiently related to activities conducted by the companies in concert with the federal government. The Circuit explained that while the companies had contracted with the government to "coordinate extraction and operations" and had "leased pipelines and terminals subject to federal regulations," these commercial relationships were not sufficiently "related to" the District's claim of making material misrepresentations because the "complaint exclusively references statements made by the Companies that relate broadly to climate change, rather than to any specific activities conducted by the Companies in concert with the federal government." *Exxon*, 89 F.4th at 157.

Unlike in *Exxon* however, Plaintiff's Complaint alleges that MOHELA's contractual relationship with the government, at least in part, was connected or associated with the conduct at issue. Under its contract with the Department, MOHELA was charged with servicing loans and administering loan forgiveness and repayment programs that the Department needs to operate the Direct Loan, IDR, and PSLF programs. Plaintiff alleges that MOHELA failed to send billing statements, Compl. ¶¶ 116–17; incorrectly calculated payment obligations, *id.* ¶¶ 118, 198; sent incorrect written notices relating to borrowers' IDR plan applications, *id.* ¶¶ 148–49; and failed to conduct appropriate audits and root cause analyses to identify errors on borrower accounts, *id.* ¶¶ 196–97.

While Plaintiff does not allege that MOHELA conducted each activity in concert with the federal government, some allegations do indicate coordination with the government. For example,

in 2024, MOHELA announced that it was internally transitioning borrower accounts to a new platform. *Id.* ¶¶ 179–180. In April and May 2024, the Department announced that it would transfer over one million borrower accounts from MOHELA to other student loan servicers and transition administration of the PSLF program away from MOHELA. *Id.* ¶¶ 179–180. Plaintiff alleges that these three changes "caused confusion for many borrowers." *Id.* ¶ 183.

Plaintiff also claims that MOHELA engaged in "call deflection"—the practice of diverting callers to MOHELA's website, the Department's website, or other self-service features, rather than connecting callers with a live customer service representative, and that this strategy is laid out in MOHELA's internal "Return to Repayment Playbook." *Id.* ¶ 159.

MOHELA notes that the Department issued guidance related to call deflection to all student loan servicers in FSA's outreach plan to borrowers, titled FSA's *Return to Repayment, Student Debt Relief, and Income Driven Repayment New Communications Playbook* ("Playbook"). Def.'s Opp'n at 13; *see* Def.'s Notice Ex. D., ECF No. 1-5. And indeed, in the Playbook's "Overview" section, FSA notes that it would be "providing language . . . for servicers to use in their [] websites to help with coordinated call deflection actions to promote borrower self-service." Def.'s Notice Ex. D. at 3. The "Overview" section also states in relevant part:

> FSA has devised an approach that plans for several communications to be sent out via numerous communication channels beginning now until March 2024. FSA will author most of the communications and will leverage its available communication channels and capabilities, or the capabilities of its servicers, to ensure these communications reach every borrower before, during, and after payments resume later this year. This document is intended to provide a roadmap for each servicer and supporting vendors on the following topics:
> - When FSA intends to send out communications to borrowers and via what channel
> - The different audiences FSA intends to reach
> - How planned vendor communication beyond this plan should be handled and sent to FSA for review and approval

Def.'s Notice Ex. D at 4.

For purposes of the removal inquiry, the court credits "[defendant's] theory of the case." *Trump Old Post Off.*, 951 F.3d at 506 (quoting *Acker*, 527 U.S. at 432). And there is some indication that FSA intended to coordinate borrower communications through its student loan servicers: the "Overview" explains that FSA would author most borrower-facing communications and either use its own channels or rely on its servicers to disseminate those messages. *See* Def.'s Notice Ex. D at 3. The Playbook also provides each servicer with a roadmap specifying the timing and channels of communication, the target audiences, and the process for submitting any additional vendor communications to FSA for review and approval. *See id.*

Likewise, Plaintiff alleges that MOHELA's representatives "lacked knowledge," "seemed unfamiliar with the student loan system, and generally could not answer borrowers' questions," Compl. ¶ 169, and the USDS contract provides that FSA would supply servicers with "a copy of the message to use as outlined in CR6703" and FAQs to assist customer service representatives in responding to borrower inquiries. USDS Contract at 10. Similarly, Plaintiff alleges that MOHELA failed to adequately train its staff, Compl. ¶ 195, and the USDS contract requires MOHELA to ensure personnel are trained and knowledgeable about applicable laws and regulations and further provides that the "development of training content and material shall be done in coordination with FSA and/or FSA's designees, as required." USDS Contract at 10. MOHELA's duties and actions as a student loan servicer under its Department contract bear at least some relation to how it conducts its operations.

