# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN FEDERATION OF TEACHERS,<br><br>                  *Plaintiff*,<br><br>      v.<br><br>HIGHER EDUCATION LOAN AUTHORITY OF THE STATE OF MISSOURI,<br><br>                *Defendant*. | Case No. 1:24-cv-02460-TSC<br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiff American Federation of Teachers ("AFT"), on behalf of itself, its members, and the general public, by and through its counsel, brings this action against the Higher Education Loan Authority of the State of Missouri ("MOHELA" or "Defendant") and alleges the following based upon information, belief, and the investigation of its counsel:

## INTRODUCTION

1.      Since 2011, the U.S. Department of Education ("ED") has paid MOHELA over $1.1 billion to do one job:  help borrowers navigate their student loan options.  MOHELA has consistently failed at this job, to borrowers' detriment.  Americans—including American educators, front-line health care workers, and other public service workers—are drowning in student loan debt.  But at a time of staggeringly high costs and the disappearance of pandemic support—when borrowers need help the most—instead of providing cash-strapped borrowers with the assistance they need, MOHELA traps more than 6.5 million borrowers in a system of its own

design, rife with errors, misinformation, and broken promises.  In doing so, MOHELA violates the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq*.

2. The student debt crisis touches forty-five million Americans who owe more than $1.8 trillion in student loans.  But for borrowers whose loans are serviced by MOHELA, the crisis is especially acute.

3. By cutting corners, prioritizing its bottom line, and deliberately ignoring its responsibilities to borrowers, MOHELA, in a few short years, has grown from a small loan servicer to a leviathan in the industry, tripling its servicing portfolio during the COVID-19 pandemic to more than eight million student loan borrowers.  That includes borrowers seeking Public Service Loan Forgiveness ("PSLF"), a program created by Congress in 2007 to provide a path to loan forgiveness for teachers, first responders, and other public servants, as well as those working at nonprofit organizations.  MOHELA's shocking series of abuses, described below, particularly impacts teachers and other public service workers, preventing them from accessing the loan forgiveness Congress promised them almost two decades ago.

4. The sheer scale of MOHELA's wrongdoing is staggering and reaches across the country.  ED announced in October 2023 that "MOHELA failed to meet its basic obligation by failing to send billing statements on time to 2.5 million borrowers."  That same month, MOHELA used the wrong federal guidelines to calculate payments, causing 280,000 borrowers to make excessive payments.  But these well-publicized blunders are merely the tip of the iceberg.

5. MOHELA misleads and misinforms borrowers, fails to process applications for PSLF and income-driven repayment ("IDR") plans in a timely manner or entirely, fails to provide refunds, miscalculates balances, overcharges borrowers, fails to respond to borrower inquiries, and denies borrowers information to which they are entitled.  Borrowers whose loans are serviced by

MOHELA cannot get the savings or forgiveness to which they are entitled, cannot trust the accuracy of MOHELA's statements of how much they have to pay, and cannot get money back from MOHELA that is rightfully theirs. Each of these wrongs impacts thousands or more individuals, their families, and communities—people who are working hard and playing by the rules, but whose financial futures are imperiled by MOHELA's actions.

6. MOHELA's misconduct is not just a matter of incompetence. MOHELA knew exactly the responsibilities it took on as a servicer and willfully disregarded those responsibilities, instead gobbling up more and more of the market even as its incapacity and unwillingness to serve existing borrowers was increasingly apparent. MOHELA's servicing failures are exacerbated by a scheme it designed to inhibit borrowers' ability to access live customer service representatives and instead divert borrowers to inadequate "self-service" phone and website platforms. This scheme results in long call wait times and poor service, leaving borrowers unable to get basic information about their accounts or correct the problems MOHELA causes. Borrowers who manage to connect with live customer service representatives encounter individuals whom MOHELA has failed to train or supervise, resulting in the dissemination of inaccurate, unhelpful, and often damaging information.

7. Individually, any one of MOHELA's failings would be sufficient to cause financial, mental, and emotional distress. Collectively, they result in a Kafkaesque experience that makes it practically impossible for borrowers to correct account errors, make important decisions to protect their economic well-being, or even confirm basic information about their student loans.

8. MOHELA's systemic failures have been ongoing for years, fueled by corporate indifference and prioritizing exponential growth and its own bottom line at the expense of

borrowers on whom America relies to educate our children and keep us well.  MOHELA's abuses must end.

9.      AFT, which represents 1.8 million public school teachers, health care workers, and other public service workers across the country, has expended significantly more resources to fulfill its mission of supporting its members, including their economic stability and dignity, because of the harm MOHELA causes the AFT members.  Under the leadership of AFT President Randi Weingarten, AFT has spent, and continues to spend, tens of thousands of dollars on debt clinics to educate members to better navigate the mess created by MOHELA, and it has diverted thousands of hours of valuable staff time that would otherwise have been spent focused on issues like collective bargaining; retirement security; health care; student learning conditions; and educators', public employees' and health care workers' working conditions.  It has also been forced to contract with an outside vendor to aid members with student debt.  AFT's mission of supporting its members requires it to provide its members with accurate information about the student loan system because of MOHELA's failure to do its job.  In addition, AFT has expended significant resources to investigate MOHELA's egregious behavior so that it can better assist its members, as detailed below.

10.      Even when armed with accurate information, however, AFT's ability to help individual borrowers is often limited to explaining their options.  Action on this advice generally requires borrowers to work through their designated student loan servicer, which for AFT members is often MOHELA.  Due to MOHELA's dysfunction, however, it remains practically impossible for borrowers to fully understand their rights relating to their federal student loans, or to properly manage those loans.

11.    Now, left with no choice, AFT comes to this Court seeking relief from MOHELA's pattern of abuse on behalf of itself, its members, and the general public affected by MOHELA's misconduct.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1442(a)(1).[1]  Plaintiff's claims arise under District of Columbia law, including under the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.* ("DCCPPA"), which provides that "[a] nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District." *Id.* § 28-3905(k)(1)(C).  That the DCCPPA applies to student loan servicing is evidenced, among other things, by the Student Loan Borrower Bill of Rights ("SBOR"), enacted as part of the New Student Loan Borrower Bill of Rights Amendment Act of 2024.  *Id.* § 31-106.02e.

13.    This Court has personal jurisdiction over the parties in this case.  AFT is headquartered in the District of Columbia and, by filing this complaint, consents to this Court having personal jurisdiction over it.

14.    This Court has personal jurisdiction over MOHELA pursuant to D.C. Code § 13-423 because MOHELA has transacted business in the District of Columbia by servicing student borrower accounts nationally, including accounts of student loan borrowers residing in, or attending educational institutions in, the District of Columbia, in its role as a servicer of federally owned loans originated under the Direct Loan program for ED.  Through those acts, MOHELA purposefully directs its conduct to the District of Columbia and avails itself of the benefits and

---

[1] *See* Order Denying Plaintiff's Motion to Remand, Sept. 29, 2025, Dkt. 47.

protections of District of Columbia law.  AFT's claims for relief on behalf of itself, its members, and the general public arise from those acts.  MOHELA also maintains a corporate office in the District of Columbia.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Columbia, and Defendant MOHELA is subject to personal jurisdiction in this District.

## PARTIES

### A.      Plaintiff

16.     AFT is a membership organization representing 1.8 million pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals.

17.     AFT's headquarters is in Washington, D.C., and it has 1.8 million members across all fifty U.S. states, with more than 8,000 who work in the District of Columbia and more than 4,000 who live there.

18.     AFT is a nonprofit organization within the meaning of the DCCPPA because it is an organization that is "neither organized nor operating, in whole or in significant part, for profit." D.C. Code § 28-3901(a)(14)(B).

19.     AFT's purpose is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and communities.  AFT does so by ensuring its members receive fair pay and benefits for their critical work, and by fighting for safe working conditions that also benefit students, patients, and all those who use public services.  Helping children and students is at the core of AFT's mission.  So too is the economic security and dignity of AFT's members and their families.

20.     As part of this work, AFT takes a leading role in fighting for the financial stability of public service, education, and health care workers, particularly when it comes to the increasingly crippling cost of higher education.  For more than a decade, that has included helping members navigate the labyrinthine student loan system and PSLF program.  Though the harms detailed herein are not limited to the PSLF Program, because approximately seventy-five percent of AFT's 1.8 million members work in roles eligible for the PSLF program, AFT has a front row seat to MOHELA's unlawful conduct, particularly as it affects public service workers.

21.     AFT, its mission, and its members are harmed by MOHELA's unlawful actions.

22.     In 2014, AFT started its Student Debt Clinic Program, aimed at helping student loan borrowers navigate an already complicated system.  The debt clinics, which are led by AFT staff and are held in-person and virtually, are designed to educate members about IDR and PSLF programs, address member questions, and educate members about AFT's partnership with Summer, described below, to assist members with their loans.  These clinics are necessary because AFT members do not receive the support and information they need from their assigned loan servicers, including MOHELA, to make informed decisions about their federal student loans.  Even when members do know what steps they would like to take, their efforts are often thwarted by the servicers.

23.     In recent years, the significant expansion of MOHELA's servicing responsibilities, especially in its role administering PSLF, has increasingly hindered AFT's ability to deliver this program to its members.  Widespread servicer errors, misinformation, and administrative failures by MOHELA have created significant borrower distress, driving a surge in requests for clinic assistance and substantially increasing the burden on clinic trainers and staff.  Scaling this program to address spiraling borrower needs places heavy demands on AFT and limits its ability to focus

7

on other core priorities, such as programs to assure the economic stability and dignity of its members, to improve public education, healthcare, and public services, and to champion fairness and economic opportunity.