Plaintiff also argues that servicing federal student loans is not a "federal duty" because "Congress intended that [the Department] would not service federal student loans itself, but instead would outsource servicing to private actors who contractually agree that they are 'not the U.S. Department of Education, and [are] not acting as the U.S. Government' when servicing those

loans." Pl.'s Mot. at 9. For the reasons discussed above and in Section III(A)(1), the court rejects this argument. The HEA states: the "Secretary shall, *to the extent practicable*, award contracts for origination, servicing, and collection of [student loans]." 20 U.S.C. § 1087f(a)(1) (emphasis added). Nothing indicates that Congress intended the Department to forgo servicing federal student loans or that doing so is not a "federal duty."

In sum, the allegations in this case are directed at MOHELA's conduct while under contract with the Department. Accordingly, the court finds that MOHELA's performance of its contractual obligations gives rise to Plaintiffs' claims, and that its actions in fulfilling those obligations are connected or associated with the conduct at issue.

### 3. MOHELA's State Sovereign Immunity Defense is Colorable

MOHELA raises three federal defenses in its Notice of Removal: state sovereign immunity, derivative sovereign immunity, and preemption. As to state sovereign immunity, MOHELA argues that it is an arm of Missouri and thus enjoys sovereign immunity from Plaintiff's claims. Because the court finds this defense colorable, it need not address MOHELA's alternative arguments.[4] *Trump Old Post Off.*, 951 F.3d at 507.

#### a. State Sovereign Immunity Principles

While the Eleventh Amendment does not expressly provide for state sovereign immunity, the Supreme Court has interpreted the Constitution as encompassing a principle of state sovereign immunity which largely shields states from suit without their consent. *See Puerto Rico Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 871–72 (D.C. Cir. 2008) (collecting cases); *Alden v. Maine*,

---

[4] On August 25, 2024, the United States filed a Statement of Interest requesting to be heard "in the event that the court were to consider the applicability of a sovereign immunity defense on the merits." U.S. Statement of Interest, ECF No. 38. Because the court is not currently considering the applicability of a sovereign immunity defense on the merits, the court need not set a hearing on the issue at this juncture.

527 U.S. 706, 713 (1999) ("[T]he Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . ."). Even if a state itself is not a named party, sovereign immunity may also bar suits against an arm or instrumentality of the state. *See Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997) (recognizing long-settled principle that "actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities"). State entities such as "universities, transportation authorities, and port authorities can be arms of the State immune from suit." *Puerto Rico Ports Auth.*, 531 F.3d at 872.

The Supreme Court has rejected a "narrow, grudging interpretation" of the federal officer removal statute, recognizing that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *Acker*, 527 U.S. at 431 (quoting *Willingham*, 395 U.S. at 407). The federal defense need only be "colorable," not "clearly sustainable," *Willingham*, 395 U.S. at 407, and an officer is not required "virtually to win his case before he can have it removed." *Acker*, 527 U.S. at 431 (citation and quotation marks omitted).

The D.C. Circuit has never decided whether MOHELA is entitled to sovereign immunity. In a recent case, the Tenth Circuit addressed—on appeal of a motion to dismiss—whether MOHELA is an arm of Missouri and thus entitled to share in Missouri's Eleventh Amendment immunity. *Good v. Dep't of Educ.*, 121 F.4th 772, 787 (10th Cir. 2024). The Tenth Circuit noted that "courts that have considered whether MOHELA is an arm of the State of Missouri are divided on the issue" and that it is "the first circuit court to definitively opine on the issue. *Id.* (collecting cases). After conducting the Circuit's "arm of the state" analysis," it concluded that MOHELA

failed to show that it is an arm of the State and reversed the district court's decision granting it state sovereign immunity. *Id. Good,* however, was not in the same removal posture as here, and was decided on the merits. Nonetheless, the court finds its holding on the validity of MOHELA's state sovereign immunity defense to be instructive.

In *Biden v. Nebraska*, 600 U.S. 477 (2023), the Supreme Court considered whether Missouri had standing to sue when it and other states alleged that the Department's program to forgive student loan debt under the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act), which was promulgated to address financial harms caused by the COVID-19 pandemic, contravened separation of powers and violated the Administrative Procedure Act. The Supreme Court ultimately found that Missouri had standing to sue because MOHELA is a "public instrumentality" of Missouri and the HEROES Act "harm to MOHELA is also a harm to Missouri." *Id.* at 490.