24.    As of the date of filing, AFT has held more than 1,000 National Student Debt Clinics, reaching more than 30,000 people and costing AFT at least $780,000 in staff time. MOHELA's failures have increased the complexity of borrower support, requiring more time and effort from staff.  AFT is also forced to expend resources to train volunteer members to hold similar debt clinics at their local unions to assist other members in navigating MOHELA's morass.

25.    As part of the Student Debt Clinic Program, AFT provides one-on-one counseling to members in need of assistance with issues concerning their student loans, such as addressing improper charges and clarifying contradictory information provided by servicers, including MOHELA.  AFT also helps borrowers navigate the consolidation, forbearance, and forgiveness processes because servicers like MOHELA routinely misinform borrowers, mishandle accounts, and are often unreachable when borrowers seek help.  AFT's staff connects with borrowers by phone or virtual calls to address these issues.  Since the Program began, AFT has counseled at least 2,400 members one-on-one, often including follow-up assistance, resulting in thousands of individual sessions with members.

26.    AFT has had to contract with Summer, a Certified B Corporation that partners with employers and labor unions to organize and simplify borrowers' student loans.  AFT planned to end its contract with Summer at the end of 2024 but was required to continue the contract because of the challenges to members created primarily by MOHELA's abuses.  Since 2023, the Summer contract has cost AFT a total of $1,600,000 and is slated to continue at least until June 2026.  But

8

for MOHELA's misconduct that affects AFT's members, AFT would likely no longer need to contract with Summer.

27.     The increasing burden created by the Student Debt Clinic Program is not the only deleterious impact on AFT's mission as a result of MOHELA's abuses.  AFT's resources have been and continue to be diverted to address MOHELA's misconduct through investigations and research.  For example, since January 2022, at least 35 AFT employees have dedicated more than 5,000 hours—or more than $1 million in staff time—to responding to MOHELA's misconduct.

28.     AFT has spent thousands more dollars researching and publicizing MOHELA's misdeeds and collecting data from members to understand the depth of harm that MOHELA has wrought.  AFT has held numerous events and produced videos, articles, and reports shining a light on MOHELA's abusive conduct.  AFT has also conducted advocacy campaigns to push for better policies and oversight of MOHELA; engaged in awareness campaigns to inform members of their rights and understand their challenges with MOHELA; and provided support and services to members harmed by MOHELA.

29.     In February 2024, in conjunction with the Student Borrower Protection Center (now known as Protect Borrowers), AFT published a comprehensive report called "The MOHELA Papers" documenting MOHELA's long line of abuses.

30.     In April 2024, AFT spent more than $4,000 to facilitate the congressional testimony of a member about her experiences with MOHELA, including flights, lodging, and additional expenses.

31.     AFT's President, Randi Weingarten, has also devoted her time and attention to advocating for borrowers and directing AFT's work to counteract MOHELA's grievous wrongs. And AFT's mission requires AFT to take these steps on behalf of its members.  But the resources

AFT has expended to combat MOHELA's unlawful behaviors would have been spent advancing its mission to secure economic security and dignity for its members, were it not for MOHELA's widespread malfeasance.

32.    AFT has been frustrated by MOHELA's provision of inaccurate and misleading information to AFT members in AFT's efforts to help members access loan forgiveness and manageable repayment programs through counselling and other educational services, and to ensure the economic stability and dignity of its members.  AFT has had to devote significant resources to identify and counteract MOHELA's provision of false and misleading information.

33.    AFT is unable to assure the economic stability and dignity of its members because of MOHELA's misconduct, which, as detailed herein, includes failing to respond to borrowers' most basic student loan needs and committing grave servicing errors, costing borrowers staggering sums and jeopardizing their financial wellbeing.  AFT is doing all it can to address these needless harms but can only do so much—the ultimate solution must come from changes to MOHELA itself.

### B.    Defendant

34.    Defendant MOHELA is one of the largest student loan servicers in the United States.  MOHELA is headquartered in Missouri, maintains an office in the District of Columbia, and currently employs hundreds of individuals across the country who work remotely in other states, including Pennsylvania, Texas, Florida, Nebraska, and Utah.  MOHELA's current staff consists of 1,277 employees and 2,010 subcontractors, who perform customary loan servicing, administrative, and advisory functions.

35.    MOHELA was established in 1981 pursuant to the Missouri Higher Education Loan Authority Act, Title XI, Chapter 173, Section 173.350 to 173.445 of the Missouri Revised Statutes, inclusive, as amended (the "Authorizing Act"), as "a public instrumentality and body

corporate" and its exercise of the authority granted it was "deemed to be the performance of an essential public function." Mo. Rev. Stat. § 173.360.

36.     MOHELA's initial purpose was "to assure that all eligible postsecondary education students have access to student loans that are guaranteed or insured, or both, and in order to support the efforts of public colleges and universities to create and fund capital projects, and in order to support the Missouri technology corporation's ability to work with colleges and universities in identifying opportunities for commercializing technologies, transferring technologies, and to develop, recruit, and retain entities engaged in innovative technologies." *Id.*

37.     Under its Authorizing Act, MOHELA can sue and be sued in its own name. *Id.* § 173.385.1(3).

38.     MOHELA's assets are not part of the state of Missouri's revenue and cannot be used for the payment of Missouri's debts. *Id.* §§ 173.386, 173.425.  Missouri, in turn, cannot be liable for MOHELA's debts. *Id.* § 173.410.  The vast majority of MOHELA's funds are segregated from state funds and controlled exclusively by MOHELA as a self-sustaining and financially independent entity.  MOHELA can contract with any federal or state agency, including with the state of Missouri. *Id.* § 173.385.

39.     Decades after it was established, MOHELA altered its business model and launched a national student loan service company to service federally owned loans originated under the Direct Loan program for ED.  Its primary mission is to service student borrower accounts nationally.  In addition to servicing Direct Loans and ED-held Federal Family Education Loan Program ("FFELP") loans for ED, MOHELA also services commercial FFELP loans and private student loans.

40.     Pursuant to its contract with ED, as of June 30, 2025, MOHELA services approximately $270.6 billion in Direct Loans and ED-owned FFELP loans representing more than seven million accounts for borrowers across the country.  Since 2011, ED has paid MOHELA over $1.1 billion for the servicing of Department-held loans.

41.     On July 1, 2022, MOHELA became the interim PSLF program federal servicer on behalf of ED.

42.     In April 2023, ED awarded MOHELA a ten-year Unified Servicing and Data Solutions contract.

43.     In January 2024, MOHELA entered into a Binding Letter of Intent to service the Navient-owned and -serviced portfolios.  Navient, a massive loan servicing company that at one time serviced more than six million accounts with loans totaling more than $200 billion, exited its relationship with ED in October 2021 after repeated scandals.  MOHELA agreed to service its remaining FFELP loan and private student loan portfolios.

44.     Although as of July 1, 2024, ED transitioned the administration of the PSLF program from MOHELA to the federal government, the majority of borrowers pursuing PSLF are still serviced by MOHELA and subjected to its ongoing misconduct.  In addition, MOHELA is one of the companies hired by ED for the administration of PSLF.

45.     MOHELA's total operating revenues increased $243.9 million in just one year— from $114.7 million in fiscal year 2022 to $358.6 million in fiscal year 2023.  The primary reason for the increase was an uptick in net servicing fee revenue of $171.7 million due to MOHELA's growth in the number of borrowers serviced, including $68.7 million through PSLF.

46.     In 2023, $295 million of MOHELA's $358.6 million in revenue was "derived from servicing fees for federal loans nationwide."  By FY 2025, MOHELA was bringing in $377 million

in operating revenues, with $313 million from servicing fees.  On information and belief, the vast majority of MOHELA's servicing fees are paid for servicing accounts for borrowers outside of Missouri.

47.    With its radical expansion since 2021, MOHELA's current out-of-state loan servicing business, which obligates it to manage loan accounts for millions of student borrowers across the country, now dwarfs its statutorily mandated work for Missouri residents.

## FACTUAL ALLEGATIONS

### A.    Background on Federal Student Loans

#### 1.    The Rise of Federal Student Loans

48.    In 1965, Congress enacted the Higher Education Act of 1965 ("HEA") to increase access to postsecondary educational opportunities by providing assistance in the form of grants and loans to students to attend colleges and universities.

49.    Over time, the HEA has authorized several different types of federal student loans, including loans issued by private lenders and guaranteed by the federal government.

50.    Since 2010, the federal government's primary student loan program has been the William D. Ford Direct Student Loan Program ("Direct Loan Program").  Through the Direct Loan Program, ED lends directly to borrowers and is the holder of the loans.

51.     Today, forty-five million Americans owe more than $1.8 trillion in student loan debt.  This crisis is years in the making, as the cost of higher education has nearly tripled, even accounting for inflation, since 1980.

52.    All of this unfolds at a time when post-secondary education is front and center.  The unemployment rate for college graduates is about half of what it is for those with only a high school diploma.  And those with college degrees earn almost twice as much per year—in fact, the wage gap between college and high school graduates has never been wider.

13

53.     Americans find themselves trapped: seeking higher education and expanded economic opportunity often entails taking on crushing debt; forgoing higher education leaves narrowed opportunity and diminished earnings.

54.     Too many borrowers cannot afford the burden of their student debt.  Prior to the COVID-19 pandemic, nearly one in four borrowers was behind on their federal student loan payment, and one in five borrowers was in default on their loan.  One million borrowers defaulted on their loans each year.  Today, ED estimates that ten million borrowers, or one in four, are in default.

55.     The student loan crisis is particularly acute for communities of color.  Students of color are more likely than their white peers to require debt, and in higher amounts, in order to afford a post-secondary education.  Borrowers of color also face greater repayment challenges. Black borrowers default at twice the rate of their white peers.  And after twenty years of repayment, the typical Black borrower owes ninety-five percent of their original balance whereas the typical white borrower has paid off ninety-four percent of their original balance.