In conducting its analysis of whether MOHELA is an arm of Missouri, the Supreme Court considered MOHELA's structure, history, and operations, and found that: (1) MOHELA is a "public instrumentality" of the State under Mo. Rev. Stat. § 173.360; (2) Missouri established MOHELA to perform the "essential public function" of helping its residents access loans for college; (3) to fulfill this public purpose, MOHELA is empowered by Missouri to invest in or finance student loans, including by issuing bonds under §§ 173.385(1)(6)–(7); (4) its profits help fund education in Missouri; (5) MOHELA is subject to Missouri's supervision and control and "directly answerable" to Missouri; and (6) MOHELA was created by Missouri to further a public purpose, is governed by state officials and state appointees, reports to Missouri, and may be dissolved by Missouri and is therefore an instrumentality of Missouri. *Id.* at 490–491.

In *Good,* the Tenth Circuit ultimately concluded that "although the Supreme Court's *Biden* opinion is certainly relevant and highlights many of MOHELA's best arguments, it does not resolve the question before us," and it therefore undertook its own arm-of-the-state inquiry. *Good v. Dep't of Educ.*, 121 F.4th 772, 797 (10th Cir. 2024). The Circuit continued:

> To be sure, *Biden* certainly stands for the proposition that there is enough of a link between MOHELA and Missouri for an injury to the former to constitute an injury to the latter. But, as MOHELA admitted at oral argument, standing is an "analytically distinct concept[ ]" from the Eleventh Amendment question before us here. []. The question at issue in this appeal is whether MOHELA is *so interconnected* with Missouri that it could be considered an arm of the state for purposes of the Eleventh Amendment. That is not a question that the Supreme Court purported to resolve, and we will not read more into the *Biden* decision than what is there.

*Id.*

While the Tenth Circuit cautioned against conflating Article III standing with Eleventh Amendment immunity, the Supreme Court's analysis in *Biden* remains instructive insofar as it squarely addressed whether MOHELA functions as an arm of Missouri. As the D.C. Circuit opined in the context of Eleventh Amendment immunity:

> Under the three-factor test, an entity either is or is not an arm of the State: The status of an entity does not change from one case to the next based on the nature of the suit, the State's financial responsibility in one case as compared to another, or other variable factors. Rather, once an entity is determined to be an arm of the State under the three-factor test, that conclusion applies unless and until there are relevant changes in the state law governing the entity.

*Puerto Rico Ports Auth.*, 531 F.3d at 873.

Here, the court must determine whether MOHELA has a "colorable" federal defense—not determine the ultimate merits of its defense. Indeed, the court does not resolve whether MOHELA is entitled to sovereign immunity "because the federal defense need only be 'colorable' at the time of removal." *In re Subpoena In Collins*, 524 F.3d 249, 252 n.2 (D.C. Cir. 2008). And several elements of MOHELA's "design would appear to suggest that it does have sovereign immunity."

*See, e.g.*, *Forman v. Small*, 271 F.3d 285, 295 (D.C. Cir. 2001) (finding indication of sovereign immunity where Smithsonian operates under a federal charter, its Board is composed of or selected by federal officials, and it is authorized to receive appropriations from Congress).

As discussed below, in addressing the three factors in this Circuit's arm-of-the-state test,[5] MOHELA has raised "a colorable federal defense because it is legitimate and can reasonably be asserted in this case." *Trump Old Post Off.*, 951 F.3d at 507. Whether MOHELA is *entitled to* a federal defense, however, is a separate inquiry reserved for a later stage, and the court makes no final determination on this issue here.

### b. State Sovereign Immunity Test: Arm-of-the State Inquiry

To determine whether an entity is an arm of the State for purposes of sovereign immunity, the Supreme Court and the D.C. Circuit generally focus on the "nature of the entity created by state law" and whether the State "structured" the entity to enjoy its immunity from suit. *Puerto Rico Ports Auth.*, 531 F.3d at 872 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280 (1977)). This requires the court to consider three factors: (1) the State's intent as to the status of the entity; (2) the State's control over the entity; and (3) the entity's overall effects on the State treasury. *See Puerto Rico Ports Auth.*, 531 F.3d at 873; *see also Galvan v. Fed. Prison Indus., Inc*, 199 F.3d 461, 463 (D.C. Cir. 1999).