**2.     Income-Driven Repayment Plans and Public Service Loan Forgiveness**

56.     Federal student loans are generally considered one of the more affordable ways to finance higher education because they offer more flexible repayment terms than private loans.

57.     One subset of repayment plans is known as Income-Driven Repayment ("IDR").

58.     As the name suggests, IDR plans set borrowers' monthly payments based on their annual income, rather than their loan balance.

59.      The four active IDR plans as of this filing are (i) Saving on a Valuable Education ("SAVE") (formerly Revised Pay As You Earn ("REPAYE")); (ii) Pay As You Earn ("PAYE"); (iii) Income-Based Repayment ("IBR"); and (iv) Income-Contingent Repayment ("ICR"). Although each has different requirements, they all follow the same general parameters.

60.    All types of IDR plans establish a borrower's monthly payment by, first, determining a borrower's "discretionary income" as income that exceeds a certain percentage of the federal poverty line and, second, setting monthly payments as a percentage of that discretionary income, divided by twelve.  For SAVE (addressed further below), discretionary income is the difference between the borrower's income and 225% of the poverty line accounting for the borrower's family size and state of residence.

61.    Another key feature of IDR plans is that they provide for the discharge of any remaining loan balance after twenty or twenty-five years of payment, with the timeframe for discharge depending on the plan and on whether the loans were taken out for undergraduate or graduate education.

62.    For many borrowers, IDR plans result in monthly payments that do not cover all of the interest that accrues on their loan each month.  This results in negative amortization, where account balances increase over time due to unpaid interest, even though borrowers are in good standing on their loans and making regular payments.  That means that, after timely paying every month for years, a borrower could still owe more than they borrowed.

63.    The IDR plans' debt cancellation feature serves as a release valve by allowing for cancellation of all outstanding debt at the end of a certain term, regardless of outstanding principal or interest.  This debt cancellation feature is critical to ensuring that borrowers, especially low- and middle-income borrowers, are not stuck in a government-sponsored debt trap for their entire lives.

64.    All IDR plans require borrowers to annually recertify their income and family size, among other things, so that their income-based payments can be adjusted each year.  Failure to

15

recertify in a timely manner can result in borrowers being dropped from their IDR plan and their loan payments increasing.

65.    Borrowers need not wait for their annual deadline to recertify their incomes; if their income changes—for example, decreases due to job loss or a switch to part-time employment—they can recertify at that time.  However, they are not *required* to recertify until the annual deadline, and a borrower whose income changes soon after they have recertified can keep their payment based on their old income and is not required to recertify again until the next deadline. The purpose of this is to avoid payment shock for borrowers, and to ensure they have consistency and predictability in their monthly payment obligations; borrowers who receive a mid-year pay bump will not immediately see the increased wage siphoned off to loan payments.

66.    The IDR plans are critical for many borrowers, not just because they offer lower payments and debt cancellation after twenty or twenty-five years, but also because they are qualifying repayment plans for borrowers seeking debt cancellation through PSLF.  Under the PSLF program, borrowers who work in qualifying public service jobs and who make payments through certain repayment plans are entitled to have the remainder of their federal student loan debt canceled after 120 such monthly payments.  In other words, payments made by public service workers on IDR plans count toward PSLF.

67.    Qualifying employers include U.S.-based government organizations at any level (federal, state, local, and tribal), meaning that public school teachers, first responders, public health workers and members of the U.S. military all qualify for PSLF.  501(c)(3) non-profit organizations are also qualifying employers.

### 3.    ED Hires Student Loan Servicers to Handle Day-to-Day Operations

68.    The federal government does not administer the student loan system's day-to-day activities itself.

69.     Student loan servicers perform a wide array of tasks, such as sending monthly bills, receiving and processing monthly payments, and providing customer service.  They also receive and process applications for repayment plans and loan discharge programs, such as IDR and PSLF. In the case of IDR, student loan servicers apply program parameters and payment formulas set by Congress and by ED in order to determine borrowers' eligibility for an IDR plan and to calculate the monthly payment based on income and family size.

70.     Student loan servicers are borrowers' primary, and often only, official points of contact regarding their federal student loans.

### 4.     MOHELA's Responsibilities

71.     As a student loan servicer, MOHELA has had and/or continues to have several essential responsibilities.  These include:

a.     Being an accessible point of contact, by telephone, email, and through its web portal, for borrowers seeking answers and information about their accounts, including how to apply for programs that they are eligible for; how to make payments; the amount of their payments; and other information to ensure that they remain current and in good standing on their accounts.

b.     Providing accurate and meaningful information to borrowers about available programs and their implications, through access to knowledgeable customer service representatives and information available in mailings and on its website.

c.     Sending timely billing statements.

d.     Correctly calculating payment amounts.

e.     Maintaining the correct repayment and forbearance status for borrowers.

f.     Automatically transferring borrowers in the REPAYE program to the SAVE plan and properly calculating their payments, and moving those borrowers to a special litigation forbearance once SAVE was challenged.

g.     Accurately tracking payments toward PSLF forgiveness.

h.     Accurately advising borrowers of IDR recertification dates.

17

i.    Timely and accurately processing applications and requests for new and existing programs, including SAVE and the refund program available during the COVID-19 Payment Pause, during which federal student loan payments and collections were paused and interest rates were reduced to zero percent ("Payment Pause").

72.    Borrower experiences in recent years during the Payment Pause, and particularly since it ended on September 1, 2023, have made clear that MOHELA is unable to fulfill its responsibilities as a student loan servicer. Its behavior is egregious even in an industry known for poor servicing at borrowers' expense.

73.    Even during the Payment Pause, when there were relatively fewer accounts that required proactive monthly servicing, MOHELA struggled to meet borrowers' needs. Its failures ran the gamut from being inaccessible, to providing inaccurate information, to making significant errors affecting borrowers' lives in the District of Columbia and across the country.

74.    Tragically for the millions of borrowers whose loans MOHELA services, its systemic failure to live up to its responsibilities and the resulting harm to borrowers continues today. Countless borrowers still cannot access their accounts, get ahold of MOHELA customer service representatives, receive the benefits of loan forgiveness, or recoup excessive payments they were forced to make, all because of MOHELA's mismanagement.

**5.    MOHELA's Student Loan Servicing Portfolio Explodes**

75.    In 2020 and 2021, several student loan servicers chose not to renew their contracts with ED to service the federally held student loan portfolio.

76.    In total, approximately sixteen million borrower accounts, representing about one-third of the borrower population, had to be transferred from one of the departing servicers to some other company or entity.

77.     ED faced a particularly critical void because one of these departing servicers, the Pennsylvania Higher Education Assistance Agency ("PHEAA"), had been the exclusive student loan servicer for borrowers seeking PSLF.

78.     PSLF-eligible borrowers saw regulatory improvements and a special one-time waiver of certain eligibility requirements for PSLF beginning in 2021 ("Limited PSLF Waiver"), shortly before PHEAA's departure.  As a result, hundreds of thousands of public service workers who previously were deemed ineligible for PSLF finally reaped the benefit of Congress's promise of debt forgiveness.

79.     The regulatory improvements to PSLF, which removed barriers that had previously prevented qualified applicants from seeking PSLF, resulted in an enormous influx of PSLF applications.  Those applications triggered the transfer of the applicants' accounts to PHEAA for servicing.  As the PSLF portfolio ballooned, millions of borrowers' accounts needed a new servicer upon PHEAA's exit.

80.     In 2022, MOHELA successfully sought to become the new exclusive PSLF servicer and took over both the related loan servicing and program administration responsibilities.  That was in addition to MOHELA's existing responsibilities as a federal student loan servicer.

81.     As a result of these loan transfers, MOHELA's portfolio more than tripled in less than three years, growing from 2.5 million borrowers in February 2020 to 8.4 million by the fall of 2023.

82.     Given its long involvement in the student loan system, MOHELA knew or should have known the enormity of the task that it was taking on.  As detailed below, however, it quickly became apparent that MOHELA was not up to the task.

83.    Upon information and belief, MOHELA conducted its own analysis, in dialogue with ED, about the costs it would incur to comply with its obligations and negotiated a compensation package to cover the investments required to meet its new responsibilities.

84.    Upon information and belief, the compensation package covered $159.7 million, or a 134% increase, in total general and administrative expenses, due in significant part to the tremendous growth of MOHELA's student loan portfolio.

85.    Upon information and belief, ED did not guarantee MOHELA a profit.  However, even with the funds it received to service its expanded portfolio, the company was unable or unwilling to invest in ensuring adequate customer service for borrowers.

86.    ED subsequently ended the practice of having a single dedicated PSLF servicer and currently distributes PSLF processing responsibilities across several contractors, including MOHELA.  But, as a result of having been the dedicated servicer for a time, MOHELA's portfolio disproportionately includes public service workers.

**6.    COVID-19: Student Loan Payment Pause, Limited PSLF Waiver, IDR Account Adjustment & Waiver of IDR Recertification**

87.    MOHELA's responsibilities expanded from servicing only a relatively small portion of the federal student loan portfolio to playing a central role in the student loan system at the same time that the system experienced an unprecedented pause.  This initially allowed MOHELA to shield from public view its incapacity and unwillingness to adequately do the job.

88.    In March 2020, the world was thrust into a total shutdown due to the COVID-19 pandemic.  Millions were left without jobs and unable to pay for basic necessities, let alone student loan bills.

89.    In response, Congress passed and President Trump signed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in March 2020, which, among other things,

paused federal student loan payments and collections and reduced interest rates to zero percent, resulting in the Payment Pause. So as to not deprive borrowers of credit toward loan cancellation through either IDR or PSLF, each paused month counted as a qualifying payment toward these programs.