### i. Missouri's Intent as to MOHELA's Status

In considering Missouri's "intent" as to MOHELA's status, the court must determine whether Missouri law "expressly characterizes [MOHELA] as a governmental instrumentality

---

[5] As both parties note, the Tenth Circuit arm-of-the-state test, and the test used in other Circuits, differ, in varying ways, from this Circuit's arm of-the-state test. *See Puerto Rico Ports Auth.*, 531 F.3d at 873 (The courts' arm-of-the-state analysis "has moved freely amongst these three categories, applying common principles." (citation omitted)).

rather than as a local governmental or non-governmental entity"; whether MOHELA performs state governmental functions; whether MOHELA is treated as a governmental instrumentality for purposes of other Missouri laws; and Missouri's representations in this case about MOHELA's status. *Puerto Rico Ports Auth.*, 531 F.3d at 874–75; *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 30 (1994).

Missouri law characterizes MOHELA as a "public instrumentality" and recognizes its exercise of powers as "the performance of an essential public function." Mo. Rev. Stat. §§ 173.360, 173.385. Thus, the statutory language strongly suggests Missouri intended to create a state government instrumentality. *See Morris*, 781 F.2d at 225 (finding Compact labeling WMATA as a "regional instrumentality, as a common agency of each signatory party" indicated that signatory States intended to confer immunity (internal quotation marks omitted)).

In *Puerto Rico Ports Authority*, the D.C. Circuit held that PRPA, a special-purpose corporation, performed functions typically tasked to state governments, as opposed to those ordinarily performed by local governments or non-governmental entities. *Puerto Rico Ports Auth.*, 531 F.3d at 875. PRPA was authorized to develop, improve, own, operate, and manage "any and all types of air and marine transportation facilities and services," and establish and manage "mass marine transportation systems in, to and from [] Puerto Rico." *Id.* (citation and quotation marks omitted). The Court explained that this demonstrated PRPA's directive to perform state government functions by promoting the general welfare and increasing "commerce and prosperity for . . . the people of Puerto Rico." *Id.* (citation and quotation marks omitted).

Just as PRPA was directed to promote Puerto Rico's general welfare, MOHELA was similarly directed to "[perform] an essential public function," § 173.360—helping Missourians access student loans for college. As the Supreme Court outlined in *Biden*, MOHELA has provided

$230 million for development projects at Missouri colleges and universities and almost $300 million in grants and scholarships for Missouri students. *Biden*, 600 U.S. at 490.

As to whether MOHELA is treated as a government instrumentality under other Missouri laws, MOHELA must provide annual financial reports to Missouri's Department of Education, detailing its income, expenditures, and assets. Mo. Rev. Stat. § 173.445. And as the *Biden* court explained, Missouri "set[s] the terms of its existence," and only Missouri "can abolish [MOHELA] and set the terms of its dissolution." *Biden*, 600 U.S. at 491 (citation omitted).

Finally, Missouri filed an amicus brief in support of Defendant's Motion to Dismiss, explicitly stating that MOHELA is "an instrumentality of Missouri" and is entitled to Eleventh Amendment sovereign immunity. State of Missouri Amicus Brief, ECF No. 31 at 2, 4; *see Morris v. Washington Metro. Area Transit Auth.*, 781 F.2d 218, 224–25 (D.C. Cir. 1986) ("There can be no doubt of Maryland's and Virginia's intentions," where the States filed a joint *amici curiae* brief stating their intent to confer immunity on WMATA); *Puerto Rico Ports Authority*, 531 F.3d at 877 (finding Puerto Rico's assertion in its amicus curiae brief declaring that corporation is an arm and an instrumentality of Puerto Rico "further substantiated the conclusion" that corporation was entitled to sovereign immunity). For these reasons, the court finds that Missouri likely intended for MOHELA to operate as a state entity, such that it is entitled to Eleventh Amendment sovereign immunity.

### ii. *Missouri exercises control over MOHELA*

The second factor of the arm-of-the-state analysis is Missouri's "control" over MOHELA, an important factor in this Circuit. *See Morris*, 781 F.2d at 227 (noting the degree of state control over an agency is a "significant consideration" in an Eleventh Amendment immunity analysis). In

assessing a state's "control," courts in this Circuit "look primarily at how the directors and officers of [an entity] are appointed." *Puerto Rico Ports Auth.*, 531 F.3d at 877.