90.     The Payment Pause was intended to afford borrowers some relief during the economic uncertainty caused by the pandemic and was extended several times by both the Trump administration and, after January 2021, the Biden administration.

91.     The Payment Pause applied only to federal student loans that were held by ED.

92.     During this period, borrowers could choose to make payments but were not required to do so.

93.     Any borrowers who did make voluntary payments were eligible for refunds of those payments as long as the refund request was made before the Payment Pause ended. ED instructed borrowers to contact their student loan servicer to request a refund.

94.     During the Payment Pause, although the vast majority of federal student loan borrowers' accounts required minimal servicing, MOHELA and the other servicers were still required to manage these accounts and to field questions from borrowers.

95.     Even without monthly bills, borrowers needed assistance with their student loans, and reasonably turned to their servicers, like MOHELA, for help. In MOHELA, they found virtually no assistance.

96.     In addition to seeking general clarification about their accounts, many borrowers sought assistance to take advantage of two specific opportunities that arose during the Payment Pause.

97.     First, in October 2021, ED announced the Limited PSLF Waiver, referenced above.

98.     Second, in April 2022, ED announced the IDR Account Adjustment.  Similar to the Limited PSLF Waiver, this opportunity gave student loan borrowers credit toward cancellation under IDR for certain periods of previously ineligible time, such as time spent on another repayment plan or in long periods of forbearance.  The Account Adjustment, like the Limited PSLF Waiver, would result in some borrowers' loans being cancelled and other borrowers moving closer to cancellation.  For borrowers working in public service, credit under the IDR Account Adjustment would count toward PSLF.

99.     Both these opportunities required borrowers with federal student loans outside the Direct Loan Program to convert those loans into Direct Loan Program loans through a process called consolidation.  Even for borrowers within the Direct Loan Program (who were already eligible for both opportunities), consolidation could maximize the benefits they could receive.  Both opportunities, however, had deadlines by which borrowers had to consolidate in order to benefit.

100.    Although the process of consolidating is simple, understanding these two opportunities and determining whether consolidation was necessary or advantageous is not.  Borrowers therefore reasonably sought assistance from their loan servicers, including MOHELA, to take advantage of the Limited PSLF Waiver and IDR Account Adjustment.

101.    Despite the relatively low demands on servicers during the Payment Pause, borrowers seeking assistance from MOHELA experienced excessive call wait times and an inability to reach customer service representatives.

102.    In May 2023, it was announced that the Payment Pause would officially end on September 1, 2023, at which point interest would begin to accrue again, with payments to be due the following month.

22

103.    For many borrowers, especially those who graduated during the Payment Pause, this transition ("Return to Repayment") marked the first time they had to make a payment on their student loans.

104.    The federal government informed borrowers that, unless they proactively changed their repayment plan at some point, borrowers would be returned to the same plan and monthly payment amount that were in place when the Payment Pause began in March 2020.

105.    During the Payment Pause, borrowers who were enrolled in IDR, which generally requires annual recertification, were not required to recertify their income and family size.  As Return to Repayment approached, ED clarified that no borrower would have to recertify for IDR until March 2024.  In effect, this meant that IDR borrowers could maintain payments based on their 2019 or 2020 incomes until March 2024.  Borrowers' 2019 or 2020 incomes were generally likely to be lower as compared to their 2024 incomes, given post-pandemic inflation and a stronger job market.

106.    In March 2024, ED extended the IDR recertification date to September 2024 and announced that any borrower who had recertified in anticipation of the March deadline would have their payment reverted to his or her prior IDR amount.

107.    Upon information and belief, ED communicated these deadlines to its student loan servicers, so that the servicers could both abide by the correct deadlines and accurately advise inquiring borrowers about their loans.

### 7.    The SAVE Plan

108.    At the same time borrowers were preparing to resume payments, a new repayment plan became available, known as the "SAVE" plan.

109.    Under the SAVE plan, a qualifying borrower's discretionary income is any income above 225% of the federal poverty line, up from 150% under REPAYE, and monthly payments

are set to ten percent of discretionary income, divided by twelve. For borrowers with only undergraduate debt, payments are calculated as five percent of discretionary income. For borrowers with a mix of undergraduate and graduate debt, the percentage of discretionary income is a weighted average between five and ten percent, proportional to the borrower's undergraduate versus graduate debt.

110. Under the new SAVE plan, any interest that is not covered by the calculated monthly payment will be waived by the government. That provision is meant to end the negative amortization described above. This benefit only applies to monthly interest that accrues while enrolled in SAVE and is not retroactive.

111. Any Direct Loan, including a Direct Consolidation Loan, is eligible for SAVE, except for Parent PLUS Loans, a type of Direct Loan taken out to finance a dependent child's education. Direct Consolidation Loans used to consolidate a Parent PLUS Loan are also ineligible for SAVE.

112. For most borrowers, the SAVE plan was the most affordable payment plan available. As such, enrolling in this plan could be life changing.

113. Despite this, and after millions of borrowers had enrolled in the new plan, a group of states sued to challenge SAVE's legality. In June 2024, a federal court enjoined components of the plan. In response, ED placed all borrowers enrolled in SAVE or with a pending application into a special forbearance and reduced their interest rate to zero while the litigation continued. ED ultimately reversed course and in August 2025 began to charge interest on loans in the SAVE forbearance, although the litigation was still pending.

114. Although payments made under the SAVE plan count toward PSLF, time in the litigation forbearance does not. However, borrowers can recuperate this time through ED's PSLF

Buyback option, which allows borrowers to count past deferment or forbearance time toward PSLF by making payments that are equivalent to what their IDR payment would have been at that point in time.

115.    On December 9, 2025, the parties in the SAVE plan litigation filed a joint proposed settlement order with the district court, pursuant to which ED's 2023 rule promulgating SAVE would be vacated.  If granted, this settlement will end the SAVE plan and require all borrowers enrolled in SAVE or with pending SAVE applications to apply to another plan.

### 8.    The One Big Beautiful Bill Act

116.    On July 4, 2025, President Trump signed the One Big Beautiful Bill Act ("OBBBA").  The law, among other things, fundamentally alters the federal student loan landscape.  It phases out the majority of existing repayment plans by July 1, 2028, replacing them with only two repayment options:  a new Standard plan and a new IDR plan, the Repayment Assistance Plan ("RAP").  However, current borrowers who do not take out any new loans after June 30, 2026, and are enrolled in the IBR plan will be able to remain enrolled in IBR and the older non-IDR plans after July 1, 2028.

117.    The law includes several important deadlines for current borrowers.  Failing to take action by these deadlines, or taking the wrong action, could permanently bar them from the legacy repayment options, leaving only the new Standard and RAP plans, which for many borrowers will result in higher monthly payments.

118.    Although the OBBBA does not make any immediate changes to borrowers' options, the upcoming changes only heighten borrowers' need for accessible and accurate information about their loans.

B.     **MOHELA Grossly Mishandles Its Loan Servicing Responsibilities**

1.     **MOHELA Fails to Bill Some Borrowers and Inaccurately Bills Others**

119.   MOHELA's servicing failures extend to even the most basic servicing functions. With payments due starting October 1, 2023, following the end of the Payment Pause, borrowers should have received bills at least twenty-one days in advance of their payment due date. However, millions of borrowers never received a timely bill, resulting in missed payments and unintentional delinquency, while others received inaccurate bills, resulting in improper payments.

120.   On October 30, 2023, just thirty days after the first borrower payments were due, ED announced that MOHELA had "failed to meet its basic obligation by failing to send billing statements on time to 2.5 million borrowers" and that, as a result, over 800,000 borrowers were delinquent on their loans.

121.   ED explained that MOHELA had also billed some borrowers for an incorrect amount and put other borrowers back into repayment who should have been in forbearance while debt relief applications were pending.

122.   ED announced it would withhold $7.2 million in payments to MOHELA as a result of the company's servicing errors.

123.   This penalty did not help the millions of borrowers whose loans MOHELA improperly serviced.

124.   Instead, affected borrowers' accounts were placed into administrative forbearance while MOHELA took corrective action. This came as a surprise to many borrowers and occurred without any meaningful explanation from MOHELA as to why borrowers were no longer being billed.

125.    Other borrowers remained in repayment but believed that their bills contained errors and struggled to reach knowledgeable MOHELA representatives who could resolve their concerns.

126.    This resulted in a frustrating scenario in which some borrowers who wished to make payments on their loans were stuck in forbearance, while others who wished to stop payments while their accounts were reviewed could not get the help they so badly needed.  Some borrowers who received an accurate bill and made complete payments even found that their payments were misallocated across their various loans.

127.    Of borrowers who were billed, some borrowers' payments were made automatically via debit from their bank accounts.  When borrowers receive incorrect bills, this results in incorrect amounts being withdrawn from their bank accounts.

128.    For some borrowers, these automatic payments were unexpected, as they had never authorized MOHELA to debit their bank account.  In the lead-up to payments resuming, ED had instructed that for borrowers to utilize auto-pay, they would have to opt in and reauthorize the government and its servicers to debit their bank accounts, even if they had been enrolled in auto-pay before the Payment Pause.  Despite this instruction, some borrowers who had not opted back into auto-pay had their bank accounts debited by MOHELA to pay their student loans.  By contrast, some borrowers seeking to enroll in auto-pay report that their applications are not being processed, approved, or denied, despite multiple attempts.

129.    For borrowers who do make payments, some experience funds being debited from their bank accounts without a corresponding credit against their loans or that were otherwise not accounted for.  For one borrower who contacted AFT for help, Maria G., a mental health therapist

27

in California, this resulted in MOHELA sending her late notices for payments that she had made. As Maria put it:

> This uncertainty makes it impossible to know whether I should continue making payments because if the payments aren't being credited, I risk falling behind and incurring more interest. Yet, if I stop paying, I could face penalties. The whole situation is frustrating and taking a toll on my mental health.

130. In the months since payments resumed, MOHELA has also sent borrowers phantom statements—bills when no actual payment is due. MOHELA has also sent borrowers enrolled in an IDR plan unsolicited notices of what their monthly payments will be once their current IDR certification period ends, which for virtually all borrowers is a significant increase over their current responsibilities. Nowhere within the notices does MOHELA indicate that these large future payments can be avoided merely by recertifying for IDR at the appropriate time.

### 2. MOHELA Fails to Accurately and Timely Process Important Borrower IDR, PSLF, and Refund Applications

131. In addition to mishandling Return to Repayment, MOHELA mishandled—and continues to mishandle—borrowers' IDR applications.

132. Since repayment has resumed, borrowers have had to navigate: the introduction of a new IDR plan; the subsequent court challenge and injunction of that plan; the proposed vacatur of that plan; and the enactment of the OBBBA. These dizzying changes were layered on top of an already mystifying system.

133. Many borrowers seeking clarity or assistance found themselves thrown into MOHELA's frustrating call center wait times or were referred to inadequate online resources. When borrowers did speak with a representative, they were unable to get answers to basic questions. These issues persist.

134.    At the same time, many borrowers who requested refunds of voluntary payments made during the Payment Pause are still waiting for these refunds to be processed months later.

135.    In some instances, MOHELA even increased borrower account balances as if the payments were refunded, even when the borrower had not received any refund check.

136.    Since contacting MOHELA representatives is practically impossible and, for those who do make contact, is often useless, these borrowers with increased balances but no refunds are left with no options to remedy this situation.

137.    For example, Chelsey H., a single mother of two, is an AFT member whose federal student loans are serviced by MOHELA.  In the fall of 2023, when Chelsey was entitled to a $0 monthly payment because MOHELA failed to provide her with a timely billing statement, MOHELA continued to collect payments via auto-debit in October, November, and December 2023 to the tune of $1,200.  MOHELA promised a refund.  As of January 2026, Chelsey has yet to receive a cent in refunds.  Chelsey ultimately gave up on contacting MOHELA because of the exorbitant wait times.

138.    Likewise, Samuel L. is a D.C. borrower who made a payment under PAYE during the Payment Pause that amounted to over $900.  Although MOHELA acknowledged that Samuel was entitled to a refund, Samuel has yet to receive anything.

139.    Mathew S., an AFT member in New Jersey, is enrolled in an IDR plan but suddenly faced higher monthly payments because MOHELA accidentally counted a paystub twice, incorrectly calculating that he had a higher income than he does.  He spent hours on the phone with MOHELA attempting to correct his payment calculation.  MOHELA said it would place his loans into forbearance while the issue was resolved but failed to do so initially.  This mistake

results in not only unaffordable payments but also delays and lost credit toward PSLF cancellation for the time Mathew is placed in forbearance.

140. MOHELA's record on PSLF was just as egregious.

141. At the time that MOHELA was the dedicated student loan servicer for PSLF, it had over one million outstanding PSLF applications, a 1,000 percent increase compared to before MOHELA took over the portfolio. As a result of these delays, which persist, public service workers who are eligible for debt cancellation are forced to continue making payments beyond the statutory threshold for debt cancellation while they wait for their applications to be processed, rather than run the risk of defaulting on their loans. This results in overpayment.

142. One borrower, Ellen G., a former teacher from Massachusetts, asked AFT for help because her PSLF Buyback application had been pending for over four months. While waiting for her PSLF Buyback application to be processed, Ellen was informed that she was going to obtain PSLF, causing further confusion about how and when she would ultimately receive forgiveness. Once approved, her loans would be discharged, which would "mean having the funds to start a family, finance a safe and reliable vehicle, and actually begin living." Ellen is still waiting for her loans to be discharged, even after being informed that she qualifies.

143. Borrowers who achieve debt cancellation due to PSLF or IDR are also eligible for refunds in some instances, such as when their debt relief was delayed and as a result they made unnecessary payments. Here, too, many borrowers await the refunds they are owed.

144. For its part, MOHELA received payment from the federal government for each processed PSLF application—including when MOHELA must reprocess applications after a wrongful denial.

145.    Finally, for many borrowers who applied to enter the SAVE plan, MOHELA delayed processing these applications.  While borrowers' applications were being processed, their loans would continue to accrue interest, whereas once enrolled in SAVE they would benefit from the plan's interest waiver for any interest remaining after their payment.  For low-income borrowers, this could mean waiver of their entire monthly accrued interest.  Any delay in processing SAVE applications therefore resulted in borrowers accruing interest that they otherwise would not have owed were they enrolled in the SAVE plan in a timely manner.

### 3.    MOHELA Actively Misleads Borrowers and Withholds Information from Borrowers

146.    In addition to inaccurately billing borrowers as described above, MOHELA has routinely provided, and continues to provide, inaccurate information about a variety of issues to borrowers.

147.    MOHELA knows or should know what programs and policies are in effect. However, it fails to train its employees, provide them with accurate call scripts, or even simply to respond to inquiries in a manner that could meet borrowers' needs.

148.    For example, even once borrowers were enrolled in SAVE, MOHELA improperly instructed borrowers to recertify their income and family size well in advance of the deadline to do so.

149.    Under clear ED guidelines, no borrower should have had to recertify for an IDR plan prior to March 2024, and federal regulations prohibit servicers from sending recertification notices more than ninety days before the recertification deadline.

150.    However, as early as July 2023 and into December 2023, MOHELA instructed borrowers enrolled in an IDR plan to recertify their income and family size—often resulting in

higher payments for borrowers. MOHELA did this both by sending borrowers written notices instructing them to recertify and by orally advising borrowers who called for assistance to do so.

151. As a result of MOHELA's improper instruction, borrowers recertified earlier than required. Many borrowers' payments increased well before they should have, and MOHELA then collected these amounts during months when payments should have been lower.

152. MOHELA's misinformation does not stop there.

153. For example, on or around August 2, 2023, one borrower asked MOHELA whether consolidating her Direct Loans would result in losing her existing PSLF credit. In a written message, a customer service representative responded that, "if you consolidate [your loans] you will lose all PSLF qualifying payments that you currently have." Due to the IDR Account Adjustment, this was inaccurate.



154.    Inaccuracies such as these—misinforming borrowers that consolidating would result in them losing all of their PSLF qualifying payments—have the foreseeable result of dissuading borrowers from taking advantage of loan relief opportunities.  During the IDR Account Adjustment, for example, a borrower with existing PSLF credit who consolidated would not lose that credit, and through the Adjustment could potentially gain additional credit, thereby reaching loan forgiveness on a faster timeline.  If a borrower abided by MOHELA's inaccurate information, they would have missed this opportunity and would remain indebted for longer than was necessary.

155.    In late 2024 and into 2025, MOHELA inaccurately informed one borrower who reached out to AFT for help, Sarah R., that while her loans were in forbearance she should make manual payments to avoid delinquency.  MOHELA further incorrectly informed her that these voluntary payments would count toward PSLF.  When she was finally informed that these payments would not count toward PSLF, she requested a refund in April 2025.  After several months she asked for an update on her refund request, and in October 2025 MOHELA denied receiving the initial request.  Sarah requested a refund again in November 2025.  She is still waiting for a refund to be issued.  Further complicating issues, MOHELA's online portal does not retain Sarah's messages.  She therefore must rely on her email correspondence to document her interactions with her servicer, which is an incomplete picture.

156.    In addition to failing to appropriately respond to borrower inquiries, MOHELA also jeopardized government efforts to help borrowers qualify for debt relief, including by failing to cooperate with the State of California's efforts to identify borrowers for outreach to maximize participation in the IDR Account Adjustment.

157.    The Consumer Financial Protection Bureau ("CFPB") complaint database clearly illustrates MOHELA's poor servicing.  Consumers filed only 359 complaints about MOHELA's

federal student loan serving between 2011 and 2022, whereas from 2022, when its portfolio exploded, to present, consumers have filed *more than 15,000* such complaints. Over half of those complaints—9,053—were filed after Plaintiff originally initiated this action in July 2024.

> **4.    MOHELA Systematically and Knowingly Subjects Borrowers to Dropped Calls, Hours-Long Holds, Uninformed Representatives, and Inaccurate Online Content**

158.    MOHELA makes it practically impossible for borrowers to get help with their loans. Instead of adequately staffing and appropriately training customer service representatives, MOHELA affirmatively took steps to make it harder for borrowers to receive help.

159.    Borrowers' desires to speak with customer service representatives to clarify their individual circumstances became more acute as the Payment Pause concluded. For some borrowers, this would mark their first experience with loan repayment. For others, they hoped pending debt cancellation applications would be approved quickly and that they would not have to resume payments at all.

160.    Despite this great and foreseeable need for customer assistance, in the months leading up to Return to Payment, borrowers reported hours-long wait times to speak with MOHELA customer service representatives.

161.    Borrowers' virtual inability to reach customer service representatives or to otherwise obtain assistance is a feature, not a bug, of MOHELA's business model. This phenomenon is the result of business decisions the company made to engage in "call deflection," rather than the required customer service.

162.    "Call deflection" is the practice of diverting callers to MOHELA's website, ED's website, or other self-service features, rather than connecting callers with a live customer service representative, which allows the company to maintain lower staffing levels than would otherwise

be necessary to meet borrowers' needs.  This strategy is laid out in MOHELA's internal Return to Repayment "Playbook."

163.    Although online and self-service options may be adequate for some borrowers or actions, they cannot meet all borrowers' needs.

164.    Further, many of the resources to which MOHELA deflects callers are incomplete or inoperable.  For example, between November 15, 2023, and December 12, 2023, the company's website warned borrowers that "you may be experiencing issues while logging in."



165.    MOHELA knew that not all of its online features were up-to-date or available.

166.    This is especially frustrating for borrowers because in its written notices, MOHELA represents that borrowers can contact it for assistance.  For example, in one of its notices to a borrower that her account was placed into administrative forbearance, MOHELA advertised its services by stating:  "Difficulty Making Payments?  We can help.  Student loan counselors are available to discuss your repayment options including:  Income-driven repayment plans, other repayment plans and schedules, [and] availability of consolidation, deferment, or forbearance."

Borrowers' experiences, however, make clear that MOHELA's loan counselors are not, in fact, available to help.

167.    During the period when borrowers sought to take advantage of the Limited PSLF Waiver and IDR Account Adjustment, borrowers were practically unable to contact MOHELA customer service representatives due to unreasonable call wait times and dropped calls.

168.    These unreasonably long wait times have been well publicized by news media and by individual borrowers sharing their stories online.  One borrower shared his experience of calling MOHELA three times and experiencing call wait times of 144 minutes, 149 minutes, and fifty minutes, respectively.

169.    Borrowers' experiences with wait times and dropped calls are also reflected in ED's own data and reporting.  According to ED's Loan Servicer Performance for the last quarter of 2024, MOHELA's "Average Speed to Answer" and "Average Call Abandonment Rate" metrics are considerably worse than the other federal student loan servicers.



**FIGURE 2    Average Speed to Answer by Servicer**

Aidvantage — 00:13
CRI — 00:16
EDFINANCIAL — 01:57
MOHELA — 0:13:28
NELNET — 00:17

Speed to Answer (minutes seconds)

Speed to answer is measured beginning when the customer selects the option to speak to a representative during the interactive voice response prompt.



FIGURE 3    Average Abandon Rate by Servicer

Abandon rate is defined as the percentage of borrowers who ask to speak with a customer service representative but hang up before being connected with a representative.

170.    Although student loan servicers, including MOHELA, also offer electronic messaging platforms, borrowers fared no better there.  On X, formerly known as Twitter, one borrower shared that, after sending a written message, MOHELA replied that it would respond within three days, but that he was still waiting for a reply three *weeks* later.

171.    Similarly, from November 2022 to March 2023, AFT member and retired community college professor Kathleen W. called and emailed MOHELA thirty times without receiving any information and, as a result, made unnecessary payments that later had to be refunded.

172.    Borrowers who did reach a customer service representative reported that these MOHELA employees lacked knowledge of the Waiver and/or Adjustment opportunities, seemed unfamiliar with the student loan system, and generally could not answer borrowers' questions.

173. Once Return to Repayment began, MOHELA's servicing errors and the resulting harms to consumers became even more stark.

174. The simple task of confirming what a borrower's monthly payment amount would be, once payments resumed, turned into an hours-long ordeal. For those borrowers who could not afford to spend hours on hold, they were left without accurate information, leading to unnecessary payments and an inability to access programs that would have reduced the accrual of interest.

175. As outlined above, MOHELA's willful and continuing failure to allow borrowers access to properly trained customer service representatives has real-world consequences for borrowers.

### 5. MOHELA Blocks Borrowers' Access to Account Information

176. In 2024, MOHELA further inhibited borrowers' ability to get help or even to self-service their accounts by discontinuing its mobile app, which many borrowers used to make payments and manage their accounts. By removing this resource, MOHELA has required more borrowers to call for assistance, diverting them into its call deflection pipeline.

177. Shortly after discontinuing its mobile app, MOHELA announced that it was internally transitioning its borrower accounts from one servicing platform to another servicing platform. This transition would not transfer accounts to another servicer, and instead would be internal to MOHELA.

178. While an individual borrower's account is being transitioned to the new platform, which is occurring on a rolling basis, MOHELA blocks all access to that borrower's records via its website for approximately two weeks.

179. Even after access is restored on the new platform, borrowers report that they cannot access historical documents and that, going forward, they can only access documents from the date of the platform transfer onward.

**6.    The Need for Access to Records and Clear Communication Increases—While MOHELA Continues to Fail Borrowers**

180.    Despite widespread attention to MOHELA's servicing failures and calls for the company to improve or be held accountable, its failure to adequately communicate with borrowers has continued.

181.    At the same time, major changes are occurring that have increased borrower confusion and the need for individualized assistance.

182.    First, on April 29, 2024, ED announced that it would transfer over one million borrower accounts away from MOHELA to other student loan servicers.  ED explained that MOHELA requested the transfer and that the transfer was being done to "ensure borrowers receive the best service and support[.]"

183.    Second, ED announced that, beginning May 1, 2024, the administration of the PSLF program would transition away from MOHELA, as the exclusive servicer, to a group of federal contractors, including MOHELA.  As part of the transition, ED would pause PSLF processing for three months.  MOHELA announced that, during this time, borrowers would not be able to access their PSLF records on their MOHELA accounts.

184.    Third, the legal challenge against the SAVE plan, subsequent injunction and administrative forbearance, and eventual proposed vacatur means that millions of borrowers' loan statuses have changed and will continue to change.  These changes involve a complicated combination of judicial intervention and executive branch policy that is difficult for borrowers to follow, necessitating more reliance on their assigned student loan servicers like MOHELA. Borrowers have needed to decide when to leave the SAVE plan and which alternative repayment plan to select—critical, fact-specific decisions with significant financial impacts.

39

185.    Fourth, in February 2025, ED stopped processing IDR and PSLF applications, which meant that enrolled borrowers could not switch plans and unenrolled borrowers could not enroll.  This action was challenged in court, and ED ultimately resumed processing IDR and PSLF applications and cancelling eligible loans under both plans.  But it caused significant confusion about the state of borrowers' applications.

186.    Fifth, when the OBBBA was enacted, borrowers suddenly had to grapple with deadlines over a three-year period that would dictate which repayment plans they would be able to access.

187.    These deadlines occurred in swift succession, and the first three were made around the same time that MOHELA announced its servicing platform transition.

188.    Because each of these changes involved a transfer or transition of some kind, they caused confusion for many borrowers.

189.    MOHELA's use of call deflection has made this confusion worse.

190.    Borrowers have attempted to contact MOHELA but have been met with the same unreasonably long call wait times described above.

191.    Others have sought information online but cannot access their account or a clear and concise explanation.

192.    Borrowers who received notices about one of these actions cannot determine whether MOHELA will remain their student loan servicer.

193.    MOHELA's call deflection, understaffing, and poor training make it practically impossible for borrowers to speak with a live customer service representative who can give an individualized and accurate explanation of what is occurring.

194. MOHELA's time as the dedicated PSLF servicer and its decision to proactively grow its portfolio distinguish it from the rest of ED's contractors. And PSLF-eligible borrowers are particularly impacted by MOHELA's unlawful behavior.

195. For example, Walter S. is an AFT member whose federal student loans are serviced by MOHELA. He has worked in the Detroit Public Schools Community District since 2012. MOHELA refuses to process his loan forgiveness under PSLF, falsely claiming he has not verified years of public service employment. Despite Walter's contacting MOHELA numerous times and mailing in the required documents, the student loan servicer will not process his debt cancellation or even provide him with an accurate count of qualifying payments, instead demanding thirty-eight additional months of payments. Walter is still awaiting loan forgiveness despite records showing 246 payments because—despite having maintained qualifying employment throughout the repayment period—MOHELA has, incorrectly, counted only 82 payments as "qualifying" (120 are needed to qualify). While he waits, his credit score is negatively impacted, and he lives with the stress of remaining loans that should be eligible for forgiveness.

### 7.  MOHELA Knows or Should Know That Its Business Operations Are Unfair and Deceptive

196. MOHELA's misconduct is the predictable result of MOHELA's own business decision to actively pursue and obtain a massive, complex student loan servicing contract worth tens of millions of dollars while implementing operational cost cutting measures such as reduced staff. Rather than ensuring student loan borrowers could successfully return to repayment after the COVID pandemic, MOHELA has derailed and continues to derail borrowers, undermining their long-term financial success and violating their legal rights.

197. MOHELA knows or should know that its operations are inadequate and result in the systematic mishandling of borrowers' student loan accounts across the country.

41

198.    For example, according to the CFPB's consumer complaint database, between January 1, 2023, at which point the account transfer from PHEAA to MOHELA was complete, and December 31, 2025, consumers filed 39,048 complaints about federal student loans. Of those complaints, *nearly half* (16,009) were made against MOHELA. That is twice as many as the next most complained-about servicer, Nelnet, which received 8,058 complaints during the same timeframe. And that is despite the fact that, according to June 2025 data published by ED, MOHELA's portfolio is only about *half the size* of Nelnet's portfolio, at more than 6.5 million accounts compared to Nelnet's 13.7 million accounts. The disproportionate number of consumer complaints makes it all too clear that MOHELA's dysfunction and poor customer service is out of step even with ED's other contracted student loan servicers. MOHELA may contend that the whole system is broken, but it is plain that MOHELA's disastrous track record is all its own.

199.    MOHELA knew the issues plaguing the student loan servicing industry and won a lucrative contract based on promises to comply with the law and to bring borrowers back into successful repayment. But it has not.

200.    Instead, MOHELA has maintained and continues to maintain insufficient staff and fails to train them adequately on student loan servicing requirements and procedures.

201.    MOHELA maintains an inadequate auditing system. Rather than employing measures to monitor its operations and loan servicing system in a manner sufficient to identify errors and problems, it shifts the burden onto borrowers to identify issues and bring them to MOHELA's attention. Then MOHELA erects barriers to obtaining a timely and successful resolution of the borrower's complaint by, for example, limiting available call center representatives and failing to train its staff.

202.    MOHELA fails to respond to borrower complaints adequately and to correct errors on borrowers' accounts.  When borrowers are able to submit complaints or raise questions about their accounts, MOHELA fails to properly investigate and resolve them.  When MOHELA discovers an error, it fails to conduct a proper root cause analysis to determine whether the issue is systemic and to correct it.

203.    MOHELA fails to meet its core responsibilities as a student loan servicer, such as accurately billing borrowers, processing IDR and PSLF applications, processing valid refund requests, and ensuring access to account records.

204.    It also makes affirmative misrepresentations to borrowers about information that it knows or should know, such as misrepresenting their opportunities under the Limited PSLF Waiver or IDR Account Adjustment or instructing borrowers to recertify their IDR plans too early.

205.    Federal and state consumer protection laws require MOHELA, and all student loan servicers, to treat borrowers fairly.  By engaging in call deflection and creating a customer service system that makes it practically impossible for borrowers to seek assistance or, more concerningly, to have MOHELA's own errors corrected, the servicer has created a deeply unfair experience for borrowers.  These harms are exacerbated by MOHELA's offer to help while routing borrowers into a customer service system that intentionally makes it practically impossible to obtain that help.

206.    Taken together, MOHELA's servicing errors and call deflection tactics suggest a decision to maximize revenues rather than to invest in the staff and infrastructure necessary to service more than 6.5 million borrowers' loans.  Borrowers and their families pay the price for this decision.

207.    This is particularly frustrating for borrowers because, in general, they do not get to pick their student loan servicer.  Borrowers have been effectively stuck with a company that cannot

or will not meet their needs.  And this is especially true for public service workers pursuing PSLF, given that, until recently, MOHELA was the dedicated servicer for the PSLF program.

208.    Unable to turn to MOHELA for help with their accounts or for reliable information about the changes to the student loan system, borrowers have been left in the cold—forced to suffer the consequences of MOHELA's failures.

209.    AFT now brings this action on behalf of itself (Count I); its members (Count II); and the general public (Count III).

## CAUSES OF ACTION

### Count I – Violation of the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*

### (On behalf of AFT)

210.    AFT incorporates by reference each preceding paragraph as though fully set forth herein.

211.    AFT brings this Count against MOHELA on behalf of itself pursuant to D.C. Code § 28-3905(k)(1)(C).

212.    MOHELA is a "person" within the meaning of D.C. Code § 28-3901(a)(1) and provides "services" within the meaning of D.C. Code § 28-3901(a)(7) by providing loan servicing to borrowers with federal student loans, including to all borrowers pursuing public service loan forgiveness.

213.    MOHELA's acts while servicing federal student loans are "trade practices" within the meaning of D.C. Code § 28-3901(a)(6); *see also* Student Loan Borrower Bill of Rights Amendment Act of 2024, D.C. Code § 31-106.02e(b) (November 27, 2024) ("A violation of [§ 31-106.02a] … is an unfair or deceptive trade practice pursuant to [D.C. Code]§ 28-3904.").

214. AFT is a "nonprofit organization" within the meaning of D.C. Code § 28-3901(a)(14).

215. It is a violation of the DCCPPA "for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived or damaged thereby[.]" D.C. Code § 28-3904. The DCCPPA provides that, among other things, it is an unfair or deceptive trade practice to:

…(e) misrepresent as to a material fact which has a tendency to mislead; …

(f) fail to state a material fact if such failure tends to mislead;

(f-1) use innuendo or ambiguity as to a material fact, which has a tendency to mislead; …

(u) represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

*Id*.

216. It is also a violation of the DCCPPA, under D.C. Code § 31-106.02e, for a student loan servicer to:

(2) Directly or indirectly employ any scheme, device, or artifice to mislead a student loan borrower;

(3) Engage in any unfair or deceptive practice toward any person or misrepresent or omit any material information in connection with the servicing of a student education loan, including an abusive act and practice; …

(5) Obtain property by misrepresentation;

(6) Misapply student education loan payments to the outstanding balance of a student education loan.

*Id.* § 31-106.02a.

217. MOHELA's practices of failing to comply with its basic responsibilities as a student loan servicer are unfair and deceptive in violation of the DCCPPA.

45

218.    MOHELA violates the DCCPPA by affirmatively misinforming AFT's members about the deadline to recertify their incomes, leading to confusion and to some members paying higher monthly payments than they owe.

219.    MOHELA further violates these provisions by falsely informing AFT's members that loan consolidation would cost them all of their prior PSLF credit.

220.    MOHELA further violates these provisions by failing to send AFT's members timely bills, as well as by sending AFT's members inaccurate bills.

221.    MOHELA further violates these provisions by deducting payments from AFT's members' bank accounts without their affirmative consent to do so.

222.    MOHELA further violates these provisions by creating unprecedented backlogs of borrower complaints, AFT's members' IDR applications, and unprocessed PSLF forms submitted by AFT's members.

223.    MOHELA further violates these provisions by concocting a call deflection scheme to make it extremely difficult for AFT's members to contact MOHELA regarding loan servicing failures, and instead directing AFT's members to self-service options that are insufficient to meet their needs or are not functional.

224.    MOHELA further violates these provisions by failing to adequately staff its call centers and by failing to adequately train its customer service representatives.

225.    MOHELA further violates these provisions by failing to record accurately AFT's members' payments, refunds, and records.

226.    MOHELA further violates these provisions by misinforming AFT's members about their payment options.  Namely, MOHELA gives AFT's members incorrect information regarding their eligibility for certain programs and time-sensitive decisions to be made relating to their loans.

227.    MOHELA further violates these provisions by reporting to AFT's members the incorrect number of PSLF-qualifying payments they have made.

228.    MOHELA further violates these provisions by denying access to PSLF to AFT's members with eligible employment by failing to properly process employment certifications and by incorrectly representing eligibility for PSLF.

229.    Upon information and belief, ED did not instruct MOHELA to engage in these acts.

230.    These acts are unfair because they cause or are likely to cause substantial injury to borrowers, which the borrowers cannot reasonably avoid, and which is not outweighed by countervailing benefits to consumers or to competition.

231.    These acts are also deceptive because they mislead or are likely to mislead borrowers, borrowers' interpretations of these misleading acts are reasonable, and the misleading acts are material.

232.    The above conduct has harmed and continues to harm AFT in several ways. As detailed above, AFT has been significantly hindered in fulfilling its mission, including providing loan counseling services to its members, by MOHELA's illegal acts. MOHELA's abuses have driven a surge in requests for AFT's clinic assistance. AFT is required, in accordance with its mission, to respond to these requests and has expended significant resources doing so. These expenditures include $1,600,000 since 2023 on an outside contractor to aid members with student loans; since January 2022, more than $1 million in staff time with at least thirty-five AFT employees having dedicated more than 5,000 hours to addressing student loan issues, including those caused by MOHELA's unlawful conduct; and at least $780,000 in staff time to hold student debt clinics. Along with the financial harm, AFT's mission has been harmed as it has been forced to divert resources and attention that would otherwise have been spent focused on issues like

47

collective bargaining; retirement security; healthcare; student learning conditions; and educators', public employees', and health care workers' working conditions.

## Count II – Violation of the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*

### (On behalf of AFT Members)

233.    AFT incorporates by reference each preceding paragraph as though fully set forth herein.

234.    AFT brings this Count against MOHELA on behalf of AFT's members whose federal student loans are serviced by MOHELA pursuant to D.C. Code § 28-3905(k)(1)(C).

235.    MOHELA is a "person" within the meaning of D.C. Code § 28-3901(a)(1) and provides services within the meaning of D.C. Code § 28-3901(a)(7) by providing loan servicing to borrowers with federal student loans, including to all borrowers pursuing public service loan forgiveness.

236.    MOHELA's acts while servicing federal student loans are "trade practices" within the meaning of D.C. Code § 28-3901(a)(6); *see also* Student Loan Borrower Bill of Rights Amendment Act of 2024, D.C. Code § 31-106.02e(b) (November 27, 2024) ("A violation of [§ 31-106.02a] … is an unfair or deceptive trade practice pursuant to [D.C. Code] § 28-3904.").

237.    AFT is a "nonprofit organization" within the meaning of D.C. Code § 28-3901(a)(14).

238.    It is a violation of the DCCPPA "for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived or damaged thereby[.]" D.C. Code § 28-3904.  The DCCPPA provides that, among other things, it is an unfair or deceptive trade practice to:

48

…(e) misrepresent as to a material fact which has a tendency to mislead; …

(f) fail to state a material fact if such failure tends to mislead;

(f-1) use innuendo or ambiguity as to a material fact, which has a tendency to mislead; …

(u) represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

*Id.*

239.    It is also a violation of the DCCPPA, under D.C. Code § 31-106.02e, for a student loan servicer to:

(2) Directly or indirectly employ any scheme, device, or artifice to mislead a student loan borrower;

(3) Engage in any unfair or deceptive practice toward any person or misrepresent or omit any material information in connection with the servicing of a student education loan, including an abusive act and practice; …

(5) Obtain property by misrepresentation;

(6) Misapply student education loan payments to the outstanding balance of a student education loan.

*Id.* § 31-106.02a.

240.    MOHELA's practices of failing to comply with its basic responsibilities as a student loan servicer are unfair and deceptive in violation of the DCCPPA.

241.    MOHELA violates these provisions by affirmatively misinforming AFT's members about the deadline to recertify their incomes, leading to confusion and to some members paying higher monthly payments than they owe.

242.    MOHELA further violates these provisions by falsely informing AFT's members that loan consolidation would cost them all of their prior PSLF credit.

243.    MOHELA further violates these provisions by failing to send AFT's members timely bills, as well as by sending AFT's members inaccurate bills.

49

244. MOHELA further violates these provisions by deducting payments from AFT's members' bank accounts without their affirmative consent to do so.

245. MOHELA further violates these provisions by creating unprecedented backlogs of borrower complaints, AFT's members' IDR applications, and unprocessed PSLF forms submitted by AFT's members.

246. MOHELA further violates these provisions by concocting a call deflection scheme to make it extremely difficult for AFT's members to contact MOHELA regarding loan servicing failures, and instead directing AFT's members to self-service options that are insufficient to meet their needs or are not functional.

247. MOHELA further violates these provisions by failing to adequately staff its call centers and by failing to adequately train its customer service representatives.

248. MOHELA further violates these provisions by failing to record accurately AFT's members' payments, refunds, and records.

249. MOHELA further violates these provisions by misinforming AFT's members about their payment options. Namely, MOHELA gives AFT's members incorrect information regarding their eligibility for certain programs and time-sensitive decisions to be made relating to their loans.

250. MOHELA further violates these provisions by reporting to AFT's members the incorrect number of PSLF-qualifying payments they have made.

251. MOHELA further violates these provisions by denying access to PSLF to AFT's members with eligible employment by failing to properly process employment certifications and by incorrectly representing eligibility for PSLF.

252. Upon information and belief, ED did not instruct MOHELA to engage in these acts.

253. These acts are unfair because they cause or are likely to cause substantial injury to borrowers, which the borrowers cannot reasonably avoid, and which is not outweighed by countervailing benefits to consumers or to competition.

254. These acts are also deceptive because they mislead or are likely to mislead borrowers, borrowers' interpretations of these misleading acts are reasonable, and the misleading acts are material.

255. The above conduct has harmed and continues to harm AFT's members in several ways, including by: forcing them to make payments on debt that should no longer exist and increasing their interest costs; delaying their receipt of loan forgiveness; depriving them of a means to resolve issues concerning their loans; forcing them to pay debts they do not owe and causing their loans to fall into delinquency; prolonging the time they spend indebted and forcing them to incur thousands of dollars in unnecessary costs to avoid default; negatively impacting their credit scores; and making it harder for them to access the relief to which they are entitled under PSLF and IDR.

## Count III – Violation of the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*

### (On behalf of the general public)

256. AFT incorporates by reference each preceding paragraph as though fully set forth herein.

257. AFT brings this Count against MOHELA on behalf of members of the general public whose federal student loans are serviced by MOHELA ("the general public") pursuant to D.C. Code § 28-3905(k)(1)(C).

258.    MOHELA is a "person" within the meaning of D.C. Code § 28-3901(a)(1) and provides services within the meaning of D.C. Code § 28-3901(a)(7) by providing loan servicing borrowers with federal student loans, including to all borrowers pursuing public service loan forgiveness.

259.    MOHELA's acts while servicing federal student loans are "trade practices" within the meaning of D.C. Code § 28-3901(a)(6); *see also* Student Loan Borrower Bill of Rights Amendment Act of 2024, D.C. Code § 31-106.02e(b) (November 27, 2024) ("A violation of [§ 31-106.02a] … is an unfair or deceptive trade practice pursuant to [D.C. Code] § 28-3904.").

260.    AFT is a "non-profit organization" within the meaning of D.C. Code § 28-3901(a)(14).

261.    It is a violation of the DCCPPA "for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived or damaged thereby[.]" D.C. Code § 28-3904.  The DCCPPA provides that, among other things, it is an unfair or deceptive trade practice to:

…(e) misrepresent as to a material fact which has a tendency to mislead; …

(f) fail to state a material fact if such failure tends to mislead;

(f-1) use innuendo or ambiguity as to a material fact, which has a tendency to mislead; …

(u) represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

*Id.*

262.    It is also a violation of the DCCPPA, under D.C. Code § 31-106.02e, for a student loan servicer to:

(2) Directly or indirectly employ any scheme, device, or artifice to mislead a student loan borrower;

(3) Engage in any unfair or deceptive practice toward any person or misrepresent or omit any material information in connection with the servicing of a student education loan, including an abusive act and practice; …

(5) Obtain property by misrepresentation;

(6) Misapply student education loan payments to the outstanding balance of a student education loan.

*Id.* § 31-106.02a.

263.     MOHELA's practices of failing to comply with its basic responsibilities as a student loan servicer are unfair and deceptive in violation of the DCCPPA.

264.     MOHELA violates these provisions by affirmatively misinforming the general public about the deadline to recertify their income, leading to confusion and to some individuals paying higher monthly payments than they owe.

265.     MOHELA further violates these provisions by falsely informing the general public that loan consolidation would cost them all of their prior PSLF credit.

266.     MOHELA further violates these provisions by failing to send the general public timely bills, as well as by sending the general public inaccurate bills.

267.     MOHELA further violates these provisions by deducting payments from the general public's bank accounts without their affirmative consent to do so.

268.     MOHELA further violates these provisions by creating unprecedented backlogs of the general public's complaints, the general public's applications, and unprocessed PSLF forms submitted by the general public.

269.     MOHELA further violates these provisions by concocting a call deflection scheme to make it extremely difficult for the general public to contact MOHELA regarding loan servicing failures, and instead directing the general public to self-service options that are insufficient to meet their needs or are not functional.

270.     MOHELA further violates these provisions by failing to adequately staff its call centers and by failing to adequately train its customer service representatives.

271.     MOHELA further violates these provisions by failing to record accurately the general public's payments, refunds, and records.

272.     MOHELA further violates these provisions by misinforming the general public about their payment options.  Namely, MOHELA gives the general public incorrect information regarding their eligibility for certain programs and time-sensitive actions they should or should not take relating to their loans.

273.     MOHELA further violates these provisions by reporting to the general public the incorrect number of PSLF-qualifying payments they have made.

274.     MOHELA further violates these provisions by denying access to PSLF to the general public with eligible employment by failing to properly process employment certifications and by incorrectly representing eligibility for PSLF.

275.     Upon information and belief, ED did not instruct MOHELA to engage in these acts.

276.     These acts are unfair because they cause or are likely to cause substantial injury to borrowers, which the general public cannot reasonably avoid, and which is not outweighed by countervailing benefits to consumers or to competition.

277.     These acts are also deceptive because they mislead or are likely to mislead the general public, the general public's interpretations of these misleading acts are reasonable, and the misleading acts are material.

278.     The above conduct has harmed and continues to harm the general public in several ways, including by: forcing PSLF borrowers to make payments on debt that should no longer exist and increasing those borrowers' interest costs; delaying borrowers' receipt of loan forgiveness;

postponing when otherwise eligible borrowers receive loan cancellation; depriving borrowers of a means to resolve disputes concerning their loans; forcing borrowers to pay debts they do not owe and causing their loans to fall into delinquency; prolonging the time borrowers spend indebted and forcing them to incur thousands of dollars in unnecessary costs to avoid default; and making it harder for borrowers to access the relief promised by PSLF and IDR.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendant and in favor of Plaintiff, and grant the following relief:

*First*, a declaration that Defendant's conduct violates the DCCPPA;

*Second*, treble damages, or $1,500 per violation, whichever is greater, to Plaintiff; or, in the alternative, an award of actual damages to Plaintiff in an amount to be determined at trial;

*Third*, appropriate injunctive relief against Defendant to remedy the systemic deficiencies that have harmed Plaintiff, its members, and the general public;

*Fourth*, punitive damages;

*Fifth*, pre- and post-judgment interest;

*Sixth*, additional relief as may be necessary to restore Plaintiff, Plaintiff's members and the general public to their rightful positions;

*Seventh*, an award of Plaintiff's reasonable attorneys' fees and costs;

*Eighth*, any other relief which the court determines proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 15, 2026

Respectfully submitted,

/s/ *Faith E. Gay*

| | |
|---|---|
| Shennan Kavanagh* (BBO #655174) | Faith E. Gay (NY Bar # 2117117) |
| Jennifer Wagner* (WVSB #10639) | Admitted to practice before the U.S. District |
| National Consumer Law Center | Court for the District of Columbia (Bar ID: |
| 7 Winthrop Square, 4th Floor | NY0698) |
| Boston, MA 02110 | Lena Konanova* (NY Bar # 4758942) |
| 617.542.8010 | David A. Coon* (NY Bar # 5538020) |
| skavanagh@nclc.org | Corey Stoughton* (DC Bar # 472867) |
| jwagner@nclc.org | Selendy Gay PLLC |
| | 1290 Avenue of the Americas |
| Alpha Taylor* (DC Bar #252602) | New York, NY 10104 |
| National Consumer Law Center | (212) 390-9000 |
| 1001 Connecticut Ave., NW | fgay@selendygay.com |
| Washington, DC 20036 | lkonanova@selendygay.com |
| 202.452.6252 | dcoon@selendygay.com |
| ataylor@nclc.org | cstoughton@selendygay.com |

Persis Yu (DC Bar # 90014714)
Admitted to practice before the U.S. District
Court for the District of Columbia (Bar ID:
MA0051)
Protect Borrowers (a fiscally sponsored project
of the Shared Ascent Fund)
1025 Connecticut Ave NW, #717
Washington, D.C. 20036
(202) 618-1328
persis@protectborrowers.org

R. T. Winston Berkman-Breen
Admitted to practice before the U.S. District
Court for the District of Columbia
(NY Bar # 5559372)
Khandice Lofton* (OH Bar # 101015)
Protect Borrowers (a fiscally sponsored project
of the Shared Ascent Fund)
40 Rector Street, 9th Floor
New York, NY 10006
winston@protectborrowers.org
khandice@protectborrowers.org

* Admitted *pro hac vice*