In *Puerto Rico Ports Authority*, the D.C. Circuit analyzed how directors and officers were appointed to the corporation's board. 531 F.3d at 877. In that case, the Board consisted of four high-ranking government officials—appointed by the Governor and automatically serving on the Board—and one "private citizen representing the public interest," appointed by the Governor with the consent of the Puerto Rico Senate. *Id.* The Circuit found that, given this structure, the Governor of Puerto Rico "controls the appointment of the entire Board," demonstrating that Puerto Rico directly controls the entity. *Id.*

Here, MOHELA's board consists of two state officials and five members appointed by the Governor and approved by the Senate. Mo. Rev. Stat. § 173.360. The Governor may remove any member for cause. Mo. Rev. Stat. § 173.360 (Governor can remove "for misfeasance, malfeasance, willful neglect of duty, or other cause."). And, as noted, MOHELA must provide annual financial reports to Missouri's Department of Education, § 173.445, making it, as the Supreme Court described, "directly answerable" to Missouri. *Biden*, 600 U.S. at 490–91. The court therefore concludes that MOHELA is likely subject to Missouri's control and this factor therefore weighs in favor of considering MOHELA an arm of Missouri.

iii. *Overall Effects on the State Treasury*

The third factor is the entity's financial relationship with the State and whether the State structured the entity to enable it to enjoy the special constitutional protection of the State. *Puerto Rico Ports Auth.*, 531 F.3d at 878. The court must also consider the entity's "overall effects on the state treasury." *Id.* Given MOHELA's independence, this factor weighs against a finding that MOHELA is an arm of Missouri.

Plaintiff argues that MOHELA is not entitled to state sovereign immunity "because it is, and has always been, financially independent from Missouri and self-sustaining." Pl.'s Mot. at 14. Plaintiff points out that MOHELA's assets are not part of Missouri's revenues and need not be deposited into the State treasury, and Missouri is not liable for MOHELA's debts. *Id.* at 15. It notes that other courts have recognized that MOHELA's financial independence weighs against finding that MOHELA is an arm of the State, while MOHELA counters that the D.C. Circuit uses a "more holistic inquiry into an entity's financial relationship with the State and its overall effects on the State's treasury." Def.'s Opp'n at 29 (cleaned up).

The D.C. Circuit has expressly stated that the "relevant issue is a State's overall responsibility for funding the entity or paying the entity's debts or judgments, *not* whether the State would be responsible to pay a judgment *in the particular case at issue.*" *Puerto Rico Ports Auth.*, 531 F.3d at 878 (citation omitted).

First, the record at this stage does not support a finding that Missouri is responsible for funding MOHELA. Instead, it appears that Missouri relies on MOHELA in several respects to help fund its higher education priorities. *See* Def's Opp'n at 4. For example, MOHELA has a statutory obligation to contribute $350 million to a fund in the State treasury that supports Missouri's higher education spending. *See* Mo. Rev. Stat. §§ 173.392.2, 173.385.2. Given these obligations, MOHELA argues that a judgment against it would adversely affect Missouri's Treasury. *See* Def.'s Opp'n at 29–31. MOHELA cites no authority finding that this is enough to satisfy the relevant factor under this Circuit's test.

Second, the record does not indicate that Missouri would be directly liable for any judgment against MOHELA. The court notes that MOHELA has conceded this point in other

cases.[6]  *See Good v. Dep't of Educ.*, No. 21-CV-2539, 2022 WL 2191758, at *4 (D. Kan. June 16, 2022) ("MOHELA concedes that a judgment against it would not come directly out of the state's treasury, but that a judgment against it could cause an indirect 'functional' liability upon the State of Missouri."); *Walker v. Higher Educ. Loan Auth. of the State of Missouri*, No. 1:21-CV-00879, 2024 WL 3568576, at *8 (E.D. Cal. July 26, 2024) (rejecting argument that Missouri would be "functionally liable for a judgment against it," where MOHELA proffered no supporting evidence and acknowledged that no statute "requires the State to cover a judgment against" it).  And Missouri does not argue otherwise.  *See* Missouri Amicus Brief at 8 ("That the State Treasurer might not be directly liable for paying any judgment against MOHELA and in favor of Plaintiff is not significant, because Plaintiff's Complaint poses a severe risk to the State's economic and policy interests.").

Accordingly, this factor favors finding that MOHELA is not an arm of Missouri.  Given the court's overall findings on the arm-of-the-state factors, however, it concludes that on balance, the factors support a finding that MOHELA has a colorable state sovereign immunity defense, although it does not reach the merits of its defense.

---

[6] The court may take judicial notice of other cases including the same subject matter.  *Fletcher v. Evening Star Newspaper Co.*, 133 F.2d 395, 395 (D.C. Cir. 1942); *see Covad Commc'ns v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).

## IV.    CONCLUSION

For these reasons, it is hereby ORDERED that Plaintiff's Motion to Remand is DENIED, and Defendant's Motion to Dismiss is DENIED without prejudice.  An Order will accompany this Memorandum Opinion.


Date: September 29, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge